IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

DAVID  L. WATKINS,  #219698,    )
                                )
          Petitioner,           )
                                )
v.                              )    CIVIL ACTION NO.
                                )    2:07-cv-1040-MHT
WARDEN LEPOSEY DANIEL,          )
et al.,                         )
                                )
          Respondents.          )

## INITIAL RESPONSE TO 28 USC § 2254 PETITION

Come now the Respondents in the above styled cause, by and through the

Attorney General of the State of Alabama, in response to this Court's order issued

on, November 29, 2007, and answer Watkins's habeas petition as follows:

1.    Watkins was convicted of murder, and sentenced on October 22,

2001, to serve life in prison.  (Ex. A, p. 1; Ex. C, C. 319-20, 331, 370)

2.    He appears to raise the following arguments in his habeas petition:

a.  "The evidence was insufficient to support intentional murder

conviction due to an absence of evidence of complicity[.]"  (Doc.

1, p. 5; Doc. 1-2, p. 7-11)

b.  Trial counsel was ineffective.  Watkins's confession indicated that

he objected to any violence that could endanger life, that he did not

participate in the violent acts, and he "tried to prevent the crime[;]" however, counsel did not challenge the State's evidence, and counsel did not request that the jury be instructed on the principle of repudiation  (Doc. 1, p. 7; Doc. 1-2, p. 11-15)

c.  Appellate counsel was ineffective for not raising the claim, in a motion for new trial, that the jury should have been instructed on manslaughter, based on intoxication, because the "three co-defendants and the victim w[ere] drinking on the night of the murder."  (Doc. 1, p. 9; Doc. 1-2, p. 15-18)

3. Watkins should be denied habeas relief, because he filed his petition outside the one-year statute of limitations created by 28 U.S.C. § 2244(d).

## PROCEDURAL HISTORY

**A.    Trial and Direct Appeal**

4. A jury found Watkins guilty of murder, and he was sentenced on October 22, 2001, to serve life in prison.  (Ex. A, p. 1; Ex. C, C. 319-20, 331, 370)

5. Watkins directly appealed his conviction to the Alabama Court of Criminal Appeals.  He raised the following issues on appeal:

2

a. The trial court erred in failing to instruct the jury on intoxication and the lesser-included offense of manslaughter.  (Ex. A, p. 1-2; Ex. C, p. 349-51)

b. The trial court erred when it allowed the prosecution to quote from a transcript of a videotaped confession.  (Ex. A, p. 2-6; Ex. C, p. 351-52)

6. The Alabama Court of Criminal Appeals determined, in a memorandum opinion issued on April 19, 2002, that the first issue was not preserved for appellate review.  (Ex. A, p. 1-2)  The second issue was also not preserved for appellate review, because Watkins's trial counsel only made a general objection, and the only adverse ruling that he received was to this general objection.  (Ex. A, p. 5-6)

7. Watkins never filed a timely application for rehearing or properly petitioned the Supreme Court of Alabama for certiorari review.  The Alabama Court of Criminal Appeals issued its certificate of judgment on May 7, 2002.  (Ex. B)

**B.    State Post-Conviction**

8. Watkins filed a state post-conviction petition, pursuant to Rule 32 of the Alabama Rules of Criminal Procedure on July 23, 2006[1].  (Ex. C, C. 13)

9. In the petition, he raised the following issues:

---

[1] The Respondents are using the earliest date that the petition could have been mailed, the date that he signed the petition.

a. Appellate counsel was ineffective for not raising a claim of ineffective assistance of trial counsel in a motion for new trial for trial counsel's failure to submit a written request that the jury be instructed on the lesser included offense of manslaughter due to intoxication, and that the jury be instructed "on a[] particularized intent to kill issue with regard to accomplice liability." (Ex. C, C. 23) (Ex. C, C. 23-34)

b. His indictment was defective, because it failed to contain a "statement of the facts and cause of the accusation of the specific offense, coming under the general description which [Watkins] was charged." (Ex. C, C. 34) He appears to argue that, because the indictment did not allege that he was an accomplice in the murder, it was defective. (Ex. C, C. 34-43)

10. The State of Alabama responded to the petition, and argued that appellate counsel could not have been ineffective for failing to raise the issue of ineffective assistance of trial counsel concerning the issue of intoxication, because it was not a reasonable theory based upon the evidence presented at trial. (Ex. C, C. 391-92) Concerning the issue on instructing the jury on intent to kill, the State argued that the trial court "gave the standard jury instructions on the charge of [m]urder, which included the language on intent." (Ex. C, C. 392)

11. The State also argued, regarding Watkins's claim of a defective indictment that the indictment "set[] forth the elements of the offense and it sufficiently apprised [Watkins] of what he must be prepared to meet."  (Ex. C, C. 392)

12.  A hearing was held in this matter.  At the hearing, Watkins's trial attorney testified that he did not believe the evidence showed that Watkins was intoxicated to such an extent as to negate the intent element of the murder charge reducing it to manslaughter.  This is why he did not request such an instruction. (Ex. C., R. 7-9)  Watkins also admitted that there was nothing in the trial transcript to indicate his level of intoxication.  (Ex. C, R. 14-16)  Concerning the issue  of instructing the jury on intent, the judge pointed out that the jury was instructed on the theory of aiding and abetting.  (Ex. C, R. 23-24)  The judge also recognized that the jury could have inferred Watkins's intent from his actions, which including kicking and urinating on the victim.  (Ex. C, R. 22-27)  The jury was charged that to find Watkins guilty of intentional murder it must find that he shot the victim or aided and abetted in that act, "[a]nd in committing the act or acts which caused the death of the deceased, the defendant acted with intent."  (Ex. C, C. 313-14)  It was explained to the jury that it could infer Watkins's intent "from the facts and circumstances surrounding the whole transaction or incident as well as the conduct of the defendant."  (Ex. C, C. 314)  The jury was also instructed on the law of

aiding and abetting.  (Ex. C, C. 314-15)  At the conclusion of the hearing, the judge

denied the petition.  (Ex. C, R. 28)

13. In a written order, the judge also stated:

> [Watkins] alleges ineffective assistance of counsel
> due to counsel's failure to ask for a jury charge on
> manslaughter because of his intoxication.  However,
> [Watkins] acknowledged that there was no actual
> evidence at trial concerning his intoxication.  Thus, there
> was no basis for requesting the lesser-included charge.
> In addition, [Watkins] failed to satisfy the requirements
> of Strickland [v. Washington, 466 U.S. 668 (1984)].

> Secondly, [Watkins] claims that the jury was not
> properly charged as to the *mens rea* required for a
> conviction of an accomplice.  The Court specifically told
> the jury that [Watkins] could only be found guilty of
> accomplice liability if he intended to assist in the murder.
> Not only is the assertion of [Watkins] without merit but
> also it is precluded as time-barred.

> Finally, [Watkins] questions his indictment.  This
> claim too is precluded as it could have been raised
> previously and it is time-barred.

(Ex. C, C. 423)

14. Watkins appealed the denial of his petition to the Alabama Court of

Criminal Appeals.

15. Watkins raised the following issues on appeal:

a.  Appellate counsel was ineffective for failing to raise ineffective

assistance of trial counsel in a motion for new trial, because trial

counsel failed to request an instruction on manslaughter due to intoxication.  (Ex. D, p. 12-18)

    b.   The trial court erred when it failed to grant his subpoena for production of a certain record, namely a videotape, to support his claims.  (Ex. D, p. 19-25)

16.  The Court of Criminal Appeals held that the ineffective assistance of appellate counsel claim was time-barred.  (Ex. E, p. 2)  The Court also ruled that Watkins did not demonstrate good cause entitling him to discovery, because the videotape was requested to support his ineffective assistance of counsel claim, a claim that was precluded from review because it was time-barred.  (Ex. E, p. 8)

17. The Alabama Court of Criminal Appeals overruled his application for rehearing (Ex. F), and Watkins petitioned the Supreme Court of Alabama for certiorari review.  In the petition, he argued that the Court of Criminal Appeals's opinion conflicted with the United States and Alabama Constitutions, Supreme Court of Alabama precedent, and Rule 32.3 of the Alabama Rules of Criminal Procedure, because the Court of Criminal Appeals determined that Watkins had not shown good cause for his discovery request, because the ineffective assistance of counsel claim was precluded as time-barred; however, the State, in its response to the Rule 32 petition never argued this ground of preclusion.  (Ex. G, p. 5-7)

18. The Supreme Court of Alabama denied certiorari review and issued its certificate of judgment on August 31, 2007.  (Ex. H)

## C.    Federal Habeas Corpus

19. Watkins filed his federal habeas corpus petition on November 26, 2007. (Doc. 1, p. 15)

## MEMORANDUM BRIEF

## A.    Applicability of the One-Year Statute of Limitations

20. Title 28 U.S.C. § 2244(d)(1) applies a one-year statute of limitation to an application for a writ of habeas corpus to an individual incarcerated pursuant to a state court judgment.

> (d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of-
>
> > (A)  the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
> >
> > (B)  the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
> >
> > (C)  the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or,

(D)  the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

21. This one-year statute of limitation became effective on April 24, 1996. See Carey v. Saffold, 536 U.S. 214, 217 (2002) (noting the effective date of the federal limitation period); Drew v. Dept. of Corr., 297 F.3d 1278, 1282 (11th Cir. 2002) (same).  In cases where the conviction is obtained following the one-year period, the defendant has one year from the date on which his conviction becomes final to mount a federal challenge.  Title 28 U.S.C. § 2244(d)(1)(A).

22. Watkins's conviction became final on May 7, 2002.  (Ex. B)  Watkins filed his Rule 32 petition on July 23, 2006.  (Ex. C, C. 13)  A total of 1,538 days passed between his direct appeal becoming final and the filing of his Rule 32 petition.[2]   The filing of Watkins's Rule 32 petition on July 23, 2006 has no tolling effect on the filing of his federal habeas petition, because the Rule 32 petition was filed after the time for filing the habeas petition had expired on May 7, 2003 -- one year following the end of the direct appeal.  See Webster v. Moore, 199 F. 3d

---

[2] Watkins is not entitled to the additional 90 days to petition the Supreme Court of the United States for certiorari review before his conviction becomes final, under Bond v. Moore, 309 F.3d 770, 773-74 (11th Cir. 2002), because he never appealed his case through the "state court of last resort," the Supreme Court of Alabama. See U.S. Sup. Ct. R. 13.1.

1256, 1259 (11th Cir. 2000) (holding a petition "that is filed following the expiration of the limitations period cannot toll that period because there is no period remaining to be tolled").

23. Watkins also has not demonstrated any "extraordinary circumstances that are both beyond his control and unavoidable with diligence" that could equitably toll his untimely petition. See Sandvik v. United States, 177 F. 3d 1269, 1271 (11th Cir. 1999). Watkins should therefore be denied relief because the statute of limitation of 28 U.S.C. § 2244 (d) bars his petition.

24. Watkins alleged in his Rule 32 petition that he never learned from his appellate counsel that his appeal had been denied. (Ex. C, C. 22) The Alabama Court of Criminal Appeals sent a letter, dated March 31, 2004, to Watkins informing him that the Court had affirmed his conviction on April 19, 2002, and the certificate of judgment issued on May 7, 2002. (Ex. C, C. 380) Therefore, even if Watkins was entitled to the benefit of not having the time begin until he learned the status of his appeal around March 31, 2004, he still waited over two years to file his Rule 32 petition, and the time for filing his federal habeas petition would have already run. See Webster, 199 F. 3d at 1259.

25. Watkins did file a mandamus petition on January 25, 2005. (Ex. I) The Respondents, however, do not believe that this is a proper post-conviction petition for collateral review referred to in Title 28 U.S.C. § 2244(d)(2), because a petition

filed pursuant to Rule 32 of the Alabama Rules of Criminal Procedure, not a

mandamus petition is the proper method to challenge a criminal conviction.  <u>See</u>

Ala. R. Crim. P. 32.4 ("A proceeding under this rule displaces all post-trial

remedies except post-trial motions under Rule 24 [motions for new trial] and

appeal.  Any other post-conviction petition seeking relief from a conviction or

sentence shall be treated as a proceeding under this rule."  A writ of mandamus, on

the other hand,

> is a drastic and extraordinary writ to be issued only where there is (1)
> a clear legal right in the petitioner to the order sought; (2) an
> imperative duty upon the respondent to perform, accompanied by a
> refusal to do so; (3) the lack of another adequate remedy; and (4)
> properly invoked jurisdiction of the court.

<u>Ex parte Trottman</u>, 965 So. 2d 780, 782 (Ala. 2007).  Therefore, a mandamus

petition is not a proper petition for collateral review, and should not be considered

for tolling purposes.  <u>See e.g.</u>, <u>Moore v. Cain</u>, 298 F. 3d 361, 366-68 (5th Cir. 2002)

(recognizing that a mandamus petition is sought to compel a court to perform its

duty is not a challenge to a conviction, and in this case, was not a post-conviction

petition seeking collateral review of a conviction; thus, it had no tolling effect).

26. Even if the mandamus petition could be considered a petition for

collateral review of Watkins's criminal conviction, the petition was not properly

filed and should have no tolling effect.  On January 26, 2005, the Alabama Court

of Criminal Appeals ordered Watkins, within 14 days, to comply with the service

requirements of Rule 21(a) of the Alabama Rules of Appellate Procedure. (Ex. J) Watkins failed to comply, and the mandamus petition was dismissed on March 2, 2005. (Ex. K)

27. Even if the Respondents, however, were to give Watkins the benefit of starting his time from the date that the Court of Criminal Appeals informed him of the status of his direct appeal, March 31, 2004, and give him the benefit of having the mandamus petition toll the one-year statute of limitations, his petition would still be time-barred. Three-hundred days elapsed between March 31, 2004, and when Watkins filed his mandamus petition on January 25, 2005. The mandamus petition was dismissed on March 2, 2005. Another 508 days elapsed between March 2, 2005, and the filing of his Rule 32 petition, on July 23, 2006. The certificate of judgment affirming the denial of his Rule 32 petition issued on August 31, 2007. From this date until the filing of his federal habeas petition on November 26, 2007, 87 days elapsed. Therefore, even giving Watkins every benefit of the doubt and tolling period possibly available, a total of 895 days elapsed between when he learned of the status of his direct appeal and the filing of his federal habeas petition. This is well over a year and his federal habeas petition would still be untimely. Consequently, he should be denied relief.[3]

---

[3] The Respondents believe that Watkins's habeas petition is clearly barred by the one-year statute of limitations and has submitted supporting documentation. If this Court does not believe that the petition is barred by the limitation period, the

Table of Exhibits

| Exhibit Designation | Exhibit Description |
| --- | --- |
| Exhibit A | Alabama Court of Criminal Appeals's decision affirming Watkins's conviction on direct appeal, on April 19, 2002 (CR-01-0232) |
| Exhibit B | Certificate of Judgment issued on May 7, 2002, affirming the conviction (CR-01-0232) |
| Exhibit C | Transcript on appeal of the denial of Watkins's Rule 32 petition (CR-06-0408) |
| Exhibit D | Watkins's appellate brief (CR-06-0408) |
| Exhibit E | The Court of Criminal Appeals's opinion issued on April 20, 2007, affirming the denial of his Rule 32 petition (CR-06-0408) |
| Exhibit F | Alabama Court of Criminal Appeals's decision overruling Watkins's application for rehearing (CR-06-0408) |
| Exhibit G | Watkins's petition for certiorari review to the Supreme Court of Alabama (CR-06-0408) |
| Exhibit H | Certificate of judgment issued on August 31, 2007 (CR-06-0408) |
| Exhibit I | Docket sheet concerning the filing of Watkins's mandamus petition (CR-04-0731) |
| Exhibit J | Alabama Court of Criminal Appeals's order giving Watkins 14 days to comply with the service requirements (CR-04-0731) |
| Exhibit K | Alabama Court of Criminal Appeals's order dismissing Watkins's mandamus |

---

respondents request an opportunity to argue, in the alternative, that the claims are unexhausted, procedurally defaulted, or were adjudicated properly in the state courts.

| | petition, on March 2, 2005, for failure to properly serve the parties (CR-04-0731) |

Respectfully submitted

Troy King
*Attorney General*


s/Jean-Paul M. Chappell
Jean-Paul M. Chappell(CHA073)
*Assistant Attorney General*

14

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of December, 2007, I filed the foregoing with the Clerk of the Court and I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants:  David L. Watkins, AIS# 219698, PO Box 1107, Elmore, AL  36025.

Respectfully submitted,

s/Jean-Paul M. Chappell
Jean-Paul M. Chappell(CHA073)
Office of the Attorney General
Alabama State House
11 South Union Street
Montgomery, AL  36130-0152
Telephone: (334) 242-7300
Fax: (334) 242-2848
E-mail: jchappell@ago.statel.al.us

356532/115872-001

# Court of Criminal Appeals

State of Alabama

Judicial Building, 300 Dexter Avenue

**P. O. Box 301555**

**Montgomery, AL 36130-1555**

April 19, 2002

H.W."BUCKY" McMILLAN
Presiding Judge
SUE BELL COBB
PAMELA W. BASCHAB
GREG SHAW
A. KELLI WISE
Judges



RELEASED

APR 19 2002

CLERK
ALA COURT CRIMINAL APPEALS

Lane W. Mann
Clerk
Wanda K. Ivey
Assistant Clerk
(334) 242-4590
Fax (334) 242-4689

<u>MEMORANDUM</u>

CR-01-0232                 Montgomery Circuit Court CC-2000-1506

<u>David Leonard Watkins, alias David L. Watkins and David Watkins  v. State</u>

PATTERSON, Retired Appellate Judge.

Watkins appeals from his conviction for murder and sentence, as a habitual offender, of life imprisonment. He was also ordered to pay $7,600.39 in restitution; $50 to the Crime Victims Assessment fund; $150 in attorney fees; and court costs.

I.

Watkins contends that the trial court erred in failing to instruct the jury on intoxication and on the offense of manslaughter, as a lesser offense of the offense of intentional murder. He argues that the evidence of his intoxication at the time of the killing supported these instructions. Watkins's appellate counsel concedes that this issue was not preserved for our review. Because this is not

1



STATE'S
EXHIBIT
A

PENGAD 800-631-6989

a death-penalty case, we cannot review it for plain error, as he requests.  See Myers v. State, 677 So. 2d 807 (Ala. Crim. App. 1995).

## II.

Watkins contends that the trial court erred in allowing the prosecution, in closing argument, to allegedly quote to the jury a portion of a transcript of Watkins's videotaped confession.   Prior to trial, the trial court denied the prosecution's request to provide that transcript to the jury.[1] Watkins asserts that, "in the closing statement, the prosecution repeatedly read from the transcript -- forcing upon the jury the prosecution's opinion of the contents of the tape." (Appellant's brief, p. 12.)  He also argues that the trial court erred in not giving the jury curative instructions.

The pertinent portion of the prosecutor's closing argument shows the following:

> "[W]hen you go back in that jury room, as finders of fact, part of your job is to determine what was said on that [videotaped] statement. .... But what I'm going to show you now comes from what we've listened to on the statement and this is what we believe the defendant to be saying from our view of the statement.  Again, as finders of fact, ... you can agree with us or you can disagree with us or you can ... determine what was actually said on this tape.   But let's start with the defendant's statement.
>
> "Question: Okay.   Answer: Once he got there, I urinated on him.   I took a leak on him for no reason

---

[1]In so ruling, the trial court noted the following:   "I think that almost all of the transcript is correct.   However, it does concern me that there are a few incidents where [the videotape] appeared to me to be inaudible ...."   The court continued, "[T]here's only a few incidents and a few words that are really, in my opinion, not audible, although it -- certainly at times the defendant is not speaking as loudly ... [as] or clearly as other portions."

whatsoever. Question: All right. Was this before or after you kicked him?

"It was before I kicked him. Question: Was this before or after Robert picked him up and threw him down on the ground? Answer: It was after. I don't know if he dropped him on the head. ... When I came outside, his head was bleeding, and that's when I took a leak on him.

"This is where the defendant confesses to urinating and kicking the victim during the altercation. I think we all heard that from the statement so we won't dwell on that.

"THE COURT: Come up here just a minute.

"(Bench conference was held.)

"MR. POWELL [the prosecutor]: Again, if you continue to go through the defendant's statement, Question: How did he get to the end of the street? Answer: He pretty much got up on his own. Question: And he walked --

"THE COURT: Come up here, Mr. Powell.

"(Bench conference was held.)

"MR. POWELL: There was another portion of the statement where Sergeant Loria asked him, Well, if you and Latoya urinated on him, how did you pick him up and carry him to the end of the street? In the statement, the defendant says, basically he got up and he staggered around and he walked down to the end of the street where the church was. Play back the portion of the tape, listen to it for yourself. In that portion of the tape, he says, that after they got done hitting him and kicking him, they walked down to the end of the street.

"There's another portion of the statement where Sergeant Loria asked the defendant who hit him over the end [sic] with the board. The defendant responds, Toya did. There's a portion of the statement where Sergeant Loria goes, Well, you saw this? And the defendant's response is I saw this. And then the defendant talks

3

about how he tried to stop her. He even said the same thing on the witness stand. He said he went over to her and grabbed her around the waist. In his statement, he also says that when he grabbed her, she dropped the board. And he also says in his statement that she was persistent. She kept on. So since she was persistent he says in his statement, if you'll listen for it, I told her to do it. Just do it. And then she went on and did it, because she was going to do it any way. If you'll listen, that's in the statement.

"Basically, the defendant is telling Toya, if you're going to hit him, go ahead and hit him.

"MR. DURANT [defense counsel]: Judge, may we approach?

"THE COURT: Yes.

"(Bench conference being held.)

"MR. DURANT: Judge, I know that you have admonished Mr. Powell not to use the actual statement in addressing the jury. But in ... fact he's still doing the same thing --

"THE COURT: He can argue, but he cannot -- (inaudible).

"MR. DURANT: Well, he is constantly referring to that, Judge.

"THE COURT: Just refer to your notes.

"(In the hearing of the jury.)

"MR. POWELL: If you continue listening to the statement, you'll come to a point where Sergeant Loria asked him, Why didn't you help him? He was begging Robert for his life, why didn't you help him? And if you'll listen to the defendant's response, he responds, He never begged me. If you continue on through his statement --

"MR. DURANT: Judge, we object again. May we approach?

"MR. POWELL: I'm -- I'm not reading.

"(Bench conference was held.)

"MR. POWELL: Then we get to the most critical portion of the statement. There comes a point where Detective Kennedy asked him -- and Junior said -- and before she can finish her question, the defendant starts talking. And I'm going to play that portion of the videotape statement for you again.

"(Taped statement played again.)

"MR. DURANT: Judge, we're going to object to this also.

"THE COURT: Overruled."

The only adverse ruling, in the excerpt above, was in response to Watkins's general objection to the prosecutor's playing a portion of the videotape. Up to that point, no adverse ruling was entered by the court. See Lee v. State, 562 So. 2d 657, 665 (Ala. Crim. App. 1989) (the record presented no adverse ruling where, even though the trial court warned the prosecutor to refrain from referring to the appellant as a vicious person, it did not expressly rule on counsel's objection, and the appellant's attorney made no request for a curative instruction to be given, or motion to strike or exclude the comment). Watkins's general objection preserved nothing for this court's review. See Marty v. State, 656 So. 2d 416 (Ala. Crim. App. 1994).

"'Generally, improper argument of counsel is not ... subject to review on appeal unless there is a timely and specific objection by counsel or a motion to exclude, and adverse ruling thereon by the trial court, or a refusal of the trial court to make a ruling, and an objection thereto.'"

Steely v. State, 622 So. 2d 421, 423 (Ala. Crim. App. 1992) (quoting Trawick v. State, 431 So. 2d 574, 578 (Ala. Crim.

App. 1983)).  We cannot review Watkins's claim.

Accordingly, the trial court's judgment is affirmed.

The foregoing memorandum opinion was prepared by Retired Appellate Judge John Patterson while serving on active duty status as a judge of this court under the provisions of § 12-18-10(e), Ala. Code 1975.

AFFIRMED.

McMillan, P.J., and Cobb, Baschab, and Wise, JJ. concur. Shaw, J., concurs in the result.

6

# THE STATE OF ALABAMA— JUDICIAL DEPARTMENT
## THE COURT OF CRIMINAL APPEALS

### CERTIFICATE OF JUDGMENT

**Criminal Appeals Case**          **CR-01-0232**

David Leonard Watkins, alias v. State of Alabama (Appeal from Montgomery Circuit Court: CC00-1506).

Whereas, the appeal in the above cause having been duly submitted and considered, it is now hereby certified that on the 19th day of April, 2002,  the judgment of the court below was affirmed.

**Witness, Lane W. Mann, Clerk,**
**Court of Criminal Appeals, this**
**7th day of May, 2002**

**Clerk**
**Court of Criminal Appeals**
**State of Alabama**

STATE'S
EXHIBIT
ℬ
PENGAD 800-631-6989

COURT OF CRIMINAL APPEALS NO. _____    CR 06-408

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

FROM

CIRCUIT COURT OF _____ MONTGOMERY _____ COUNTY, ALABAMA

CIRCUIT COURT NO _____ CC 00-1506.60

CIRCUIT JUDGE _____ TRUMAN HOBBS

Type of Conviction/ Order Appealed From: _____ RULE 32

Sentence Imposed: _____

Defendant Indigent:    ☑ YES    ☐ NO

## DAVID WATKINS

NAME OF APPELLANT

PROSE  AIS#219698
(Appellant's Attorney)                    (Telephone No.)
P.O.BOX 1107
(Address)

ELMORE, ALABAMA  36025
(City)              (State)              (Zip Code)

V.

## STATE OF ALABAMA

NAME OF APPELLEE

(State represented by Attorney General)

NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

df
_____

(For Court of Criminal Appeals Use Only)

STATE'S
EXHIBIT
C

PENGAD 800-631-6989

# INDEX
## CLERK'S RECORD

CASE ACTION SUMMARY................................................................ 1-2

RULE 32 PETITION...................................................................... 3-16

BRIEF IN SUPPORT OF PETITIONER, DAVID L.WATKINS, RULE 32.......................................................................................... 17-382

ORDER GRANTING PETITIONER'S REQUEST THAT FILING FEES BE WAIVED DUE TO HIS SUBSTANITAL HARDSHIP STATUS................ 383

PETITIONER OBJECTION TO THE STATE'S FAILURE TO SUBMIT A TIMELY CONTROVERING AFFIDAVITS, TIMELY MOTION TO DISMISS RULE 32 PETITION AND PETITIONER............................. 384-387

MOTION FOR EXTENSION.............................................................. 388-389

STATE'S MOTION TO DISMISS OR IN THE ALTERNATIVE ANSWER TO DEFENDANT'S PETITION FOR RELIEF FROM CONVICTION OR SENTENCE.................................................................................. 390-393

ORDER SETTING HEARING ON RULE 32......................................... 394

AFFIDAVIT IN SUPPORT................................................................ 395-397

TRAVERSE................................................................................... 398-405

MOTION FOR SUBPOENA DUCES TECUM DATED 10/10/06.............. 406-410

MOTION TO SHOW CAUSE WHY THE NEW ROUNDS WERE NOT KNOWN OR COULD NOT HAVE BEEN ASSCERTAINED THROUGH REASONABLE DILIGENCE WHEN FIRST PETITION WAS HEARD AND FAILURE TO ENTERTAIN THE PETITION WILL RESULT IN A MISCARRIAGE OF JUSTICE....................................................... 411-422

ORDER DISMISSING PETITION...................................................... 423-424

MOTION TO ALTER, AMEND OR VACATE A JUDGMENT-ORDER DENYING MOTION TO ALTER, AMEND OR VACATE A JUDGMENT................................................................................ 425-426

MOTION FOR SUBPOENA DUCES TECUM DATED 10/25/06.............. 427-431

AFFIDAVIT IN SUPPORT................................................................ 432-435

MOTION TO SET ASIDE JUDGMENT-ORDER DENYING MOTION TO SET ASIDE JUDGMENT.............................................................. 436-438

NOTICE OF APPEAL...................................................................... 439-440

DOCKETING STATEMENT................................................... 441-442

REPORTER'S TRANSCRIPT ORDER........................................ 443

CLERK'S NOTICE OF APPEAL............................................. 444

CERTIFICATE OF COMPLETION........................................ 445

```
ACRO370            ALABAMA JUDICIAL INFORMATION SYSTEM      CASE: CC 2000 001506.60
OPER: TOR                   CASE ACTION SUMMARY
PAGE:   1                   CIRCUIT   CRIMINAL              RUN DATE: 12/05/2006
====================================================================================
IN THE CIRCUIT COURT OF MONTGOMERY                                      JUDGE: TMH

STATE  OF  ALABAMA                   VS      WATKINS DAVID LEONARD
                                             DRAPER C.F.
CASE: CC 2000 001506.60                      PO BOX 1107
                                             ELMORE, AL  36025 0000

DOB: 09/18/1979          SEX: M  RACE: B  HT: 5 07  WT: 150    HR: BLK EYES: BRO
SSN: 381867261     ALIAS NAMES:
CHARGE01: RULE 32-FELONY         CODE01: RULE  LIT: RULE 32-FELONY TYP: F #: 001
OFFENSE DATE:                            AGENCY/OFFICER: 0030100

DATE WAR/CAP ISS:                        DATE ARRESTED:
DATE    INDICTED:                        DATE    FILED: 08/16/2006
DATE    RELEASED:                        DATE  HEARING:
     BOND AMOUNT:           $.00            SURETIES:

DATE 1:              DESC:                   TIME: 0000
DATE 2:              DESC:                   TIME: 0000

TRACKING NOS: CC 2000 001506 00  /                        /

   DEF/ATY:                        TYPE:                           TYPE:

                          00000                          00000

PROSECUTOR:


====================================================================================
OTH CSE: CC200000150600 CHK/TICKET NO:               GRAND JURY:
COURT REPORTER: _____  SID NO:      000000000
DEF STATUS: PRISON              DEMAND:                           OPER: TOR
====================================================================================
  TRANS DATE     ACTIONS, JUDGEMENTS, AND NOTES                            OPE
====================================================================================
| 08/22/2006 | ASSIGNED TO: (TMH) TRUMAN M HOBBS              (AR01) | TOR |
|------------|---------------------------------------------------------|-----|
| 08/22/2006 | CHARGE 01: RULE 32-FELONY/#CNTS: 001          (AR01) | TOR |
|------------|---------------------------------------------------------|-----|
| 08/22/2006 | INITIAL STATUS SET TO: "P" - PRISON          (AR01) | TOR |
|------------|---------------------------------------------------------|-----|
| 08/22/2006 | FILED ON: 08/16/2006                         (AR01) | TOR |
|------------|---------------------------------------------------------|-----|
| 08/22/2006 | CASE ACTION SUMMARY PRINTED                  (AR08) | TOR |
|------------|---------------------------------------------------------|-----|
| 08/22/2006 | CAS ATTACHMENT PRINTED                       (AR08) | TOR |
|------------|---------------------------------------------------------|-----|
| 09/20/2006 | PETITIONERS OBJECTION TO THE STATE'S FAILURE TO      | DBH |
|------------|---------------------------------------------------------|-----|
| 09/20/2006 | ..SUBMIT A TIMELY CONTROVERING AFFIDAVITS, TIMELY    | DBH |
|------------|---------------------------------------------------------|-----|
| 09/20/2006 | ..MO TO DISMISS RULE 32 PETITION & PETITIONER       | DBH |
|------------|---------------------------------------------------------|-----|
| 09/20/2006 | ..REQUEST FOR ORAL ARGUMENT                         | DBH |
|------------|---------------------------------------------------------|-----|
| 09/21/2006 | MO FOR EXTENSION OF TIME                            | REG |
|------------|---------------------------------------------------------|-----|
| 09/28/2006 | 09252006 ORDER GRANT MO FOR EXTENSTION              | REG |
|------------|---------------------------------------------------------|-----|
| 10/10/2006 | AFFIDAVIT IN SUPPORT                                | TOR |
|------------|---------------------------------------------------------|-----|
| 10/10/2006 | TRAVERSE                                            | TOR |
|------------|---------------------------------------------------------|-----|
| 10/10/2006 | MOTION FOR SUBPOENA DUCES TECUM                     | TOR |
|------------|---------------------------------------------------------|-----|
| 10/23/2006 | JUROR FELONY FLAG SET ON FOR INDIVIDUAL      (AR10) | REG |
|------------|---------------------------------------------------------|-----|
| 10/23/2006 | CHARGE 01 DISPOSED BY: DISMISSED ON: 10/20/2006     | REG |
```

ACRO369   A L A B A M A   J U D I C I A L   I N F O R M A T I O N   C E N T E R

CASE ACTION SUMMARY
CONTINUATION                          CASE: CC 2000 001506.60
                                      JUDGE ID:   TMH

STATE OF ALABAMA                 VS   WATKINS DAVID LEONARD

| DATE | ACTION, JUDGMENTS, CASE NOTES |
|------|-------------------------------|
| 10/20/06 | Rule 32 Petition Dismissed |
| 10/26/06 | Denied motion to alter, Amend or vacate a Judgement |
| 11/14/06 | notice of appeal w/ forms |
| 12/05/06 | Clerk's notice of appeal to Crm. Appls, AG, DA, Sy. & Court Reporters |

Case number  CC 00-1506.60 TMH
ID    YR    NUMBER
(To be completed
by Court Clerk)

# IN FORMA PAUPERIS DECLARATION

IN THE CIRCUIT COURT OF MONTGOMERY COUNTY
[Insert appropriate court]

David L. Watkins
(Petitioner)

vs.

State OF Alabama
(Respondent(s)

## DECLARATION IN SUPPORT OF REQUEST TO PROCEED
## IN FORMA PAUPERIS

I, David L. Watkins _____, declare that I am the petitioner in the above entitled case; that in support of my motion to proceed without being required to prepay fees, costs, or give security therefor, I state that because of my poverty I am unable to pay the costs of said proceeding or to give security therefor; that I believe I am entitled to relief.

1. Are you presently employed?    Yes _____    No ✓

    a. If the answer is "yes", state the amount of your salary or wages per month, and give the name and address of your employer.

    _____

    _____

    b. If the answer is "no", state the date of last employment and the amount of the salary and wages per month which you received.

    _____

    _____

2. Have you received within the past twelve months any money from any of the following sources?

    a. Business, profession, or other form of self-employment?

       Yes _____    No ✓

    b. Rent payments, interest, or dividends?

       Yes _____    No ✓

    c. Pensions, annuities, or life insurance payments?

       Yes _____    No ✓

    d. Gifts or inheritances?

       Yes _____    No ✓

    e. Any other sources?

       Yes _____    No ✓

2

If the answer to any of the above is "yes", describe each source of money and state the amount received from each during the past twelve months.

3. Do you own cash, or do you have money in a checking or savings account?

Yes _____    No __✓__

(Include any funds in prison accounts.)

If the answer is "yes", state the total value of the items owned.

4. Do you own any real estate, stocks, bonds, notes, automobiles, or other valuable property (excluding ordinary household furnishings and clothing)?

Yes _____    No __✓__

If the answer is "yes", describe the property and state its approximate value.

5. List the persons who are dependent upon you for support, state your relationship to those persons, and indicate how much you contribute toward their support.

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.

Executed on _5-17-06_
        **(Date)**

_David L. Watkins_
**Signature of Petitioner**

## CERTIFICATE

I hereby certify that the petitioner herein has the sum of $ _23.82_ on account to his credit at the institution where he is confined. I further certify that petitioner likewise has the foregoing securities to his credit according to the records of said _Draper Corr. Fac_ institution:

_5-17-06_
**DATE**

_P S Brown  Acct Clerk_
**AUTHORIZED OFFICER OF INSTITUTION**

Rule 32

3

STATE OF ALABAMA
DEPARTMENT OF CORRECTIONS
DRAPER CORRECTIONAL FACILITY

AIS #: 219698      NAME: WATKINS, DAVID LEONARD      AS OF: 05/17/2006

| MONTH | # OF DAYS | AVG DAILY BALANCE | MONTHLY DEPOSITS |
|-------|-----------|-------------------|------------------|
| MAY | 14 | $1.70 | $0.00 |
| JUN | 30 | $6.94 | $96.00 |
| JUL | 31 | $0.09 | $0.00 |
| AUG | 31 | $9.26 | $106.50 |
| SEP | 30 | $11.45 | $25.00 |
| OCT | 31 | $6.73 | $39.00 |
| NOV | 30 | $7.42 | $30.00 |
| DEC | 31 | $16.19 | $60.00 |
| JAN | 31 | $9.32 | $25.00 |
| FEB | 28 | $31.02 | $120.00 |
| MAR | 31 | $10.75 | $60.00 |
| APR | 30 | $8.94 | $50.00 |
| MAY | 17 | $9.68 | $55.00 |

# PETITION FOR RELIEF FROM CONVICTION OR SENTENCE

### (Pursuant to Rule 32,
### Alabama Rules of Criminal Procedure)

Case Number

| ID | YR | NUMBER |
|---|---|---|

IN THE __CIRCUIT__ COURT OF __MONTGOMERY__, ALABAMA

__David L. Watkins__ vs. __STATE OF ALABAMA__
Petitioner (Full Name)                    Respondent

[Indicate either the "State" or,
if filed in municipal court, the
name of the "Municipality"]

Prison Number __Z19698__ Place of Confinement __DRAPER CORRECTIONAL CENTER__

County of conviction __MONTGOMERY__

### NOTICE: BEFORE COMPLETING THIS FORM, READ CAREFULLY THE ACCOMPANYING INSTRUCTIONS.

1. Name and location (city and county) of court which entered the judgment of conviction or sentence under attack __Circuit Court of Montgomery County__

2. Date of judgment of conviction __MAY 15, 2001__

3. Length of sentence __LIFE__

4. Nature of offense involved (all counts) __INTENTIONAL MURDER__

5. What was your plea?   (Check one)
   (a)  Guilty _____
   (b)  Not guilty __✓__
   (c)  Not guilty by reason of mental disease or defect _____
   (d)  Not guilty and not guilty by reason of mental disease or defect _____

6. Kind of trial: (Check one)

   (a)  Jury _✓_             (b)  Judge only _____

7. Did you testify at the trial?

   Yes _✓_              No _____

8. Did you appeal from the judgment of conviction?

   Yes _✓_              No _____

9. If you did appeal, answer the following:

   (a)  As to the state court to which you first appealed, give the following information:

      (1)  Name of court _Montgomery County Court House_

      (2)  Result _Guilty_

      (3)  Date of result _May 15, 2001_

   (b)  If you appealed to any other court, then as to the second court to which you appealed, give the following information:

      (1)  Name of court _Criminal Court of Appeals_

      (2)  Result _Affirmed_

      (3)  Date of result _April 19, 2002_

   (c)  If you appealed to any other court, then as to the third court to which you appealed, give the following information:

      (1)  Name of court _____

      (2)  Result _____

      (3)  Date of result _____

10. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions with respect to this judgment in any court, state or federal?

Yes _____          No __✓__

11. If your answer to Question 10 was "yes", then give the following information in regard to the first such petition, application, or motion you filed:

   (a)  (1)  Name of court _____

        (2)  Nature of proceeding _____

        (3)  Grounds raised _____

                _____

                _____

                _____

                _____

                (attach additional sheets if necessary)

        (4)  Did you receive an evidentiary hearing on your petition, application, or motion?

            Yes _____          No _____

        (5)  Result _____

        (6)  Date of result _____

   (b)  As to any second petition, application, or motion, give the same information:

        (1)  Name of court _____

        (2)  Nature of proceeding _____

        (3)  Grounds raised _____

                _____

                _____

                _____

                _____

                (attach additional sheets if necessary)

        (4)  Did you receive an evidentiary hearing on your petition, application, or motion?

            Yes _____          No _____

        (5)  Result _____

        (6)  Date of result _____

   (c)  As to any third petition, application, or motion, give the same information (attach additional sheets giving the same information for any subsequent petitions, applications, or motions):

        (1)  Name of court _____

(2) Nature of proceeding _____

(3) Grounds raised _____

_____

_____

_____

(attach additional sheets if necessary)

(4) Did you receive an evidentiary hearing on your petition, application, or motion?

Yes _____          No _____

(5) Result _____

(6) Date of result _____

(d) Did you appeal to any appellate court the result of the action taken on any petition, application, or motion?

(1) First petition, etc.          Yes _____          No _____

(2) Second petition, etc.          Yes _____          No _____

(2) Third petition, etc.          Yes _____          No _____

**ATTACH ADDITIONAL SHEETS GIVING THE SAME INFORMATION
FOR ANY SUBSEQUENT PETITIONS, APPLICATIONS, OR MOTIONS.**

(e) If you did not appeal when you lost on any petition, application, or motion, explain briefly why you did not:

_____

_____

_____

12. Specify every ground on which you claim that you are being held unlawfully, by placing a check mark on the appropriate line(s) below and providing the required information. Include all facts. If necessary, you may attach pages stating additional grounds and the facts supporting them.

# GROUNDS OF PETITION

**Listed below are the possible grounds for relief under Rule 32. Check the ground(s) that apply in your case, and follow the instruction under the ground(s):**

✓ A. The Constitution of the United States or of the State of Alabama requires a new trial, a new sentence proceeding, or other relief.

For your information, the following is a list of the most frequently raised claims of constitutional violation:.

(1)   Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily with understanding of the nature of the charge and the consequences of the plea.

(2)   Conviction obtained by use of coerced confession.

(3)   Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.

(4)   Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.

(5)   Conviction obtained by a violation of the privilege against self-incrimination.

(6)   Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.

(7)   Conviction obtained by a violation of the protection against double jeopardy.

(8)   Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.

(9)   Denial of effective assistance of counsel.

This list is not a complete listing of all possible constitutional violations.

If you checked this ground of relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each constitutional violation that you claim, whether or not it is one of the nine listed above, and include under it each and every fact you feel supports this claim. Be specific and give details.

_____   B.   **The court was without jurisdiction to render the judgment or to impose the sentence.**

If you checked this ground or relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

_____   C.   **The sentence imposed exceeds the maximum authorized by law, or is otherwise not authorized by law.**

If you checked this ground or relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

_____   D.   **Petitioner is being held in custody after his sentence has expired.**

If you checked this ground or relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

_____   E.   **Newly discovered material facts exist which require that the conviction or sentence be vacated by the court, because:**

**The facts relied upon were not known by petitioner or petitioner's counsel at the time of trial or sentencing or in time to file a post-trial motion pursuant to rule 24, or in time to be included in any previous collateral proceeding, and could not have been discovered by any of those times through the exercise of reasonable diligence; and**

**The facts are not merely cumulative to other facts that were known; and**

<u>The facts do not merely amount to impeachment evidence; and</u> 

<u>If the facts had been known at the time of trial or sentencing, the result would probably have been different; and</u>

<u>The facts establish that petitioner is innocent of the crime for which he was convicted or should not have received the sentence that he did.</u>

If you checked this ground or relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

—— F.    <u>The petitioner failed to appeal within the prescribed time and that failure was without fault on petitioner's part.</u>

If you checked this ground or relief, attach a separate sheet of paper with this ground listed at the top of the page. On this separate sheet of paper list each and every fact you feel supports this claim. Be specific and give details.

13.   **IMPORTANT NOTICE REGARDING ADDITIONAL PETITIONS RULE 32.2(b) LIMITS YOU TO ONLY ONE PETITION IN MOST CIRCUMSTANCES. IT PROVIDES:**

"**Successive Petitions**.  The court shall not grant relief on a second or successive petition on the same or similar grounds on behalf of the same petitioner. A second or successive petition on different grounds shall be denied unless the petitioner shows both that good cause exist why the new ground or grounds were not known or could not have been ascertained through reasonable diligence when the first petition was heard, and that failure to entertain the petition will result in a miscarriage of justice."

A.   Other than an appeal to the Alabama Court of Criminal Appeals or the Alabama Supreme Court, have you filed in state court any petition attacking this conviction or sentence?

Yes ———          No ✓

B.   If you checked "Yes," give the following information as to earlier petition attacking this conviction or sentence:

(a)   Name of court _____

(b)   Result _____

(c)   Date of result _____
        (attach additional sheets if necessary)

C.   If you checked the "Yes" line in 13A, above, and this petition contains a different ground or grounds of relief from an earlier petition or petitions you filed, attach a separate sheet or sheets labeled: "EXPLANATION FOR NEW GROUND(S) OF RELIEF."

On the separate sheet(s) explain why "good cause exists why the new ground or grounds were not known or could not have been ascertained through reasonable diligence when the first petition was heard, and [why the] failure to entertain [this] petition will result in a miscarriage of justice."

14.   Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack?

Yes ———          No ✓

15. Give the name and address, if known, of each attorney who represented you at the following stages of the case that resulted in the judgment under attack:

(a) At preliminary hearing _____

_____

(b) At arraignment and plea _____

_____

(c) At trial _____

_____

(d) At sentencing _____

_____

(e) On appeal _____

_____

(f) In any post-conviction proceeding _____

_____

_____

(g) On appeal from adverse ruling in a post-conviction proceeding _____

_____

_____

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?

Yes _____              No _____

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?

Yes _____              No _____

(a) If so, give name and location of court which imposed sentence to be served in the future: _____

_____

(b) And give date and length of sentence to be served in the future: _____

_____

(c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?

Yes _____              No _____

18. What date is this petition being mailed?

_____

Wherefore, petitioner prays that the court grant petitioner relief to which he may be entitled in this proceeding.

7

# PETITIONER'S VERIFICATION UNDER OATH
# SUBJECT TO PENALTY FOR PERJURY

I swear (or affirm) under penalty of perjury that the foregoing is true and correct.

Executed on _____7-23-06_____ .
(Date)

_David L. Watkins_
Signature of Petitioner

SWORN TO AND SUBSCRIBED before me this the 23 day of _July_ 2006 19___

_Notary Public_
My Commission Expires March 25, 2008

### OR *

## ATTORNEY'S VERIFICATION UNDER OATH
## SUBJECT TO PENALTY FOR PERJURY

I Swear (or affirm) under penalty of perjury that, upon information and belief, the foregoing is true

and correct. Executed on _____ .
(Date)

_____
Signature of Petitioner's Attorney

SWORN TO AND SUBSCRIBED before me this the _____ day of _____, 19 ____

_____
Notary Public

Name and address of attorney representing petitioner
in this proceeding (if any)

_____

_____

_____

_____

_____

* If petitioner is represented by counsel, Rule 32.6(a) permits either petitioner or counsel to verify the petition.

# RULE 32.   POST-CONVICTION REMEDIES

### Rule 32.1   Scope of Remedy.

Subject to the limitations of Rule 32.2, any defendant who has been convicted of a criminal offense may institute a proceeding in the court of original conviction to secure appropriate relief on the ground that:

(a)   The constitution of the United States or of the State of Alabama requires a new trial, a new sentence proceeding, or other relief.

(b)   The court was without jurisdiction to render judgment or to impose sentence.

(c)   The sentence imposed exceeds the maximum authorized by law or is otherwise not authorized by law.

(d)   Petitioner is being held in custody after petitioner's sentence has expired.

(e)   Newly discovered material facts exist which require that the conviction or sentence be vacated by the court, because:

(1)   The facts relied upon were not known by petitioner or petitioner's counsel at the time of trial or sentencing or in time to file a post-trial motion persuant to Rule 24, or in time to be included in any previous collateral proceeding and could not have been discovered by any of those times through the exercise of reasonable dilgence;

(2)   The facts are not merely cumulative to other facts that were known.

(3)   The facts do not merely amount to impeachment evidence;

(4)   If the facts had been known at the time of trial or of sentencing, the result probably would have been different; and

(5)   The facts establish that petitioner is innocent of the crime for which petitioner was convicted or should not have received the sentence that petitioner received.

(f)   The petitioner failed to appeal within the prescribed time and that failure was without fault on petitioner's part.

### Rule 32.2   Preclusion of Remedy.

(a)   Preclusion of Grounds. A petitioner will not be given relief under this rule based upon any ground:

(1)   Which may still be raised on direct appeal under the Alabama Rules of Appellate procedure or by post-trial motion under Rule 24; or

(2)   Which was raised or addressed at trial; or

(3)   Which could have been but was not raised at trial, unless the ground for relief arises under Rule 32.1(b); or

(4)   Which was raised or addressed on appeal or in any previous collateral proceeding; or

(5)   Which could have been but was not raised on appeal, unless the ground for relief arises under Rule 32.1(b).

(b)   Successive Petitions. The court shall not grant relief on a second or successive petition on the same or similar grounds on behalf of the same petitioner. A second or successive petition on different grounds shall be denied unless the petitioner shows both that good cause exists why the new ground or grounds were not known or could not have been ascertained through reasonable diligence when the first petition was heard, and that failure to entertain the petition will result in a miscarriage of justice.

(c)   Limitations Period. Subject to the further provisions hereinafter set out in this section, the court shall not entertain any petition for relief from a conviction or sentence on the grounds specified in Rule 32.1(a) and (f), unless the petition is filed: (1) In the case of a conviction appealed to the Court of Criminal Appeals, within two (2) years after the issuance of the certificate of judgment by the Court of Criminal Appeals under Rule 41, A.R.App.P.; or (2) In the case of

a conviction not appealed ● the Court of Criminal Appeals, within ● (2) years after the time for filing an appeal lapses. The court shall not entertain a petition based on the grounds specified in Rule 32.1(e) unless the petition is filed within the applicable two-year period specified in the first sentence of this section, or within six (6) months after the discovery of the newly discovered material facts, whichever is later; provided, however, that the two-year period during which a petition may be brought shall in no case be deemed to have begun to run before the effective date of the precursor of this rule, i.e., April 1, 1987.

## Rule 32.3   Burden of proof.

The petitioner shall have the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief. The state shall have the burden of pleading any ground of preclusion, but once a ground of preclusion has been pleaded, the petitioner shall have the burden of disproving its existence by a preponderance of the evidence.

## Rule 32.4   Nature of proceeding and Relation to Other Remedies.

A proceeding under this rule displaces all post-trial remedies except post-trial motions under Rule 24 and appeal. Any other post-conviction petition seeking relief from a conviction or sentence shall be treated as a proceeding under this rule. Proceedings under this rule shall be governed by the Rules of Criminal Procedure, except that the trial court in its sole discretion may allow the taking of depositions for discovery or for use at trial.

## Rule 32.5   Venue.

Petitions filed under this rule shall be filed in and decided by the court in which the petitioner was convicted. If a petition is filed in another court, it shall be transferred to the court where the conviction occurred.

## Rule 32.6   Commencement of Proceedings.

(a)   Form, Filing, and Service of Petition.   A proceeding under this rule is commenced by filing a petition, verified by the petitioner or petitioner's attorney, with the clerk of the court. A petition may be filed at any time after entry of judgment and sentence (subject to the provisions of Rule 32.2(c)). The petition should be filed by using or following the form accompanying this rule. If that form is not used or followed, the court shall return the petition to the petitioner to be amended to comply with the form. The petition shall be accompanied by two copies thereof. It shall also be accompanied by the filing fee prescribed by law or rule in civil cases in circuit court unless the petitioner applies for and is given leave to prosecute the petition in forma pauperis, in which event the fee shall be waived. If the petitioner desires to prosecute the petition in forma pauperis, he shall file the In Forma Pauperis Declaration at the end of the form. In all such cases, the petition shall also be accompanied by a certificate of the warden or other appropriate officer of the institution in which the petitioner is confined as to the amount of money or securities on deposit to the petitioner's credit in any account in the institution, which certificate may be considered by the court in acting upon his application for leave to proceed in forma pauperis. Upon receipt of the petition and the filing fee, or an order granting leave to the petitioner to proceed in forma pauperis, the clerk shall file the petition and promptly send a copy to the district attorney (or, in the case of a petition filed in the municipal court, to the municipal prosecutor).

(b)   Specificity.   The petition must contain a clear and specific statement of the grounds upon which relief is sought, including full disclosure of the factual basis of those grounds. A bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceedings.

(c)   Notification of Appellate Court.   If an appeal of the petitioner's conviction is pending, the clerk shall also promptly send a copy of the petition to the appropriate appellate court, noting in the record the date and manner by which it is sent.

(d)   Assignment of Judge.   The proceeding shall be assigned to the sentencing judge where possible, but for good cause the proceeding may be assigned or transferred to another judge.

## Rule 32.7   Additional Pleadings; Summary Disposition; Amendments.

(a)   Prosecutor's Response.   Within thirty (30) days after the service of the petition, or within the time otherwise specified by the court, the district attorney (or, in the case of a petition filed in the municipal court, the municipal prosecutor) shall file with the court and send to the petitioner or counsel for the petitioner, if any, a response, which may be supported by affidavits and a

certified record or su■portions thereof as are appropriate o■■terial to the issues raised in the petition.

(b) <u>Amendment of Pleadings.</u>  Amendments to pleadings may be permitted at any stage of the proceedings prior to the entry of judgment.

(c) <u>Appointment of Counsel.</u>  If the court does not summarily dismiss the petition, and if it appears that the petitioner is indigent or otherwise unable to obtain the assistance of counsel and desires the assistance of counsel, and it further appears that counsel is necessary to assert or protect the rights of the petitioner, the court shall appoint counsel.

(d) <u>Summary Disposition.</u>  If the court determines that the petition is not sufficiently specific, or is precluded, or fails to state a claim, or that no material issue of fact or law exists which would entitle the petitioner to relief under this rule and that no purpose would be served by any further proceedings, the court may either dismiss the petition or grant leave to file an amended petition. Leave to amend shall be freely granted. Otherwise, the court shall direct that the proceedings continue and set a date for hearing.

<u>Rule 32.8   Prehearing Conference.</u>

In order to expedite the proceeding, the court may hold a prehearing conference, at which the petitioner need not be present if he or she is represented by counsel who is present. The conference may be by telephone. Whether held by telephone or in person, the conference shall be stenographically recorded or tape-recorded. At the prehearing conference, the court may order a showing by the petitioner of the materiality of the testimony expected to be presented by any witness subpoenaed by the petitioner, supported by affidavit where appropriate, and, upon petitioner's failure to show the requisite materiality, may order that the subpoena for such witness not be issued or be quashed.

<u>Rule 32.9   Evidentiary Hearing.</u>

(a) <u>Hearing.</u>  Unless the court dismisses the petition, the petitioner shall be entitled to an evidentiary hearing to determine disputed issues of material fact, with the right to subpoena material witnesses on his behalf. The court in its discretion may take evidence by affidavits, written interrogatories, or depositions, in lieu of an evidentiary hearing, in which event the presence of the petitioner is not required, or the court may take some evidence by such means and other evidence in an evidentiary hearing. When facilities are available, the court may in its discretion order that any evidentiary hearing be held at the place of petitioner's confinement, giving at least seven (7) days' notice to the officer in charge of the confinement facility. A verbatim record of the hearing shall be made.

(b) <u>Testimony of Petitioner.</u>  The petitioner may be called to testify at the hearing by the court or by either party.

(c) <u>Decision.</u>  If the court finds in favor of the petitioner, it shall enter an appropriate order with respect to the conviction, sentence, or detention; to any further proceedings, including a new trial; and to any other matters that may be necessary and proper.

(d) <u>Findings of Fact.</u>  The court shall make specific findings of fact relating to each material issue of fact presented.

<u>Rule 32.10   Appeal.</u>

(a) <u>Who May Appeal; Court to Which Appeal is Taken.</u>  Any party may appeal the decision of a circuit court according to the procedures of the Alabama Rules of Appellate Procedure to the Court of Criminal Appeals upon taking a timely appeal as provided in Rule 4, Alabama Rules of Appellate Procedure. Any party may appeal a decision of a district or municipal court according to existing procedure.

(b) <u>Release of Petitioner.</u>  The petitioner shall not be released on bond pending appeal by either party. Release of the petitioner on bond pending a retrial after an order requiring retrial has become final, or after the time for filing an appeal from such an order has lapsed, shall be governed by the laws and rules governing release on bond pending an initial trial.

IN THE CIRCUIT COURT OF
MONTGOMERY COUNTY

DAVID L. WATKINS
Petitioner,

V.

STATE OF ALABAMA
Plaintiff

On Post-Conviction relief from the
Circuit Court of Montgomery County.
Alabama Case Number: CC 00-1506.60

BRIEF IN SUPPORT OF PETITIONER,
DAVID L. WATKINS, RULE 32

DAVID L. WATKINS
DRAPER CORRECTIONAL CENTER
P.O. BOX 1107
ELMORE, AL 36025

# TABLE OF CONTENTS

| Title | Page |
|-------|------|
| Table of Authorities | 1 |
| Statement of the Case and Fact | 3 |
| Arguments & Allegations | 5 |
| Conclusion | 25 |
| Exhibits | *** |
| Certificate of Service | *** |

## TABLE OF AUTHORITIES

Adam v. State, 484 So.2d 1160 (Ala.App. 1985)

Darker v. Wingo, 33 L.Ed. 101

Beck v. Alabama, 447 US 625, 65 L.Ed 2d 392, 100 S.Ct. 2382

Brown v. State, 32 Ala.App. 246, 24 So.2d 450

Burns v. State, 229 Ala. 68, 155 So. 561 (1934)

Cabana v. Bullock, 474 US 276, 384, 106 S.Ct. 689, 695, 88 L.Ed.2d 704 (1986)

Carella v. California, 491

Chapman v. California, 386 U.S. 18, 97 S.Ct. 824, 17 L.Ed 705 (1967)

Chessman v. Teets, 1 L.Ed.2d 1253

City of Dothan v. Halloway, _____ So.2d 1136, 1170 (Ala. 1986)

Cole v. State of Arkansas, 333 U.S. 196, 68 S.Ct. 514, 92 L.Ed.2d 644

Dowdell v. State of Alabama, 854 So.2d 1195, 1198 (Ala.Crim.App 2002)

Drayton v. State, 600 So.2d 1088, 1090 (Ala.Cr.App. 1992)

Drope v. Missouri, 420 US 162, 43 L.Ed.2d at 114, 95 S.Ct. 896

Duncan v. State, 827 So.2d 838, 848 (Ala.Cr.App. 1999)

Eatman v. State, 139 Ala. 67, 36 So.2d 16

Evitts v. Lucey, 83 L.Ed.2d 821, 829-30–469 I.S. 387, 105 S.Ct. 830, 33 L.Ed.

Ex Parte Ebbers, 871 So. 776

Ex Parte Long, 600 So.2d 982 (Ala. 1992)

Falkner v. State, 586 So.2d 39

Gayden v. State, 262 Ala. 468, 80 So.2d 501

Giles v. Maryland, 386 U.S. 66, 98, 17 L.Ed 737, 87 S.Ct. 793 [(1967)]

Gray v. State, 482 So.2d 1318, 1319 (Ala.Crim.App. 1985)

Green v. United States, 2 L.Ed 1991

Guierrez De Martinez v. Lamago, 132 L.Ed.2d 375, 393 (1995)

Hamling v. United States, 418 US 87, 117-18, 94 S.Ct. 2887, 2907-8, 41 L.Ed.2d 590 (1974)

Hill v. State, 348 So.2d 848, 851 (Ala.Cr.App.    )

Hormel v. Helvering, 85 L.Ed. 1037

1

Hornsby v. State, 94 Ala. 55, 10 So. 522

Howlett v. Rose, 496 US 356, 110 S.Ct. 2430, 110 L.Ed.2d 332

Hunter v. Moore, 304 F.3d 1066, 1069 (11th Cir. 2002)

Jackson v. Virginia, Supra, 443 US 307, 61 L.Ed.2d 560 99 S.Ct. 2781

Johnson v. Zerbst, 304 US at 463

Kaufman v. United States, 394 US at 228, 22 L.Ed. 227, 238, 89 S.Ct. 1069

Kimmelman v. Morrison, 477 US 365, 378, 91 L.Ed.2d 305, 321, 106 S.Ct. 2574

Lee v. Flordia, 392 U.S. 378, 88 S.Ct. 2096, 20 L.Ed.2d at 1168

Mackenna v. Ellis, 280 F.2d at 603

McDonald v. State, 241 Ala. 172, 1 So.2d 658

Mitchell v. State, 210 Ala. 456, 98 S. 285 (1923)

Mooney v. Holohan, 79 L.Ed. 791

Moore v. Illinois, 408 U.S. 786, 810, 33 L.Ed.2d 706, 92 S.Ct. 2562 [(1972)]

Moore v. State, 647 So.2d 43 (Ala.Cr.App. 1994)

Nelson v. State, 50 Ala.App. 285, 289

Nye and Nissen v. United States, 366 US 613, 619, 69 S.Ct. 766, 933 L.Ed. 919 (1949)

Pennzoil Co. v. Texaco Inc., 95 L.Ed.2d 1

Raisler v. State, 55 Ala. 64

Reeves v. State, 530 So.2d 894, 897 (Ala.Crim.App. 1988)

Russell v. United States, 8 L.Ed.2d 240, 251 (1962)

Salter v. State, 606 So.2d at 211 (Ala.Cr.App. 1992)

Schlup v. Delo, 513 US at 325, 130 L.Ed.2d 835, 115 S.Ct. 851 (1995)

State v. Agurs, 427 US. [97] 112 [(1976)]

State v. Bush, 68 So. 492, 493 (1915 Ala.App.)

State v. Redmon, 885 So.2d 850 (2004)

Strickland v. Washington, 466 US 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)

United States v. Cronic, 466 US 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984)

United States v. Oritiz-Loya, 777 F.2d 973, 980 (5th Cir. 1985)

United States v. Sanchez, 269 F.3d 1250, 1314 (11th Cir. 2001)

## STATEMENT OF THE CASE AND FACT

The Grand jury of said County Charge that before the finding of the indictment,

David Leonard Watkins, alias

David L. Watkins, Alias

David Watkins,

Whose name is otherwise unknown to the Grand jury, and/or accomplice did intentionally cause the death of another person, John Ferrell, by shooting with a gun, in violation of section §13A-6-2 of the Code of Alabama.

(R.15-16) The indictment resulted from an incident in which John Ferrell was beaten and then killed from a gunshot wound to the head. On the night of the incident, a dispute arose during a game of cards, which was later continued outside of the house of the co-defendant Robert Watkins. Petitioner, while under the influence of alcohol, admitted that he did in fact assault the victim. (R. 85-86) The body of the victim was later found in a ditch at the end of the street.

Two other co-defendants, Latoya Davis and Robert Watkins, were also involved. (R. 277) All three were convicted of murder and each received a life sentence. (R. 287)

On September 28, 2000, Petitioner was arraigned and entered a plea of not guilty to the charge. On May 15, 2001 Petitioner had a jury trial. (R. 1)

Trial Counsel for Petitioner never filed any written motions nor submitted any jury instructions to prevent a denial of due process, which is a constitutional violation of Petitioner's 6th and 14th Amendment Rights. (See Petitioner's EXHIBIT 3 at R.270-274)

On Oct. 22, 2001, the trial court held a sentencing hearing (R. 277). As noted, Watkins was sentenced to serve life imprisonment (R. 287). He was additionally ordered to pay $7,600.39 in restitution, $50.00 to the Crime Victim Assessment Fund, and $150.00 in attorney fees (EXHIBIT 8). Oral notice of appeal was given the date of sentencing (EXHIBIT 8 and PETITIONER'S EXHIBIT 3 at R.289).

On February 6, 2002, Appellate Counsel for Petitioner submitted brief on Direct Appeal raising only (2) two issues. These issues were not properly raised before the Criminal Court of Appeals. Appeal was affirmed by memorandum on April 19, 2002 and

certificate of judgment was issued on <u>May 7, 2002</u>, thereby concluding Petitioner's appeal. (See Petitioner's Exhibit <u>4</u>)

    After the Appellate Court's decision apparently, Appellate Counsel failed to inform Petitioner of the outcome of his appeal. (See exhibit 15, 16, 17, 18, 19). THIS RULE 32 POST-CONVICTION REMEDY ENSUES

## ARGUMENT

The fifth, sixth, and fourteenth Amendment of the Constitution of the United
States are Art I  6 of the Alabama Constitution requires a new trial, or other relief
as law requires. Because Petitioner was deprived of his liberty due to the denial of
effective assistance of Appellate Counsel, due to his failure to raise non-frivolous
issues in a motion for new trial as follows: The denial of the effective assistance of
trial counsel, due to trial counsel failure to submit written requests that the trial
court instruct the jury.

(1) On a lesser included offense of manslaughter regarding intoxication and (2)
properly instruct the jury on an particularize intent to kill issue with regard to
accomplice liability.

In fact, Appellate Counsel never even filed a motion for new trial to preserve
issues for appellate review.

## ALLEGATIONS

1.     Petitioner's Appellate Counsel was ineffective for his failure to

raise in a motion for new trial the issues of, denial of the effective

assistance of trial counsel, due to trial counsel failure to submit a

written request that the trial counsel instruct the jury on an lesser

included offense of manslaughter regarding intoxication.


As you can see from (Petitioner's exhibit 3 at R. 270-274) The trial court did not

instruct the jury on the lesser-included offense of manslaughter-regarding

intoxication. Since the evidence undisputedly reflects that all the defendants and

the victim were drinking heavily and likely intoxicated at the time of the alleged

murder, See Petitioner's  exhibit 1 at R. 40,46 )  and the Petitioner's trial counsel,

indeed, should have submitted a written request that the trial court instruct  the

jury on the lesser included offense of manslaughter regarding intoxication.

Because, it is axiomatic that, in a criminal case the instructions given to the jury must require the jury to find every element of the crime charged, under the proper standard of proof. *See* **Cabana v. Bullock, 474 vs. 376, 384, 106 S.Ct. 689, 695, 88 L.Ed 2d 704 (1986).**

Also, in **Gray v. State 482 So.2d 1318, 1319 [Ala.Crim.App. 1985]** "When the crime charged involves specific intent, such as murder, and there is evidence of intoxication the trial judge should instruct the jury on the lesser included offense of manslaughter. (*See also* **McNeil, 496 So.2d at 109, Moore v. State, 647 So.2d 43 [Ala.Cr.App. 1994]**)

Therefore, "Whether the level of intoxication is sufficient to negate an essential element of the crime, such as intent is a question of fact to be resolved by the jury. **Adams v. State, 484 So.2d 1160 (Ala.App. 1985)**

Because, the Sixth Amendment requires that all elements of the crime be found by the jury-not just by appellate judge's reviewing the record. **Carella v. California, 491 vs at 268-69, 109 S.Ct. 2419, 2422, 105 L.Ed.2d 218 (1989) (Scalia, J., Concurring), (quoting, U.S. v. Caldwell, 989 F.2d 1056, 1061 (9th Cir. 1993)** In fact, the decisions of the Supreme court of Alabama are to the effect that every accused is entitled to have charges given, which would not be misleading, which correctly state the law of his case, and which are supported by [any] evidence,

however weak, insufficient, or doubtful in credibility. **Burns v State**, 229 Ala.. 68 , 155 So. 561 (1934). (Quoting) **Ex Parte Long**, 600 So.2d 982 (Ala. 1992).

Moreover, in federal courts, the defendant is entitle to an instruction on a lesser included offense of the evidence would permit a jury rationally to find him guilty of the offense and acquit him of the greater, **Beck v. Alabama**, 447, 625, 65 L.ed 2d 392, 100 S.Ct. 2382.

2. Petitioner's Appellate Counsel was ineffective for his failure to raise the issue of a motion for new trial the denial of the effective assistance of trial counsel, due to trial counsel failure to submit a written request that the trial court properly instruct the jury on a particularize intent to kill issue with regard to accomplice liability.

In this present case, in relevant part, the trial court charge to the jury reflected the following:

"Now, you've heard the attorneys mention aid and abet. The law in Alabama is that a person is legally accountably for the behavior of another person constituting a crime if with intent to promote or assist the commission of that crime he aids or abet such other person in committing the crime. In other words, there's really no distinct—distinction between principals and accessories in the commission of an offense.

"Aid and abet comprehends all assistance rendered by acts or words of encouragement, support or presence, actual or constructive, to render assistance, should it become necessary. However, mere presence without giving aid or encouragement at or

before the commission of the crime does not constitute aiding and abetting. But where there are two or more persons who enter into a common enterprise and a criminal offense is comtempted, then each could be said to be a co-conspirator. And if the unlawful act is carried out, each is guilty of the offense. And, again, any word or act contributing to the commission of the offense or intended to incite or encourage its accomplishment makes one a co-conspirator.

'Now, it's a jury question for you to decide whether or not the defendant aided or abetted or was a co-conspirator in the commission of the offense here. And if you're convinced beyond a reasonable doubt that he was present with a view to render aid should it become necessary, then he could be found guilty of being an aider or abettor.

"However, if you're not convinced beyond a reasonable doubt that he aided, abetted, and/or conspired to commit the offense, then you would not be able to determine that he aided and abetted in the offense." (See Petitioner's exhibit 3 at R. **270-71**).

The Due Process clause of the fourteenth Amendment denies states the power to deprive the accused of his liberty unless the prosecution proves beyond a reasonable doubt [every] element of the charged offense. Jury instructions [relieving] states of this burden violate a defendant due process rights.

**Carella v. California 491 US at 265.** Because the sixth Amendment requires that all elements of the crime be found by the Jury not just by appellate judge's reviewing the record. **Carella v. California 491 vs at 268-69, 109** S.Ct. 2419, 2422, 105 L.Ed.2d 218 (1989) (Scalia, J., Concurring), (quoting U.S. v. Caldwell, 989 F.2d 1056, 1061 (9th Cir. 1993).

Since **Mitchell v. State, 210 Ala. 457, 98 So. 285 (1923)**, it has been uniformly held that it is the mandatory duty of a trial judge to instruct the jury orally on the different and distinguishing elements of the offense charge and that in the absence of such instruction from the court, the jury could not intelligently comply with their duty as jurors. **See Strickland v. State, 771 So.2d 1123, 1128-29 (Ala.200).**

The Petitioner is content that the [key elements of accomplice liability] are encouragement or presence with a view to render aid should it become necessary. 'When liability is predicated on the latter, it is essential that the principle be aware of the accomplice's support and willingness to lend assistance. **Reeves v. State, 530 So.2d 894, 897 (Ala.Crim.App. 1988)**

As we have read and seen earlier from (Petitioner exhibit 3 at **R. 270-71** the trial court did not clearly charge the jury on the essential element that the principle has to be aware of the accomplice has to be aware of the accomplice's support and willingness to lend assistance to kill the victim.

In **Duncan v. State, 827 So.2d 838, 848 (Ala.Crim.App. 1999)** the trial court correctly instructed the jury on the particularize intent to kill issue. Furthermore, the trial court correctly instructed the jury with regard to accomplice liability relevant part as follows.

"The mere presence of a defendant, who intends to assist with the criminal act, should it become necessary, is aiding and abetting if, and only if, the one who commits the act knows of the defendant's presence and 'the intent to assistance in [that] offense.'"

This so being, since in this present case the key element that the Principle knew that the Petitioner was assisting him to kill the victim is absent from the court's oral charge the

jury could not intelligently comply with their duty as jurors. Moreover, the prosecution was relieved of finding [every] element of the charge offense beyond a reasonable doubt.

It has been well established, in the federal courts, that:

"It will be observe that all those definitions have nothing whatsoever to do with the forbidden result would follow upon the accessory's conduct; and that they all demand that he in some sort [associated] himself with the venture, that he [participated] in it as in something he wished to bring about, that he seek by action to make it succeed.

All the words used-even the colorless, 'abet'-carry on implication of purposive attitude towards it." See Hill v. State, Ala.Cr.App., 348 So.2d 848,851

Take not, the above statement was given by Judge Learned Hand, in which his statement was adopted by the Supreme Court in Nye and Nissen v. United States, 366 U.S. 613, 619, 69 S.Ct 766, 933 L.Ed. 919 (1949); also see Supra, Hill at 851.

In United States v. Ortiz-Loya, 777 F.2d 973, 980 (5th Cir. 1985) the court define the word 'ASSOCIATED' as follows:

"[Associated] means that the defendant share in the criminal intent of the principle."

Therefore, in such absence of the asaid element of aiding and abetting the Petitioner's counsel hurt the Petitioner defense-that he did not intend to promote or assist the Principle by aiding and abetting him to cause the death of the victim.

In order to prevail on a claim of ineffective-assistance-of-counsel, a defendant must show (1) that his counsel's performance was deficient, and (2) that he was prejudice by the deficient performance. Strickland v. Washington, 466 U.S. 668,

104 S.Ct. 2052, 2064, 80 L.Ed.2d 674. See Strickland v. State, 771 So.2d 1123, 1125 (Ala.Crime.App. 1999).

    Nevertheless, the Supreme Court set out an exception to the Strickland test, however, in United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed2d 657 (1984), was decided on the same day.  The court in Cronic determined that there are "circumstances that are so likely to prejudice the accused that the cost of litigation their effect in a particular case is unjustified, "Cronic", 466 U.S. at 658, 104 S.Ct. at 2039.  A [petitioner] whose case presents such a circumstance need not make the specific showing of prejudice required by Strickland. Id. at 659, 104 S.Ct. 2039.  An ineffective assistance claim should be analyzed under Cronic, rather than Strickland, if the defendant either "is denied counsel at a critical stage of his trial" or if "counsel entirely fails to subject the prosecution case to meaning adversarial testing." Id, at 659, 104 S.Ct. 2039 (Quoting Hunter v. Moore, 304 F.3d 1066, 1069 (11th Cir, 2002).

    Thus, the adversarial process protested by the sixth Amendment required that the accused have "counsel acting in the role of an advocate." R1.

n1. "To satisfy the constitution, counsel must function as an advocate for the defendant as opposed to a friend of the court's."  Indeed, an indispensable element of the effective performance of [defendant counsel's] responsibilities is the ability to independently of the Government and to oppose it in adversary litigation," Cronic, Id, at n19.

    The right to the effective assistance of counsel is thus the right of the accused to require to prosecution's case to survive the crucible of meaning adversarial testing, Cronic, 466 U.S. at 456-57, 104 S.Ct. 2039.

Therefore, in this instance, the court must respect what the Cronic, teaches; that claims such as this one should be reviewed under the standard laid out in United States v Cronic, 466 U.S. 648, 104 S. Ct, 2039, 80 L.ed 2d. 657 (1984) Due to the cost of counsel not submitting the said written request and the trial court not instructing the jury on the lesser included offense of manslaughter-regarding intoxication and (2) properly instruct the jury on a particularize intent to kill issue with regard to- accomplice liability.

## DISCUSSION

Petitioner, who has been represented by counsel below claims that he was denied effective assistance of counsel on his direct appeal because Appellate Counsel failed to raise the claim of ineffective assistance of counsel in a motion for new trial before the trial court as required under Rule 24.1 (b), A.R. Crim. P.

Petitioner's Appellate Counsel claims that: "Appointed trial counsel for the Appellant never filed any written motion whatsoever and rarely objected or otherwise attempted to preserve issues of potential error.   The appeal is therefore limited on preserved issues. (See Petitioner's Exhibit 5, at page 6 & 9) However, had Appellate Counsel presented these facts before the trial court in the appropriate motion for a new trial as required under Rule 24.1(b), A.R. Crim. P., it would have given him enough time to review the trial's transcript and identify any deficient trial counsel performance and move the trial judge for a new trial before Petitioner's case was heard on appeal.

In Ex Parte Jackson the court stated.
"We encourage counsel, whenever possible, to ascertain any possible defect in the trial process and to make an issue of that defect in an appropriate motion for new trial."

Failure to include a reasonably ascertainable issue in a motion for a new trial will result in a bar to further argument of the issue on appeal and in Post-Conviction Proceedings, "(See Ex Parte Jackson, 598 So.2d 895 (Ala. 1992)

Nevertheless, Petitioner raises the following issues in this Rule 32 Petition as required and recognized from the holding of Ex Parte Ingram, 675 So.2d. 863 (Ala. 1996).

In furtherance, to be more specific on the claim of the denial of effective assistance of counsel is that : (1) the four page Argument (See Petitioner's exhibit 4,5,6,) the Petitioner's Appellant Counsel filed on appeal did not even meet the minimum standards for a "frivolous appeal" brief because Issue one was not preserved for Appellate review, due to this is not a death-penalty case, therefore, the Court of Criminal Appeal cannot review it for plain error, as Petitioner's Appellate Counsel requested (See MEMORANDUM; which is Petitioner's exhibit 4). As for Issue Two Petitioner's Appellate Counsel raised, is no point of error, which would have entitled Petitioner's to reversal of his conviction.

The specific points the Petitioner claims his appellate Counsel should have raised are: (1) Petitioner received ineffective assistance of counsel at trial, due to counsel failure to submit written request that the court charged the jury on an lesser included offense of manslaughter and property instruct the jury on an particularize intent to kill issue-with regard to accomplice liability, thereby, depriving the Petitioner of his liberty without due

process of law, because the Due Process Clause of the Fourteen Amendment denies States the Power to deprive the accused of his liberty unless the prosecution proves beyond a reasonable doubt [every] element of the charged offense. Jury instructions [relieving] states of this burden violate a defendant due process rights. **Carella v. California, 491 VS at 265.**

Since a layman will ordinarily be unable to recognize counsel's errors and to evaluate counsel's professional performance, consequently a criminal defendant will rarely know that he has not been represented competently until after trial or appeal. **Kimmelman v. Morrison, 477 US 365, 378, 91 L.Ed 2d 305, 321, 106 S.Ct. 2574.** Therefore, an accused is constitutionally entitled to the effective assistance of counsel on a direct appeal as of right. **Evitts v. Lucey, 469 LS. 387, 105 S.Ct. 830, 33 L.Ed 2d 821 (1985).** The primary question here is whether or to what extent prejudice must be shown from denial of such right in order for the Petitioner to obtain Post-Conviction relief.

Must Petitioner demonstrate that this denial of the effective assistance of counsel prejudiced him, at least in the sense that had his counsel not been this deficient his conviction would likely have been reversed? **Penson** provides the proper framework for analysis in their connection. In **Penson**, the Court distinguished between two types of the denial of effective assistance of appellate counsel: first, those in which the deficiency consists of failure to raise (or properly brief or argue) one or more specific issues or the like; and or more specific issues or the like; and second, those in which there has been an actual or constructive complete denial of any assistance of appellate counsel. **109 S.Ct at 354.** In the first type of case, prejudice must apparently be shown, as required by **Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).** In

14

the second type of case, prejudice is 'presumed', and neither the prejudice test of Strickland not the harmless error analysis of <u>Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)</u> is appropriate. <u>Penson, 109 S.Ct. at 354.</u>

Here, Counsel's deficiencies clearly come closer to fitting in the second or total denial of counsel category, than in the first category, that of counsel omitting one or more discrete lapses from minimum professional standards. At the trial level, at least, it is clear that merely because counsel is 'physically' present throughout does not necessarily mean that there has not been total denial of counsel. See <u>United States v. Cronic, 466 US 648, 104 S.Ct 2039, 2047, 80 L.Ed.2d 657 (1984)</u> ("Counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable"). Here Petitioner's appellate counsel did [nothing] to attempt to bring before the Court that Petitioner was denied the effective assistance of trial counsel, which thereby, deprived him of a fair trial to aid Petitioner's appeal, beyond the initial perfecting of the appeal itself.

Therefore, Petitioner is comfortable in not requiring to meet the <u>Strickland,</u> standard of showing, at the least, that there is a reasonable probability that his conviction would have been reversed had he had the effective assistance of appellate counsel. Because the issues that Petitioner claims should have been raised on appeal are certainly not frivolous claims, and at the same time of appeal they may very well have led to a reversal of Petitioner's conviction.

Based upon the foregoing, Petitioner urges this court to protect and safeguard every right guaranteed by the <u>United States Constitution,</u> by granting Petitioner's Post

Conviction issues unless the State affords Petitioner an out-of-time appeal with in such reasonable time as the court may fix, and for further proceedings not consistent herewith.

## ARGUMENT II

The fifth, sixth, and fourteenth Amendment of the United States Constitution, requires a new trial, or other relief as law requires; because Petitioner is being deprived of his liberty with our due process; because Petitioner was convicted on a defective indictment, due to the indictment not being accompanied with such a statement of facts and cause of the accusation of the specific offense, coming under the general description which Petitioner was charged.

Omitting the formal parts, the indictment reads as follows:

The grand jury of said County Charge that before the finding of the indictment,

David Leonard Watkins, alias
David L. Watkins, alias
David Watkins,

Whose name is otherwise unknown to the Grand jury, and/or accomplice did intentionally caused the death of another person, John Ferrell, by shooting with a gun, in violation of section 13A-6-2 of the Code of Alabama, (See **Petitioner exhibit 7**)

Petitioner contends that the above indictment is defective in substance that it will not support the judgment of conviction. In the United States Constitution, Article VI CL.

"This Constitution and laws of the United States which shall be made in pursuance thereof, and all treaties made, or which in shall be made under the authority of the United States, shall be the Supreme Law of the Land; and the Judges in every state

shall be bound thereby.  Anything in the Constitution or laws of any state to the contrary not withstanding.

The United States Constitution's fourteenth Amendment states, in pertinent part:

"No person shall be deprived of his liberty without due process of law."

In City of Dothan v. Holloway 501 So.2d 1136, (Ala.1986); the Court then quoted from the Alabama Constitution (1901), §6, and then stated:

"The manifest purpose of this provision is to accord to every citizen security against the arbitrary action of those in authority, and to place him under the protection of the 'law of the land', which is synonymous with the expression, 'due process of law'.

The word "shall" is used in the United States Constitution Article VI [2] and the fourteenth Amendment of the United States Constitution.  The word "shall" generally indicates a command that admits of no discretion on the part of the person instructed to carry out the directive.  Gutierrez De Martinez v. Labagno, 132 L.Ed.2d 375, 393 (1995); Also see, State v. Redmon, 885 So.2d 850 (2004).

The United States Constitution [Supreme Law of the Land] has been expanded by the decision of the United State Supreme Courts.  See Clack Law Dictionary, Due Process, p. 500-501 (6th ed. 1990). Therefore, the United States Constitution, and the Supreme Court shall be bound by the 'Supreme law of the land.'

In **Russell v. United States**, 8 L.Ed.2d 240, 251, The United States Supreme Court stated:

"It is an elementary principle of criminal pleading, that where the definition of an offense, whether it be at common law or by statute, includes generic terms, it is not sufficient that the indictment shall charge the offense in the same generic terms as in the definition; but it must state the species, -it must descend to particulars, an indictment not framed to appraise the defendant "with reasonable certainty to the nature of the accusation against him is defective although it may follow the language of the statute.

In an indictment upon a statute, it is not sufficient to set forth the offense in the words of the statute, unless those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished undoubtedly the language of the statute may be accompanied with such a statement of the fact and circumstances as will inform the accused of the specific offense, coming under the general description with which he is charged." (See exhibit 7)

In **Russell, supra**, the Court has emphasized two of the protections, which an indictment is intended to guarantee, reflected by two of the criteria by which the sufficiency of an indictment is to be measured. These are:

**First:**    Whether the indictment contains the elements of the offense intended to be charged, and sufficiently appraises the defendant of what he must be prepared to meet and,

**Secondly:**    in case any other proceedings are taken against him for a similar offense, whether the record shows with accuracy to what extent he may plead a former acquittal conviction.

In the case at hand, the State contends that Petitioner committed the crime of intentional murder as an accomplice. However, the language of the indictment does not set forth the necessary means by which Petitioner committed the offense (**Hornsby v. State, 94 Ala. 55, 10 So. 522; Nelson v. State, 50 Ala.App. 285**). In order to properly inform the accused of the "nature and cause of the accusation, within the meaning of the constitution and of the rules of the common law; Not only must all the element of the offense be stated in the indictment, but that also they must be stated with clearness and certainly, and with a sufficient degree of particularity to identify the transaction to which the indictment relates as to place, persons, things and other details.

The accused must receive sufficient information to enable him to reasonably understand, not only the nature of the offense, but the particular act or acts touching which he must be prepared with his proof, and when liberty and perhaps his life, are at stake, he is not to be left so scantily informed as to cause him to rest his defense upon the hazard of being surprised by proofs on the part of the prosecution of an entirely different act or series of acts, at least so far as surprise can be avoided by reasonable particularity and fullness of description of the alleged offense. (**Italics Supplied**) **United States v. Potter, 1 Cir 56 F.83, 89**

At common, it was necessary to set forth in an indictment for murder the means by which an offense was committed. (Hornsby v. State, 94 Ala. 55, 10 So. 522; Nelson v. State 50 Ala.App. 285)

An indictment must state the facts constituting the offense, in ordinary and concise language, in such a manner as to enable a person of common understanding to know what is intended. It must likewise inform the accused not only of the nature of the offense, but also of the particular act or means by which it was committed. (See Ala. Code 1975 Title 15-8-25. Indictment)

It states as follows:

III.    Offense must be charged with certainty.

"An indictment not framed to apprised the defendant with reasonable certainty, of the nature of the accusation against him is defective, although it may follow the language of the statute. (Russell, 369)

"Furthermore, if the indictment tracks the language of the statute, it must be accompanied with such a statement of facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged. "Id at 765, 82 S.Ct. at 1048; See also Hamling v. United States, 418 U.S. 87, 117-18, 94 S.Ct. 2887, 2907-8, 41 L.Ed.2d 590 (1974)

The indictment in this case does not appraise the accused of all the requirements under the 5th, 6th and 14th Amendments of the Constitution.

Again, omitting the formal parts, the indictment reads as follows:

The grand jury of said County charge that, before the finding of the indictment,

> David Leonard Watkins, alias
>
> David L. Watkins, alias
>
> David Watkins,

Whose name is other wise unknown to the grand jury and/or accomplice did intentionally caused the death of another person, John Ferrell, by shooting with a gun, in violation of section 13A-6-2 of the Code of Alabama,

"When the indictment uses generic terms, it must state with particularity. (Russell, 369 U.S. at 765, 82 S.Ct. at 1047)

An indictment must also enable the defendant to enter a plea that will bar any "future prosecutions for the same offense." (Hamling 418 U.S. at 117, 94 S.Ct. at 2907.)

However, this indictment charges that Petitioner "did as an accomplice, intentionally caused the death of another, by shooting with a gun.

Petitioner is apprised of the charges against him to this extent but he could not know the contentions of the state as to how he committed murder. Under the law, a person acts intentionally when it is his purpose to cause the death of that person. An intent may be inferred from the facts and circumstances surrounding the whole transaction or incident as well as the conduct of the defendant.

So in order to convict here, the State must prove beyond a reasonable doubt, first: that John Farrell is dead. And, second that the defendant, David L. Watkins, caused the death of Mr. Farrell by shooting him or aiding and abetting in committing the act or acts which caused the death of the deceased.

Therefore, Petitioner could not have properly prepare his defense, because the means in which to show how he could have been an accomplice-is absent from the indictment. There are numerous other cases holding that where an indictment fails to state any offense such defect must be noticed despite the absence of any attack on it in the court below. Brown v. State, 32 Ala.App. 246, 24 So.2d 450: Raisler v. State, 55 Ala. 64; Emmonds v. State. Also, see Duncan v. State in regarding aiding and abetting. 827 So.2d. 838, 848 (Ala.Cirm.App.1999)

The United States Supreme Court have ruled in numerous cases that, "For an indictment to be valid, it must" contend [] the elements of the offense intended to be charged, and sufficiently apprise [] the defendant of what he must be prepared to meet. Russell v. United States, 369 U.S. 749, 763, 82 S.Ct. 1038, 1047, 8 L.Ed.2d 240 (1962)(internal quotations omitted); United States v. Sanchez, 269 F.3d 1250, 1314 (11th Cir. 2001)(en bench), cert. Denied, 535 U.S. 942, 122 S.Ct. 1327, 152 L.Ed.234 (2002).

In addition, to the language of the statute relating to the indictments. Title 15, Section 232, Code of Alabama 1940, says:

> "The Constitutional right of an accused to demand the nature and case of his accusation is not a technical right, but is fundamental and essential to the guaranty that no person shall be deprived

of his liberty except by due process of law, nor be twice put in jeopardy for the same offense.

"An indictment should be sufficiently specific in its averments in four prime aspects to afford this guaranty:

(1)    To identify the accusation or charge lest the accused should be tried for an offense different from that intended by the grand jury.

(2)    To enable the defendant to prepare for his defense.

(3)    That the judgment may inure to his subsequent protection and foreclose the possibility of being twice put in jeopardy for the same offense.

(4)    To enable the court, after conviction to pronounce judgment on the record.

This protection which the law furnishes to one charged with a crime has not been relaxed or relented by Alabama's courts throughout its history.

"The law does not contemplate that a person charged with a crime should be brought to trial and stand before the courts of our land unaware or in doubt of the nature and character of the accusation against him."

In a Supreme Court case by way of certiorari, *Gayden v. State*, 262 Ala. 468, 80 So.2d 501. There, Mr. Justice Simpson, speaking for the majority, said:

"Indictments must always conform to the mandates of organic law. The emphasis in our case 'that in all criminal prosecutions, the accused has the right *** to demand the nature and cause of the accusation' now §6 of the Constitution of 1901- is not meaningless tautology, but one of the cornerstones of our Bill of Rights.

Furthermore, where the means is unknown it is proper to allege in the indictment by means to the grand jury unknown. **Eatman v. State, 139 Ala. 67, 36 So. 16; McDonald v. State, 241 Ala. 172, 1 So.2d 658.**"

We are further restrained in this case by the requirements of the fourteenth Amendment of the Constitution. The following utterances by our Federal Courts are pertinent. No principle of procedural due process is more clearly established than the notice of the specific charge, and a chance to be heard in a trial of the issue raised by that charge, if desired, are among the constitutional right of every accused in a criminal proceeding in all Courts, State or Federal. **Cole v. State of Arkansas, 92 L.Ed 644, 333 U.S. 196, 201, 68 S.Ct. 514, 517,** 'The Petitioner charged that he had been denied any real notice of the true nature of the charge against him, the first and most universally recognized requirement of due process. **Smith v. O'Grady, 312 U.S. 329, 334, 61 S.Ct. 572, 85 L.Ed. 859.**

In **Cole v. State of Arkansas, 333 U.S. 196, 68 S.Ct. 514, 92 L.Ed. 644,** the Supreme Court said:

"No principle of procedural due process is more clearly established than that notice of the specific charge, and a chance to be heard in a trial of the issues raised by the charge, are among the

constitutional rights of every accused in a criminal proceeding in all courts, State or Federal." See, Supra, Nelson at 289;

## CONCLUSION

The conviction in this case cannot stand as it offends the first requirement of constitutional due process. The failure to charge an offense and the obvious harm to the defendant resulting there from, is the kind of defect involved in due process of law and it cannot be waived.

Petitioner respectfully urges this court for this cause to reverse and remand for a new trial.

Respectfully submitted,

*David L. Watkins*

David L. Watkins

Petitioner

EXHIBIT-1

1
2                    IN THE CIRCUIT COURT
3                            OF
4              MONTGOMERY COUNTY, ALABAMA

5
6         STATE OF ALABAMA,
7              Plaintiff,
8         vs.                          CASE NO:   CC-00-1506
9         DAVID LEONARD WATKINS,
10             Defendant.
11
12
13
14                    *  *  *  *  *  *  *  *  *  *  *
15
16                    PROCEEDINGS in the above-styled
17      cause before the Honorable Sally M. Greenhaw,
18      Presiding Judge, in Courtroom 3-C, Montgomery
19      County Circuit Court, 251 South Lawrence Street,
20      Montgomery, Alabama, commencing on Monday,
21      May 14, 2001.
22
23                    *  *  *  *  *  *  *  *  *  *  *
24
25
            Meridith D. Newman, CSR
            Official Court Reporter

1                              APPEARANCES

2

3

4          FOR THE STATE:

5          Mr. Michael Kidd
           Montgomery County Deputy District
6          Attorney
           251 South Lawrence Street
7          Montgomery, Alabama  36078

8

9

10         FOR THE DEFENDANT:

11         Mr. Winston Durant
           Attorney at Law
12         445-C South McDonough Street
           Montgomery, Alabama  36104

13

14              * * * * * * * * * * *

15

16

17

18

19

20

21

22

23

24

25

# I N D E X

OPENING STATEMENTS . . . . . . . . . . . . . . . 37

PLAINTIFF'S WITNESSES:

    GENO HOWTON
        DIRECT BY MR. KIDD . . . . . . . . . 50
        CROSS BY MR. DURANT . . . . . . . 66

    A. LORIA
        DIRECT BY MR. POWELL . . . . . . . 74
        CROSS BY MR. DURANT . . . . . . . 96
        REDIRECT BY MR. POWELL . . . . . 110

    WILLIAM HUETT
        DIRECT BY MR. POWELL . . . . . . . 112
        CROSS BY MR. DURANT . . . . . . . 135
        REDIRECT BY MR. POWELL . . . . . 140

    JAMES SPARROW
        DIRECT BY MR. KIDD . . . . . . . 144

    JAMES LAURIDSON
        DIRECT BY MR. KIDD . . . . . . . 147
        CROSS BY MR. DURANT . . . . . . 173
        REDIRECT BY MR. KIDD . . . . . . 179

STATE REST . . . . . . . . . . . . . . . 183

DEFENDANT'S WITNESSES:

    DAVID WATKINS
        DIRECT BY MR. DURANT . . . . . . 185
        CROSS BY MR. KIDD . . . . . . . 202

DEFENSE REST . . . . . . . . . . . . . . . 229

CLOSING STATEMENTS . . . . . . . . . . . 231

JURY CHARGE . . . . . . . . . . . . . . . 265

VERDICT . . . . . . . . . . . . . . . 275

SENTENCING . . . . . . . . . . . . . . . 277

4

1

2          THE COURT:   Good morning.   I'm Judge

3    Sally Greenhaw, and we're about to start a trial.

4    And I apologize for the delay, but Monday mornings

5    are just slow.

6          But I'm Judge Sally Greenhaw, and we're about

7    to start a criminal case.   The name of or the style

8    of the case is State of Alabama versus David

9    Watkins.   Mr. Watkins is charged with the murder of

10   John Christopher Farrell that is alleged to have

11   occurred on or about October the 19th of 1999 in

12   the vicinity of the Seven Hundred block of Keystone

13   Street here in Montgomery.   And I'm mentioning that

14   to you, because I'm going to ask you in a moment if

15   you know or if you've heard anything about the

16   case.

17         But, first of all, I'm going to introduce you

18   to everyone seated at counsel table.   And the

19   State, today, is represented by Michael Kidd and

20   Will Powell.   And seated next to them is Willie Mae

21   Davis, and she is the mother of the -- of John

22   Christopher Farrell.   And down at this end is the

23   defendant, David Watkins, and his attorney,

24   Winston Durant.

25         I'm now going to ask you to introduce yourself

5

1    to us.  When I call your name -- and if I
2    mispronounce someone's name, please correct me --
3    but when I call your name, if you would please
4    stand -- and I know this information is on your
5    questionnaire, but this gives the attorneys an
6    opportunity to put your face with your
7    questionnaire -- so when I call your name, if you
8    would please stand.  If you're employed, tell us
9    where.  If you're married, the same about your
10   spouse, if she's -- if he or she is employed or
11   not.  If you're fortunate enough to be retired, the
12   occupation from which you're retired.  That would
13   also apply to your spouse.  Or if you're not
14   working or in school, we need to know that as well.
15                  (Roll call was taken.)
16                  THE COURT:  I'm going to be asking
17   some questions.  If anyone needs to respond, if
18   you'll stand, repeat your name, and give any
19   details that may be helpful.  When I refer to
20   family members, I'm referring to someone in your
21   immediate family, your spouse, children,
22   grandchildren, brother, sisters, parents,
23   grandparents, or if there's a particularly close
24   friend that you think it would be helpful for the
25   attorneys to have that information, you can tell us

1    about that as well.

2        I'd introduced you to everyone at counsel

3    table, and I'm now going to ask the same question

4    about each of them as well as some witnesses, and I

5    may not repeat it each time.  But what I need to

6    know is if you know any of them or related to them

7    by blood or marriage?

8        Again, the State, today, is represented by

9    Michael Kidd and Will Powell.  And our DA in

10   Montgomery County is Ellen Brooks.  Anyone know any

11   of them or related to them by blood or marriage?

12                (No response.)

13            THE COURT:  And, again, down at this

14   end is Willie Mae Davis, and her son was John

15   Christopher Farrell.  Does anyone know -- or did

16   they know Mr. Farrell or know Ms. Davis?

17                (Juror raises hand.)

18            THE COURT:  Okay.  If you'll just

19   stand and tell us who you knew, and don't give u

20   any details.  We may need to talk to you in

21   private.  And we'll start -- yes ma'am?

22            PROSPECTIVE JUROR:  Okay.  I don'

23   know them.  But by them being in the Baptist

24   Church, I do know that her husband is a pastor.

25            THE COURT:  Okay.  But you don't o

7

1    to their church or -- you just know them in the

2    community?

3                    PROSPECTIVE JUROR:   (Prospective

4    juror nods.)

5                    MR. DURANT:   Excuse me, Judge.

6    What's your name?

7                    PROSPECTIVE JUROR:   Yolanda

8    Griswold.

9                    THE COURT:   Yes, ma'am?

10                    PROSPECTIVE JUROR:   My name is

11    Cassie Jackson, and I know Ms. Davis.

12                    THE COURT:   And you know her?   I'm

13    sorry.

14                    PROSPECTIVE JUROR:   Yes.

15                    THE COURT:   And how do you know her?

16    Do you go to church or just know her in the

17    community or organization -- .

18                    PROSPECTIVE JUROR:   We lived in the

19    same community at one time and went to the same

20    church.

21                    THE COURT:   And how long ago was

22    that?

23                    PROSPECTIVE JUROR:   Um --

24                    THE COURT:   Just approximately.

25                    PROSPECTIVE JUROR:   I guess five

8

1    years maybe.

2                    THE COURT:  Okay.  But you don't

3    still go to the same church or live --

4                    PROSPECTIVE JUROR:  I'm still in the

5    same church --

6                    THE COURT:  And is it her husband's?

7                    PROSPECTIVE JUROR:  No.  It's at our

8    home church.

9                    THE COURT:  Okay.  And let me ask

10   both of you, by having some contact or knowing who

11   she is, would that have any impact whatsoever with

12   your sitting on this jury?

13                   PROSPECTIVE JUROR:  No.

14                   THE COURT:  Okay.  Anyone else?

15                   (No response.)

16                   THE COURT:  And, again, down at this

17   end is David Watkins and his attorney,

18   Winston Durant?

19                   (No response.)

20                   THE COURT:  I'm going to read out

21   some witnesses.  I'm first going to start maybe

22   with the Montgomery Police Department.  And if you

23   aren't sure, maybe the attorneys can help us out.

24   But I think all of these witnesses are with the

25   Montgomery Police Department.  Detective

9

1    Geno Howton, Detective A. Loria, Detective R. H.

2    Green, and Detective W. R. Huett?

3                    (No response.)

4                    THE COURT:  And with the Department

5    of Forensic Science is Joe Saloom --

6          Is Jim Sparrow with Forensics?

7                    MR. KIDD:  Yes, ma'am.

8                    THE COURT:  Jim Sparrow and

9    James Lauridson?

10                   (No response.)

11                   THE COURT:  And also as a witness,

12   is George McCree in the courtroom?

13                   (No response.)

14                   THE COURT:  And Roger Fletcher?

15                   (No response.)

16                   THE COURT:  Have I looked over any

17   witnesses -- any other witnesses?

18                   (No response.)

19                   THE COURT:  Has anyone here -- an

20   if you have, we just need you to stand and identify

21   yourself -- but has anyone here heard anything

22   about this matter or -- at all?

23                   (No response.)

24                   THE COURT:  Okay.  And you don't

25   know anything about the facts of the case?

1          (No response.)

2          THE COURT:  At any time, if you had

3     rather not answer a question in front of the rest

4     of the panel, remember that we can talk to you in

5     private.  And sometimes the attorneys need to

6     follow up something on your questionnaire and talk

7     to you in private.

8          Has anyone here or anyone in your immediate

9     family ever worked for the Montgomery Police

10    Department or any law enforcement agency, the

11    Sheriff's Department, Federal Government?  If so,

12    we need to know who it was, when they worked

13    there -- and I see some hands on the back row --

14    but anybody on the front row?  Let's do it by --

15    we'll start with the postal people.

16          PROSPECTIVE JUROR:  My name is

17    Mary Donald, and my step-son, Phillip D. Taylor

18    just resigned from the Montgomery Police Department

19    and is now going through Trooper Academy.

20          THE COURT:  Okay.

21          PROSPECTIVE JUROR:  I'm Kim Dowe

22    and my brother-in-law is a Deputy District Attorney

23    for the State of Alabama.

24          PROSPECTIVE JUROR:  My name is

25    Gene Draper, and my sister-in-law is records clerk

11

1     down at the Montgomery Police Department.

2               THE COURT:  Let me ask, do y'all --

3     do y'all know each other --

4               (Prospective jurors nod.)

5               THE COURT:  -- before today?  Okay.

6     What about the next row?  I see someone on the back

7     row.

8               THE COURT REPORTER:  There's a hand

9     on the second row, Judge.

10              THE COURT:  Okay.  If you would

11    stand and --

12              PROSPECTIVE JUROR:  Yolanda

13    Griswold.  My brother is a former police officer

14    and that's been like maybe ten years ago.

15              THE COURT:  Okay.  And the back

16    rows?

17              PROSPECTIVE JUROR:  George

18    Jackson Jr.  My daughter is with the Sheriff's

19    Department.

20              PROSPECTIVE JUROR:  Karen Jakeman.

21    My husband was a state trooper.

22              THE COURT:  Okay.  Let me ask, if

23    anyone here would automatically give a police

24    officer's testimony any more weight than you would

25    any other witness simply because of their position?

12

1                  (No response.)

2            THE COURT: As I said, Mr. Watkins

3  is charged with murder. And has anyone in your

4  family ever been a victim of such an offense of

5  murder or manslaughter? And, again, if you had

6  rather not answer it, you can talk to us in

7  private. But if you want to answer it, we need to

8  know when it was, who it was, if it went to trial,

9  that type thing. Does anyone want to answer it now

10  or have anyone in your family?

11                 (No response.)

12           THE COURT: Does anyone here have a

13  fixed opinion as to the guilt or the innocence of

14  the defendant which would bias your verdict?

15               (No response.)

16           THE COURT: And has anyone here made

17  any promises or assurance that he or she will

18  convict or acquit?

19               (No response.)

20           THE COURT: Sometimes for religious

21  reasons, moral reasons or just personal reasons,

22  someone thinks or feels like they cannot sit in

23  judgment on their fellow man. Does anyone feel

24  that they could not sit on this case because of

25  such beliefs?

13

1               (No response.)

2           THE COURT:  And there's probably

3  going to be a number of visual aids during the

4  course of this trial.  And if you do have any

5  difficulty -- and I don't think there's going to be

6  with where they'll be placed -- but if you do have

7  any difficulty seeing or hearing and you're

8  selected for the jury, just let us know, and we'll

9  be sure to put you somewhere where you won't have a

10  problem.

11      Does the State have additional questions?

12           MR. KIDD:  Judge, I do have a few.

13     Good morning, ladies and gentlemen.  As the

14  Judge told you earlier, my name is Michael Kidd,

15  and I am a full-time prosecutor with the State of

16  Alabama with Montgomery County.  This is

17  Mr. Will Powell.  He's also a full-time prosecutor

18  with our office.  And he and I will be trying this

19  case together.

20     This is my opportunity to get a little bit of

21  information about you guys.  You've already

22  provided some information about yourselves, but

23  I'll kind of do the same thing you had to do.

24  My wife is Christy, and she lives here in

25  Montgomery.  And I'm originally from Randolph

14

1    County, and I don't have any children as of yet.

2         What I'm going to be doing is asking you just

3    a few questions.  My questions are certainly not

4    designed to embarrass anyone or make anybody feel

5    uncomfortable.  It's just really the only way that

6    we have to get to know you.  And what I'm going to

7    ask you to do, if you would for me, because I'm not

8    very good with names sometimes, and also so our

9    court reporter here, Ms. Newman, can make sure we

10   have an accurate record here of what we're trying

11   to do.  If you respond to one of my questions, if

12   you'll stand up for me first, and then if you'll

13   tell me who you are -- even if it is repetitive,

14   that way we've got a good record of who is

15   responding to my questions.

16        If I ask any question that you just feel

17   uncomfortable responding to in front of the entire

18   venire, I'm sure the Judge will allow you to come

19   forward and we can discuss it at the bench, if you

20   prefer to do it that way.

21        Is anyone familiar with Mr. Winston Durant?

22   Mr. Durant is an attorney here in Montgomery and

23   he's been practicing for a long time, does a lot of

24   things in the legal community.  Is anyone familiar

25   with Mr. Durant?

58

15

1              (No response.)

2              THE COURT:  I didn't ask about them.

3      I'm sorry.  I must have overlooked it.

4              MR. KIDD:  That's okay.

5              THE COURT:  Also the defendant.

6              MR. KIDD:  The defendant here is

7      Mr. David Watkins.  Is anyone familiar with

8      David Watkins or know a member of Mr. Watkins'

9      family?

10             (No response.)

11             MR. KIDD:  I see no response to that

12     question.

13         The State anticipates calling a number of

14     witnesses this morning.  Some of the people that I

15     may identify for you may not testify.  But if

16     certain things happen in the trial, the State may

17     call them as witnesses.  Is anyone familiar with an

18     individual by the name of Robert Watkins?

19             (No response.)

20             MR. KIDD:  A young female by the

21     name of Latoya Davis?

22             (No response.)

23             MR. KIDD:  I see no response to that

24     question.  How about a young female by the name of

25     Felisha Jones?  She goes by the nickname of

16

1    Fee Fee.

2              (No response.)

3              MR. KIDD:  I see no response to that

4    question.  How about Christopher Wysatt?

5              (No response.)

6              MR. KIDD:  I see no response to that

7    question.  Ronnie Scott?

8              (No response.)

9              MR. KIDD:  How about Detective Keith

10   Barnett with the Montgomery Police Department?

11   Does anyone know Detective Keith Barnett?

12             (No response.)

13             MR. KIDD:  How about Detective

14   Guy Naquin?

15             (No response.)

16             MR. KIDD:  Okay.  Now, the Judge is

17   going to tell you -- and I'll tell you from the

18   beginning right now -- this case involves a murder.

19   And during the course of the trial there will be

20   pieces of evidence that will be offered.  There

21   will be some photographs that are offered.  Some of

22   the photographs may be graphic and may depict

23   extreme violence.  Due to the nature of the case

24   being a murder case and some of the evidence that

25   may be coming in, does anyone feel uncomfortable

17

1    sitting as a juror or just would say because of

2    what this involves, I just don't want to

3    participate?

4                (No response.)

5                MR. KIDD:  I see no response to that

6    question.  Does any member of the jury venire have

7    any type of religious or moral beliefs that would

8    make it where you would be uncomfortable as sitting

9    as a juror?

10               (No response.)

11               MR. KIDD:  I see no response.  Are

12   there any members of the jury venire that are

13   members of some type of organization such as the

14   NRA or ACLU?

15               (No response.)

16               MR. KIDD:  I see no response.  Now,

17   with all the television shows and the drama that

18   depicts court activities, I'm sure a lot of you

19   know what the burden of proof is in a criminal

20   case.  The Judge will instruct you that the burden

21   of proof in a criminal case is the State has to

22   prove a case beyond a reasonable doubt.  Is there

23   anyone here that just is not really for sure what

24   that means?

25               (No response.)

18

1            MR. KIDD:  I see no response.  Does

2    anyone believe that in a criminal case that the

3    State should be required to remove all doubt from

4    your mind before you would be willing to convict

5    someone?

6            (No response.)

7            MR. KIDD:  I see no response to that

8    question.  Does anybody feel that in a murder case

9    that the burden of proof that's on the State should

10   be greater than, say, a shoplifting case?  Does

11   anyone feel that way, because this is a murder that

12   the State should be held to a little bit higher

13   standard?

14           (No response.)

15           MR. KIDD:  I see no response.  Has

16   any member of the jury venire ever had a bad

17   experience with any member of the Montgomery Police

18   Department?  And before you answer, I want you to

19   think about that.  And what I'm asking, it could be

20   something very trivial.  It could be something to

21   the effect that you got a speeding ticket that

22   maybe you didn't feel that you deserved.  Or

23   perhaps you were a victim of a burglary and the

24   detectives came out and didn't do an adequate job

25   investigating the crime.  I had that happen to

19

1    myself. Anything along that nature with any member

2    of the Montgomery Police Department?

3                    (No response.)

4                    MR. KIDD: I see no response. How

5    many people, just by the show of hands, believe

6    that street gangs are a problem here in Montgomery?

7                    (Jurors raise their hands.)

8                    MR. KIDD: Does anybody feel that

9    street gangs are not a problem?

10                   (No response.)

11                   MR. KIDD: I see no response. Does

12   anyone in the jury venire know someone that is a

13   member of a street gang or an organization?

14                   (No response.)

15                   MR. KIDD: I see no response to that

16   question.

17                   PROSPECTIVE JUROR: Wait. Rephrase

18   that again.

19                   THE COURT: I don't think he means

20   just any organization.

21                   MR. KIDD: I'm not talking -- I'm

22   talking about a street gang or a street

23   organization.

24                   PROSPECTIVE JUROR: Do I know

25   anyone --

20

1          MR. KIDD:  Do you know anyone that

2    would be a member of a street gang or street

3    organization?

4                    PROSPECTIVE JUROR:  I've had

5    encounters with some street gangs.

6                    MR. KIDD:  Okay.

7                    PROSPECTIVE JUROR:  But not

8    personally know them.

9                    MR. KIDD:  Okay.  Sir, what was your

10   name?  I'm sorry.

11                   PROSPECTIVE JUROR:  Gary Holt.

12                   MR. KIDD:  Mr. Holt, because of your

13   encounter with an individual such as that, could

14   you be fair and impartial in the case if there was

15   some evidence that there was some gang activity

16   going on in this case?

17                   PROSPECTIVE JUROR:  Sure.  No

18   problem.

19                   MR. KIDD:  You could remain mutual?

20                   PROSPECTIVE JUROR:  (Prospective

21   juror nods.)

22                   MR. KIDD:  Thank you very much.

23   Anyone else other than Mr. Holt?

24                   (No response.)

25                   MR. KIDD:  Are there any members of

1    the jury venire that are familiar with the area

2    with where this crime allegedly took place?  I'll

3    tell you that this area is right off Day Street.

4    It's a street by Keystone Street.  Knox Street

5    intersects it.  And it's just right off of Day

6    Street over by the Airport Base.  Is anyone

7    familiar -- I believe they actually call this

8    community a beer (sic) match.

9                    PROSPECTIVE JUROR:  Bear match,

10   isn't it?

11                   MR. KIDD:  Bear match, I'm sorry.

12   I'm from out-of-town.  Yes, sir, are you familiar

13   with this area?

14                   PROSPECTIVE JUROR:  When I was in

15   the service at Maxwell.

16                   MR. KIDD:  Right across from the

17   base?

18                   PROSPECTIVE JUROR:  I knew where it

19   was at.

20                   MR. KIDD:  Okay.

21                   PROSPECTIVE JUROR:  Also --

22                   MR. KIDD:  Your name is

23   Mr. Dickerson, thank you.

24                   PROSPECTIVE JUROR:  Jackson.  I used

25   to drive a truck, and I delivered in that area.

22

1              MR. KIDD:  Okay.  Are you familiar

2   with the area of Keystone Street -- do you know

3   that street by name?

4              PROSPECTIVE JUROR:  I know where

5   it's at.

6              MR. KIDD:  Okay.  Thank you.  This

7   case may involve evidence that there were other

8   participants and that there was some

9   co-conspirators or co-defendants involved.  Does

10  any member of the jury venire believe that if the

11  evidence were that the defendant was a

12  co-conspirator, he should not be held to the same

13  burden of proof to, say, someone who was actually a

14  principal?  Now, let me rephrase --

15            THE COURT:  Let me say this.  The

16  Court is going to instruct you on the law if the

17  evidence supports such an instruction on that type

18  of law and what you should consider.  Would there

19  be anyone here who could not follow the law as far

20  as a co-defendant or -- aiding and abetting, that

21  type thing?

22            (No response.)

23            THE COURT:  Okay.  Go ahead.

24            MR. KIDD:  Thank you, Judge.  Can

25  each juror just promise to listen to the evidence

23

1   as it comes to you from the witness stand, to
2   listen to the Judge's instruction, and follow the
3   Judge's instructions and apply the law as it
4   applies to the evidence and render a verdict
5   accordingly? Can everybody promise me to do that?
6             (Prospective jurors nod.)
7             MR. KIDD: Thank you very much. I
8   don't have any further questions.
9             THE COURT: Mr. Durant, do you have
10  any additional questions?
11            MR. DURANT: One.
12     My name is Winston Durant, and I represent
13  Mr. David Watkins, the defendant, in this case.
14  I -- you have heard, and I assume that all of you,
15  from time to time, looked at television shows
16  depicting courtroom scenes and prosecutors and
17  defense lawyers. And I'm sure that you've heard
18  about the presumption of innocence. And the Judge
19  is going to instruct you at the end of this case
20  that the presumption of innocence is evidence. Can
21  all of you promise me, in spite of what kind of
22  scenes you might see depicted in this case, what
23  kind of evidence that might come up that might
24  indicate an influence, can you promise me that you
25  will adhere to the principle of presumption of

24

1   innocence until the State meets its burden beyond a
2   reasonable doubt?  Can you promise me that you will
3   stick to the presumption of innocence?  Everyone
4   who comes into the courtroom is presumed to be
5   innocent.  Can you do that?

6                    (Prospective jurors nod.)

7                    THE COURT:  Okay.  One thing I might
8   add.  We should conclude the case by tomorrow
9   sometime.  It may be tomorrow afternoon.  But does
10  anyone have a problem?  I don't see that anyone had
11  been excused?

12                   (No response.)

13                   THE COURT:  We're going to try to
14  let you know before noon who is selected for this
15  jury.  I'm going to excuse you now to go back to
16  the jury assembly room.  If there's anyone who
17  needs to stay in here and tell us something in
18  private, I would ask you to remain.  The rest of
19  you can go back, and we'll certainly let you know
20  where we are by noon.

21                   (Out of presence of the jury.)

22                   (In the presence of Mr. Day.)

23                   THE COURT:  Mr. Day, you indicated
24  you needed to tell us something in private.

25                   PROSPECTIVE JUROR:  Well, the only

25

1  thing I wanted to say, he asked a question if you

2  had a family member that's been --

3            THE COURT:  Yes.

4            PROSPECTIVE JUROR:  My sister's

5  ex-husband has been convicted of murder in the

6  past.  And I don't know whether that would have any

7  bearing, but --

8            THE COURT:  When was that?

9            PROSPECTIVE JUROR:  Oh, let's see --

10  it's been, I guess, four or five years ago when he

11  was convicted.

12            THE COURT:  Was it here in

13  Montgomery County?

14            PROSPECTIVE JUROR:  No, ma'am.  It

15  was over in Slapout.

16            THE COURT:  Okay.  Would that be

17  something you would hold against the State in this

18  case --

19            PROSPECTIVE JUROR:  (Prospective

20  juror nods.)

21            THE COURT:  Would you be able to

22  treat each side fairly --

23            PROSPECTIVE JUROR:  I think I can.

24            THE COURT:  Were you -- did you go

25  to the trial?

26

```
 1              PROSPECTIVE JUROR:  No, ma'am, I did
 2   not.  And, like I say, she had been divorced from
 3   the guy several years before this incident
 4   occurred.  And I just wanted to let y'all know
 5   that.
 6              THE COURT:  Well, we appreciate
 7   that.
 8        Do y'all have any follow-up questions?
 9              MR. KIDD:  I don't, Your Honor.
10              THE COURT:  Thank you, sir.
11              PROSPECTIVE JUROR:  Thank you.
12              (Out of the presence of Mr. Day.)
13              THE COURT:  Do y'all have any
14   motions with regard to anyone?  It looks like we
15   have twenty-eight, and we'll just get two
16   alternates.  So do y'all need about five minutes or
17   are y'all ready to start?
18              MR. KIDD:  Judge, if you'll let me
19   get my chart organized --
20              THE COURT:  I don't think we're
21   going to be able -- I mean, we haven't even struck
22   the jury.  You aren't going to be able to do that.
23   When you say your chart --
24              MR. KIDD:  Just so I can keep track
25   of who I'm striking.
```

27

```
 1                    THE COURT:  Oh, okay.  I'll give you
 2      a couple minutes.
 3                    (Brief recess taken.)
 4                    (Striking of the jurors.)
 5                    THE CLERK:  No. 117, 124, 125, 135,
 6      156, 161, 169, 170, 174, 181, 183, 185, 186, and
 7      208.
 8                    MR. KIDD:  I've got 125 and 170 as
 9      alternates.
10                    THE CLERK:  Right.
11                    THE COURT:  Okay.  Why don't we go
12      get the jurors, and we'll swear them in and I can
13      give my little bit and then --
14                    (In the presence of the jury.)
15                    THE COURT:  If you'll go to one of
16      the end of the rows and remain standing.
17                    (Jurors sworn.).
18                    THE COURT:  Okay.  You can be
19      seated.  I'm just going to keep you here a moment,
20      and then we'll take a break for lunch.
21           There's one chair -- I don't think for this
22      length of time, it's going to be --
23                    THE CLERK:  There's enough chairs,
24      Judge.
25                    THE COURT:  I know, but for this
```

28

1  period of time, I think everybody can just be

2  seated.  There's one --

3       THE CLERK:  Jane told them the chair

4  was not strong.

5       THE COURT:  Okay.  Before we break

6  for lunch, I'm going to briefly explain to you the

7  procedures that we'll be following and the duties

8  of the Court and the duties of the jury.

9       Now, first of all, as trial Judge, it's my

10  duty to ensure the orderly conduct of the trial,

11  rule on questions of law as they may arise from

12  time to time, and at the end of the case instruct

13  you on the law that applies.

14       Now, you as the jury, you're the sole and

15  exclusive judges of the evidence.  It's your duty

16  to listen to the evidence and from it determine the

17  true facts and then apply the law as given to you

18  by the Court to the facts as you find them to

19  arrive at your verdict.

20       Now, the procedure that we'll be following is

21  first of all, counsel for the State will make an

22  opening statement, and then counsel for defendant

23  will respond.  Now, these statements, they're

24  simply given to familiarize you with the case.

25  They're not evidence.  They're, again, just to tell

29

1   you what the case is about.  Following opening

2   statements, then evidence will be presented by

3   witnesses from the witness stand, and there will

4   probably also be quite a bit of documentary

5   evidence in this case.

6        During the course of the trial, the attorneys

7   will object from time to time.  That's their job.

8   And it's up to the Court to rule on those

9   objections.  But you should not concern yourself

10  with any of the reasons for my rulings, as they're

11  controlled and required by law.  You're also not to

12  speculate as to any possible answers to questions,

13  which are not required to be answered.

14       Finally, the overruling of an objection is not

15  intended to indicate the weight to be given such

16  evidence.  Following the close of the evidence,

17  then the attorneys will address you again and make

18  closing arguments.  And at that time, they'll

19  discuss the evidence that's been presented and all

20  reasonable inferences to help guide you to your

21  verdict.

22       Now, we'll be taking a break -- and we're

23  going to in just a moment -- but during the course

24  of the trial, if you do need to take a break, just

25  raise your hand, I'll try to be watching and we can

30

1   do so.  Sometimes it depends on where we are with a

2   witness whether we take a break.

3        I do want to caution you, at this time, not to

4   discuss the case with anyone.  That includes a

5   fellow juror.  In fact, you're not even to consider

6   the matter until you've heard all of the evidence.

7   And, in addition, if you're in the hall or taking a

8   break, and someone inadvertently, a spectator or a

9   witness, says something in front of you, you just

10  need to let the Court know.

11       Finally, I want to caution you not to --

12  you're not to make any type of investigation on

13  your own, such as go to the scene or consult legal

14  periodicals.  In other words, your verdict must

15  strictly be based on the evidence presented in this

16  courtroom and the law that applies.  I'm going to

17  give you an hour and a half -- excuse me -- an hour

18  and a half today, and we'll get you at 1:30 in the

19  jury assembly room.  And we'll see you then.

20  You're excused now for lunch.

21                 (Out of presence of the jury.)

22                 THE COURT:  I don't think there are

23  any matters --

24                 MR. KIDD:  Judge, just a couple.

25  Judge, the only thing I would like to ask the Court

31

1    about.  This case primarily is going to be a
2    statement case.  The State's contention is that
3    David Watkins' statement convicts him of the
4    offense.  There is a video interview with
5    Sergeant Loria where Mr. Watkins gives a videotaped
6    statement.  There's portions of that video
7    statement where he has his head down and he's
8    talking in a very low voice.  It's audible, but you
9    have to really strain sometimes to hear it.  What I
10   would like to do is to be able to offer the jurors
11   the transcription --

12             THE COURT:  Well, I'm going to have
13   to look at that and make a decision.  So get out
14   the tape.

15             MR. KIDD:  The tape or the
16   transcription?

17             THE COURT:  Well, I need both.  I
18   have to review it.

19             MR. KIDD:  It's a videotape, Judge.

20             THE COURT:  Well, I'll have to
21   review it.  I've got to review it before I make a
22   decision.

23             MR. KIDD:  Okay.

24             THE COURT:  How long is that going
25   to take?

32

```
 1              MR. KIDD:  The tape is about
 2    twenty-five minutes.
 3              THE COURT:  Well, if it's just one
 4    portion of it --
 5              MR. KIDD:  Well, Judge --
 6              THE COURT:  Y'all be back at one and
 7    have that portion that you say is inaudible --
 8              MR. KIDD:  Well, Judge, it's the
 9    whole thing.  I mean, it's.
10              MR. POWELL:  Basically --
11              THE COURT:  Well, you cannot do that
12    until I review it.  So get it out.  Now, he's got
13    to go to lunch.  Would it be better to take him now
14    and have him back at one or wait until we get
15    through with the tape?
16              THE BAILIFF:  It doesn't matter to
17    me.  Whatever you want to do. .
18              THE COURT:  It doesn't --
19              THE BAILIFF:  I mean, he needs to go
20    eat.
21              THE COURT:  This is something I
22    could have done last week is look at that and go
23    over it and see whether a transcript is going to be
24    provided to a jury.
25              MR. KIDD:  Judge, I apologize.  I
```

33

1    didn't realize it was going --

2              THE COURT:  I think by law I'm

3    required to do that.  So, let's get started.  And

4    if he doesn't get back from lunch, of course,

5    that's going to cause a problem with the jurors

6    being delayed.

7              THE BAILIFF:  Let me just let the

8    jail know --

9              THE COURT:  Why don't you -- yeah.

10             MR. KIDD:  Judge, we'll just forget

11   the transcript.  That's fine.

12             THE COURT:  I don't mind reviewing

13   it.

14             MR. KIDD:  You know, it's going to

15   take probably at least -- the transcript is about

16   twenty-five pages.

17             MR. POWELL:  Twelve --

18             MR. KIDD:  Twelve, I'm sorry.

19             THE COURT:  And I know during a

20   video, there are probably pauses and so forth.

21             MR. POWELL:  It's pretty consistent.

22             THE COURT:  Well, we either need to

23   get started with it or not.  He needs to let them

24   know --

25             MR. KIDD:  Judge, we need to get a

34

1   VCR for you to look -- do you have one or do I need

2   to --

3                    THE COURT:  No --

4                    MR. POWELL:  It would be better,

5   Your Honor, if we started at one.

6                    THE COURT:  Okay.  We'll start back

7   at one.

8                    MR. KIDD:  We'll have it ready to

9   go.

10                    THE COURT:  Okay.

11                    MR. KIDD:  Judge, in the meantime,

12   would you like to take a copy of the transcript --

13                    THE COURT:  It's not going to help

14   me until I -- I would like one to have as I go

15   along.

16                    (Lunch break was taken.)

17                    THE COURT:  During the course of the

18   lunch break, I had an opportunity to review the

19   taped statement as well as I was provided a copy of

20   the transcript.  And I know, Mr. Durant, you had an

21   opportunity to also look at the video as well as

22   the transcript.  Do you have any motions?

23       Well, let me say, I think that almost all of

24   the transcript is correct.  However, it does

25   concern me that there are a few incidents where it

35

1  appeared to me to be inaudible and there was a

2  transcript of a -- part of his statement, and I

3  certainly think the tape would be admissible, but

4  I'm not inclined to let the jury have a copy of the

5  transcript while hearing it or looking at it.

6              MR. DURANT:  Judge, if I may, I

7  would just make a -- I'll just make a motion to

8  keep the video out, because I think there's a

9  problem with continuity.  I think there are many

10  incidents where it's inaudible and the detective,

11  is, in general, supplying the answer.  And I don't

12  think it's necessarily in response of the

13  defendant.  I think it's -- I think that his

14  testimony is somewhat distorted by the problem of

15  not having the proper audio and also the gaps in

16  the tape.

17              THE COURT:  Do you have anything you

18  want to say for the Record, Mr. Kid?

19              MR. KIDD:  No, ma'am, Your Honor, I

20  don't.

21              THE COURT:  Well, again, I do

22  think -- there's only a few incidents and a few

23  words that are really, in my opinion, not audible,

24  although it -- certainly at times the defendant is

25  not speaking as loudly as he -- or clearly as other

36

1   portions.  But I'm going to let them -- I'm going

2   to let the jury view it.  But, as I say, again, not

3   have a copy of the transcript.

4         Is there anything else we need to take up?

5               MR. KIDD:  Judge, I've got some

6   requested jury charges, but we can do that later on

7   this afternoon.

8               THE COURT:  Okay.  Are the jurors

9   here?

10              MS. HARRELL:  They're all here.

11              THE COURT:  Okay.  Then we can get

12  started.

13        Let me say to everyone in the courtroom.

14  You're welcome to be here.  You cannot get up and

15  leave at random.  You can only take breaks and

16  leave the courtroom at a break.  And there will be

17  no talking in the courtroom.  Anyone here, a

18  spectator, needs to go either to the second floor

19  or the fourth floor to use restrooms, so there will

20  be no inadvertent contact with the jurors.  Okay.

21        If there are any witnesses in the courtroom,

22  you need to leave.  I don't know who is a witness

23  and who isn't.

24              (In the presence of the jury.)

25              THE COURT:  Okay.  At this time, are

1    you ready for your opening?

2         MR. KIDD:  Good afternoon, ladies

3    and gentlemen.  As I said earlier this morning --

4    I'm going to try not to trip over this cord -- my

5    name is Michael Kidd.  I'm a full-time prosecutor

6    with the State of Alabama.  This case involves the

7    defendant in this case, Mr. David Watkins, who is

8    seated here at counsel table with his attorney.

9         Ladies and gentlemen, seated at counsel table

10   with us is Ms. Mae Davis.  Ms. Davis is the mother

11   of Jonathan Farrell.  Jonathan Farrell was killed

12   on October the 19th, 1999.

13        This was Jonathan Farrell before he met

14   David Watkins.  He met David Watkins on the night

15   of October 19th of 1999.  And after he met

16   David Watkins, this was what was left.

17        David Watkins has been charged in this case

18   with intentional murder.  In Alabama, intentional

19   murder, someone is -- commits the crime of

20   intentional murder when he acts with the intent to

21   cause the death to another person and his actions

22   actually do cause the death of another person.

23        Now, what must the State prove in order to

24   prove its case beyond a reasonable doubt in this

25   case?  The State must prove that David Watkins

38

1   acted with the intent to kill Jonathan Farrell.

2   That he did, in fact, act with that specific

3   intent.  And that Jonathan Farrell is dead as a

4   result.

5       What does the State not have to prove in this

6   case?  The State does not have to prove to you that

7   the defendant, David Watkins, was the actual

8   shooter or was the actual individual that pulled

9   the trigger.  The State does not have to prove that

10  to you.

11      What evidence is there that David Watkins

12  killed Jonathan Farrell?  This trial will basically

13  be a two-part trial.  The first part of the trial

14  will actually consist of a tape confession where

15  David Watkins confesses to his involvement in this

16  crime.  You will actually see him on video.  I'll

17  tell you that the video is not good.  The volume on

18  the video, David Watkins throughout the entire

19  interview has his head down, he mumbles,

20  Sergeant -- Tony Loria, who you will meet later on

21  in the afternoon, conducted the video.  He

22  repeatedly attempted to get Mr. Watkins to speak

23  up.  I'm going to ask you to listen carefully.

24  There are certain portions of the statement that

25  are unmistakeable.  And portions of that statement

39

1    indicate that David Watkins is guilty in the way

2    that the State is charging.

3         The second part of the trial will be the

4    physical evidence. There will be several pieces of

5    physical evidence that come to you. The

6    interesting thing about physical evidence is

7    physical evidence only tells one story. It cannot

8    lie. And the physical evidence will show you that

9    David Watkins did participate in the manner in

10    which he said. But it will also show you that

11    there were things that David Watkins omitted, and

12    that his culpability is even worse than what he

13    says in his own statement.

14         This trial is about three individuals --

15    actually four. We start with David Watkins, who is

16    the defendant in this case. With David Watkins is

17    his first cousin, Robert Watkins. They lived on

18    Keystone Street here in Montgomery County. With

19    them on the night of October the 19th of 1999 was a

20    female, Latoya Davis. Latoya Davis' sister dated

21    Robert Watkins. There's a relationship between all

22    three of these individuals. Robert and

23    David Watkins are first cousins. Latoya Davis is

24    friends with David Watkins, and she has relations

25    with Robert Watkins in that her sister dates

40

1    Robert Watkins.  Those are the three individuals

2    involved in this crime.

3        The victim in the crime is Jonathan Farrell.

4    That's Mr. Farrell on his knees in a ditch with a

5    bullet hole through his head.  These three

6    individuals cruelly beat, tortured, and executed

7    Jonathan Farrell in the early morning hours of

8    October the 20th, late evening, October the 19th.

9        What does David Watkins say in his statement?

10   As you watch this video, you'll see David Watkins

11   talk about exactly what happened.  His rendition of

12   the facts is that he was over at Robert Watkins'

13   house with Latoya Davis and that the individual

14   known as Jonathan Farrell, this lady's son, comes

15   over to visit, and he brings a case of beer, a

16   friend drops him off.  He walks in and has some

17   conversation with Robert Watkins.  He is familiar

18   with Robert.  He knew him from a past encounter.  I

19   believe the evidence may be he actually worked, at

20   one time, with Robert Watkins.  He was friends with

21   Robert.  And as he came over, he shared his beer

22   with them.  He sat down.  He wanted to talk to

23   them, just kind of hang out.  They started playing

24   cards.  And during the course of the card playing,

25   something terribly went wrong, according to

41

1    David Watkins.   David says that Jonathan Farrell

2    misplayed a couple of hands of cards and that

3    Latoya Davis, the fifteen-year-old female that was

4    there, was upset because he kept misplaying his

5    cards.   And then a fight broke out.

6         Now, in his statement, David Watkins is not

7    really specific about who was involved in that

8    initial altercation.   But, in fact, there was some

9    type of fight there, and that the fight progressed,

10   that it moved from the inside of the house outside

11   in the yard.   Now, David Watkins says while he was

12   outside in the yard that Latoya Davis took a

13   two-by-four timber and cracked it across the back

14   of Jonathan Farrell's head causing a laceration

15   about two or three inches across the back of his

16   skull.   That he actually hit or kicked

17   Jonathan Farrell as he laid on the ground.   He

18   watched Latoya Davis as she did the same.   And then

19   when Jonathan Farrell was floundering on the

20   ground, unable to get up, this gentleman right here

21   says that he walked over to him, he unzipped his

22   fly, and he pulled out his penis, and he urinated

23   in this man's face while that man laid helplessly

24   on the ground unable to do anything.   That's what

25   David Watkins says he did.

42

1          In addition to that, if that's not bad enough,

2     David Watkins tells a story of how

3     Jonathan Farrell, after he urinated in his face,

4     was able to get to his feet, how he was disoriented

5     because he had been hit over his head with this

6     two-by-four, and how he staggered and stumbled some

7     two-hundred yards away from the initial crime scene

8     to an area at the end of Keystone Street, where

9     there's a culvert and water that runs through the

10    culvert.  David Watkins says all three:  He,

11    Latoya Davis, and Robert Watkins followed this --

12    Mr. Farrell down to the end of Keystone Street.

13    And that some point in time, they came back to the

14    house, they talked about what would happen, and

15    what had transpired, and Robert Watkins produced a

16    gun and said, you know, he knows where I live.  He

17    knows all of us.  He can tell on us.  We've got to

18    kill him.  That's what we've got to do.

19         David Watkins says he had conversations with

20    Robert Watkins about who was actually going to

21    shoot him.  At some point in time, David Watkins

22    says, in his own words, that he encouraged

23    Robert Watkins to take the life of

24    Jonathan Farrell.  That's what he says, not the

25    State.  It comes from his mouth.  After they had

43

1   this conversation, they couldn't decide who was

2   going to kill Jonathan Farrell.  David Watkins

3   tells you that Latoya Davis said I'll do it.  She

4   grabbed the gun.  She walked over, and she kicked

5   Jonathan Farrell into the ditch.  And as

6   Jonathan Farrell sat on his knees and begged and

7   pleaded for his life, according to David Watkins,

8   she fired two shots.  The second one,

9   Jonathan Farrell never spoke again.  That's what

10  David Watkins says.

11       But, ladies and gentlemen, in addition to his

12  statement, there's physical evidence too.  But

13  David Watkins says in his confession that he

14  conspired to kill Jonathan Farrell.  That

15  conspiracy was when he was talking to Latoya Davis

16  and he was talking to Robert Watkins about somebody

17  has got to kill him.  He encouraged Robert Watkins

18  to pull that trigger.  He testifies, in his

19  statement, that he actually participated in this

20  act.  He tells you how he beat Jonathan Farrell,

21  kicking him in the side, how he urinated on

22  Jonathan Farrell, while he laid helplessly on the

23  ground.  And then finally how he encouraged his

24  cousin, Robert Watkins, to take his life.

25       What does the physical evidence tell us in

44

1   addition to this?  The physical evidence, ladies

2   and gentlemen, is going to tell you that there were

3   two separate gunshots.  David Watkins says, in his

4   statement, that these gunshots came almost in

5   succession.  That after the first gunshot, he heard

6   Jonathan Farrell cry out for his life for the last

7   time.  And then shortly thereafter, there was a

8   second gunshot.

9       Ladies and gentlemen, the physical evidence is

10  going to tell you that there's two separate

11  gunshots.  The first or one of the gunshots came --

12  embraced the side of the cheek, but the -- excuse

13  me -- the fatal gunshot was an actual contact

14  wound.  Whoever pulled that trigger, took the end

15  of that gun and stuck it to Jonathan Farrell's head

16  while he was sitting on his knees begging for his

17  life and pulled the trigger.  They shot him from

18  the back.  The projectile went through his head and

19  lodged in the front.  You have two different

20  directions that those gunshots came from.  And I

21  submit to you, there is no way possible that the

22  way that David Watkins describes that shooting in

23  his statement could have occurred the way that the

24  physical evidence tells us that it happened.

25      The physical evidence also will tell us -- and

45

1   you'll actually see a crime scene video, and you'll

2   see what we're talking about -- there is no way

3   possible that you could have seen what happened in

4   that ditch unless you were right there next to him.

5   Your visibility is blocked from just about all

6   angles.  And the only way -- this was night.  It

7   was almost midnight -- the only way you could have

8   seen it was to be right there with whoever it was

9   committing the deed.

10      And, finally, the physical evidence will show

11  you that Jonathan Farrell did die on his knees just

12  as David Watkins said.  Ladies and gentlemen,

13  Jonathan Farrell was executed.  Why?  Why did this

14  man have to die?  Why could this individual act so

15  callously?  He says it's because this man misplayed

16  a hand of cards.  That's the explanation that he

17  gives you.

18      What is your role as a juror in this case?

19  What are you supposed to do?  The first thing

20  you're supposed to do is listen to the evidence.

21  Don't take my word for it.  Don't take Mr. Durant's

22  word for it.  Listen to it.  It comes right here

23  from the witness stand.  You'll see the video.

24  You'll see this gentleman speaking on the video.

25  Listen intently.

46

1    The Judge is going to tell you what the law is

2    in this case.  She'll give you instructions on that

3    law.  She's going to ask you to apply the law to

4    the facts and the evidence in this case.  After

5    that, you'll have the unique opportunity to speak

6    with the voice of justice.  Ladies and gentlemen,

7    how loud will your voice speak?  Thank you.

8                THE COURT:  Mr. Durant?

9                MR. DURANT:  Ladies and gentlemen,

10   my name is Winston Durant, and I represent

11   Mr. David Watkins.  Mr. Kidd has just set forth

12   what the prosecution in this case is going to be.

13   And as the Judge would instruct you, just before

14   you start your deliberation, after you've heard all

15   of the evidence, is that nothing that we say here

16   in opening statement or closing statement should be

17   considered as evidence, because it is not evidence.

18   It's just what we believe the evidence will show.

19       And it is not as clear as Mr. Kidd would like

20   for you to believe.  He would concede that my

21   client, Mr. David Watkins; Robert Watkins, his

22   cousin; Latoya Davis; and the deceased,

23   Jonathan Farrell were playing cards.  I think you

24   would see through the evidence that there was the

25   use of alcohol by these individuals and the use of

47

1    drugs and that several of the people involved in

2    this tragic episode were impaired by alcohol and

3    drugs.

4         And let me, hasten to add, it's going to be

5    assorted set of evidence that you're going to hear.

6    But please don't let that distract you from what

7    your purpose is in hearing the evidence and taking

8    the Judge's instruction and deliberating and

9    reaching a decision.  Please don't let that

10   distract you.

11        You're going to see some horrible photographs.

12   And I ask you, in my opening statement, please

13   don't let -- although it is easy for this to

14   happen -- but please don't let sympathy or bias or

15   fear enter into your deliberation, because that's

16   not what it's all about.  I ask you to be

17   objective, listen to every witness and evaluate

18   their testimony, whether it's a police witness or

19   whether it's a civilian witness.

20        The Judge will instruct you -- and I think you

21   heard some of it during voir dire this morning --

22   that you're not supposed to give any more credence

23   or credibility to a police witness over a regular

24   witness.  You're the ultimate judge.  You're going

25   to make the decision as to who was telling the

48

1   truth, who was credible, or who was not telling the

2   truth.

3       You're going to see the video of my client

4   giving his statement, and I -- and, as I said, it's

5   assorted kind of set of facts. But please don't

6   let that interfere, because whether he, indeed,

7   urinated or kicked Mr. Farrell, he's not charged

8   with those -- with anything concerning that. He's

9   charged with murder. That is what he's charged

10  with, murder -- intentional murder. Must have

11  specific intent to commit a murder.

12      And as I just stated to you, everybody was

13  drinking just prior to what occurred. We don't

14  know what precipitated the argument. You really

15  don't. As Mr. Kidd told you, there were four

16  people involved here. We don't know who struck who

17  first. We don't know any of that. We don't know

18  what caused the striking of the blows. We don't

19  have a weapon.

20      Yes, Mr. Farrell was shot, but we don't know

21  who shot him. And it is our position that before

22  you can convict my client, you have to be sure,

23  beyond a reasonable doubt, that he had specific

24  intent to commit a murder with what he's charged

25  with, intentional murder. Was there specific

49

1   intent?  I think that after you've heard all of the
2   evidence, you will conclude there was no specific
3   intent to commit murder.
4         So, as I ask you and asked you in voir dire
5   earlier this morning, concerning the presumption of
6   innocence, that is evidence.  The presumption of
7   innocence is evidence.  That accompanies the
8   defendant into the jury deliberation, and it does
9   not disappear until you have reached a verdict
10  beyond a reasonable doubt.  So I ask you to keep a
11  very opened mind about every witness that comes to
12  the stand.  Keep an opened mind, because I am
13  convinced that after you've heard all of the
14  witnesses, I'm convinced that you will find for the
15  defendant, that the defendant did not have any
16  specific intent.  He did not fire a shot or, put it
17  another way, the prosecution is not going to be
18  able to prove beyond a reasonable doubt that
19  David Watkins had specific intent and fired a shot
20  or shots that killed Jonathan Farrell.  Thank you
21  very much.
22                THE COURT:  Are you ready?
23                MR. KIDD:  Your Honor, State calls
24  Detective Geno Howton.
25                THE COURT:  If you would, raise your

50

1    right hand.

2              DETECTIVE GENO HOWTON

3         The witness, having first been duly sworn or

4    affirmed to speak the truth, the whole truth, and

5    nothing but the truth, testified as follows:

6              DIRECT EXAMINATION

7    BY MR. KIDD:

8         Q.    Sir, if you would, please state your name

9    for the ladies and gentlemen of the jury, please?

10        A.    Corporal Geno Howton.

11        Q.    Corporal Howton, how are you currently

12   employed?

13        A.    I'm a homicide investigator for

14   Montgomery Police Department.

15        Q.    How long have you been working in law

16   enforcement?

17        A.    Nineteen years.

18        Q.    How long have you been a detective?

19        A.    Right about eight years.

20        Q.    And how long have you been working

21   homicides here in Montgomery?

22        A.    Four-and-a-half years.

23        Q.    Detective Howton, as a homicide

24   investigator, specifically, what are your duties

25   and obligations, in just layman terms, in the

51

1   investigation of a homicide?

2       A.    To gather information, put together and

3   do a case file, and how the information developed a

4   suspect, and make an arrest.

5       Q.    Now, Detective Howton, I'm going to

6   direct your attention back to October the 19th of

7   1999.  Are you familiar with that particular date?

8       A.    Yes.

9       Q.    I believe it was actually on the morning

10  of the 20th of October.  You were dispatched to an

11  area on Keystone Street here in Montgomery; is that

12  correct?

13      A.    Yes, sir.

14      Q.    What was your purpose for going there?

15      A.    We had -- we were notified of a death

16  over at the dead end of Keystone Street.

17      Q.    When you arrived there at Keystone

18  Street, what was going on and who was present?

19      A.    Well, we had marked patrol units and

20  patrol supervisors over there.  When we got there,

21  they led us back to the ditch area at the dead end,

22  and there they took us to a body they found in the

23  ditch.

24      Q.    Okay.  Did you actually -- or did you

25  have the opportunity to observe the body

52

1    undisturbed?

2        A.    Yes.

3        Q.    And did you also have the occasion to

4    observe some items of physical evidence?

5        A.    Yes.

6        Q.    If you could, describe this area that the

7    victim was found in.

8        A.    Well, the ditch -- there's actually two

9    parts of that ditch.  One part runs north and

10   south.  The second part is a small, I guess,

11   secondary type ditch.  It runs along the railroad

12   tracks.  It runs east and west.  And the victim was

13   found in the secondary portion of that ditch.  He

14   was laying in a westerly direction.  And this ditch

15   is at the south end of Keystone Street.

16       Q.    Now, Detective Howton, I'm going to ask

17   you -- this is a crime scene video, I believe,

18   State's Exhibit No. 1.

19            MR. KIDD:    I'll mark it for

20   identification purposes, Mr. Durant.

21       Q.    Are you familiar with this video?

22       A.    Yes.

23       Q.    And does this video accurately reflect

24   the crime scene as it was there when you arrived

25   that morning?

53

1        A.    Yes.

2               MR. KIDD:  Your Honor, we offer

3   State's 1 at this time.

4              THE COURT:  Admitted.

5             (State's Exhibit No. 1 was admitted

6             into evidence.)

7             MR. KIDD:  If the Court will indulge

8   me for must a moment?

9             (Brief second was taken.)

10     Q.  Detective Howton, I'm going to show you

11  what I've marked for identification purposes,

12  State's Exhibit No. 2.  Can you identify State's 2

13  for me, please?

14     A.  Well, it appears to be an aerial

15  photograph of the area of Keystone Street.

16     Q.  Detective Howton, I'm going to allow you

17  to take that -- and this is a laser pointer.  If

18  you will, show me on that aerial photograph, the

19  location where this crime allegedly occurred and

20  began?

21     A.  Well, that should be the area where the

22  body was found right there.

23     Q.  Okay.  And that's the ditch right there.

24  Does this photograph accurately reflect the aerial

25  photograph of the crime screen as it occurred there

54

1    on that morning?

2        A.    Well, that's the area, yes.

3        Q.    Okay.

4            MR. KIDD:  Your Honor, we offer

5    State's 2 at this time.

6            THE COURT:  Admitted.

7            (State's Exhibit No. 2 was admitted

8            into evidence.)

9        Q.    Detective Howton, I'm going to show you

10    what I've marked for identification purposes as

11    State's Exhibit No. 42.  Are you familiar with

12    State's 42?

13        A.    It appears to be the area of Keystone

14    Street and Knox Street.

15        Q.    Will State's Exhibit No. 42 help you

16    describe to the jurors where particular pieces of

17    physical evidence were found?

18        A.    Yes.

19        Q.    Detective Howton, this would be State's

20    Exhibit No. 2?

21        A.    Yes.

22        Q.    And this would be State's Exhibit No. 42;

23    is that correct?

24        A.    Yes.

25        Q.    Now, Detective Howton, when you arrived

55

1    at the crime scene, where was your attention first

2    directed toward?

3        A.    Down here at the dead end in the

4    secondary area of the ditch.

5        Q.    What pieces of physical evidence did you

6    see there in that particular area?

7        A.    We had the victim's body and his

8    clothing.  We found a .22 caliber casing, which was

9    laying in the ditch next to the victim.  And we

10   also found a box of Black and Mild cigars in that

11   area.

12       Q.    Now, Detective Howton, I'm going to show

13   you what's been marked for identification purposes

14   as State's Exhibit No. 3.  Are you familiar with

15   this photograph?

16       A.    Yes, sir.

17       Q.    And what would this photograph represent?

18       A.    That's the victim, Mr. Farrell, lying in

19   the ditch.

20       Q.    And does this photograph accurately

21   reflect the condition of Mr. Farrell's body when

22   you came across it there that morning?

23       A.    Yes, sir.

24           MR. KIDD:   Your Honor, we offer

25   State's 3 at this time.

56

1          THE COURT:  Admitted.

2          (State's Exhibit No. 3 was admitted

3          into evidence.)

4     Q.    Detective, I'm now going to show you what

5   I've marked for identification purposes as State's

6   Exhibit No. 4.   Can you describe this photograph

7   for me?

8     A.    That's the victim, Mr. Farrell, laying in

9   the ditch.   The camera angle is just different.

10    Q.    What, if any, injuries can you see in

11  that photograph?

12    A.    Well, if you look real carefully, you can

13  see where blood and some damage to the head is

14  right here on the right side of his head.

15    Q.    Does this photograph accurately reflect

16  the condition of Mr. Farrell's body from the

17  reverse angle?

18    A.    Yes.

19          MR. KIDD:  Your Honor, we offer

20  State's 4 at this time.

21          THE COURT:  Admitted.

22          (State's Exhibit No. 4 was admitted

23          into evidence.)

24    Q.    Detective Howton, I'm now going to show

25  you what I've marked for identification purposes as

57

1    State's Exhibit No. 5.  Can you describe State's 5
2    for me, please?
3          A.    That's the graffiti.
4                MR. DURANT:  Objection.  May we
5    approach?
6                (Bench conference was held.)
7                THE COURT:  I'm going to overrule
8    your objection.  I can see it now.
9          Q.    Detective Howton, can you describe
10   State's Exhibit No. 5 for me, please?
11         A.    That's the same drainage ditch, the
12   secondary ditch where the victim was found laying
13   in.
14         Q.    And does this photograph accurately
15   reflect the condition of the ditch as it was when
16   you found Jonathan Farrell there that morning?
17         A.    Yes, sir.
18                MR. KIDD:  Your Honor, we offer
19   State's 5.
20                THE COURT:  Admitted.
21                (State's Exhibit No. 5 was admitted
22                into evidence.)
23         Q.    Detective, now, I'm going to show you
24   what I've marked for identification purposes as
25   State's Exhibit No. 6.  Can you identify this

58

1    photograph for me, please?

2         A.    That is the same secondary ditch where

3    the victim was found lying.  You can tell it's

4    running east and west along a main ditch line.

5         Q.    Now, Detective Howton, I'm going to refer

6    you back to what's been offered as State's Exhibit

7    No. 42.  Can you show the jurors where State's

8    No. 6 is in relation to this particular diagram?

9         A.    Well, if you're talking about the body,

10   it's sitting right here in the secondary ditch.

11   This is the main ditch that's running north --

12   well, we call it north and south -- but the

13   secondary ditch is right here and the body is

14   laying right there next to the tracks.

15        Q.    And this photograph, State's Exhibit

16   No. 6, is from what direction?

17        A.    It's going to be -- he's facing west --

18   or southwest.

19        Q.    Does this photograph accurately reflect

20   the condition of Mr. Farrell from that view --

21        A.    Yes.

22        Q.    -- that morning?

23        A.    Yes.

24              MR. KIDD:  Your Honor, we offer

25   State's 6 at this time.

59

1    THE COURT:  Admitted.

2    (State's Exhibit No. 6 was admitted

3    into evidence.)

4    Q.   Detective Howton, I'm going to show you

5    what I've marked for identification purposes as

6    State's Exhibit 7.  Can you identify State's 7 for

7    me, please?

8    A.   Well, that's basically the same angle

9    photograph except it's further back.  But you have

10   the ditch here.  The railroad tracks right above

11   and the victim laying right in here in the

12   secondary ditch.

13   Q.   Where would the intersection of

14   Keystone -- or where would Keystone dead end in

15   relation to this photograph?

16   A.   Right over in here.

17   Q.   And, approximately, how far is the

18   individual that's taking that photograph from the

19   ditch there?

20   A.   What, a hundred feet, maybe.  I don't

21   know.  I'm not real sure.

22   MR. KIDD:  Your Honor, we offer

23   State's 7 at this time.

24   THE COURT:  Admitted.

25   (State's Exhibit No. 7 was admitted

60

1          into evidence.)

2    Q.   Detective, I'm going to show you what

3 I've marked for identification purposes as

4 State's 8.  Can you identify State's 8 for me,

5 please?

6    A.   That's the photograph of the crime scene

7 area.

8    Q.   What is depicted there beneath that light

9 pole there?

10    A.   Dirt mound.

11    Q.   I'm going to reference you back to what

12 we've offered as State's Exhibit No. 42.  Can you

13 show the ladies and gentlemen of the jury where

14 those dirt mounds are at on there?

15    A.   There's one mound here at the dead end.

16 And you have one just adjacent to it.

17         MR. KIDD:  Your Honor, we offer

18 State's 8 at this time.

19         THE COURT:  Admitted.

20         (State's Exhibit No. 8 was admitted

21         into evidence.)

22    Q.   Detective Howton, I'm going to show you

23 now what I've marked for identification purposes as

24 State's 9.  Can you identify this photograph for

25 me, please?

61

1      A.    Yes, sir.   That's the second mound and

2   you're facing back toward the church would be a

3   northeast shot photograph.

4      Q.    Where would the photographer be standing

5   in relation to the ditch?

6      A.    He is just north of the ditch, next to

7   that larger mound of dirt.

8               MR. KIDD:   Your Honor, we offer

9   State's 9.

10              THE COURT:   Admitted.

11              (State's Exhibit No. 9 was admitted

12              into evidence.)

13     Q.    Detective Howton, I'm going to show you

14   what I've marked for identification purposes as

15   State's 10.   Can you identify this photograph for

16   me, please?

17     A.    That's taken from the top of the railroad

18   tracks and that's a photograph of the main ditch.

19     Q.    Detective Howton, with your laser

20   pointer, can you indicate on that photograph where

21   Jonathan Farrell's body would be in relation to

22   that photograph?

23     A.    He's going to be back this way.

24              MR. KIDD:   Your Honor, we offer

25   State's 10.

62

1              THE COURT:  Admitted.

2              (State's Exhibit No. 10 was admitted

3              into evidence.)

4         Q.   Detective Howton, can you identify

5    State's 11 for me, please?

6         A.   That's going to be a picture of the

7    secondary ditch, it appears.  That's what it

8    appears to be.

9              MR. KIDD:  Your Honor, we offer

10   State's 11 at this time.

11             THE COURT:  Admitted.

12             (State's Exhibit No. 11 was admitted

13             into evidence.)

14        Q.   Detective Howton, I'm going to show you

15   what I've marked as State's 13.  Can you identify

16   this photograph for me, please?

17        A.   That is a photograph of the victim's head

18   in the water.  He has two wounds.  One here on the

19   right side and one near the top of the head.

20             MR. KIDD:  Your Honor, we offer

21   State's 13.

22             THE COURT:  Admitted.

23             (State's Exhibit No. 13 was admitted

24             into evidence.)

25             MR. KIDD:  Your Honor, at this point

63

1    in time, I would like to ask permission to play the

2    videotape of the crime scene, if I may do so?

3                    THE COURT:  Has it been identified?

4            MR. KIDD:  Yes, ma'am, it was.

5            THE COURT:  Is that your first --

6            MR. KIDD:  That's Exhibit No. 1.

7                    (Videotape being played for

8                    the jury.)

9        Q.    Detective Howton, can you show me, with

10   your pointer, where the body is in relation to this

11   photograph?

12       A.    It's going to be right over in here.

13   It's going to be on the other side of this dirt

14   mound here.

15       Q.    That video that's being shot, how far is

16   that from the very end of the street?

17       A.    Probably about ten, fifteen -- maybe

18   twenty yards or more.

19       Q.    Okay.

20                    (Videotape stopped.)

21       Q.    Detective Howton, the video depicts two

22   different crime screens or two different areas; is

23   that correct?

24       A.    Yes, sir.

25       Q.    Show the jurors where the body was found

64

1    again, please.

2        A.    The body was found down here at the dead

3    end in the ditch.

4        Q.    And, Detective Howton, the second area

5    that was depicted in that crime scene video, can

6    you show the ladies and gentlemen of the jury where

7    that was at?

8        A.    It's going to be up here at the top.

9        Q.    Approximately, in your best judgment, how

10   far is it from that residence, 659 Keystone, to

11   where the victim's body was found?

12       A.    Say over a hundred yards.

13       Q.    Do you know who resides at 659 -- or who

14   did reside at 659 Keystone?

15       A.    Robert Watkins.

16       Q.    And, Detective Howton, after collecting

17   this evidence, did you know, at that particular

18   time, who the victim was?  Did you know his

19   identity?

20       A.    No.

21       Q.    How were you able to determine who that

22   victim was?

23       A.    His prints were sent to DFS and the State

24   eventually came back with a hit on the prints.  And

25   then after that, we found some prints at

65

1  headquarters and we took prints, which were

2  obtained from DFS, and took them down to the ET

3  office, where the fingerprint examiner matched the

4  prints.

5      Q.   Now, how long, period of time, lapsed

6  from the time this actually occurred until you were

7  able to identify who the victim was?

8      A.   About two days.

9      Q.   And during that time, was this

10 investigation ongoing?

11     A.   Yes.

12     Q.   And during that time, did you have any

13 information connecting David Watkins to that crime?

14     A.   No.

15     Q.   At what point in time -- or tell me how

16 David Watkins actually became a suspect?

17     A.   Well, we ended up receiving some

18 information that some of the other detectives

19 developed and eventually had led us to a girl by

20 the name of Latoya Davis.  And then from her, we

21 eventually picked up Robert Watkins.  And then we

22 ended up getting David Watkins.

23     Q.   Okay.  So David Watkins was the last of

24 the three individuals who you actually picked up?

25     A.   Right.  He was one of the last ones.

1    Q.    Now, after David Watkins was picked up,

2    did someone there at the police department have an

3    opportunity to speak with him?

4    A.    Yes.

5    Q.    And who was that?  Do you know?

6    A.    Sergeant Loria.

7    MR. KIDD:  Judge, I don't believe I

8    have any further questions for Detective Howton.

9    CROSS-EXAMINATION

10   BY MR. DURANT:

11   Q.    Detective Howton, when was the first time

12   you became involved in the case?

13   A.    The morning we were notified of the body

14   found in the ditch.

15   Q.    There were two scenes shown, the scene

16   where the ditch was where the body was found and

17   also the scene of the area around Keystone and

18   Knox; is that correct?

19   A.    Yes.

20   Q.    And Mr. Kidd, in his direct examination

21   stated that there were bloodstains; is that

22   correct?

23   A.    Yes, sir.

24   Q.    Did they take samples of those

25   bloodstains?

67

1        A.    Yes.

2        Q.    Okay.   Were they able to come up with any

3    identification of those bloodstains?

4        A.    I believe they came back belonging to

5    Mr. Farrell.

6        Q.    As far as the cigar -- you said there was

7    a cigar box found?

8        A.    Yes.

9        Q.    What kind of box was it?

10       A.    It was Black and Mild.

11       Q.    Black and --

12       A.    Black and Mild cigar box.

13       Q.    Did that belong to Mr. Farrell?

14       A.    Um, I don't know.

15            MR. DURANT:  That's all.

16            THE COURT:  Anything else for him?

17            MR. KIDD:  Nothing, Your Honor.

18            THE COURT:  Come up here and let me

19    see where we are with witnesses.

20            (Bench conference was held.)

21            THE COURT:  It's probably going to

22    be a good time to take a break.  I'm going to give

23    you fifteen minutes, and we'll get you in the jury

24    assembly room.  And, at that time, Mr. Powell, you

25    can move that.  Can they get by -- y'all can leave

68

1    at this time.

2            (Brief recess was taken.)

3            THE COURT:  Mr. Johnson had a

4    request -- and I -- we probably need to get this on

5    the Record -- for his client to come and remain in

6    the courtroom during this trial.  And I understand

7    the State had listed him as a witness.

8        And, Mr. Johnson, you said he would invoke the

9    fifth?

10            MR. JOHNSON:  He would have.  He was

11   never served with the State's subpoena.  He was

12   only served with a subpoena by Mr. Hartley to

13   testify for Latoya.  He was never served with a

14   subpoena in this trial.  So, we feel like he should

15   be able to remain in the courtroom.  He will revoke

16   his fifth amendment privilege not to testify.  I

17   think the case law says he can't be called if he's

18   going to revoke his fifth amendment privilege.

19            THE COURT:  I'm not sure.  I haven't

20   had this come up before.

21            MR. KIDD:  I haven't either, Judge.

22            THE COURT:  He hasn't been

23   subpoenaed --

24            MR. KIDD:  Judge, we can go get him

25   served, I mean, if that's the problem.

69

```
 1                    THE COURT:  I don't think that's
 2    really going to solve the problem.
 3         Do you have some law?
 4                    MR. CARTER:  Basically under 9.3
 5    and --
 6                    THE COURT:  9.3, criminal rule?
 7                    MR. CARTER:  615.
 8                    MR. POWELL:  Rule of Evidence, 615,
 9    Your Honor, and Criminal Procedure, 9.3.
10                    THE COURT:  Okay.
11                    MR. CARTER:  Basically, that they
12    should be excluded if they're under subpoena.
13                    THE COURT:  Well, he's not under
14    subpoena right now.  I know he can be put under
15    subpoena.  So, I'm not -- you say -- what do you
16    have as far as the law?
17                    MR. JOHNSON:  Well, Judge, I don't
18    have the law.  The 11th Circuit in Atlanta recently
19    ruled on a case that the Court had about excluding
20    witnesses, but not public from the courtroom --
21    because --
22                    THE COURT:  But I think this is a
23    little different situation.
24                    MR. JOHNSON:  Well, let me just
25    say --
```

70

1    THE COURT:  Go ahead.

2    MR. JOHNSON:  Let me just say.  The

3  defendant has not been -- my client has not been

4  disruptive.  He's not made any comments to anyone.

5  He's not hurting anyone by sitting in the courtroom

6  except us in preparing his defense on his case.

7  And this is a public trial.  Unless he's disruptive

8  or going to be a witness, he cannot be excluded

9  from the courtroom.  And I think the right goes to

10  this defendant of a public trial also.  I don't

11  know if they want to assert their right to a public

12  trial, but --

13    THE COURT:  I'm not going to get

14  into that area.  They have not subpoenaed him.

15  They can subpoena him -- I'm sure -- could I see

16  what rule?

17    (Attorney hands it over.)

18    THE COURT:  You have it marked.

19  Until all witnesses have been released by the

20  Court -- if your client takes the fifth, I don't

21  know why I wouldn't release him.

22    MR. JOHNSON:  He would.  And I think

23  the case law is clear that the State cannot call a

24  witness to the stand, knowing he's going to take

25  the fifth amendment.

71

```
1.              THE COURT:  And you cited another --

2              MR. CARTER:  Yes.  Rule 615, Your

3    Honor.

4              THE COURT:  Is your client here?

5              MR. JOHNSON:  He's out in the hall.

6              THE COURT:  I think we should get

7    him in here.  I know you're on his behalf, but I

8    want to hear from him whether he would be a witness

9    if subpoenaed.

10             MR. JOHNSON:  Okay.

11             (In the presence of Mr. Johnson's

12             client.)

13             THE COURT:  And, for the Record,

14   would you state your name?

15             CO-DEFENDANT:  Robert E.

16   Watkins, Jr.

17             THE COURT:  And, Mr. Watkins, your

18   attorney has indicated if you were called as a

19   witness in this case, you would invoke your fifth

20   amendment priviledge not to testify.  And have you

21   discussed this with him?

22             CO-DEFENDANT:  Yes, ma'am.

23             THE COURT:  And would that be your

24   position if you were called as a witness?

25             CO-DEFENDANT:  Yes, ma'am.
```

72

1    THE COURT:  Although, the State may

2    not have subpoenaed him in this case, they

3    certainly can subpoena him.  But if they did and he

4    takes the fifth, I don't know why I wouldn't

5    release him from the rule or release him as a

6    potential witness, so I'm going to allow him to

7    stay in here.

8                    MR. JOHNSON:  Okay.  Thank you.

9                    THE COURT:  Okay.  Anything else?

10                   MR. KIDD:  Judge --

11                   THE COURT:  I don't know who else is

12   in the courtroom.  A number of people came back in

13   just then and -- I know the victim's family, where

14   you are.  And are the others, Mr. Durant, are they

15   friends or family of the defendant?

16                   MR. KIDD:  Judge, Latoya Davis'

17   father is here.  I know that there was a subpoena

18   issued for him, because he is on the video with

19   her.  And I would ask --

20                   THE COURT:  What's his name --

21   Latoya Davis' father, you have been subpoenaed as a

22   witness -- and take off your hat when you come in

23   the courtroom -- you will need to leave the

24   courtroom.  And Latoya Davis, was she subpoenaed

25   too?

73

```
1                    MR. KIDD: Yes, ma'am, she was. She

2    is a defendant as well.

3                    THE COURT: I know. But was she

4    subpoenaed?

5                    MR. KIDD: Judge, if she was not

6    served, we can get her served. We intended to

7    serve her, but I'm assuming your rule --

8                    THE COURT: It's going to be the

9    same situation. I don't want the two families to

10   have any contact. When we take a break, I think it

11   would be easier for y'all to go to the second

12   floor. And for anyone -- other spectators to go to

13   the fourth floor. And that way there won't be any

14   type of contact with the jurors or the family.

15       Okay. Anything else?

16                    (Brief recess was taken.)

17                    (In the presence of the jury.)

18                    THE COURT: Okay. Your next

19   witness?

20                    MR. POWELL: Your Honor, State calls

21   Detective Loria.

22                    THE COURT: If you would raise your

23   right hand?

24                    DETECTIVE A. LORIA

25       The witness, having first been duly sworn or
```

74

1    affirmed to speak the truth, the whole truth, and

2    nothing but the truth, testified as follows:

3                    DIRECT EXAMINATION

4    BY MR. POWELL:

5        Q.    Could you state your name for the jury?

6        A.    Sergeant Tony Loria, Montgomery Police

7    Department.

8        Q.    Sergeant Loria, where are you from?

9        A.    Originally?

10       Q.    Originally.

11       A.    New Jersey.

12       Q.    New Jersey.  And how long have you been a

13   police officer with the Montgomery Police

14   Department?

15       A.    Almost nine -- ten years.

16       Q.    And how are you currently employed,

17   what's your official capacity there?

18       A.    Assigned to the homicide unit as a

19   supervisor.

20       Q.    Okay.  Do you have a specific rank?

21       A.    Sergeant.

22       Q.    And how long have you been assigned to

23   the homicide unit at the Montgomery Police

24   Department?

25       A.    About sixteen months -- approximately

75

1    sixteen or seventeen months.

2        Q.   Okay.  In your capacity as a homicide

3    detective, how many cases do you think you've

4    worked in those sixteen months?  Hundreds?

5        A.   I've been involved in several.

6        Q.   Clear enough.  Now, Sergeant Loria, I

7    want to point your attention to an incident that

8    occurred over at the Bear Match neighborhood over

9    on Keystone Street.  Are you familiar with the

10   incident that I'm referring to?

11       A.   Somewhat, yes.

12       Q.   Now, were you involved in an

13   investigation of a homicide involving a victim by

14   the name of John Christopher Farrell?

15       A.   I was.

16       Q.   Okay.  At some point, did you receive any

17   instructions about this defendant here,

18   David Watkins?

19       A.   I was.

20       Q.   Okay.  What were you instructed to do?

21       A.   After interviews were taken, we learned

22   that David Watkins was involved in a homicide of

23   John Farrell.  We were told at that point that he

24   was currently located at 1929 A Gibbs pertaining

25   to -- at that particular time.  I can't give you an

76

1  exact time.  I advised Detective Kennedy that she

2  and I were going to that location and pick up --

3  pick Kennedy up -- excuse me -- pick Watkins up.

4       Q.   Now, Sergeant Loria, who is

5  Detective Kennedy?

6       A.   She was, at that time, a member of the

7  homicide unit.

8       Q.   And did the two of y'all go over there

9  together to this location over on Gibbs Street

10  looking for the defendant?

11       A.   We did.

12       Q.   And this was based on information you

13  received throughout the investigation of this case?

14       A.   Yes.

15       Q.   Okay.  Now, what day was that?  Do you

16  remember?

17       A.   The -- if I can go to my notes -- it was

18  on the 21st.

19       Q.   What month?

20       A.   October -- I'm sorry -- yeah,

21  October 21st.

22       Q.   What year?

23       A.   1999.

24       Q.   So on October the 21st, 1999, you and

25  Detective Kennedy went over to an address on Gibbs

77

1    to find the defendant?

2        A.    That's correct.

3        Q.    Did you find him?

4        A.    We did.

5        Q.    What happened next?

6        A.    We advised him he needed to come down to

7    the police headquarters for an investigation.  He

8    was on the telephone.  I believe making attempts to

9    get someone to watch some children or a child there

10    at that location.  Subsequently, we transported him

11    down to police headquarters.

12        Q.    So you took the defendant down to police

13    headquarters?

14        A.    We did.

15        Q.    Now, just for the Record, Sergeant, is

16    the defendant you transported or the individual you

17    transported down to police headquarters in the

18    courtroom here today?

19        A.    He is.

20        Q.    Could you point him out to the jury?

21        A.    Sitting to my right, wearing a white

22    shirt.

23        Q.    How has his appearance, if -- changed, if

24    any, between today and the time you picked him up

25    back in October?  Can you recall?

78

1        A.    I don't recall his hair being quite like

2    that.  I don't believe he had that style of hairdo

3    or that much hair on his head at the time.

4        Q.    Okay.  Other than the hair, is that the

5    same person you transported?

6        A.    It appears to be, yes.

7        Q.    Okay.  Now, what happened once you got

8    down to police headquarters with the defendant?

9        A.    After notification --

10        Q.    Let me stop you right there.  What do you

11    mean when you say after notifications?

12        A.    Well, at the time, a Lieutenant, who I

13    was working for, let him know we got him down to

14    headquarters, notify the case agent.  We get him

15    down to headquarters, standard procedure to

16    interview and, of course, mirandise the subject.

17        Q.    Okay.  Now, you made reference to a case

18    agent in this case?

19        A.    That's correct.

20        Q.    Who was that?

21        A.    At the time, Detective Howton.

22        Q.    Okay.  Now, you also made reference to

23    mirandising this individual.  Was that done?

24        A.    Yes, it was.

25        Q.    Okay.  Now, I'm going to show you what

1    we're going to mark as State's 43.  Sergeant Loria,

2    do you recognize State's 43?

3         A.    Yes, I do.

4         Q.    What is it?

5         A.    It's a standard miranda form which the

6    detective division of Montgomery Police Department

7    uses.

8         Q.    Is that a fair and accurate copy of the

9    actual form that you presented to the defendant on

10   this time in question when you were down at police

11   headquarters?

12        A.    Yes.

13        Q.    Okay.  Now, did the defendant -- did you

14   read that form to the defendant?

15        A.    I did.

16        Q.    Did he appear to understand that form and

17   substance that was read?

18        A.    If you notice these lines that separate

19   inside the miranda itself is where we pause after

20   almost each sentence.  We break it down and ask it

21   on an individual basis, if you would understand it,

22   instead of reading it completely as one paragraph.

23        Q.    Sergeant Loria, would you read that

24   paragraph to the jury like you read it to the

25   defendant?

80

A.    "Before asking you any questions, I must explain to you that you can remain silent."

Q.    Would you speak up a little bit for me, Sergeant?  I'm having a hard time hearing you back here.

A.    "Before asking you any questions, I must explain to you that you can remain silent."  And I would have to reflect the standard what I would do in previous cases, do you understand that?  Then they'll give a response back.

Q.    Do you recall, did he give a response back?

A.    I would have to --

Q.    Eventually, we're going to get --

THE COURT:  Wait.  Don't talk at the same time.

Q.    Sergeant Loria, eventually, we're going to get to the audio and the video portion.

A.    That's --

Q.    Would the defendant's response to these questions be indicated on that?

A.    Yes.

Q.    Okay.  So continue reading the form. "That anything you say can be used against you in court."  And we would say, Do you understand that?

1            "That you will have the right to talk to a

2     lawyer first, and you have the right to the advice

3     and presence of a lawyer even though you cannot

4     afford to hire one."  Again, we stop and wait for a

5     response.

6            "If you cannot afford to hire a lawyer during

7     your interrogation, the Court will appoint one

8     before we question you."  Again, we pause.

9            "If you want to answer questions now, you can

10    do so.  But you can stop answering at any time."

11    Do you understand what I just read?  That's not on

12    there, but -- and what I'll do is sign --

13          Q.   Now, on this particular time when you

14    have the defendant at police headquarters, did he

15    sign that miranda form?

16          A.   Yes, he did.

17          Q.   What was he indicating to you by signing

18    that miranda form?

19          A.   That he understands what I just read to

20    him.  And at that particular time, he did not have

21    any questions pertaining to his rights.

22          Q.   Now, at that time, did the defendant

23    invoke his right to have an attorney present?

24          A.   No.

25          Q.   At that time, did the defendant say, no,

82

1    I don't want to talk to you?

2        A.    No.

3        Q.    At that time, did the defendant seem like

4    he was willing to give you a statement?

5        A.    Yes.

6        Q.    How did he indicate that to you?

7        A.    Well, as standard, after reading this

8    bottom paragraph stating that he understood what

9    was read to him, he agreed to speak to us.

10       Q.    Now, were you alone when you read this

11   form to him?

12       A.    No.

13       Q.    Who was with you?

14       A.    Detective Kennedy.

15       Q.    So there were two detectives in there

16   with the defendant?

17       A.    Yes.

18       Q.    Okay.  At any point when y'all were

19   explaining these rights, did you threaten him?

20       A.    No.

21       Q.    Did you ever say, I'm going to go easy on

22   you if you cooperate with us?

23       A.    No, sir.

24       Q.    Did you ever physically touch him or hit

25   him or anything like that?

83

1          A.    No.

2          Q.    Is any of that standard procedure for the

3    Montgomery Police Department?

4          A.    No, it's not.  No.

5          Q.    Do you -- did you do anything in

6    questioning this defendant other than read him that

7    miranda form before this interview started?

8          A.    No.

9          Q.    Now, was there -- how was the interview

10   recorded?

11         A.    The actual -- well, we audiotape and

12   videotape -- not every interview -- this particular

13   one was audio and videotaped.

14         Q.    Why did you do both in this particular

15   case?

16         A.    Not every witness is videotaped.

17   Depending on the severity of the case, such as

18   murder, capital murder.  At this time, we were

19   going for capital murder.  And for that matter, any

20   murder investigation we feel strongly to videotape

21   and interview every defendant or a very crucial

22   witness.

23         Q.    So in going in this interview, was there

24   any question to you whether or not the defendant

25   understood you were about to question him regarding

84

1    the murder of John Farrell?

2       A.   No.

3       Q.   He understood why he was there?

4       A.   Yes, he did.

5       Q.   And he gave you all indications of why he

6    was there?

7       A.   Yes.

8       Q.   Did you explain to him why he was there?

9       A.   He was actually answering questions

10   pertaining to the homicide.

11      Q.   Okay.  Now, have you had an

12   opportunity -- you were there when you took the

13   statement?

14      A.   I was.

15      Q.   Okay.  Now, basically, I want to show you

16   what's been marked as State's Exhibit No. 12.  Do

17   you recognize this?

18      A.   I recognize it to be a videotape and a

19   label stating victim, Jonathan Farrell and the

20   suspect, David Watkins.

21      Q.   Okay.  Now, based on the label from that

22   videotape, does that indicate to you that that

23   would be a fair and accurate copy of the videotaped

24   statement that was taken from David Watkins on the

25   date indicated?

85

1          A.    Yes, it would.

2                    MR. POWELL:  We offer State's 12,

3     Your Honor.

4                    THE COURT:  Admitted.

5                    (State's Exhibit No. 12 was admitted

6                    into evidence.)

7                    MR. POWELL:  Your Honor, we would

8     also like to admit State's 43 at this time.

9                    THE COURT:  Okay.  That's the

10    signed --

11                   MR. POWELL:  The miranda form.

12                   THE COURT:  Admitted.

13                   (State's Exhibit No. 43 was admitted

14                   into evidence.)

15         Q.    Okay.  Now, on top of having a videotape

16    of this statement was there also audiotapes made of

17    it?

18         A.    There was.

19         Q.    Do you have those audiotapes or are they

20    still in the possession of Detective Howton?

21         A.    They may be with Detective Howton out in

22    the hallway.

23                   MR. POWELL:  Your Honor, may I have

24    a moment to get those from Detective Howton?

25                   THE COURT:  Yes.

1                    (Brief moment was taken.)

2          Q.    Now, I'm showing you what I've marked as

3     State's 44.  Do you recognize that?

4          A.    I recognize the envelope.

5          Q.    Would you open that envelope, please?

6     What is it?

7          A.    Two cassette tapes.

8          Q.    Now, Sergeant Loria, based on the

9     markings on the envelope that you just opened, what

10    do those appear to be audio cassette tapes of?

11         A.    Of David Watkins --

12         Q.    Okay.

13         A.    -- pertaining to the interview of

14    David Watkins.

15         Q.    And would those, to your knowledge, be

16    fair and accurate audio depictions of the statement

17    given to you by David Watkins?

18         A.    Yes.

19         Q.    And would those also be just another form

20    of the same information that was taken on that

21    videotape?

22         A.    Yes.  Actually -- what we do, standard

23    is -- and I'm going by this indication of letter A

24    on this particular tape -- by video also has a

25    backup of taping audio.  As well as this, the

87

1    investigator, themselves, most of the time, in my

2    cases, I can say I've always done it.  I would have

3    my own tape recorder and taking audio of that as

4    well should there be any problems with the tapes.

5        Q.    So inside State's 44 there are two

6    cassettes; is that correct?

7        A.    Yes.

8        Q.    And one of them was marked with the

9    letter A; is that correct?

10       A.    Yes.

11       Q.    And that is the audio visual man's backup

12   cassette?

13       A.    I didn't write that.  Yes.

14       Q.    Okay.  And so the unmarked tape would be

15   your audiotape?

16       A.    That's correct.

17       Q.    Okay.

18            MR. POWELL:  We offer State's 44,

19   Your Honor.

20            THE COURT:  Admitted.

21            (State's Exhibit No. 44 was admitted

22            into evidence.)

23       Q.    Now, Sergeant Loria, I want you to think

24   back and just kind of recall in your mind the

25   statement given to you by David Watkins.  I'm not

88

1    going to ask you anything specific about it.  I

2    just want you to ask you about, basically, how loud

3    he was when he gave you a statement.  Was he easy

4    to understand?

5        A.   No, he wasn't.

6        Q.   Why not?

7        A.   Two reasons I can remember this -- one,

8    is because I had to review this briefly prior to

9    coming in here, getting ready for the interview

10   itself.  Second thing is, I've never had a case

11   where someone urinated on a man that was --

12            MR. DURANT:  Objection.

13            THE COURT:  I'm going to sustain and

14   exclude that last portion.

15       Q.   I'm just simply asking you about the

16   manner the defendant --

17       A.   Very low toned mumbling.

18       Q.   Okay.  At some point -- where is the

19   videotape positioned in relation to where you're

20   actually conducting the interview?

21       A.   It would be behind us.

22       Q.   Behind you?

23       A.   That's correct, inside a wall separating

24   the audio and video between a two-way glass.

25       Q.   So, have you had an opportunity to review

89

1    the video portion of the videotape?

2         A.   I worked with the audiotape that was

3    given to me.

4         Q.   So you haven't necessarily listened to

5    the videotape then?

6         A.   No, I haven't.

7         Q.   Okay.  Now, when you are tape recording

8    his statement, that actual cassette tape that

9    you're talking about --

10        A.   Yes.

11        Q.   -- where is that tape recorder?

12        A.   Depending on how the interview, if we had

13   the table set there, we would sit it on the table.

14   I don't recall the position of how the video

15   interview was taken.  It may very well have been --

16   I have a microphone that I would attach to me, and

17   it wouldn't be that far away from the subject --

18   the person being interviewed.

19        Q.   So your audiotape is going to be right

20   there at the defendant?

21        A.   Very close proximity, yes.  Very close

22   proximity.

23        Q.   And the videotape may be stationed

24   somewhere further away?

25        A.   The recording device for the video will

1  be coming out of the ceiling -- directly centered

2  in the room itself.

3      Q.    So, basically, what I'm getting at,

4  Sergeant Loria, is the sound quality on this

5  audiotape and on this videotape may be different?

6      A.    Yes.

7      Q.    Okay.  Do you think it may be necessary

8  after we've had a chance to look at the videotape

9  to listen to both, the video and the audio?  Would

10 that be unreasonable?

11     A.    It wouldn't be unreasonable, no.

12         MR. POWELL:  Okay.  So I want to

13 start with the videotape.

14         THE COURT:  Let me ask.  If for some

15 reason some of you are watching the TV and others

16 the screen, if you cannot see, let me know.

17         (Videotape being played.)

18     Q.    Now, before we get started,

19 Sergeant Loria, just so we're all clear, could you

20 point out Detective Kennedy for the jury?

21     A.    To my right, right there.

22     Q.    And just for the Record, there are three

23 people on the image on the video screen.

24 Detective Kennedy is the one on the far right that

25 we're looking at?

'91

```
 1        A.    That is correct?

 2        Q.    And which one is the defendant?

 3        A.    Standing or sitting between both

 4   detectives right there.

 5        Q.    And, again, just so we're finished here,

 6   which one is you?

 7        A.    To the left.

 8        Q.    All right.

 9              THE COURT:  Let -- is the TV screen

10   interviewing with anyone's view?

11              (Juror raises hand.)

12              THE COURT:  Okay.  Come up here and

13   let me --

14              (Bench conference was held.)

15              THE COURT:  Let me explain.  The TV

16   has the sound.  This does not have the sound.  So

17   we're going to try putting it to the side and see

18   if you can see the big screen and hear the sound

19   from the little screen.

20              MR. POWELL:  Is that blocking y'all

21   now?

22              (Jurors nod.)

23        Q.    Now, Sergeant Loria, does this appear to

24   be the statement that you took from David Watkins?

25        A.    Yes.
```

92

1        (Tape being played.)

2    Q.    Detective Loria, before we go to the

3    audiotaped statement, I want to clarify a couple of

4    things.  Who were the three people that the

5    defendant identified in the house?

6            THE COURT:  Wait just a moment.

7    Anyone that stays in the courtroom, I expect you to

8    sit in a proper manner, not go to sleep.  And if

9    you need to go to sleep, you need to leave the

10   courtroom at this time.  Does anyone want to do

11   that?

12           (No response.)

13           THE COURT:  Then I expect you to sit

14   in the courtroom properly.  And you're not doing

15   so.  Do you understand that?

16       Let's take about a five-minute break.  And if

17   y'all will go to the jury assembly room.

18               (Out of the presence of the jury.)

19           THE COURT:  If anyone is going to

20   sleep in the courtroom, you need to leave now.  I

21   also expect anyone sitting together to sit

22   separately and not be laying or having yourselves

23   all draped over each over.  Now, if you can't do

24   that, you need to leave now or I will cite you for

25   contempt of court.  Do you understand that?  And

93

```
 1.   that's punishable by incarceration and a fine.  If
 2    anyone needs to leave, you need to do so now.  Do
 3    you understand that?
 4                    (Brief recess was taken.)
 5                    (In the presence of the jury.)
 6                    THE COURT:  Okay.  Mr. Powell?
 7        Q.   Sergeant Loria, before we go any further,
 8    who were the four people that the defendant
 9    identified in the house from his statement?
10        A.   Robert Watkins, Jr. who has an alias or
11    is referred to as Junior.
12        Q.   Who was the next person?
13        A.   Himself, David --
14        Q.   Let me stop you right there.  Now, when
15    we're talking about the defendant, David Watkins,
16    does he have an alias or street name?
17        A.   Nard or Nod.  It's -- on the arrest
18    report, Nard.  It's hard to understand.  But we
19    refer to him on the tape with other co-defendants
20    or witnesses as Nod.  Nod or Nard, if that --
21        Q.   Do you know the defendant's middle name?
22        A.   Lenard or Leonard.
23        Q.   Now, the other person that was identified
24    in the Davis -- in the videotape, the female, who
25    was she?
```

1      A.    Latoya Davis, at that particular time,

2    fifteen.  Also referred, if you listen or just

3    watch -- you'll listen to it in a second -- she's

4    referred to as Toya.

5         Q.    That's Latoya Davis?

6         A.    Yes.

7         Q.    And how old is she?

8         A.    At the time of the incident, fifteen.

9         Q.    That's the person that the defendant said

10    did all of this?

11        A.    That's correct.

12        Q.    Now, how old was the defendant at the

13    time the statement was taken?

14        A.    Twenty years old.

15        Q.    What about the other individual,

16    Robert Watkins, Jr.?

17        A.    Twenty-one.  And then, of course -- well,

18    you've heard them say -- refer to as the cat --

19    meaning our victim, John.  And at that particular

20    time, he was twenty-one years of age.

21        Q.    So the victim was twenty-one?

22        A.    Yes.

23        Q.    John Farrell?

24        A.    That is correct.

25        Q.    So we got -- as far as Junior or

95

1    Robert Watkins, he's twenty-one --

2                    THE COURT:  Well, he's testified who

3    was what.  Move on.

4                    MR. POWELL:  Thank you, Your Honor.

5       Q.   Now, I want to play for the jury, the

6    video -- or the audio cassette portion of the

7    statement, because the other was difficult to hear.

8    Now, I'm going to be playing the tape that we

9    marked as Exhibit No. 44 with the letter A on it.

10   Which tape is that?

11      A.   That would be the one where our evidence

12   technician is at in the back room with the audio

13   and video device.

14      Q.   Where is that microphone located?

15      A.   In the -- comes out of the ceiling in the

16   center of the room.

17      Q.   All right.  And this is -- so we're all

18   clear -- this is an audiotap

: of the exact same

19    thing we just watched?

20        A.    Yes.

21                    (Audiotape played.)

22                    (Audiotape stopped.)

23        Q.    Sergeant Loria, on the videotape and the

24    audiotape, you indicated the ending time of that

25    interview; is that correct?

96

```
 1          A.   Yes.

 2          Q.   At any point after that, did you ever

 3     review the defendant?

 4          A.   No, I didn't.

 5               MR. POWELL:  No further questions at

 6     this time, Your Honor.

 7                    CROSS-EXAMINATION

 8     BY MR. DURANT:

 9          Q.   Sergeant Loria, how did you first make

10     contact with David Watkins?

11          A.   Give me a few seconds and let me look

12     that up.

13          Q.   When I say when was the first time, I'm

14     speaking in terms of days.  I'm not talking about

15     any --

16          A.   That evening?

17          Q.   That evening.  That was the 21st?

18          A.   Yes, the 21st.

19          Q.   How was he developed as a suspect?

20          A.   We were advised to pick him up through

21     Lieutenant Shawn Smith.

22          Q.   And do you know on what basis Shawn Smith

23     told you to pick him up?

24          A.   From interviewing a co-defendant, Toya.

25          Q.   Toya.  Are you pretty sure of that?
```

97

1          A.    Based on my recollection, I am.

2          Q.    You're positive that it was based on

3     conversation they had with Toya?

4          A.    I was -- I have to review -- I didn't

5     have a lot --

6          Q.    You didn't review your records before you

7     came in here today?

8          A.    Very briefly.

9          Q.    And you're testifying from what, two

10    year's memory?

11         A.    Yes.

12         Q.    Do you know how many suspects were

13    developed in this case?

14         A.    We had a few.  I don't know a number, no.

15         Q.    What is a few?

16         A.    I don't know a number.

17         Q.    Weren't you involved in this case from

18    day one, so-to-speak, say the 21st, until it was

19    so-called completed, the investigation?

20         A.    Yes.

21         Q.    And didn't you have constant meetings

22    with other detectives in this case?

23         A.    To a point, yes, sir.

24         Q.    Did y'all colloquy bear match over and

25    over?

98

```
 1          A.    We did.
 2          Q.    And then you would return to
 3    headquarters; isn't that correct?
 4          A.    Yes.
 5          Q.    And then meet and converse about possible
 6    suspects?
 7          A.    That is correct.
 8          Q.    And would you say it's a number of, say,
 9    at least twenty suspects were developed?
10          A.    If you have a number, you can tell --
11          Q.    No, I don't have the number.  You're the
12    detective, so I'm asking you.
13          A.    I don't know.
14          Q.    You talked -- do you recall an interview
15    with one person named Maxon?
16          A.    Who.
17          Q.    Devarious Maxon?
18          A.    No.
19          Q.    Do you remember an interview with one
20    Felisha Davis?
21          A.    No.  I would have to read -- no.
22          Q.    Do you recall any conversations that you
23    had with any of your fellow detectives that where
24    Felisha Davis implicated herself in this murder?
25          A.    I don't know a name of a particular
```

99

1  female.  Are you referring to saying, did she say

2  she was there?

3              MR. POWELL:  Your Honor, we're going

4  to object to this.  Who said what to what

5  detective, that's hearsay.

6              THE COURT:  I'm going to sustain

7  that objection.  But you can ask your next

8  question.

9      Q.    Are you aware of Felisha -- are you aware

10  of a female implicating herself in this murder?

11      A.    Not by a name off my head.  Through

12  notes, yes.

13      Q.    When you -- before you talked to

14  David Watkins, you do what you call a

15  pre-interview, right?

16      A.    That's correct.

17      Q.    How long does the pre-interview last?

18      A.    It varies.

19      Q.    But you basically inquire that individual

20  of the same -- the substance of what you testified

21  to what David -- or what was played on the tape,

22  right?

23      A.    Basically.

24      Q.    You know what your answers are going to

25  be before you put them on video?

100

1        A.    No.

2        Q.    You don't?

3        A.    No, I don't.

4        Q.    Well, at some point you said in your

5    interview on the tape, well, when did you kick him?

6    Do you recall saying this to him?

7        A.    Yes.

8        Q.    Well, didn't you ask him about that prior

9    to the video interview?

10       A.    I'm sure I did, yes.

11       Q.    So those are the things I'm talking

12   about.  Don't you ask what you consider to be

13   pertinent questions --

14       A.    Sure.

15       Q.    -- before you do the video?

16       A.    Yes.

17       Q.    And you made sure, isn't it true, that

18   you get your answers down before you put that

19   person on video?

20       A.    No.

21       Q.    Did Mr. -- when you first interviewed

22   Mr. Watkins, did Mr. Watkins tell you that he had

23   been drinking and smoking?

24       A.    I would have to refer to my notes.  I

25   don't recall.

EXHIBIT-2

101

1    Q.    You have to refer to your notes?  How
2    long did it take you --
3    A.    My sups pertaining to this investigation.
4    Q.    Pardon me?
5    A.    My investigative sups.
6    Q.    Now, you don't recall him telling you
7    that he had been smoking and drinking?
8    A.    No --
9              MR. KIDD:  Judge, I'll object unless
10   he can point to a specific time.
11             THE COURT:  Yeah.  Come up here.  We
12   can just take a break, if you need to.
13             (Bench conference was held.)
14             THE COURT:  I don't know how long it
15   will take him to review his notes, but if he needs
16   to -- how long will it take you to look over your
17   notes?
18             THE WITNESS:  Without any
19   disrespect, I know pertaining to my interview with
20   him.  I don't -- I don't know the answers to his
21   questions as far as what he's looking at.
22             THE COURT:  Then we better take
23   about a ten-minute recess.
24        I'm going to give you a ten-minute break, and
25   it will probably be the last one for the day.

102

1    We'll get you in the jury assembly room.  And every

2    spectator needs to remain in the courtroom.

3                    (Out of the presence of the jury.)

4                    THE COURT:  While you're reviewing

5    your notes -- sir, right there, if you would just

6    stay right where you are.

7         I don't know how I can make it clearer, that

8    if you stay in this courtroom, you're not going to

9    go to sleep.  You're not going to be disrespectful.

10        And, Sir, what is your name?

11                   SPECTATOR:  Fred.

12                   THE COURT:  Well, you have been

13   there sleeping it appears to me like; is that

14   correct?

15                   SPECTATOR:  No, ma'am.

16                   THE COURT:  You've just been sitting

17   there nodding.  Well, if you cannot sit in the

18   courtroom and sit up straight -- and tomorrow I

19   want another deputy in here.

20        And, young lady, when you're back there, don't

21   be -- it appears to be, again, you're sleeping

22   during the first part when we came back, you had

23   your head on the side of that bench.  I'm not going

24   to have anyone in this courtroom comport themself

25   in that manner.  Anybody else that does, you're

1    going to be excused and not be able to attend the

2    rest of the trial. Is that clear?  Okay.

3                    (Brief recess was taken.)

4                    (In the presence of the jury.)

5                    THE COURT:  Okay.  We'll resume.  I

6    know you were not aware until today that you were

7    selected for the jury.  I would like to get through

8    with the witness, but we won't keep you too late.

9    Would anybody have to leave, if we had to stay just

10   a few minutes after five?

11                   (Jurors nod.)

12                   THE COURT:  Okay.  Continue.

13                CROSS-EXAMINATION (CONTINUE)

14   BY MR. DURANT:

15       Q.   Have you been able to review your

16   records?

17       A.   A little bit, yes, sir.

18       Q.   And are you able to answer --

19       A.   And the subject does not state that he

20   was intoxicated or had beers at anytime.

21       Q.   It doesn't state that?

22       A.   I didn't see it, no.

23       Q.   And you don't recall that that was the

24   case?

25       A.   No.

104

```
 1          Q.    And let me ask you this.  When you were

 2     giving him his miranda rights, you didn't detect

 3     that he might -- that he was impaired?

 4          A.    No.

 5          Q.    You didn't think anything was unusual

 6     about him?

 7          A.    Which time, sir?

 8          Q.    When he was giving the statement.  When

 9     you were taking the statement from him.

10          A.    Sure.

11          Q.    You did not detect anything unusual about

12     him?

13          A.    Other than he was acting differently on

14     the video opposed to the pre-interview.

15          Q.    And what you mean acting differently?

16          A.    His demeanor was different.

17          Q.    And how was that?

18          A.    As you saw on the tape.

19          Q.    If -- were you concerned that he might

20     not be understanding some of your questions?

21          A.    No.

22          Q.    At one point -- at one point in your

23     interview you asked him if he was okay now; is this

24     correct?

25          A.    That's correct.
```

105

1    Q.    At what -- why did you ask him that?

2    A.    Again, because of the way he was acting

3    on the video.

4    Q.    If you had to look at the video

5    without -- if you had the benefit to look at the

6    video without doing a pre-interview of him -- do

7    you understand me?

8    A.    I understand you.

9    Q.    You had just the benefit of the video,

10    would you consider that he was acting unusual?

11    A.    That's not a fair question, because I got

12    to see him before the video.

13    Q.    Okay.    Prior to -- prior to you putting

14    him on video, did you tell him that you would help

15    him out?

16    A.    No.

17    Q.    That is not something that officers say

18    to defendants from time to time in pre-interviews,

19    Listen, if you'll cooperate, I'll help you out.

20    A.    No.    What we do tell them -- what I can

21    tell you from experience is what we do tell them is

22    we don't have a decision in this matter.

23    Q.    And that's -- that's all you tell him,

24    You don't have a decision in this matter?

25    A.    That's correct.

106

1     Q.    You didn't intimidate him in any manner?

2     A.    No.

3     Q.    You didn't threaten him?

4     A.    No, sir.

5     Q.    Were you able to ascertain that

6  Mr. Watkins did not know Mr. Farrell, prior to

7  that -- prior to the time -- prior to that evening?

8     A.    I do not know if they had any type of

9  relationship, whether be acquaintance or not, no,

10 sir.

11    Q.    You didn't ask him that in the

12 pre-interview?

13    A.    He, according to the interview, he did

14 not know him.

15    Q.    You said you got -- you got word from

16 Shawn Smith to go pick Mr. Watkins up, right?

17    A.    That is correct.

18    Q.    When you -- when you went to pick

19 Mr. Watkins up, isn't it normal police procedure --

20 did you draw your weapon?

21    A.    I don't recall if I did.  It would be if

22 it was a felony suspect wanted for murder, yes,

23 sir, I would do it.  And I have done it in the

24 past.

25    Q.    And do you recall whether you drew your

1    weapon inside the house or outside of the house?

2         A.    I would have it out prior to making entry

3    into the residence, yes, I would. Therefore, if he

4    was inside the house, which he was when we took him

5    into custody, out of practice, it would be fair to

6    say, yes, I had my weapon drawn.

7         Q.    When you got into the house, wasn't

8    Mr. Watkins on the telephone?

9         A.    Yes, he was.

10        Q.    And did you tell him to put the phone

11   down and put the beer can down?

12        A.    I don't recall that. I -- I recall

13   telling him to get off the phone, yes.  Whether

14   there was a beer can or not, I don't recall.

15        Q.    But if you saw him with a beer can and

16   you took him to police headquarters, wouldn't it be

17   prudent police procedure to ask him whether he's

18   okay or whether he's been drinking or whether he's

19   been smoking pot or whether he could answer your

20   questions?

21        A.    If I saw him with a beer can.  It's not

22   saying that I did see him with a beer can.

23        Q.    But the fact that you don't recall

24   doesn't mean that you didn't see it.  You just

25   don't recall?

1    A.   Nor does it mean that I did see him with

2  one.

3              THE COURT:   Just answer his

4  question.

5    A.   No, I don't recall.

6    Q.   Let me ask you.   Did you personally

7  receive any unanimous calls during this

8  investigation concerning who might be involved in

9  this murder?

10   A.   I did not personally receive a call.

11   Q.   Do you know of anyone who received a

12 call?

13   A.   Yes, I do.

14   Q.   And it was more than one; is that

15 correct?

16   A.   I believe two.

17   Q.   But those calls did not implicate

18 Mr. Watkins?

19   A.   At that time, no.

20   Q.   Did Mr. -- Mr. Watkins never admitted to

21 you that he conspired to hurt Mr. Farrell, did he?

22   A.   No.

23   Q.   He never conceded to you that he shot

24 Mr. Farrell, did he?

25   A.   No.

109

1    Q.   The only things -- the only things he

2    conceded to, is it not, that he urinated on him and

3    he kicked him four times; is that correct?

4    A.   Yes, sir.

5    Q.   I'm going to -- you said that you can't

6    recall whether he was drinking or whether he said

7    he was drinking or whether he was drunk, I'm going

8    to show you what --

9              MR. DURANT:   Judge, may I approach?

10             THE COURT:   Sure.

11   Q.   I'm going to show you what is called --

12   what you know and what it says is an Alabama

13   Uniform Arrest Report.

14   A.   Okay.  Under drinking, it says drinking.

15   Q.   Yeah.  And you prepared that report;

16   isn't that true?

17   A.   Yes, my name is on it.

18   Q.   So he did, at least, tell you that he was

19   drinking; isn't that correct?

20   A.   I don't recall him telling me he was

21   drinking.

22   Q.   But it's in the report, is it not?

23   A.   It's not saying that he's telling me he

24   was drinking.

25   Q.   But why would --

110

1     A.   I don't know, as far as -- I don't know if

2    I observed that he was drinking at the time or if

3    he had been drinking or he told me he was drinking.

4     Q.   Well, who would make the notation that he

5    was drinking?

6     A.   I would or whoever completes the arrest

7    report.

8     Q.   So more than likely, you were the one

9    that made that notation, right?

10     A.   Yes.

11             MR. DURANT:  Judge, may I enter this

12    into evidence?

13             MR. KIDD:  May we look at it?

14             (Mr. Durant hands it to Mr. Kidd.)

15             MR. KIDD:  Judge, I have an

16    objection as to being hearsay.

17             THE COURT:  Well, I'll take that up

18    at the break.  I'll just reserve ruling.

19             MR. DURANT:  No further questions.

20             THE COURT:  Anything else for this

21    witness?

22             REDIRECT EXAMINATION

23    BY MR POWELL:

24     Q.   Sergeant Loria, as this investigation

25    proceeded to its conclusion, were you able to

111

```
 1    eliminate all other suspects except for this

 2    defendant, Latoya Davis, and Robert Watkins?

 3         A.    That is correct.

 4                   MR. POWELL:  No further questions,

 5    Judge.

 6                   THE COURT:  Okay.  You can step

 7    down.  You're excused -- can he --

 8                   MR. KIDD:  He can be excused as far

 9    as the State is concerned, Your Honor.

10                   THE COURT:  Do you have a witness

11    that may not take very long?

12                   MR. KIDD:  Judge, our next witness

13    is quite lengthy.

14                   THE COURT:  I'm going to excuse you

15    until tomorrow at nine.  We'll get you in the jury

16    assembly room at that time.  And when you go home,

17    if anybody ask you about the case, just say the

18    Judge said I can't talk about it.  We'll see you in

19    the morning.

20                   (Out of presence of the jury.)

21                   THE COURT:  Can I see that?

22                   MR. KIDD:  Judge, we don't have any

23    objection.

24                   THE COURT:  Okay.  Admitted.

25                   (Defendant's Exhibit No. 1 was
```

112

```
 1                        admitted into evidence.)
 2                        (Court adjourned for the afternoon.)
 3                        (Tuesday, May 15th, 2001, in the
 4                        presence of the jury.)
 5                   THE COURT:  Good morning.  Okay.
 6       Are you ready with your next witness?
 7                   MR. POWELL:  Your Honor, the State
 8       calls Sergeant Ricky Huett.
 9                   THE COURT:  And if you would raise
10       your right hand, please.
11                        WILLIAM R. HUETT
12          The witness, having first been duly sworn or
13       affirmed to speak the truth, the whole truth, and
14       nothing but the truth, testified as follows:
15                        DIRECT EXAMINATION
16       BY MR. POWELL:
17          Q.   Good morning, Sergeant Huett.  Could you
18       state your name for the jury?
19          A.   It's William R. Huett.
20          Q.   And how are you employed?
21          A.   I work for the Montgomery Police
22       Department in the Crime Division of the Crime Scene
23       Bureau.
24          Q.   Now, how long have you been with the
25       Montgomery Police Department?
```

113

1.    A.    Since September of 1981.

2.    Q.    And what is your current capacity in the

3.    detective division in the crime scene bureau?  What

4.    does that mean?

5.    A.    I'm a sergeant in what we call the crime

6.    scene bureau of the detective division, and,

7.    basically, we respond to crime scenes and process

8.    evidence for fingerprints.  We photograph crime

9.    scenes.

10.    Q.    Are you also known as an evidence tech?

11.    A.    Yes, sir.

12.    Q.    So is it a fair statement to say that one

13.    of your primary roles on a crime scene is to

14.    collect evidence?

15.    A.    Yes, sir.

16.    Q.    And, generally, how are you qualified to

17.    do that?  What training have you had in collecting

18.    evidence?  Just briefly.  You don't have to go into

19.    extensive detail.  Just give us some idea the

20.    training the police department requires for you to

21.    hold that position.

22.    A.    Basically, your first training is

23.    on-the-job training where you ride with a senior

24.    officer for approximately three months, depending

25.    on the amount of training that you receive.  And

114

1    then, of course, you attend schools.  And I've

2    attended several local schools and two schools at

3    the FBI Academy in Quantico in reference to the

4    collection of evidence.

5        Q.    Now, Sergeant Huett, I want to focus your

6    attention on a crime scene that occurred back in

7    October of 1999, that involved a victim by the name

8    of John Christopher Farrell.  Are you familiar with

9    that crime scene?

10        A.    Yes, sir.

11        Q.    Were you the evidence tech on that crime

12    scene?

13        A.    Yes, sir.

14        Q.    What all did -- just give us kind of an

15    overview of everything you did on that crime scene,

16    just real quick.

17        A.    I photographed it.  I collected evidence.

18    I made a crime scene videotape, which basically is

19    a video of the crime scene and the area surrounding

20    it.  And transported the evidence -- processed some

21    evidence for fingerprints and transported the

22    evidence to the forensic science.

23        Q.    Now, let's start with the photographs.

24    You actually took the photographs of the crime

25    scene?

115

1    A.    Yes, sir.

2    Q.    And I'm also going to refer you to what's

3   already been entered into evidence as State's 1,

4   the crime scene video.  Do you know who took this

5   video?

6    A.    Yes, sir.

7    Q.    Who did?

8    A.    I did.

9    Q.    And whose voice is on this video?

10    A.    Mine.

11    Q.    Okay.  So that was you that the jury

12   heard when we played the video?

13    A.    Yes, sir.

14    Q.    And that was you working the camera?

15    A.    Yes, sir.

16    Q.    Okay.  Now, I want to run through these

17   photographs real quick with you, Sergeant Huett,

18   and then we'll go to the computer monitor.  I'm

19   going to show you what's been marked as State's 14.

20   Do you recognize that?

21    A.    Yes, sir.

22    Q.    What is it?

23    A.    It's a picture of a cigar box.

24    Q.    Now, did you find that on the crime

25   scene?

116

```
 1        A.   Yes, sir.

 2        Q.   Okay.  Is that a fair and accurate copy

 3   of the picture of that cigar box?

 4        A.   Yes, sir.

 5             MR. POWELL:  We offer State's 14,

 6   Judge.

 7             THE COURT:  Admitted.

 8             (State's Exhibit No. 14 was admitted

 9             into evidence.)

10        Q.   I'm showing you what's now been marked as

11   State's 16.  Do you recognize that?

12        A.   Yes, sir.

13        Q.   Did you take that picture?

14        A.   Yes, sir.

15        Q.   Did you take State's 14?

16        A.   Yes, sir.

17        Q.   Now, going back to 16, what is that?

18        A.   It's a shell casing in the water in the

19   ditch.

20        Q.   Okay.  Is that a fair and accurate

21   depiction of that shell casing where you found it

22   on that day?

23        A.   Yes, sir.

24             MR. POWELL:  We offer State's 16,

25   Judge.
```

117

```
 1            THE COURT:  Admitted.
 2            (State's Exhibit No. 16 was admitted
 3            into evidence.)
 4       Q.   Now, I'm showing you State's 18.  Do you
 5   recognize that?
 6       A.   Yes, sir.
 7       Q.   What is it?
 8       A.   It's a picture of a cloth that had blood
 9   on it, a wooden block that was in the street of 600
10   Block of Keystone.
11       Q.   And that's a photograph of an area of
12   this crime scene that we're talking about in this
13   case today?
14       A.   Yes, sir.
15       Q.   Did you take that photograph?
16       A.   Yes, sir.
17       Q.   Is it a fair and accurate depiction of
18   what you've just described?
19       A.   Yes, sir.
20            MR. POWELL:  We offer State's 18,
21   Judge.
22            (State's Exhibit No. 18 was admitted
23            into evidence.)
24       Q.   Now, I'm showing you State's 21.  What is
25   that?
```

118

1      A.     This is the blood stain that is on the --
2   still on Keystone Street -- no.

3      Q.     Take a second there to compare it to your
4   notes, if you need to, Sergeant.  You took these
5   photos back in '99?

6      A.     Yes, sir.

7      Q.     And you took several of them, didn't you?

8      A.     Yes, sir.

9      Q.     It's kind of hard to keep track of all
10  that in your head, isn't it?

11                 MR. DURANT:  Objection, Judge.

12                 THE COURT:  Sustain.  Don't make
13  comments.  Disregard that.

14     A.     These are the stains on the ground in the
15  600 Block of Keystone Street.  There's the fence
16  and the wooden block would be over in this area.

17     Q.     You're talking about State's 21?

18     A.     Yes.

19     Q.     Is that a fair and accurate depiction of
20  all that?

21     A.     Yes, sir.

22                 MR. POWELL:  We offer State's 21,
23  Judge.

24                 THE COURT:  Admitted.

25                 (State's Exhibit No. 21 was admitted

119

```
 1                        into evidence.)

 2        Q.   And this is State's 22.  Do you recognize

 3   that?

 4        A.   Yes, sir.

 5        Q.   What is it?

 6        A.   This is a picture of the blood on the

 7   roadway in the 600 Block of Keystone Street.

 8        Q.   Is that a fair and accurate picture of

 9   that bloodstain?

10        A.   Yes, sir.

11                  MR. POWELL:  We offer 22, Judge.

12                  THE COURT:  Admitted.

13                  (State's Exhibit No. 22 was admitted

14                  into evidence.)

15        Q.   And this is State's 24.  What is that?

16        A.   This is a .380 caliber shell casing.

17        Q.   Is it a fair and accurate depiction of

18   that shell casing you recovered?

19        A.   Yes, sir.

20                  MR. POWELL:  We offer State's 24,

21   Judge.

22                  THE COURT:  Admitted.

23                  (State's Exhibit No. 24 was admitted

24                  into evidence.)

25        Q.   And all of these photographs that we just
```

120

1   made reference to, you actually took all of those;

2   is that correct?

3          A.    Yes, sir.

4          Q.    Okay.  Now, Sergeant Huett, I'm going to

5   refer you to this photograph on the overhead

6   projector.  It's already been admitted as State's

7   Exhibit 2.  Do you recognize that scene?

8          A.    Yes, sir.

9          Q.    What is it?

10         A.    This is an aerial view of the scene at

11  the dead end of Keystone Street where the railroad

12  tracks run across the ditch and as Keystone goes up

13  toward Day Street.

14         Q.    Now, I'm going to show you what we

15  offered as State's 42, I believe.  Do you recognize

16  this kind of graphical depiction of the photograph?

17         A.    Yes, sir.

18         Q.    Okay.  Now, on this, could you point out

19  for the jury -- and you can use this.  Just hit

20  that button right there.  Could you point out for

21  the jury where the residence at 659 Keystone is

22  located?

23         A.    It's right there.

24         Q.    Did you find some evidence in front of

25  that residence?

121

1      A.    I photographed the bloodstain on the

2  ground on the roadway.

3      Q.    Now, this photograph right here, we just

4  offered as State's Exhibit 22.  Is that the

5  bloodstain that you're referring to?

6      A.    Yes, sir.

7      Q.    Okay.  Now, that diagram has an arrow and

8  a circle.  Is that the location where you found

9  that bloodstain?

10     A.    Yes, sir, that would be approximately it.

11     Q.    Now, what's that a photograph of?

12     A.    That's a photograph of a cloth.

13     Q.    Could you use the pointer there and show

14 the jury the cloth you're referring to?

15     A.    Right here.

16     Q.    You're using the pointer now to point to

17 what's been marked and admitted as State's 18.

18     A.    This was the cloth.

19     Q.    Now, was that cloth significant to you?

20     A.    Yes, sir.

21     Q.    Why?

22     A.    It had blood on it.

23     Q.    Now, how long have you been an evidence

24 tech?

25     A.    Since August of '87.

122

```
 1          Q.    Have you processed blood at a crime scene
 2     before?
 3          A.    Yes, sir.
 4          Q.    How many times?
 5          A.    I don't know.  It's a large number.
 6          Q.    So you've seen blood before?
 7          A.    Yes.
 8          Q.    And you're telling the jury -- is that
 9     blood on that rag to your knowledge?
10          A.    Yes, sir.
11          Q.    Now, what else does that photograph in
12     State's 18 show us?
13          A.    It also shows a wooden block right here.
14          Q.    Is there any other evidence that you can
15     show the jury in State's 18?
16          A.    No, sir.
17          Q.    Now, we're showing you what's been
18     admitted as State's 3.  What's that a photograph
19     of?
20          A.    That's a picture of the victim.
21          Q.    Does that circle and arrow correctly
22     indicate where the victim was found on the diagram?
23          A.    Yes, sir.
24          Q.    And that's the position you observed the
25     victim in?
```

123

1      A.    Yes, sir.

2      Q.    Now, Sergeant Huett, I want you to take a

3  second and look at all three of these photographs.

4  That's basically our overall crime scene right

5  there.  There's a couple things that we haven't put

6  in yet.  But the general area is on Keystone Street

7  where you collected most of your evidence; is that

8  a fair statement?

9      A.    Yes, sir.

10     Q.    Now, we've got -- what is that?

11     A.    That's the stain in front of 659 Keystone

12  Street in the roadway.

13     Q.    And that photograph?

14     A.    And that indicates the cloth and the

15  wooden block over in front of 668 Keystone.

16     Q.    Now, I want to use this photograph for a

17  second and refer to the diagram behind it.  Now,

18  were these items that you collected found directly

19  across from each other?

20     A.    I'm not sure.  I don't remember.

21     Q.    You don't remember for sure?

22     A.    No.

23     Q.    But do those circles indicate the

24  approximate location where you found those?

25     A.    Yes, sir.

124

```
 1          Q.    But you do know they were found in the
 2    same vicinity?
 3          A.    Yes, sir.
 4          Q.    In between those two residences you just
 5    made reference to?
 6          A.    Yes, sir.  I just don't remember if they
 7    were straight across from each other.
 8          Q.    Okay.  Now, what -- we've put State's 24
 9    on the board there down in the lower left-hand
10    corner.  What's that a photograph of -- let me show
11    you State's 24 close up so you can see.
12          A.    This is a photograph of the .380 caliber
13    casing.
14          Q.    Okay.  Is that the casing you're
15    referring to?
16          A.    Yes, sir.
17          Q.    Okay.  Now, where was that casing found?
18          A.    It was on Knox Street.
19          Q.    About what vicinity of Knox Street?  Can
20    you remember?
21          A.    It was approximately half way down the
22    street from Keystone until the next street --
23          Q.    Okay.
24          A.    -- which would be -- approximately in
25    that area.
```

125

1        Q.    There's an arrow depicting Knox Street.

2   Is that arrow a fair and accurate depiction of

3   where you found that shell casing?

4        A.    Yes, sir.

5        Q.    Now, I want to refer you to the area

6   that's indicated in that large oval.  What is that

7   area?

8        A.    That's -- it holds where the victim was

9   located at the bottom.  Two piles of dirt at the

10  end -- at the dead end of Keystone Street, then

11  goes up to the intersection of Keystone and Knox.

12       Q.    Now, is that a photograph of -- the

13  actual photograph of those dirt pounds that we were

14  talking about?

15       A.    Yes.

16       Q.    Okay.  Now, did you recover any physical

17  evidence from the area of that dirt mound there?

18       A.    Yes, sir.

19       Q.    What was that?

20       A.    A cigar box.

21       Q.    Now, I'm showing you what's already been

22  admitted as State's 14.  Is that the cigar box

23  you're referring to?

24       A.    Yes, sir.

25       Q.    Is that the area where you recovered the

126

1    cigar box from that dirt mound?

2        A.    Yes, sir.

3        Q.    Okay.  Now, do you have some physical

4    evidence with you, Sergeant Huett?

5        A.    Yes, sir.

6        Q.    Could you produce that cigar box for us?

7        A.    (Witness complies.)

8        Q.    Okay.  You just got a small bag out of a

9    large bag.  What was the impound number on the

10   large bag?

11       A.    189357.

12       Q.    Now, before coming to court today, was

13   that bag sealed and closed?

14       A.    Yes, sir.

15       Q.    And who opened the seal on that bag?

16       A.    I did.

17       Q.    Okay.  Now, what bag did you take out of

18   there?

19       A.    I took the bag labeled R-3.

20       Q.    Okay.  Now, we're going to mark the

21   overall impound -- withdraw that.  Keep going,

22   Sergeant Huett.  Okay.  From the bag R-3, what have

23   you produced?

24       A.    Middleton's Black and Mild Cigar Box.

25       Q.    Sergeant, I'm going to mark these

127

```
 1        State's 15.  Now, is this the same cigar box that's

 2     depicted in that photograph that you recovered from

 3     the crime scene?

 4            A.   Yes, sir.

 5                    MR. POWELL:  Your Honor, we offer

 6     State's 15 at this time.

 7                    THE COURT:  Admitted.

 8                    (State's Exhibit No. 15 was admitted

 9                    into evidence.)

10            Q.   Now, did you do anything to that cigar

11     box other than collect it?

12            A.   Yes, sir.

13            Q.   What?

14            A.   I processed it for fingerprints.

15            Q.   Did your processing of that cigar box for

16     fingerprints reveal anything?

17            A.   No, sir.

18            Q.   What does that mean?

19            A.   It means there was no fingerprint -- we

20     call it ridge detail present on the box.

21            Q.   You call it what?

22            A.   Ridge detail.

23            Q.   Ridge detail?

24            A.   Yes, sir.

25            Q.   What's that referring to?
```

128

```
 1          A.    It's referring to what is called friction
 2   of the skin, which is on the tips of your fingers.
 3          Q.    So that box didn't tell you anything as
 4   far as fingerprints go?
 5          A.    Yes, sir.
 6          Q.    Okay.  Now, I'm referring to a photograph
 7   on our overhead that's already been admitted as
 8   State's 3.  Did you take that photograph?
 9          A.    Yes, sir.
10          Q.    And does that depict the way y'all found
11   Mr. Farrell's body in that ditch that day?
12          A.    Yes, sir.
13          Q.    Is that a close-up of the same body?
14          A.    Yes, sir.
15          Q.    Now, what's the white there located, kind
16   of the area of his pants?
17          A.    It's where his pockets have been turned
18   inside out.
19          Q.    Is that another angle of the body?
20          A.    Yes, sir.
21          Q.    Now, I want to go and talk to you about
22   what we admitted as State's 16.  Is that a
23   photograph of State's 16?
24          A.    Yes, sir.
25          Q.    What is that?
```

129

1      A.    It's a .22 caliber shell casing.

2      Q.    Now, do you have that .22 caliber shell

3   casing in your possession?

4      A.    Yes, sir.

5      Q.    Okay.  Before we get to that, let's go

6   back one step.  How do you know it was a .22

7   caliber shell casing?

8      A.    When I picked it up, I looked at it.

9      Q.    Did it say that on there?

10     A.    I thought it did.

11     Q.    Okay.  Well, let's look at it.  Just for

12  the Record, Sergeant, can you read the impound

13  number of that package you're opening right there?

14     A.    189357.

15     Q.    And the -- what's the smaller package

16  you're opening from that?

17     A.    It's labeled R-1.

18     Q.    Okay.  And just for the Record is R-1

19  still sealed at this time?

20     A.    Yes, sir.

21     Q.    And in order to open that, you're having

22  to break the seal on that package; is that correct?

23     A.    Yes, sir.  Do you have a knife?

24     Q.    I don't have one.  I'm a bad lawyer.

25  Okay.  Now, what have you produced out of R-1

130

1   there?  What are you holding in your hand?

2        A.   Shell casing.

3        Q.   Now, is that the same shell casing that's

4   depicted in this photograph here that was recovered

5   next to the victim's body?

6        A.   Yes, sir.

7             MR. POWELL:  Your Honor, at this

8   time, we would like to mark this shell casing as

9   State's 17 and offer it.

10            THE COURT:  Okay.  Admitted.

11            (State's Exhibit No. 17 was admitted

12            into evidence.)

13       Q.   Now, take a second, Sergeant Huett, and

14   look at that shell casing for me?

15       A.   (Witness complies.)

16       Q.   Does it indicate to you that's it's a .22

17   caliber shell casing?

18       A.   No, sir.

19       Q.   How long have you been working around

20   bullets and things like that?

21       A.   Since August of 1987.

22       Q.   And you've seen shell casings similar to

23   that before?

24       A.   Yes, sir.

25       Q.   And in your training and experience with

131

1    the Montgomery Police Department, what kind of

2    shell casing is that?

3         A.   A .22 caliber.

4         Q.   Now, there's an arrow from the shell

5    casing to an area of the body, does that fairly and

6    accurately reflect where you recovered that shell

7    casing from?

8         A.   Yes, sir.

9         Q.   Okay.  Now, how close -- or what's your

10   best judgment of how close that shell casing was to

11   the victim's body?

12        A.   If I remember correctly, it was

13   approximately between one and two feet.

14        Q.   A couple feet?

15        A.   Yes, sir.

16        Q.   Okay.  Now, from your examination of that

17   shell casing right there, can you tell what type of

18   weapon it was fired from?

19        A.   The brand?

20        Q.   Not anything specific.  Just pistol,

21   revolver or anything --

22        A.   No, sir.

23        Q.   No, you can't?

24        A.   No, sir.

25        Q.   Okay.  Now, what's that a photograph of?

132

1      A.    It's a photograph of the injuries to the

2   victim's head.

3      Q.    Okay.  How many injuries did you

4   personally observe on the victim's head?

5      A.    Two.

6      Q.    Do you still have that remote control,

7   Sergeant?

8      A.    Yes, sir.

9      Q.    Using that laser pointer, point out the

10  two injuries you're referring to.

11     A.    One is here.  And the other is here.

12     Q.    Now, could you tell whether or not one of

13  those injuries was a gunshot wound?

14     A.    No, sir.

15     Q.    So from your training and experience, you

16  can't really tell us anything about the nature of

17  those two injuries?

18     A.    They appear to be a gunshot wound.

19     Q.    That's fine, Sergeant.  But that's one of

20  the injuries where the arrow is indicating?

21     A.    Yes, sir.

22     Q.    And that's the other one.  Now, do both

23  of those appear to be gunshot wounds to you or --

24     A.    Yes, sir.

25     Q.    To you, they both look like gunshot

133

wounds?

    A.   Yes, sir.

    Q.   Now, Sergeant Huett, when we made reference, I believe it was in State's 23 or 24, to a .380 caliber shell casing, do you have that shell casing in your possession?

    A.   Yes, sir.

    Q.   Could you get that out for us?

    A.   (Witness complies.)

         MR. DURANT:  Judge, may we approach?

         THE COURT:  Sure.

         (Bench conference was held.)

    Q.   Now, do you have -- what did you pull out of the bag there?

    A.   This is a .380 caliber shell casing.

    Q.   And is that the same shell casing that was in the photograph that you collected from Knox Street over at the crime scene?

    A.   Yes, sir.

    Q.   And you were the one that collected that shell casing?

    A.   Yes, sir.

    Q.   Is that the exact same shell casing that you collected from the crime scene?

    A.   Yes, sir.

134

1    Q.    And is it in the same or substantially

2    the same condition as it was the day you collected

3    it?

4    A.    Yes, sir.

5              MR. POWELL:    I'm going to mark that

6    as State's 24 and offer it at this time.

7              THE COURT REPORTER:    I have you down

8    for a 24 already.

9              MR. POWELL:    Well, 24A.

10             (State's Exhibit No. 24A was

11             admitted into evidence.)

12   Q.    Now, Sergeant Huett, we've been over the

13   blood and the other physical evidence you collected

14   from that crime scene.  Did you collect any other

15   physical evidence on that day from that particular

16   crime scene aside from photographs?  I'm not

17   talking about photographs.

18   A.    Yes, sir, I collected a blue nylon

19   jacket.

20   Q.    You're talking about clothing of the

21   victim at this point?

22   A.    It was actually up under the victim.  And

23   that cloth that was referred to.

24   Q.    Now --

25   A.    And I also collected a sample from the

135

1    bloodstain in the street near the 600 block of

2    Keystone Street.

3         Q.   Now -- and we've seen photographs of the

4    locations of all this physical evidence that you

5    collected at this time?

6         A.   Yes, sir.

7                   MR. POWELL:   Thank you.

8                   CROSS-EXAMINATION

9    BY MR. DURANT:

10        Q.   Sergeant Huett, you did testify, did you

11   not, that no fingerprints were -- you were not able

12   to lift any prints from any of the evidence that

13   you collected; is that correct?

14        A.   Yes, sir.

15        Q.   You were not able to lift any prints that

16   would show that's the prints of David Watkins,

17   would you?

18        A.   No, sir, I was not able to lift any

19   fingerprints.

20        Q.   And the blood that you were able -- you

21   collected blood samples, right, from Keystone

22   Street?

23        A.   Yes, sir.

24        Q.   And were you able to determine whose

25   blood that was?

136

1       A.    I submitted it to the Department of

2   Forensic Sciences, and I'm unaware of the results.

3       Q.    And you are aware -- you just testified

4   on direct that you could observe -- from your

5   training, you could observe two gunshots in the

6   head of Mr. Farrell; is that correct, that it

7   appeared to be gunshot wounds?

8       A.    Yes, sir.  The two injuries appeared to

9   be a gunshot wounds.

10      Q.    And you were only able to -- you were

11  only able to recover one shell casing -- a .22

12  shell casing; is that correct?

13      A.    I recovered a .22 caliber shell casing

14  beside the victim and the .380 caliber casing up on

15  Knox Street.

16      Q.    How far is Knox Street from where the

17  victim was ultimately found?

18      A.    It -- I would guess a couple hundred

19  yards?

20      Q.    A couple of hundred yards?

21      A.    Yes, sir.

22      Q.    Were you able to determine whether a .380

23  caliber weapon was used in this -- in this murder?

24      A.    No, sir.

25      Q.    Is it -- in your experience, is it

137

1    unusual in canvassing an area -- and, obviously,

2.   you canvas a wide area -- in canvassing an area, is

3    it unusual to find paraphernalia that might

4    seemingly relate to a crime, but, in fact, is not?

5    Do you understand my question?

6         A.   It happens.  What your question is:  Do

7    we find things that are unrelated?  Yes, sir.

8         Q.   Okay.  So what you do is just, whatever

9    is in your view -- as far as the -- particularly in

10   your concern -- whatever is in your view, you'll

11   collect because you don't know what it's about?

12        A.   Yes, sir.

13        Q.   And are you -- are you aware -- are you

14   aware -- are you aware that this is a high crime

15   area?

16        A.   No, sir.

17        Q.   Are you aware that there is gun fire

18   frequently in this particular area?

19        A.   Yes, sir.

20        Q.   So it's nothing unusual for you to have

21   recovered a .380 caliber casing, is it?

22        A.   Yes, sir, I would think you would find

23   something.

24        Q.   You'll think that you would find

25   something?

138

1          A.    Yes, sir.

2          Q.    And going back to your -- your -- your

3    responsibilities mainly are just to collect

4    evidence?

5          A.    Yes, sir.

6          Q.    And it's probably somebody else's

7    responsibility to make a determination as to

8    whether -- as to what that evidence is, whether it

9    contains this person's blood or that person's

10   blood; is that correct?

11         A.    Yes, sir.

12         Q.    And as far as you know, nothing that you

13   collected had any relationship to

14   Mr. David Watkins, as far as you know?

15         A.    I collected some oral swabs that I got

16   that were supposed to be identified to be from

17   Mr. Watkins.

18         Q.    Okay.  Some oral swabs?

19         A.    Yes, sir.

20         Q.    Of Mr. Watkins?

21         A.    No, sir.  I got them from supply.

22         Q.    Okay.  But they were taken from

23   Mr. Watkins?

24         A.    To my knowledge, yes, sir; they were.

25         Q.    Okay.  As far as you know -- as far as

139

1    you know, there is nothing that -- strike that.  As

2    far as the cloth and the blood is concerned, you

3    said you found that across the street?

4         A.    I found it in the street near 668

5    Keystone.

6         Q.    And that's the house across the street, I

7    take it?

8         A.    It was across from 659, yes, sir.

9         Q.    Okay.  And you don't know what -- what --

10   whose blood that was?  Do you know?

11        A.    No, sir.

12        Q.    But, again, in terms of -- in terms of

13   collecting evidence, it's nothing unusual to find

14   that kind of paraphernalia around the streets; is

15   that correct?

16        A.    It's unusual to find a bloody cloth in

17   the street, yes, sir.

18        Q.    A bloody cloth?

19        A.    Yes, sir.

20        Q.    And you only found one bullet at the --

21   with the body; is that correct?

22        A.    One shell.

23        Q.    One shell, I should say?

24        A.    Casing, yes, sir.

25               MR. DURANT:  That's all.

MR. POWELL:  Briefly, Your Honor.

### REDIRECT EXAMINATION

BY MR. POWELL:

Q.    Sergeant Huett, Mr. Durant just asked you about the shell casings.  I want to ask you this. Did they ever recover any type of weapon in this case?

A.    Not to my knowledge, no, sir.

Q.    In your experience, would you need the weapon to do any type of ballistic testing to compare and match any kind of bullets to a gun?

A.    Yes, sir.

Q.    Was that possible in this case without a weapon?

A.    Without a weapon, it would not be possible.

Q.    Okay.  Now, let's talk about those injuries to his head for a second.  Now, you say, in your opinion, they look to you like gunshots; is that right?

A.    From my opinion, they appeared to be from a gun.

Q.    Okay.

A.    Whether one is entrance and one is exit, I don't know or if they're two separate wounds.

141

1    Q.   Now, from your training and experience,

2    would you consider that opinion to be absolutely

3    conclusive as to the nature or type of these

4    wounds?

5                    MR. DURANT:  Objection.

6    A.    No.

7                    THE COURT:  I didn't hear all of the

8    question.

9                    MR. POWELL:  I'll rephrase it, Your

10   Honor.

11   Q.   Now, are you -- in you -- are you for

12   certain -- let me rephrase it.  How certain are you

13   that both of those injuries were gunshots?

14                   MR. DURANT:  Objection.

15                   THE COURT:  Sustained.

16   Q.   Now, let's talk about those fingerprints.

17   You didn't get any lifts off that box?

18   A.    Yes, sir -- no sir, I didn't get any

19   lifts.

20   Q.   What are some reasons why you wouldn't

21   get fingerprint lifts off a box like you found?

22                   MR. DURANT:  Objection.

23                   THE COURT:  That's a rather broad

24   question.  Let's focus on that case.

25   Q.   Sergeant, I want to refer to that

142

1    specific cigar box that we admitted into evidence.

2    Do you have any reasons why you would have been

3    unable to obtain fingerprints off of that piece of

4    evidence?

5         A.    First thing is, is depending on the way

6    the person touched the cigar box originally.    And

7    then with the amount of pressure that was applied,

8    what type of fingerprint --

9                   MR. DURANT:   Objection.

10                   THE COURT:   I'm going to sustain the

11    objection.   Just state your question again and

12    don't go any further than necessary to answer it.

13        Q.    So one reason would be the way they

14    touched the box?

15        A.    Yes, sir.

16        Q.    Are there any other reasons?

17        A.    The material the box is made out of.

18        Q.    What material is it made out of?

19        A.    It's made out of a light paper.

20        Q.    And why would that have anything to do

21    with whether it takes a fingerprint or not?

22        A.    Because smooth surfaces tend to -- you

23    tend to leave fingerprints on them more readily.   A

24    surface that's indented or pushes down or something

25    is not as readily to leave a fingerprint on.

143

| 1 | Q. So which kind of surface is that cigar |
| 2 | box? |
| 3 | A. It's one that's light that you don't have |
| 4 | to put a lot of pressure on it. |
| 5 | Q. Are there any other reasons why a |
| 6 | fingerprint might not take on that cigar box? |
| 7 | MR. DURANT: Judge, I object to this |
| 8 | line of questioning. |
| 9 | MR. POWELL: We'll move on, Your |
| 10 | Honor. |
| 11 | Q. Now, Sergeant Huett, can you say with any |
| 12 | degree of medical certainty -- |
| 13 | MR. DURANT: Objection. |
| 14 | THE COURT: Sustained. |
| 15 | MR. POWELL: We don't have anything |
| 16 | further, Judge. |
| 17 | THE COURT: Okay. You can step |
| 18 | down. |
| 19 | MR. KIDD: Judge, may this witness |
| 20 | be excused? |
| 21 | THE COURT: Yes. |
| 22 | (Witness excused.) |
| 23 | MR. KIDD: Judge, if I can just take |
| 24 | one second? |
| 25 | THE COURT: And if you would raise |

144

```
1      your right hand, please?

2                    :        JAMES SPARROW

3          The witness, having first been duly sworn or

4      affirmed to speak the truth, the whole truth, and

5      nothing but the truth, testified as follows:

6                          DIRECT EXAMINATION

7      BY MR. KIDD:

8          Q.    Sir, if you would, state your name for

9      the ladies and gentlemen of the jury?

10         A.    James Presley Sparrow.

11         Q.    Mr. Sparrow, how are you currently

12     employed?

13         A.    I'm employed as a Forensic Investigator

14     with the Alabama Department of Forensic Sciences.

15         Q.    I think there's been a lot of television

16     shows and that sort of thing on forensic

17     investigators.  Basically, just in layman terms,

18     tell us, on an everyday basis, what you do for the

19     State?

20         A.    Our department in Montgomery, I work for

21     the state medical examiner's office.  We're request

22     for service agency and death investigations in

23     Montgomery County and seventeen other counties, we

24     respond and to assist local authorities in

25     investigating a scene.
```

1    Q.    So, basically, you cover a

2   seventeen-county geographical area here in Alabama?

3        A.    That's correct.

4        Q.    And when you go out to crime scenes,

5   specifically, what do you do?

6        A.    I'm associated primarily with death

7   investigations.  My primary purpose is that of the

8   deceased and surrounding area of the deceased.

9        Q.    And, Mr. Sparrow, I'm going to direct

10  your attention to October 19th, 1999, were you

11  called to an area here in Montgomery for crime

12  scene investigation?

13       A.    Yes, sir, I was.

14       Q.    And did you take custody of a body of a

15  Mr. Jonathan Farrell?

16       A.    Yes, sir, I did.

17       Q.    And after you took custody of that body,

18  what did you do with it?

19       A.    From the scene, I transported the body to

20  our facility in Montgomery.

21       Q.    And when you took possession of that body

22  and delivered it to the morgue, was it in the same

23  or substantially the same condition as it was when

24  you found the body?

25       A.    Yes, sir, it was.

146

1              MR. KIDD:  Judge, I have no further

2     questions.

3                   THE COURT:  Any questions of him?

4              MR. DURANT:  No questions.

5              THE COURT:  And you are excused.

6              (Witness excused.)

7              THE COURT:  Your next witness -- I

8     think this witness may take a little while, so

9     let's have a fifteen-minute recess, and then

10    we'll -- he can set up in the meantime.  We'll get

11    you in the -- you know by now, we'll get you in the

12    jury assembly room.

13              (Brief recess was taken.)

14              (In the presence of the jury.)

15              THE COURT:  I don't think I've sworn

16    you in.  I'm going to do that now.

17                   JAMES LAURIDSON

18        The witness, having first been duly sworn or

19    affirmed to speak the truth, the whole truth, and

20    nothing but the truth, testified as follows:

21              MR. KIDD:  Your Honor, the State

22    calls James Lauridson.

23              THE COURT:  And I swore him in, as

24    some of you saw.

25                   DIRECT EXAMINATION

147

BY MR. KIDD:

    Q.    Dr. Lauridson, if you would take a moment to introduce yourself to the ladies and gentleman of the jury.

    A.    I'm James Lauridson.

    Q.    Dr. Lauridson, how are you currently employed?

    A.    I'm currently employed by the Office of Prosecution Services.

    Q.    And what is your capacity of employment with OPS?

    A.    I'm -- my job title is director of graphics.  That means that I'm preparing graphics for trial presentations.

    Q.    And how long have you been doing that for OPS?

    A.    I've been doing it part time since October and full-time since the last month.

    Q.    And so this is basically a new job for you?

    A.    It is, yes.

    Q.    Prior to your current position, how were you employed?

    A.    I was a medical examiner for the Alabama Department of Forensic Sciences.

148

1    Q.    So, Dr. Lauridson, just in layman terms,

2    what is a medical examiner?

3    A.    A medical examiner is a physician who has

4    specialty training in forensic pathology.  The job

5    of the medical examiner is to examine the bodies of

6    persons who have died under certain circumstances

7    and to establish a cause and manner of death in

8    those cases.

9    Q.    And, Dr. Lauridson, you just made a

10   reference to types of training.  What type of

11   training and education do you have to qualify you

12   as a medical examiner?

13   A.    I have a degree in medicine from the

14   University of Colorado.  I am specialty trained in

15   board certification in internal medicine and

16   anatomic pathology and forensic pathology.

17   Q.    Dr. Lauridson, how long have you worked

18   as a medical examiner?

19   A.    Approximately fifteen years.

20   Q.    And during your last year with the

21   Alabama Department of Forensic Sciences,

22   approximately, how many autopsies did you do that

23   single year?

24   A.    Between two hundred and fifteen and three

25   hundred.

149

1    Q.    Would it be fair to say -- would it be

2    possible for you to say how many autopsies you've

3    done over your fifteen-year career?

4    A.    My estimate is about three thousand, five

5    hundred.

6    Q.    Okay.   Dr. Lauridson, I'm going to direct

7    your attention first to what we have already

8    referenced as State's Exhibit No. 42.   Give you a

9    second to familiarize yourself with this

10   photograph.   Can you identify that?

11   A.    Yes, I can.

12   Q.    And what is this?

13   A.    This is a graphic that I created that is

14   a scale graphic that represents the scene of the

15   crime.

16   Q.    And how were you able to make that a

17   scale representation?

18   A.    This was made from an aerial photograph

19   that was prepared by the city, so that all of the

20   streets and the houses could be exactly located.

21   And I used that aerial photograph to position these

22   houses.

23   Q.    And have you referenced a scale on

24   State's Exhibit No. 42?

25   A.    I have, yes.

150

1          Q.    Okay.

2                   MR. KIDD:   Your Honor, we offer

3     State's 42 at this time.

4                   THE COURT:   Admitted.

5                   (State's Exhibit No. 42 was admitted

6                   into evidence.)

7          Q.   Dr. Lauridson, what I would like to do

8     now is give you a series of paragraphs and see if

9     you can identify these photographs for me.   I'm

10    going to show you what I've marked as State's

11    Exhibit No. 26.   Can you identify State's 26,

12    please?

13         A.    Yes, this is a photograph of a person who

14    is, eventually, identified to me, as John Farrell.

15         Q.    Okay.   And is that prior to coming to the

16    morgue?

17         A.    It is, yes.

18                  MR. KIDD:   Your Honor, we offer

19    State's 26 at this time.

20                  THE COURT:   Admitted.

21                  (State's Exhibit No. 26 was admitted

22                  into evidence.)

23         Q.   Dr. Lauridson, if you would, take a look

24    at State's 27.   Can you identify State's 27?

25         A.    Yes, this is a photograph that I took at

151

1  the beginning of my examination of M. Farrell's

2  body.

3      Q.   Dr. Lauridson, we offer -- or excuse me?

4          MR. KIDD:   Judge, we offer State's

5  27.

6          THE COURT:   Admitted.

7          (State's Exhibit No. 27 was admitted

8          into evidence.)

9      Q.   I'm going to show you State's 28.   Can

10 you identify State's 28?

11     A.   Yes, this is also a photograph that I

12 took during the examination.

13     Q.   What does that represent?

14     A.   It shows the face of Mr. Farrell.

15         MR. KIDD:   Your Honor, we offer

16 State's 28 at this time.

17         THE COURT:   Admitted.

18         (State's Exhibit No. 28 was admitted

19         into evidence.)

20     Q.   Dr. Lauridson, I show you State's 29.

21 Can you identify State's 29, please?

22     A.   Yes, this is a photograph showing the

23 left side of the face of Mr. Farrell.

24         MR. KIDD:   Your Honor, we offer

25 State's 29.

152

1    THE COURT:  Admitted.

2    (State's Exhibit No. 29 was admitted

3    into evidence.)

4    Q.   Dr. Lauridson, I show you State's 30.

5    Can you identify State's 30 for me, please?

6    A.   Yes, this is a photograph that I also

7    took during the examination showing a wound of the

8    left cheek of Mr. Farrell.

9    Q.   Dr. Lauridson, I show you State's 31.

10    MR. KIDD:  We offer State's 30, Your

11    Honor.

12    THE COURT:  Admitted.

13    (State's Exhibit No. 30 was admitted

14    into evidence.)

15    A.   31 is a photograph that I took of the

16    same wound, this being the close-up of this wound.

17    MR. KIDD:  Your Honor, we offer

18    State's 31.

19    THE COURT:  Admitted.

20    (State's Exhibit No. 31 was admitted

21    into evidence.)

22    Q.   Dr. Lauridson, would you look at State's

23    Exhibit 32?  Can you identify State's 32?

24    A.   Yes, this is a photograph of an x-ray

25    that I took during postmortem examination of

153

```
 1    Mr. Farrell's head.
 2              MR. KIDD:  Your Honor, we offer
 3    State's 32.
 4         Q.   Dr. Lauridson, look at State's 33.  Can
 5    you identify that for me?
 6         A.   This is a close-up photograph of the
 7    bullet that I recovered from Mr. Farrell's head
 8    that I took during the postmortem.
 9              MR. KIDD:  Your Honor, we offer
10    State's 33.
11              THE COURT:  Both of the last ones
12    are admitted.
13              (State's Exhibits No. 32 and 33 were
14              admitted into evidence.)
15         Q.   Dr. Lauridson, if you'll take a look at
16    State's 34.  Can you identify that for me, please?
17         A.   34 is a photograph that I took of the
18    bullet that I recovered from Mr. Farrell's head
19    and -- (inaudible.)
20              MR. KIDD:  Your Honor, we offer
21    State's 34.
22              THE COURT:  Admitted.
23              (State's Exhibit No. 34 was admitted
24              into evidence.)
25         Q.   Dr. Lauridson, if you will look at
```

1    State's 35.  Can you identify that, please?

2       A.   Yes, this is a photograph that I took

3    from Mr. Farrell's head -- the back of the head,

4    which shows a separate wound to the back of his

5    head.

6              MR. KIDD:  Your Honor, we offer

7    State's 35.

8              THE COURT:  Admitted.

9              (State's Exhibit No. 35 was admitted

10             into evidence.)

11      Q.   Dr. Lauridson, if you will take a look at

12   State's 36.  Can you identify that?

13      A.   Yes, this is a photograph of

14   Mr. Farrell's left wrist that I took.

15             MR. KIDD:  Your Honor, we offer

16   State's 36.

17             THE COURT:  Admitted.

18             (State's Exhibit No. 36 was admitted

19             into evidence.)

20      Q.   Dr. Lauridson, can you look at State's

21   37?

22      A.   This is another photograph that I took of

23   the left hand.

24             MR. KIDD:  Your Honor, we offer

25   State's 37.

155

1          THE COURT:  Admitted.

2                    (State's Exhibit No. 37 was admitted

3                    into evidence.)

4      Q.   Dr. Lauridson, will you look at State's

5   38?  Can you identify that for me, please?

6      A.   Yes, this is a photograph that I took of

7   the left side of Mr. Farrell's elbow.

8                MR. KIDD:  Your Honor, we offer

9   State's 38.

10                   THE COURT:  Admitted.

11                   (State's Exhibit No. 38 was admitted

12                   into evidence.)

13     Q.   Dr. Lauridson, would you look at State's

14   39 for me, please?

15     A.   This is a photograph of Mr. Farrell's

16   left knee.

17                MR. KIDD:  Your Honor, we offer

18   State's 39.

19                   THE COURT:  Admitted.

20                   (State's Exhibit No. 39 was admitted

21                   into evidence.)

22     Q.   And finally, Dr. Lauridson, can you look

23   at State's 40?

24     A.   Yes, this is also a photograph that I

25   took showing an abrasion on the left side of

156

1    Mr. Farrell's abdomen.

2                    MR. KIDD:  Your Honor, we offer

3    State's 40.

4                    THE COURT:  Admitted.

5                    (State's Exhibit No. 40 was admitted

6                    into evidence.)

7         Q.    Dr. Lauridson, when you received

8    Mr. Farrell's body into your possession, what was

9    the first thing that you would do in order to

10   prepare that body for an autopsy?

11        A.    First thing I do in preparation for the

12   autopsy itself is to do an overall photograph of

13   the body with clothing and any evidence still in

14   tact.

15        Q.    And how is an autopsy performed or where

16   do you start and how do you work through it?

17        A.    The autopsy or postmortem examination

18   begins with an external examination of the body

19   documenting any clothing or any evidence that might

20   be present.  Also documenting any signs of any

21   injury.  That documentation is photographed and

22   also body diagram.  I also create certain notes

23   during that time.

24            Following that, then I do internal examination

25   which the major organ systems of the body are

examined.  Again, looking for signs of injury and

collecting any fluids or other evidence that might

be necessary.

Q.  And, Dr. Lauridson, with regard to

Jonathan Farrell, did you follow this procedure in

conducting your autopsy with regard to Mr. Farrell?

A.  I did, yes.

Q.  And, Dr. Lauridson, did you reach a cause

of death for Mr. Farrell?

A.  I did.

Q.  And if you will, please, explain to the

ladies and gentlemen of the jury what the cause of

death was.

A.  The cause of death of Mr. Farrell was a

gunshot wound to his head.

Q.  Dr. Lauridson, are you familiar with this

photograph?

A.  I am.

Q.  And what will this paragraph represent?

A.  This is a photograph of Mr. Farrell

before he was injured and killed.

Q.  Are you familiar with this photograph?

A.  I am.

Q.  And what does that photograph represent?

A.  This is a photograph of Mr. Farrell's

158

1    face after he had been killed at the scene.

2        Q.   Dr. Lauridson, what does that photograph

3    represent?

4        A.   This is a diagram that's used to

5    illustrate the location of wounds.  And this

6    represents a front view of the face.

7        Q.   Dr. Lauridson, did you put this graphic

8    together?

9        A.   Beg your pardon?

10        Q.   Did you put this graphic together?

11        A.   I did, yes.

12        Q.   Dr. Lauridson, these red spots that

13    appear on the head in this general area, can you

14    identify those for me, please?

15        A.   Yes, those spots are meant to indicate

16    the location of superficial injuries to

17    Mr. Farrell's left forehead.

18        Q.   What about the wounds here on his cheek?

19        A.   The same with the wounds to the left

20    cheek are locations of abrasions.

21        Q.   Dr. Lauridson, this area that appears in

22    red on his nose --

23        A.   Mr. Farrell also had superficial injuries

24    to his nose.

25        Q.   And finally, Dr. Lauridson, this area

1   around his -- appears to be around his mouth?

2       A.   The left upper lip also had abrasions and

3   contusions.

4       Q.   Dr. Lauridson, the picture that just

5   appeared to the right, what is this picture today?

6       A.   This is a photograph I took during the

7   postmortem examination.

8       Q.   And, Dr. Lauridson, this photograph

9   here --

10      A.   Likewise.

11      Q.   Dr. Lauridson, what can you tell us about

12  these injuries?  I believe you described them as

13  being superficial.

14      A.   The injuries that are indicated on the

15  diagram on the left are shown in a photograph taken

16  at the autopsy.  These are all superficial

17  injuries.  They're scraped injuries, technical

18  terms -- abrasion.  It means that the skin is

19  scraped along something rough and the skin has been

20  scraped off.

21      Q.   Dr. Lauridson, this particular area that

22  that appeared -- what are these arrows --

23      A.   These arrows are simply there to assist

24  in correlating the diagram and photograph.

25      Q.   Do these arrows fairly and accurately

160

1    depict the nature and the location of the injuries

2    that were sustained to Mr. Farrell's face?

3        A.    They do.

4        Q.    Dr. Lauridson, this particular graphic

5    here, did you prepare as well?

6        A.    I did.

7        Q.    And what does this graphic represent?

8        A.    This is a diagraphic view of the left

9    side of the face.

10        Q.    Dr. Lauridson, what does the arrow there

11    represent?

12        A.    The arrow represents the location of a

13    gunshot wound to the left cheek.  It also indicates

14    the direction that the bullet was traveling when it

15    struck the cheek.

16        Q.    And, Dr. Lauridson, first of all, how can

17    you determine the direction that a -- first of all,

18    how can you determine this was a gunshot?

19        A.    It had -- it had configuration in the

20    front part of it what's called an abrasion collar,

21    where the bullet then begins to enter.  And as the

22    bullet tore along the skin -- this was a grazed

23    wound -- as it tore along the skin, it tore the

24    skin in a certain way.  And by looking at the way

25    that skin was torn, I could then tell the direction

161

| | |
|---|---|
| 1 | that the bullet was traveling. |
| 2 | Q.  And, Dr. Lauridson, does this arrow in |
| 3 | this graphic depict the direction that that |
| 4 | projectile traveled? |
| 5 | A.  It does. |
| 6 | Q.  Dr. Lauridson, what would this photograph |
| 7 | represent? |
| 8 | A.  This is a photograph that shows the |
| 9 | grazed wound to the left cheek that we were just |
| 10 | discussing. |
| 11 | Q.  And this photograph here? |
| 12 | A.  This is the close-up photograph of that |
| 13 | same grazed wound.  And over on the left -- on the |
| 14 | observer's left side in that area is the abrasion |
| 15 | collar that I mentioned, that's where the bullet |
| 16 | first entered the skin.  And then along that wound, |
| 17 | one can see the skin tags -- the tears in the skin |
| 18 | that I was talking about.  And those tears assisted |
| 19 | me and actually allowed me to establish the |
| 20 | direction that the bullet was traveling. |
| 21 | Q.  Dr. Lauridson, what does this graphic |
| 22 | represent? |
| 23 | A.  This is a graphic that indicates the |
| 24 | location of the gunshot wound to the right and back |
| 25 | of Mr. Farrell's head. |

1    Q.   Dr. Lauridson, the red circle there in

2    this general vicinity, what does it represent?

3    A.   Well, that's -- that is meant to

4    illustrate the location of the wound.

5    Q.   Dr. Lauridson, the photograph that

6    appeared to the right, what does this photograph

7    represent?

8    A.   This is a photograph of an x-ray that I

9    had taken during the postmortem examination during

10   the autopsy.

11   Q.   Dr. Lauridson, what is the purpose for

12   taking an x-ray in this case?

13   A.   The x-ray assists us greatly in locating

14   the bullet because it shows up on the x-ray.

15   Q.   Dr. Lauridson, the circle that appears on

16   the x-ray, what would this x-ray represent?

17   A.   The circle on this x-ray is the entrance

18   wound.  As one looks closely there, you can see a

19   little hole in the bone.  You can also see little

20   fine fragments of lead that broke off when the

21   bullet entered the bone at that point.

22   Q.   Dr. Lauridson, would the circle there in

23   the x-ray and the red dot on the graphic, do they

24   correspond with one another?

25   A.   They do.

163

1       Q.   Dr. Lauridson, the circle that just

2   appeared on the right of the x-ray, what does the

3   circle represent?

4       A.   This is the bullet.

5       Q.   Dr. Lauridson, the photograph that just

6   popped up there, what would that photograph

7   represent?

8       A.   That's a close-up view of the bullet

9   after I had recovered it from Mr. Farrell's head.

10       Q.   Dr. Lauridson, in your experience as a

11   pathologist, what can you tell us about this

12   particular type of projectile as far as the type of

13   gun that would have fired it?

14       A.   The best that I can tell is that it

15   appeared to be a small caliber.  I can't tell

16   anything more than that.  And, obviously, the

17   bullet had also undergone a great deal of damage as

18   a result of having gone through bone and striking

19   bone.

20       Q.   Dr. Lauridson, the photograph that just

21   popped up in the center of the screen, what would

22   this photograph represent?

23       A.   That's a photograph of the same bullet,

24   except it's taken further away, and it shows the

25   evidence envelope that I sealed the bullet in.

164

1    Q.    Dr. Lauridson, I'm going to show you what
2   I've marked for identification purposes as State's
3   Exhibit No. 45.  Can you take a look at this and
4   identify this for the ladies and gentlemen of the
5   jury?
6    A.    Yes, this is that evidence envelope with
7   my initials on it, the case number, and the date.
8    Q.    And has that evidence envelope been
9   sealed?
10   A.    It has been, yes.
11   Q.    Is that evidence envelope, the contents
12  of that, do you know what it is?
13   A.    It's that bullet that you can see on the
14  screen.
15   Q.    And would that envelope and that
16  projectile therein be in the same or substantially
17  the same condition as it was when you recovered it?
18   A.    Yes.
19           MR. KIDD:  Your Honor, we offer
20  State's 45 at this time.
21           THE COURT:  Admitted.
22           (State's Exhibit No. 45 was admitted
23           into evidence.)
24   Q.    Dr. Lauridson, this red arrow that just
25  appeared through the x-ray photograph, what does it

165

1    represent?

2         A.   It represents the general direction of

3    the bullet traveling to the left on Mr. Farrell's

4    body and downward and very slightly backward.

5         Q.   Dr. Lauridson, did you prepare this

6    particular graphic?

7         A.   I did.

8         Q.   And what does it represent?

9         A.   It is a diagram also of the view of the

10   left side of the person's face and head.

11        Q.   Dr. Lauridson, the arrow that just

12   appeared on the screen, what does this arrow

13   represent?

14        A.   That represents the direction of the

15   gunshot that struck Mr. Farrell in the cheek.

16        Q.   You categorized this gunshot as a grazed

17   type injury?

18        A.   Yes.

19        Q.   Dr. Lauridson, the second arrow that just

20   appeared in this graphic, what would it represent?

21        A.   That arrow represents the direction of

22   the bullet that struck Mr. Farrell in the right

23   side of his head.

24        Q.   And, Dr. Lauridson, do these two arrows

25   fairly and accurately reflect the general direction

1    that the projectiles took when they struck

2    Mr. Farrell?

3        A.    Yes, they do.

4        Q.    Dr. Lauridson, of these two projectiles

5    or the two injuries there, which one was the fatal

6    injury?

7        A.    The gunshot wound to the right side of

8    the head.

9        Q.    Would that be the area that I'm pointing

10    to now?

11        A.    It is.

12        Q.    Dr. Lauridson, did you prepare this

13    particular graphic?

14        A.    I did.

15        Q.    And what does it represent?

16        A.    It represents the back of a head

17    diagrammatically.

18        Q.    Dr. Lauridson, there's a red area that

19    appears on this graphic.  Can you tell us what that

20    red area represents?

21        A.    This is the location of a laceration, a

22    different kind of wound, to the back of

23    Mr. Farrell's head.

24        Q.    Dr. Lauridson, the photograph that just

25    appeared on the screen, what does this photograph

167

1    represent?

2         A.    This is a close-up view of that

3    laceration taken at the time of autopsy.

4         Q.    Dr. Lauridson, from observing this type

5    of injury, what does this type of injury tell us as

6    far as the possible causes?

7         A.    This is classified as a laceration, which

8    to the medical examiner, means that it was caused

9    by something that's blunt, so that it struck the

10   head and actually tore the tissue causing that

11   opening in the skin.  This is a distinctive

12   something such as a knife, and this is caused by a

13   blunt object.

14        Q.    Dr. Lauridson, when you're talking about

15   blunt, would you acquaint that term to something

16   that's flat?

17        A.    Yes, it could be.

18        Q.    Dr. Lauridson, are you familiar with this

19   photograph?

20        A.    I am.

21        Q.    The piece right here that's identified in

22   the circle, what would that be?

23        A.    It was a piece of board -- piece of wood.

24        Q.    That particular piece of evidence there,

25   would it be consistent in causing that type of

168

```
1    injury?
2         A.    It is consistent with it, yes.
3         Q.    And, Dr. Lauridson, there is no way that
4    you can possibly tell us if that board caused that
5    specific injury; is that correct?
6         A.    That is correct.
7         Q.    But that particular wound is consistent
8    with that type of object?
9         A.    Yes.
10        Q.    Dr. Lauridson, did you prepare this
11   particular graphic?
12        A.    I did.
13        Q.    What does it represent?
14        A.    It is a diagram representing the back of
15   a person.
16        Q.    Did you notice any type of injuries on
17   the back of Mr. Jonathan Farrell?
18        A.    I did, yes.
19        Q.    The area that just appeared on the
20   graphic, would that represent the general area that
21   you observed this injury?
22        A.    Yes.
23        Q.    What type of injury was it?
24        A.    It was also a superficial abrasion kind
25   of injury.
```

1          Q.    Dr. Lauridson, what does this particular

2     graphic represent?

3          A.    This is a diagram of a person's knees.

4          Q.    Dr. Lauridson, the area -- well, let me

5     ask you this.  Did you observe any type of injury

6     to Mr. John Farrell's knees?

7          A.    I did.

8          Q.    And this particular area that appears on

9     the graphic, is that the general location where

10    those injuries were observed?

11         A.    It is.

12         Q.    Dr. Lauridson, the photograph that just

13    appeared, what does it represent?

14         A.    It's a photograph of Mr. Farrell's left

15    knee that I took at the time of the autopsy.

16         Q.    And the arrow that just appeared on the

17    screen, what does it reflect?

18         A.    It reflects the relationship to the

19    injury showed on the diagram and the injury

20    observed on the photograph.

21         Q.    Dr. Lauridson, what does this particular

22    graphic represent?

23         A.    This is a diagram of the left side of a

24    person's chest and abdomen.

25         Q.    Did you observe any type of injuries to

170

1      Mr. Farrell's left side or abdomen?

2           A.    I did.

3           Q.    And the area that's indicated with the

4      red on the graphic, what does it represent?

5           A.    It represents the area that I noted the

6      injury.

7           Q.    In this particular photograph here, what

8      does it represent?

9           A.    It shows the same area outside of the

10     abdomen.

11          Q.    Dr. Lauridson, what can you tell us about

12     this particular injury?

13          A.    This, likewise, is a superficial injury.

14     It's an abrasion. Something pushed or was rubbed

15     along the abdomen, that area.

16          Q.    What does this particular arrow

17     represent?

18          A.    It also shows the correlation between the

19     location on the diagram and the location of the

20     photograph.

21          Q.    Dr. Lauridson, what would this graphic

22     represent?

23          A.    This is a view of the left side of a left

24     forearm.

25          Q.    Did you notice any type of injuries to

171

1    the left side or left lower arm of

2    Mr. Jonathan Farrell?

3         A.    I did.

4         Q.    The area that just appeared on the

5    graphic, what does it represent?

6         A.    It's a location of a superficial injury

7    on the side of Mr. Farrell's left elbow.

8         Q.    Dr. Lauridson, this particular area here

9    at the top, what does it represent?

10        A.    Those are injuries also on the left lower

11   arm and left hand.

12        Q.    These particular injuries that are on his

13   hand, can you classify those type of injuries for

14   us?

15        A.    Those are, likewise, superficial injuries

16   and abrasions and contusions.

17        Q.    Dr. Lauridson, this particular photograph

18   here, what does it represent?

19        A.    It's a photograph on the injury on the

20   left side of Mr. Farrell's elbow.

21        Q.    And the corresponding arrow?

22        A.    That correlates the location in the

23   diagram and the photograph.

24        Q.    Dr. Lauridson, on the photograph in the

25   center of the screen, what does it represent?

172

1      A.     It's the back of Mr. Farrell's hand.

2      Q.     And the corresponding arrow there?

3      A.     It shows the location of those injuries.

4      Q.     And finally the last arrow that appeared?

5      A.     Correlates the location of those injuries

6   in the diagram.

7      Q.     Dr. Lauridson, this particular photograph

8   here, have you been able to identify it?

9      A.     I'm sorry.  I missed the question.

10      Q.     Can you identify this photograph here?

11      A.     Yes, I have seen this photograph before.

12      Q.     Dr. Lauridson, all of these photographs

13   that appeared in power-point presentation, how was

14   this power-point presentation put together -- well,

15   let me rephrase that.  That's not a very good

16   question.  The photographs that we have previously

17   entered into evidence, are those photographs the

18   photographs that appeared in the power-point

19   presentation?

20      A.     They are, yes.

21      Q.     Now, Dr. Lauridson, do you prepare a

22   report of your findings?

23      A.     I do, yes.

24      Q.     And how do you memorialize those or how

25   do you record those?  What do you -- let me

173

1    withdraw that question.  It's not a very good

2    question.  What's contained in your report?

3         A.   In my report, it's a description of my

4    findings in a seven step that reflects my opinion

5    in the cause of death.

6         Q.   Dr. Lauridson, I'm going to show you what

7    I'm marking as State's Exhibit No. 41.  Can you

8    identify State's 41 for me, please?

9         A.   This is a copy of my report.

10                  MR. KIDD:  Your Honor, we offer

11   State's 41 at this time.

12                  THE COURT:  Admitted.

13                  (State's Exhibit No. 41 was admitted

14                  into evidence.)

15                  MR. KIDD:  I don't have any further

16   questions for Dr. Lauridson.

17                  CROSS-EXAMINATION

18   BY MR. DURANT:

19        Q.   Good morning.  How are you?

20        A.   Good morning.

21        Q.   Dr. Lauridson, is it your testimony that

22   the bullet that caused the death of Mr. Farrell was

23   too damaged to be recognizable as any particular

24   caliber?

25        A.   It appeared to me that that was the case.

174

1    However, I'm not an expert in firearms and that

2    question probably was best left to the firearms

3    examiner.

4        Q.    Could you -- could you state -- in

5    examining the body, there were several abrasions --

6    superficial abrasions as you testified to?

7        A.    Yes, sir.

8        Q.    Could you state what could have caused

9    those abrasions?

10       A.    The best I can say is the abrasions were

11   caused by something that was relative flat and

12   rough.  But beyond that, I can't be more specific.

13       Q.    Could you state whether they were caused

14   by someone hitting someone?

15       A.    We're talking about just the abrasions

16   over the face and the arms --

17       Q.    -- and the legs.

18       A.    It's possible, I suppose, that the

19   abrasions on the hands may have been related to

20   that.  The abrasions over the face, however, look

21   more like abrasions, meaning something flat and

22   rough and had drug the skin over that.

23       Q.    That could have -- that -- is it possible

24   that that could have resulted from a fall?

25       A.    Yes.

1    Q.    And I don't know whether this is a fair

2    question for you.  The wound that created the

3    laceration at the back of the head and the board --

4    A.    Yes.

5    Q.    -- were you in possession of that piece

6    of board?

7    A.    No.

8    Q.    So you don't know that any examination

9    was made of that board --

10   A.    I don't.

11   Q.    -- in terms of blood?

12   A.    I don't.

13   Q.    Could you -- could you ascertain from,

14   say, the bullet that was fired around the cheek

15   area -- facial area, could you ascertain just how

16   close a range that was?

17   A.    I could not.

18   Q.    You could not?

19   A.    It was not a close range going in,

20   because I did not see --

21   Q.    It was not a close range you say?

22   A.    That's right.  Because I didn't see

23   stippling.  But beyond that, I can't say the

24   distance.

25   Q.    Okay.  The wound to the head, could you

176

1    ascertain whether that was a close range or medium

2    range or whatever?

3        A.    Yes.    It was very close.    I call it a

4    contact wound.

5        Q.    So you would -- would you say that all -

6    most of the superficial abrasions that you speak

7    of, that most of them could have been caused by a

8    fall or falling over or whatever?

9        A.    I think that's certainly one acceptable

10    explanation for it, yes.

11        Q.    In your internal examination, were you

12    able to determine the use of any substances --

13    illegal substances or alcohol or what have you?

14        A.    Yes.

15        Q.    What kind of substances did you find?

16        A.    I collected --

17        Q.    -- traces of?

18        A.    I collected fluids and tissues for

19    examination by our toxicologists.    Would you like

20    me to read those results?

21        Q.    Yes.    Thank you.

22        A.    There was alcohol present.    And there

23    were traces of cocaine and cocaine metabolites

24    present.

25        Q.    What is cocaine metabolites indicative

177

1  of?

2      A.   Cocaine metabolite is what happens to

3  cocaine after you take it in your body.  The body

4  breaks it down into different substances.

5      Q.   And can you differentiate -- are you

6  differentiating metabolites when the body breaks it

7  down and in another situation where the body has

8  just ingested -- let me ask the question another

9  way.  Could -- in your examination, were you able

10  to determine whether cocaine had recently been

11  used?

12     A.   That's beyond my well of expertise.

13     Q.   Okay.  What was the alcohol level?

14     A.   0.26 percent.

15     Q.   And just for the ladies and gentlemen of

16  the jury, what amount of alcohol is that?

17     A.   Well, one reference is that in Alabama,

18  to be illegally intoxicated for driving purposes,

19  the number is 0.08 percent, so that this number was

20  greater than three times that.

21     Q.   So a person is fairly intoxicated with

22  this level of alcohol?

23     A.    It's hard for me to say how certain

24  levels would affect individuals.  But, it -- this

25  amount was certainly very --

178

1         Q.   And your -- your examination in this case

2    and in other cases -- but we're dealing with this

3    specific case here -- your examination of a body is

4    somewhat divorced from the rest of the

5    investigation as far as the Department of -- the

6    Montgomery Police Department is concerned?

7        A.   May I elaborate on that question?

8        Q.   (Attorney nods.)

9        A.   I take into account scene circumstances

10   in my establishing the manner of death.  But I

11   think the answer to your question, beyond that, I

12   don't interact with the police in their

13   investigation.

14       Q.  So your investigation, if I may use this

15   word -- is somewhat antiseptic?  It is somewhat

16   removed from --

17       A.   Yes.

18       Q.   -- from the investigation?

19       A.   Yes.  I don't participate in the

20   police --

21       Q.   Yours is purely scientific so-to-speak?

22       A.   Yes.

23            MR. DURANT:  Thank you.  That's all.

24            MR. KIDD:  Judge, I have just a

25   couple of questions on redirect.

179

|  |  |
|---|---|
| 1 | REDIRECT EXAMINATION |
| 2 | BY MR. KIDD: |
| 3 |     Q.    Dr. Lauridson, if you'll reference the |
| 4 | report, can you tell me the height and weight of |
| 5 | Mr. Farrell? |
| 6 |     A.    Yes.  Mr. Farrell was sixty-seven inches |
| 7 | tall, five foot, seven and weighed a hundred and |
| 8 | fifty-six pounds. |
| 9 |     Q.    Dr. Lauridson, Mr. Durant asked you, |
| 10 | specifically, if the type of abrasions and |
| 11 | lacerations could be consistent with Mr. Farrell |
| 12 | falling down.  I believe you said that -- it's a |
| 13 | possibility.  Would it not also be possible that |
| 14 | those wounds could have been created if he were |
| 15 | drug down the road? |
| 16 |     A.    Yes. |
| 17 |     Q.    And, Dr. Lauridson, you spoke in regard |
| 18 | to Mr. Durant's question about the gunshot that you |
| 19 | classified as a fatal gunshot being the contact |
| 20 | wound? |
| 21 |     A.    Yes. |
| 22 |     Q.    What, specifically, do you look for or |
| 23 | what does the evidence tell you or how do you |
| 24 | determine that type of range of gunshot? |
| 25 |     A.    When I see a gunshot wound to the head |

1    and, particularly, gunshot wound, it's a small

2    caliber, I look, first of all, to see if there is

3    any substances deposited on the skin around the

4    wound, such as called soot stippling.  And then I

5    look at the wound itself.  In this case, the barrel

6    was close enough that the wound had actually torn

7    open when the bullet was fired and soot, which is

8    burned to death gunpowder had been deposited inside

9    the wound.  That's an indication to me that the

10   barrel was close in Mr. Farrell's skin when it was

11   fired.

12       Q.    And, Dr. Lauridson, did you detect any

13   soot or stippling around the out -- or outer

14   surfaces of the injury?

15       A.    I did not.

16       Q.    And for what you're saying, the only

17   place that you saw soot was in the inner portions

18   of that particular injury?

19       A.    Yes.

20       Q.    And you talked about some cuts or some

21   skin tears, what actually causes that?

22       A.    Now, that's in reference to the abrasion?

23       Q.    No.  I'm talking about the gunshot to the

24   top of the head.  I'm sorry.

25       A.    Yes.  The tears in the skin occur because

181

1    when you shoot a gun, in addition to the bullet,

2    gases come out of the end of the barrel. And if

3    the barrel is tight against the skin, those gases

4    are trapped in the wound and those gases can cause

5    the wound to tear.

6        Q.    Now, Dr. Lauridson, Mr. Durant asked you

7    about the blood alcohol level of Jonathan Farrell.

8    Actually, there are two blood alcohol levels listed

9    there in your report; is that correct?

10       A.    Yes.

11       Q.    Explain those two differences of the two.

12       A.    One is the actual blood alcohol level and

13   the other is the level of alcohol in the fluid that

14   was removed from the eye, called the vitreous

15   wound.

16       Q.    And, Dr. Lauridson, why do you take two

17   or why are there --

18       A.    Couple of reasons. One is that they kind

19   of check on each other. But, also, if the person

20   has just begun to drink, we expect the blood

21   alcohol to be higher than the alcohol in the fluid

22   in the eye. But if a person has stopped drinking,

23   then we often expect to see the blood alcohol to be

24   lower than the alcohol in the eye. In other words,

25   the alcohol within the eye lags behind the blood

182

1   alcohol.

2        Q.   And, Dr. Lauridson, what was the

3   discrepancy between vitreous humor and in the blood

4   alcohol?

5        A.   The blood alcohol in the case was 0.26,

6   and the vitreous humor alcohol in the eye was 0.29

7   percent.

8        Q.   So the vitreous humor alcohol was higher

9   than the blood alcohol level?

10       A.   It was.

11       Q.   And what would that indicate to you?

12       A.   It indicates to me that Mr. Farrell was

13   no longer taking alcohol in, and had started then

14   to metabolize the alcohol in his blood stream.

15       Q.   Dr. Lauridson, someone that is 0.26 blood

16   alcohol level, would that level severely impair

17   their motor capabilities?   Could it?

18       A.   It could --

19              MR. DURANT:   Objection.

20              THE COURT:   Overruled.

21       Q.   Could -- I'm sorry.

22       A.   As I mentioned earlier, I can't make

23   comments about specific individuals.   But,

24   generally, that level is one we would associate

25   with some impairment.

183

1        Q.  And, Dr. Lauridson, just let me rephrase

2  my question.  For someone that was 0.26, would

3  their motor capabilities with no blood alcohol

4  level at all?

5       A.  Yes.

6           MR. KIDD:  I have no further

7  questions, Your Honor.

8           THE COURT:  Anything else?

9           (No response.)

10         THE COURT:  Okay.  You're excused --

11         MR. KIDD:  Yeah, may he be excused,

12  Your Honor?

13         THE COURT:  Yes.

14         (Witness excused.)

15         THE COURT:  Let me see where we are

16  with witnesses.

17         (Bench conference was held.)

18         THE COURT:  At this time, does the

19  State have any other witnesses?

20         MR. KIDD:  Judge, the State would

21  rest at this time.

22         THE COURT:  We're going to need to

23  take up some things outside the presence of the

24  jury, so I'm going to give you a fifteen-minute

25  recess, and we'll see where we are.

184

```
 1                    (Out of the presence of the jury.)

 2              THE COURT:  Okay.  Mr. Durant, the

 3    State has rested.  And do you have any motions?

 4              MR. DURANT:  Judge, the defense

 5    would move for a judgment of acquittal based on the

 6    fact that the State has not met its burden by tying

 7    Mr. Watkins in the commission of this crime.

 8              THE COURT:  I'm going to deny your

 9    motion.  I think a jury question is presented.  And

10    if you'll tell me -- we'll take a few minutes and

11    you can see where you are.

12                    (Brief recess was taken.)

13                    (Back on the record.)

14              MR. DURANT:  Judge, I just want to

15    say to the Court that I have discussed with

16    Mr. Watkins his right to take the stand and his

17    right not to take the stand.  -

18         And is it your decision, Mr. Watkins, that you

19    are going to take the stand?

20              THE DEFENDANT:  Yes, sir.

21              MR. DURANT:  And you have not been

22    coerced or forced to do that?

23              THE DEFENDANT:  No, sir.

24              MR. DURANT:  And you're doing this

25    with your own free will?
```

185

```
 1                    THE DEFENDANT:  Yes, sir.

 2                    THE COURT:  And you have discussed

 3      this in full detail with your attorney?

 4                    THE DEFENDANT:  Yes, ma'am.

 5                    THE COURT:  And I'm sure he's given

 6      you certain legal advice, but it's your decision to

 7      take the stand?

 8                    THE DEFENDANT:  Yes, Your Honor.

 9                    THE COURT:_ Okay.  Let's try to get

10      started with him.  We'll get the jury.

11          I'll go ahead and swear you in if you'll raise

12      your right hand.

13                       DAVID WATKINS

14          The witness, having first been duly sworn or

15      affirmed to speak the truth, the whole truth, and

16      nothing but the truth, testified as follows:

17                    (In the presence of the jury. )

18                    THE COURT:  At the time, before the

19      break, of course, the State had rested.  And now

20      the defendant is going to testify, and I've already

21      sworn him in.

22                   DIRECT EXAMINATION

23      BY MR. DURANT:

24          Q.   Would you state your name for the ladies

25      and gentlemen of the jury?
```

1      A.    Yes, my name is David Watkins.

2      Q.    And, Mr. Watkins, where -- prior to your

3  arrest, where were you living?

4      A.    I was at Gibbs Village.  I don't remember

5  the address exactly, but that's where I was when

6  they picked me up.

7      Q.    You have -- you have sat in the

8  courtroom, and, obviously, you have heard all of

9  the testimony.  On October the 18th, 1999, did you

10  visit an address on Keystone Street?

11      A.    Yes, sir, I did.

12      Q.    Do you recall what time of the day that

13  you got over there?

14      A.    I think it had to be around about --

15  probably three in the afternoon, probably.

16      Q.    And who were you visiting?

17      A.    I was visiting Robert Watkins.

18      Q.    Are you related to Robert Watkins?

19      A.    Yes.  Cousins.

20      Q.    When you first got there, was Mr. Watkins

21  alone at home?

22      A.    Yes, sir.

23      Q.    At some point -- at some point that day,

24  did someone else come over to the house?

25      A.    Yes.

187

```
 1          Q.    Could you tell the ladies and gentlemen

 2    of the jury who came to the house?

 3          A.    Latoya Davis.

 4          Q.    Okay.  About what time -- your best

 5    recollection, about what time did she come to the

 6    house?

 7          A.    I would have to say around about five

 8    maybe, six that same afternoon, I think, if I'm not

 9    mistaken.

10          Q.    And what -- what y'all were doing?

11          A.    Well, basically, we were just sitting

12    around and -- Robert and I were drinking and

13    listening to some CD's that I had out in the car.

14          Q.    Okay.  At some point in the evening, did

15    anyone else come to the house?

16          A.    When you say other than Robert and --

17          Q.    Yourself.

18          A.    The three that was there?

19          Q.    Yes.

20          A.    Yes.  Mr. Farrell came along.  Him and a

21    friend came and dropped him off when he came.

22          Q.    And could you remember what time that

23    was?

24          A.    Now, I don't remember the time exactly,

25    but it was late probably.  I'll say seven or eight
```

188

```
 1    probably.

 2        Q.   So from around say three o'clock to late

 3    in the evening, what -- what the three or four of

 4    you were doing -- well, at first, it was you,

 5    Mr. Robert Watkins, and Latoya Davis, what were the

 6    three of you doing?

 7        A.   We was pretty much listening to music and

 8    listening to her talk, you know.  She was talking

 9    about -- whatever.  I don't remember.

10        Q.   You don't have to say what anybody was

11    saying.

12        A.   Oh, okay.

13        Q.   At some point in the evening, did y'all

14    decide to do anything in particular?

15        A.   The three of us or the four?

16        Q.   The four of you.

17        A.   Oh, yes.  After we finished conversating,

18    talking and everything, we decided to play cards.

19        Q.   Okay.  And how long -- did something

20    happen during the card game?

21        A.   Um --

22        Q.   Was there an argument or something like

23    that --

24        A.   Yes, there was.

25        Q.   -- as best you can recall?
```

189

| | | |
|---|---|---|
| 1 | A. | Yes, sir. |
| 2 | Q. | And who -- who did the argument involve? |
| 3 | A. | Latoya Davis and Mr. Farrell. |
| 4 | Q. | Okay. What was the -- what was the |

5  argument about?

6  A.  I really don't recall, not exactly.

7  Q.  Okay.  Did anything happen?

8  A.  Yeah, other than -- the two got into a

9  fight, you know.

10  Q.  Okay.  Could you tell the ladies and

11  gentlemen of the jury what was the nature of the

12  fight in terms of what happened?

13  A.  Physically?

14  Q.  Yes.

15  A.  Basically, it was more of a shove, push,

16  and falling and, you know.  And I think there was

17  an incident where he got ready to sit down after

18  Robert separated the two of them from fighting --

19  at one time, he got ready to sit down, and she

20  pulled his chair back, and he fell.

21  Q.  Okay.  And -- at some point in time, did

22  they -- did they end up outside?

23  A.  Yes, sir.

24  Q.  And how did they happen to get outside?

25  A.  I think Robert put them out at the time,

190

1    because he didn't, you know, his kids were there,

2    and she was trying to sleep or whatever, and he put

3    them out then?

4        Q.   Where were you at this time when they

5    were put out?

6        A.   Oh, I was putting the chairs and

7    everything back to the table and pretty much

8    putting everything back in order.

9        Q.   Did there come a time that they reentered

10    the house?

11        A.   No, sir, I can't say that they did.

12        Q.   Did you ever go outside?

13        A.   Yes, I did.

14        Q.   Okay.  What did you observe when you went

15    outside?

16        A.   Well, when I first went out, Robert was

17    on his way back in, you know. . And I didn't see

18    anybody on the outside at the time that I went out.

19        Q.   Uh-huh.

20        A.   You know.  And --

21        Q.   Did you -- any time subsequent to that

22    did you see anything?

23        A.   I don't understand the question.

24        Q.   Did you see Mr. Farrell and Latoya after

25    that?

```
1        A.   After they went outside?

2        Q.   Yes.

3        A.   Yes, sir, I did.

4        Q.   And what was happening there?

5        A.   There was another fight.  Latoya

6   continued to, you know, fight with him, you know.

7   And, like I said, he was intoxicated.  At the time

8   they was drinking.  So she was pretty much kicking

9   him and, you know, shoving on him at the time.

10       Q.   Okay.  Did Mr. Robert Watkins come out

11  any time after that?

12       A.   Yeah, he came out to bring a towel to

13  Mr. Farrell to wipe his nose or whatever.

14       Q.   Okay.  Did you -- did you eventually go

15  back into the house?

16       A.   Yes, sir, I did.

17       Q.   When you went back into the house, where

18  did you leave Mr. Farrell and Ms. Davis?

19       A.   I think -- when I went back in the house,

20  this was -- this was before the little

21  confrontation that started right back up that had

22  started in the house, but they were outside.

23       Q.   Okay.  After you went back in the house

24  the second time, did you go back outside again?

25       A.   Yes, sir, I did.
```

192

```
1          Q.    And did you see Mr. Farrell?

2          A.    No, sir.

3          Q.    You didn't see him?  Did you see

4     Latoya Davis?

5          A.    No, I didn't actually see them when I

6     came back out the second time.

7          Q.    Okay.  Did you hear any -- did you hear

8     any gunshots during that time?

9          A.    No, sir.

10          Q.    Did you see Latoya Davis subsequent to

11     that?  Did she come back to the house?

12          A.    You mean come back in?

13          Q.    Yes.

14          A.    No, sir.

15          Q.    Okay.  Did there come a time -- I believe

16     it was the 21st of October -- that you got a call

17     at your house where you got a call in Gibbs

18     Village?

19          A.    Yes, sir.

20          Q.    And was that call from David Watkins --

21     from Robert Watkins?

22          A.    Yes, sir -- well, before I got the call

23     from Robert, I got one from a detective that called

24     first.

25          Q.    And what did they want?
```

193

1      A.    Well, they told me they needed me to come

2   down and make a statement because they had a reason

3   to believe that I was guilty of murder or had

4   something to do with it -- involved in it or

5   whatever.

6      Q.    Okay.  And you were in Gibbs Village; is

7   that correct?

8      A.    Yes, sir.

9      Q.    What -- you got off of work around 3:30,

10  right?

11     A.    Yeah, three to four.

12     Q.    And they came to get you around seven,

13  7:30; is that correct?

14     A.    Yeah, I think.

15     Q.    And what had you been -- what were you

16  doing, prior to the time, they got you there?

17  Could you tell the ladies and gentlemen of the jury

18  what you were doing?

19     A.    Actually, it was on a Thursday when I got

20  off, so I had just moved up here from Lowndes

21  County to Gibbs Village, and I was getting ready to

22  get a place on my own.  So I recently talked to a

23  landlord about getting a house, and she pretty much

24  put the cards on the table so I could get that.  So

25  I was celebrating really, the house that I was

```
 1    getting for the first time, so I was actually

 2    drinking and smoking to myself waiting on my father

 3    to come up there, so he can pretty much take me to

 4    get some furniture and everything for the house.

 5         Q.   Okay.  And this particular -- this

 6    particular -- this particular afternoon, you

 7    were -- you were drinking and you were smoking

 8    marijuana; is that correct?

 9         A.   Yes, sir, I was.

10         Q.   And you had been doing this for about

11    four hours?

12         A.   At the most, I was mostly drinking

13    though.

14         Q.   When -- when the detective came -- what

15    time did the detective come to get you, your best

16    recollection?

17         A.   I have to say eight or either 8:30.  I

18    don't know.  I'm not sure.  It was late.  Seven --

19    I don't know.

20         Q.   Okay.  And when he came, how did he

21    approach you?

22         A.   Well, first, I heard a knock at the door,

23    and then I was on the phone, because we were

24    waiting for them to show up for them to come get

25    me.
```

195

1        Q.   Because they had called you previously --

2        A.   They called me earlier.  So I was on the

3  phone with my sister, and I was telling her that

4  they hadn't showed --

5        Q.   What happened in terms of how the

6  detective entered the house and so forth?

7        A.   Well, first, they knocked on the door and

8  told me who they was.  Once I seen them come in, I

9  seen a pistol at my face to let me know if I did

10  anything out of the way, they were going to shoot

11  me pretty much.

12        Q.   And what did the detective say to you?

13        A.   First, he asked me to put the phone down.

14  And when I reached to put the phone down, the other

15  officer asked me to put the bottle of beer down

16  that I had.

17        Q.   And you complied with that?  You did what

18  they told you to do?

19        A.   Yes, sir.

20        Q.   And then they handcuffed you?

21        A.   Yes, sir.

22        Q.   And they took you down?

23        A.   Yes, sir.

24        Q.   Okay.  When they took you down to

25  headquarters, did you -- did they -- and before

196

```
 1    they gave you -- they mirandised you -- before they
 2    told you about your miranda rights, did you say
 3    anything to them?
 4         A.   No, sir.  They were mostly doing all the
 5    talking.
 6         Q.   Okay.  But did you tell them that you
 7    were drinking and you were smoking?
 8         A.   Yes, sir.
 9         Q.   And who did you tell this to?
10         A.   The detective that brought me down.
11         Q.   Okay.  And they spoke to you generally
12    prior to putting you on the videotape, right?  They
13    talked to you before they actually taped you?
14         A.   Yes, sir.
15         Q.   And how long did they talk to you?
16         A.   I'll say twenty-five, fifteen -- fifteen
17    or twenty minutes.
18         Q.   And what do they -- do you recall what
19    they said to you?
20         A.   They pretty much told -- the officer that
21    told me, he said, first, if you expect for me to --
22    first -- let me see if I can quote exactly what he
23    said.  He said, First, if you expect me to take
24    your story over Latoya's story, you can forgot it.
25    He said, The story that Robert gave was a crack of
```

1    bull, so on and so forth.  And there's no way that

2    I will take y'all's story over hers.

3         Q.    Okay.  And did you understand -- did you

4    fully understand -- when he was explaining to you

5    about your rights, did you understand that?

6         A.    Not as well as I feel I should have.

7         Q.    And did you indicate at any point -- in

8    the pre-interview, did you indicate to them that

9    you really didn't want to give a statement in that

10   state?

11        A.    Yes, sir, I did.

12        Q.    And what did they say to you?

13        A.    Well, they pretty much ignored what I was

14   saying and kept talking.  I guess considering that

15   I came down, I wanted to give a statement, I

16   suppose.

17        Q.    And they -- you told certain things in

18   the pre-interview, right?

19        A.    Yes, sir.

20        Q.    One of those things that you didn't want

21   to give a statement?

22        A.    Yes, sir.

23        Q.    Because you had been drinking and your

24   head is not clear; is that correct?

25        A.    Yes, sir.

198

1        Q.    And how did the detectives treat you?

2        A.    Well, once the tape came on, they treated

3     me fair.  But before then, it was more of a, you

4     know, whatever you say, we'll just take it as it

5     is.  In other words, they was -- I wouldn't say

6     they was fair.  I wouldn't say that.

7        Q.    But did you feel like you were being

8     intimidated?

9        A.    Yes, sir, I was -- I did.  -

10       Q.    And you made it clear to them that you

11    didn't want to give a statement?

12       A.    Yes, sir, I did.

13       Q.    Once you -- do you -- you saw the

14    videotape yesterday.  And you saw the statement --

15    you saw the statement that you made.  Do you recall

16    anything in that statement as you gave it on that

17    particular evening?

18       A.    Well, actually that statement that I

19    gave, I don't.  I really don't remember giving it.

20    But I can't say I didn't do it, considering that I

21    seen it.  A lot of stuff that I said shouldn't have

22    been said in the beginning, but, I guess, I

23    wasn't --

24       Q.    Okay.  There were a couple points during

25    the statement where the officer said to you in a

199

1  very sharp tone, do you want -- do you want to

2  cooperate? And you said, Well, not really. What

3  was going on then in your mind?

4      A.   Well, actually --

5             MR. KIDD:  Judge, I'll object as to

6  what was going on in his mind.

7             THE COURT:  I'll sustain.

8      Q.   Well, what were you -- what were you

9  thinking?

10             MR. KIDD:  I'll object to what he

11  was thinking.

12             THE COURT:  Sustained.

13      Q.   Okay.  When the officer said to you, Do

14  you want to cooperate, what did you -- what was

15  your response?

16      A.   Well, actually, I really didn't know the

17  whole story to what they wanted to know.  I didn't

18  know the whole, you know, incident as it really

19  happened, and I couldn't remember it, so, it was --

20  I really didn't want to give a statement because I

21  really didn't know exactly what happened as far as

22  that, the murder, anyway.

23      Q.   Okay.  Do you -- do you recall you

24  saying -- well, you saw the tape yesterday and so

25  I'm sure you recall that you -- you urinated on

200

| | |
|---|---|
| 1 | Mr. Farrell?  Do you recall that? |
| 2 | A.    No. |
| 3 | Q.    In the video? |
| 4 | A.    No, I really don't recall it. |
| 5 | Q.    But you saw it on the video? |
| 6 | A.    But I did see it, yes. |
| 7 | Q.    But do you recall it as of the night that |
| 8 | happened? |
| 9 | A.    I can't remember exactly how it -- you |
| 10 | know, what exactly happened that night. |
| 11 | Q.    Okay.  The night that you were giving the |
| 12 | statement? |
| 13 | A.    Yes, sir. |
| 14 | Q.    There's a statement in there, as you |
| 15 | recall, that you kicked him.  Do you recall -- do |
| 16 | you recall saying that when you gave that |
| 17 | statement? |
| 18 | A.    In the statement? |
| 19 | Q.    Yes. |
| 20 | A.    No, I don't recall saying that. |
| 21 | Q.    Did you -- did you know Mr. Farrell prior |
| 22 | to that evening? |
| 23 | A.    No, sir, I can't say that I know him. |
| 24 | Q.    And that was the first time that you had |
| 25 | seen him? |

EXHIBIT-3 

201

| 1 | A.   No, I think I seen him once before, |
| 2 | before then.  But, you know, I didn't know him, |
| 3 | actually know him. |
| 4 | Q.   But that was the first time that you |
| 5 | actually sort of socialized? |
| 6 | A.   Yes, sir. |
| 7 | Q.   Did you have anything against |
| 8 | Mr. Farrell? |
| 9 | A.   No, sir. |
| 10 | Q.   Was there any reason for you to not like |
| 11 | him? |
| 12 | A.   No, I can't say that there was. |
| 13 | Q.   Did you have anything to do with the |
| 14 | shooting of Mr. Farrell? |
| 15 | A.   No, sir, I didn't. |
| 16 | Q.   Did you see the -- did you witness the |
| 17 | shooting of Mr. Farrell? |
| 18 | A.   No, sir. |
| 19 | MR. DURANT:  That's all. |
| 20 | THE COURT:  Mr. Kidd, come up here. |
| 21 | (Bench conference was held.) |
| 22 | THE COURT:  We're going to go ahead |
| 23 | and take a lunch break.  I'm going to give you |
| 24 | until 1:15.  It's -- I have about -- the clock up |
| 25 | there says about ten till, so 1:15, and we'll get |

202

1   you in the jury assembly room.  And everyone stay

2   in the courtroom until the jurors leave.

3                    (Lunch break was taken.)

4                    (In the presence of the jury.)

5              THE COURT:  Okay.  Are you ready for

6   your cross-examination?

7              MR. KIDD:  Yes, ma'am.

8                 CROSS-EXAMINATION

9   BY MR. KIDD:

10     Q.   Mr. Watkins, I'm Mike Kidd with the

11  district attorney's office.  I'm going to be asking

12  you a few questions, okay?

13     A.   Okay.

14     Q.   In the event you don't understand any of

15  my questions, if you'll just tell me and ask me to

16  start over, I'll either restate my question or I'll

17  try to rephrase it in a way that you can

18  understand.  Okay?

19     A.   Yes, sir.

20     Q.   There's something that I want to start

21  with and I want to get clear.  You told Mr. Durant,

22  your attorney, that when the police officers took

23  you down to the police station, there were portions

24  of things that happened that night that you did not

25  remember; is that correct?

203

1      A.    Yes, sir.

2      Q.    Okay.  I understood --

3            THE COURT:  Could you slip up just a

4    little bit toward that microphone?

5            THE WITNESS:  (Witness complies.)

6      Q.    Just for my own benefit, I'm going to

7    start back with the moment that you got to the

8    police station.  Do you recall about what time it

9    was?

10     A.    No, sir, I'm not exactly sure what time

11    it was.

12     Q.    From the time that the police officers

13    arrived at your house until the time that it took

14    you to get to the police station, about how long

15    did that take?

16     A.    I'm not sure.

17     Q.    Would it be less than thirty minutes?

18     A.    It should take less than thirty minutes,

19    it should.

20     Q.    Okay.  Now, you told your attorney, if I

21    understood correctly, that the police officers came

22    to your house sometime between seven and 7:30 p.m.;

23    is that correct?

24     A.    If I'm not mistaken, it should be around

25    that time.

204

1      Q.   Okay.  So that would put you at the

2  police station somewhere between 7:30 p.m. and 8:00

3  p.m.; is that correct?

4      A.   I suppose so.

5      Q.   Okay.  What do you remember happening

6  when you first got to the police station?

7      A.   Let me think.  Just only -- they took me

8  upstairs to the -- to the room or whatever, and I

9  was handcuffed to the table.  From there, they

10  asked me -- let me think -- I think they offered me

11  something to drink or whatever.  And I think I took

12  a cup of coffee from them.  I think they

13  probably -- let me think -- from there, I think

14  they started stating why they had me down there and

15  so on and so forth.

16      Q.   Did you have to sit and wait for any

17  period of time before they started questioning you?

18      A.   Yes, sir, I did.

19      Q.   Do you recall how many detectives were

20  questioning you?

21      A.   No, I can't say that I can recall how

22  many.  I remember there was more than one in the

23  room.

24      Q.   Okay.  And do you remember -- do you

25  remember if there were any females in the room --

1    female detectives in the room?

2         A.   Yeah, I think there was one.

3         Q.   Okay.  And how many male detectives do

4    you remember?

5         A.   The rest of them were males according to

6    my memory.

7         Q.   You saw Sergeant Loria testify yesterday,

8    Tony Loria.  Do you recall him being there?  Do you

9    recall speaking to Mr. Loria?

10        A.   That's the guy with the low hair cut,

11   right?

12        Q.   Yes, sir.

13        A.   Yeah, I remember him.

14        Q.   So you remember him being there as well?

15        A.   Yeah, I remember his face.

16        Q.   Okay.  Now, you started your testimony a

17   few moments ago with what happened there on

18   Keystone Street on the night of the 18th or the

19   early morning hours on the 19th of October of 1999.

20   During that statement, you said that Latoya Davis

21   and Mr. Farrell got into an argument there at the

22   card table; is that correct?

23        A.   I wouldn't exactly call it an argument,

24   but they got --

25        Q.   Tell me --

206

1   A. -- into a little altercation.

2   Q. Well, tell me, so I've got a clear

3 understanding, exactly what did happen between the

4 two of them while you were at the card table?

5   A. Well, to the best of my memory, it was a

6 few insults, you know.

7   Q. Who was insulting you?

8   A. Latoya was insulting him.

9   Q. And did those words come to blows where

10 they were actually touching each other?

11   A. So as you're saying punching or slapping?

12   Q. Punching or slapping or pushing or

13 tussling?  Did any of those things occur?

14   A. That was on -- all right, to the best of

15 my memory, I can only recall an insult and he stood

16 up and she pulled his chair back when he got ready

17 to sit back down.

18   Q. And he fell?

19   A. Yeah.

20   Q. How many people were sitting at the

21 table?

22   A. There was four of us.

23   Q. And, if you would, describe where you

24 were sitting at in relation to Robert Watkins?

25   A. Well, considering that me and Latoya was

1       on --

2             Q.    Teams.

3             A.    -- teams, yeah.  So I guess --

4             Q.    So Robert was sitting directly either to

5       your right or to your left?

6             A.    Sitting to my right.

7             Q.    To your right.  Latoya Davis would have

8       been directly in front of you, correct?

9             A.    Yeah.

10            Q.    And then Jonathan Farrell would have been

11      to your right -- or excuse me, to your left or to

12      your right?

13            A.    He would have been to my left.

14            Q.    Left.  Okay.  And after she pulled the

15      chair out from under him, he fell to the floor,

16      what happened?

17            A.    Well, he got up.  He got up and sat back

18      in the chair.

19            Q.    Did you continue to play cards?

20            A.    Yes, sir, we did.

21            Q.    What card game were you playing, if you

22      recall?

23            A.    I don't remember exactly what we was

24      playing.

25            Q.    Okay.  How long had you been playing

1  cards?

2       A.   We wasn't playing too long.

3       Q.   A couple of hands?

4       A.   I don't think we got through the first

5  hand, I don't think.

6       Q.   What ended the card game?

7       A.   The altercation between her and

8  Mr. Farrell.

9       Q.   What exactly happened during that

10  altercation?  Describe it for me, please.

11       A.   More or less like I -- like I said, it

12  was a couple of insults given.  I think there was a

13  case when he responded back, you know.

14       Q.   With another insult?

15       A.   All right.  Well, there was an insult

16  given by her, which he responded back to the insult

17  that was given.  And I think he called her an unfit

18  name, I'll put it like that.

19       Q.   Did you ever see Latoya Davis make

20  physical contact with Jonathan Farrell inside the

21  trailer -- or inside the house, excuse me?

22       A.   Physical contact in what way?

23       Q.   In any way, pushing, shoving, slapping --

24       A.   Yes, sir, I did.

25       Q.   What did she do?

1       A.    She pushed him, I remember that.

2       Q.    And then what?

3       A.    From there, you know, they -- once the

4   noise started happening in the house, Robert

5   escorted them to the -- um -- the door, told them

6   to leave because he didn't want his baby woke.

7       Q.    Would you describe their actions as

8   tussling?

9       A.    Well, I wouldn't actually call it a

10   tussle, considering that he really wasn't doing too

11   much of the hitting.

12       Q.    What was he trying to do?

13       A.    He was actually trying to leave.

14       Q.    And she was -- was she trying to prevent

15   him from leaving?

16       A.    I would say that, yeah.

17       Q.    So is it your testimony that

18   Robert Watkins asked Ms. Davis and Mr. Farrell to

19   leave the residence?

20       A.    Uh-huh.

21       Q.    And did he, in fact, escort them outside?

22       A.    Yes, sir.

23       Q.    And did you follow or did you go outside

24   with Robert as he escorted the other two out of the

25   house?

210

1       A.    No -- after -- no, at the time, I didn't

2   go out, I don't think. No.

3       Q.    What happened after Robert escorted them

4   outside?

5       A.    Well, to be truthful, once they left out,

6   I don't know what happened, because I didn't go

7   outside.

8       Q.    Well, what did you do?

9       A.    Oh, I was still on the inside putting the

10   chairs back in order at the table.

11       Q.    Who was the next person that you remember

12   seeing after they left from the house?

13       A.    Robert.

14       Q.    And where did you see Robert at?

15       A.    He was coming back in the house.

16       Q.    And did -- I'm not asking you what he

17   said -- but did Robert make any statements to you?

18       A.    Nothing, but they're fixing to tear up --

19   they're fixing to tear up my "D" house.

20       Q.    Okay. So he was talking about that they

21   were going to do some damage to his house if they

22   remained inside?

23       A.    Yes, sir.

24       Q.    After Robert came back inside, what did

25   you do?

211

1    A.    I think I started to playing the radio

2  again, I believe.  Considering that we were

3  listening to a CD.

4    Q.    What did Robert do after he came back

5  inside?

6    A.    I don't know.  I don't know if he went to

7  check on the baby or went to the bathroom or -- I

8  don't know exactly what he did when he came back

9  in.

10    Q.    Now, you told Mr. Durant that at some

11  point in time, Robert got some type of rag or some

12  type of dishcloth; is that correct?

13    A.    Uh-huh.

14    Q.    When did he do that?

15    A.    This was after we went out -- well, once

16  I went back outside for the second time.

17    Q.    Okay.  When did you go outside for the

18  first time?

19    A.    The first time was when I went, I

20  think -- I think I went to go get a CD out of the

21  car --

22    Q.    Okay.

23    A.    -- if I'm not mistaken.

24    Q.    And this was before or after the tussling

25  and everything went on between Jonathan Farrell and

1    Latoya Davis?

2        A.    This was after.

3        Q.    Okay.  Now, a few moments ago, when

4    Mr. Durant asked you about going outside for the

5    first time, if I don't recall -- if I recall

6    correctly, you told Mr. Durant that you went

7    outside on the porch and you didn't see anything;

8    is that correct?

9        A.    Yes, sir.

10        Q.    You did not mention to Mr. Durant that

11    you got a CD.  Did you, in fact, get a CD?

12        A.    Yes, sir.

13        Q.    Okay.  And did you see Jonathan Farrell

14    and Latoya Davis?

15        A.    I don't recall seeing them, no.

16        Q.    Did you ever hear anyone outside?

17        A.    I can't say that I did.

18        Q.    After -- what type of CD did you get?  Do

19    you recall?

20        A.    I just brought the whole book in.

21        Q.    Okay.  And after you came back inside

22    with the CD's, what did you do then?

23        A.    I played the radio.

24        Q.    Okay.  And you said that Robert took this

25    rag outside.  How long were you back inside

1    listening to CD's before Robert went back outside

2    with the rag?

3        A.    I went out before Robert.

4        Q.    I understand that.  But I believe your

5    testimony was that you went out to the car --

6        A.    Uh-huh.

7        Q.    -- that you got some CD's, that you came

8    back into the house, and you started playing music.

9    Now, at some point in time, you said that Robert

10   took a rag outside; is that correct?

11       A.    Yes, sir.

12       Q.    When did that occur is what I'm asking?

13       A.    Oh, when did he take the rag back out?

14       Q.    Yes.

15       A.    That was after I went outside for the

16   second time.

17       Q.    Okay.  When did you go outside for the

18   second time?

19       A.    That's when I went to go use the

20   restroom.

21       Q.    Okay.  So you went outside to use the

22   restroom?

23       A.    Yeah, because he was in at the time.

24       Q.    When you went outside for the second

25   time, did you see anything?

214

1    A.   Not as soon as I hit the outside, no.  I

2    don't recall seeing --

3    Q.   Well, at any time while you were outside?

4    A.   Oh, the second time, did I see anything?

5    Q.   Yes.

6    A.   Yeah, the second time, yeah.

7    Q.   What did you see?

8    A.   First, I think I heard a noise.  I think,

9    if I'm not mistaken.

10   Q.   And where was that noise coming from?

11   A.   The street.

12   Q.   The street?

13   A.   Uh-huh.

14   Q.   I'm going to show you what we've marked

15   as State's Exhibit No. 42.  This little button

16   makes a red dot on here.  I want you to take that

17   and show me where you heard the noise out on the

18   street?

19   A.   Right here?

20   Q.   Uh-huh, where it says laser.  Point it at

21   the screen there.

22   A.   Are you saying where was I?

23   Q.   Show me where you heard the noise coming

24   from.

25   A.   Right up in here.

!215

1      Q.    So it would have been directly in front

2   of the house?

3      A.    Yes, sir.

4      Q.    Okay.  Let me take that back.

5      A.    (Witness complies.)

6      Q.    Now, Mr. Watkins, how far is it from this

7   house to this house?

8      A.    Not that far.

9      Q.    About thirty feet, give or take a few

10  feet?

11     A.    I really don't know the distance in

12  walking.

13     Q.    About the width of this courtroom, more

14  or less?

15     A.    It would be, probably.

16     Q.    So somewhere you walked outside -- I'm

17  standing about three quarters to the back of the

18  courtroom -- some -- when you walked outside, you

19  heard some noise coming from this general area; is

20  that correct?

21     A.    Uh-huh.

22     Q.    Now, there are street lights on that

23  street, is there not?

24     A.    Yeah, there's a few.

25     Q.    Did you see anything that was making that

216

1    noise?

2        A.    Really I wasn't paying much attention to

3    it, what was making it when I heard it.

4        Q.    Did you ever see Latoya Davis and

5    Jonathan Farrell out there?

6        A.    Yes, I did.

7        Q.    And where were they?

8        A.    In the street.  He was laying down.

9        Q.    So he was laying down.  Would it have

10   been in this general area right here?

11       A.    Yes, it was.

12       Q.    Okay.  When did Robert come back outside?

13       A.    During that time.

14       Q.    How did Robert know that Mr. Farrell

15   needed a rag?

16       A.    I suppose he seen him -- I guess he seen

17   him when he first came out, I suppose.

18       Q.    Well, how -- you said that you went out

19   to the car --

20       A.    Uh-huh.

21       Q.    -- and that when you went out to the car,

22   Robert Watkins had already come back inside,

23   correct?

24       A.    Uh-huh.

25       Q.    And you went to the car, and you got your

1   CD player -- or your CD's.  You came back inside

2   and you sat down, had enough time to decide what CD

3   you wanted to play, put some music on and started

4   listening to it before you ever went back outside;

5   is that correct?

6        A.   Uh-huh.

7        Q.   About how far -- what is the length of

8   time between the first time that you went outside

9   until the second time that you went outside?

10       A.   I'm not sure.

11       Q.   Well, would it be ten minutes?

12       A.   It depends on how many songs I listened

13  to at that time.  I really don't remember exactly.

14       Q.   But it wouldn't have been a matter of

15  seconds, though, correct?  If you had time to do

16  all of those things, it would have taken at least a

17  few minutes?  Is that fair to say?

18       A.   I wouldn't say that it took too long.

19       Q.   Okay.  So Robert had been in the house

20  for a period of time.  And then all of a sudden, he

21  comes outside, knowing that Jonathan Farrell was

22  bleeding and needed a rag.  Is that what your

23  testimony is?

24       A.   Uh-huh.

25       Q.   Now, what -- you said Jonathan Farrell

```
 1     was lying in the street in this area.  What was

 2     Latoya Davis doing?

 3          A.   What was she doing?

 4          Q.   Yes.

 5          A.   Well, at the time that I heard the noise,

 6     it was -- there was a board -- sounding like a

 7     board -- something hitting the street -- I can't

 8     say that it was a board -- but the sound of

 9     something hitting the street.  That's when, you

10     know, I looked up to see they had started back up

11     again.

12          Q.   So they were fighting again?

13          A.   Well, she was pretty much kicking him.

14          Q.   She was hitting him?

15          A.   Uh-huh.

16          Q.   And what happened then after you saw this

17     happen?

18          A.   Well, I tried to stop her from fighting

19     with Mr. Farrell, trying to hit him, you know.

20          Q.   And then what happened?

21          A.   That's when Robert came on the outside.

22          Q.   And did Robert give Mr. Farrell a rag?

23          A.   Not right then.

24          Q.   Not right then?

25          A.   No.
```

```
 1        Q.   Now, how did you try to stop Latoya Davis

 2   from hitting him with this board?  What did you do?

 3        A.   Stopped her from hitting him with the

 4   board.

 5        Q.   How did you stop him?

 6        A.   The only thing I did was grabbed her

 7   around the waist and, you know, restrained her.

 8        Q.   Were you able to successfully restrain

 9   her?

10        A.   Not successfully.  You know, I pulled her

11   away for a moment.

12        Q.   And then what did she do?

13        A.   She went back at him.

14        Q.   Did she hit him again --

15        A.   I would say so.

16        Q.   -- with the board?

17        A.   I don't know if she hit him with the

18   board again or did she hit him with the board or --

19        Q.   Did you see -- how did she attack him

20   that time that she broke away from you?  What did

21   she do?  I want to know specifically.

22        A.   I just remember her kicking him.

23        Q.   Okay.  So you remember the kicking

24   portions of it?

25        A.   Uh-huh.
```

220

1    Q.    Then what happened?

2    A.    I think that's when Robert came on the

3    outside.

4    Q.    Okay.  After Robert came outside, what

5    did she do?

6    A.    Well, I think from there, he told her to

7    go home and, you know, that's when he spoke to

8    Mr. Farrell, I guess.  I don't know what he told

9    him.  But Mr. Farrell got up --

10   Q.    Did you go back in the house at that

11   point?

12   A.    Did I go back in the house?

13   Q.    Yes.

14   A.    No, not right then.  That's when Robert

15   got a rag and gave it to him.

16   Q.    Did you urinate on him during this time?

17   A.    I can't remember.

18   Q.    Now, Mr. Watkins, you have testified now

19   for about ten minutes with all of the details about

20   what happened inside of that house prior to this

21   occasion --

22   A.    Well, actually --

23   Q.    Now, listen to my question.  Okay?  You

24   talked about how she pulled the chair out, who went

25   in, who went out, playing music, and all that sort

221

1    of stuff.  And you now say that you do not remember

2    whether or not you urinated on this gentleman in

3    the street.  Is that your testimony?

4         A.    Yes, sir.

5         Q.    You're not denying that you urinated on

6    him, are you?

7         A.    No, I can't say that I'm denying it.

8         Q.    After Robert gave him the rag, when did

9    you go back inside?

10        A.    I'm not sure if we went right back in or

11   did we sit on the porch.  I don't remember exactly

12   what took, you know, place, word for word

13   afterwards.

14        Q.    What did you see Latoya Davis and

15   Jonathan Farrell do after Robert gave him the rag?

16        A.    I think they separated, if I'm not

17   mistaken.

18        Q.    So they both left; is that correct?

19        A.    Latoya left at the time.

20        Q.    What did John do?

21        A.    I don't remember.  It's not like I was

22   standing up there watching the whole time what was

23   going on.

24        Q.    When you went back in the house, where

25   was Jonathan Farrell?

222

1       A.    Well, he wasn't in the house.

2       Q.    Was he in the street?

3       A.    Like I say, I don't know exactly where he

4    was when I went back in the house.

5       Q.    Did you ever see Jonathan Farrell in this

6    area of Keystone Street?

7       A.    No.

8       Q.    Did you ever walk down to this area of

9    Keystone Street after this confrontation started?

10      A.    Not that I remember, no.

11      Q.    So you don't remember that either?

12      A.    I don't remember going down there.

13      Q.    You're not denying that you went down

14   there?  You're just saying that you don't remember;

15   is that correct?

16      A.    I didn't go down there.

17      Q.    Okay.  So you're emphatically denying

18   that you never went to this area of Keystone --

19      A.    No, I didn't go.

20      Q.    Did you ever hear any gunshots that

21   night?

22      A.    No, I can't remember hearing any, no.

23      Q.    You done remember hearing any?

24      A.    Huh-uh.

25      Q.    Did you ever see someone with a gun at

1223

```
1     any point in time during that night?
2          A.   No, I didn't.
3          Q.   So you never saw Robert Watkins with a
4     gun?
5          A.   No.
6          Q.   You never saw Latoya Davis with a gun?
7          A.   No, sir, I didn't.
8          Q.   Did you ever see Jonathan Farrell with a
9     gun?
10         A.   No, sir, I didn't.
11         Q.   Now, David, I'm going to direct your
12    attention back to the police department, okay?  You
13    said that the pre-interview, where the detectives
14    discussed what was going to be happening as far as
15    the statement went and the facts of the case,
16    lasted somewhere between fifteen and twenty
17    minutes; is that correct?
18         A.   If I'm not mistaken.
19         Q.   And you saw the video yesterday.  Was
20    that you on that video?
21         A.   Yeah, I saw the video.  And to be
22    truthful about the whole thing, if I was to look at
23    that and see it, if it had not been for that video,
24    I wouldn't believe that I said a lot of those
25    things that were mentioned on the video.
```

224

1        Q.   But that was you on that video, was it

2    not?

3        A.   Yeah, that was me.

4        Q.   Do you remember giving that statement?

5        A.   Huh-uh, not exactly.

6        Q.   Do you ever remember being in that

7    interview room?

8        A.   Yeah, I remember being there.

9        Q.   And you're saying -- your testimony is

10   that you do not recall any of the things that you

11   testified to on video yesterday?

12       A.   I remember partly, certain things.

13       Q.   What do you remember about that

14   statement?  What parts do you remember?

15       A.   Well, from viewing the video and looking

16   at it again, I can say that a lot of things that I

17   spoke, I remember repeating a lot of things that

18   were told to me from the officers, I remember that.

19       Q.   So you do remember portions of the video

20   statement; is that correct?

21       A.   Portions.

22       Q.   Well, Mr. Watkins, let me ask you this.

23   How would you have been able to provide

24   Detective Loria and Detective Kennedy with all of

25   the details that all of these ladies and gentlemen

225

1   of the jury heard yesterday coming from you on that

2   video, how could you have provided those details if

3   you say that you never went to this area of

4   Keystone Street?

5        A.   As I was saying, he gave me -- he spoke

6   to me before the video, so I -- I can't say that,

7   you know, I didn't remember a lot of things that he

8   told me at that time.  And, as I said, I remember

9   quoting a lot of things that he had already told

10  me.  I remember saying that, you know, quoting him.

11       Q.   So what you're telling these jurors, that

12  in a matter of time, fifteen to twenty minutes,

13  Detective Loria and Detective Kennedy were able to

14  put all of that into your head for you to memorize

15  so you could regurgitate it back out on the video?

16       A.   Well, actually, they spoke to me from the

17  time we left the house, after they put me in the

18  car.  They was talking to me from the ride from the

19  house all the way up to the police station.  And

20  from there, they gave me -- they also spoke to me

21  once again once we got on the inside.

22       Q.   Now, Mr. Watkins, you said that when

23  Detective Loria -- or I'm sorry.  I'll withdraw

24  that portion.

25       You said a detective came in and started

226

```
 1    speaking with you in the pre-interview and told you
 2    that he was not going to believe anything you said;
 3    is that correct?
 4         A.    Yes, sir.
 5         Q.    So you remember that happening?
 6         A.    I remember him telling me -- there was a
 7    lot of things that he told me.  But that's one in
 8    particular that I remember.
 9         Q.    So your testimony would be that the
10    detective told you, before ever even speaking with
11    you, if you completely confess to this crime in
12    doing it all by yourself, he wasn't going to
13    believe you?
14         A.    I ain't saying all that now.
15         Q.    Well, you said that he told you from the
16    beginning that he wasn't going to believe anything
17    you said.  He didn't know what you were going to
18    say.  Is that not true?
19         A.    Well, actually -- he actually told me
20    before -- before he even spoke to me, you know, he
21    said that he didn't believe the story, something
22    about what Robert had told him.  And he said
23    something about if I expected him to take my -- you
24    know, me and Robert's statement over Latoya's, I
25    could forgot it, you know.
```

227

1      Q.   So he made a reference to your and

2  Robert's statement?

3      A.   Yes, sir.

4      Q.   So before he even spoke to you, he was

5  assuming that your statement was going to be

6  identical, if not the exact same, as

7  Robert Watkins'?

8      A.   Yes, sir.

9      Q.   Let me ask you this question,

10  Mr. Watkins.  When your attorney was asking you

11  questions earlier today, you were talking about the

12  telephone calls that you received coming to the

13  house?

14      A.   Uh-huh.

15      Q.   I believe Mr. Durant may have cut you

16  off.  But you said that you received a telephone

17  call from David Watkins after you received a call

18  from the detectives.  Is that true?

19      A.   Say that again.  Repeat that again,

20  because it sounded like you --

21      Q.   I believe you told your attorney, first

22  of all, that you received a call from the police

23  department and they told you that you were a

24  suspect in either a murder or capital murder

25  investigation.  Is that true?

228

1      A.    Uh-huh.

2      Q.    You also told your attorney that after

3    that happened David Watkins called you; is that

4    correct?

5      A.    No, that's not.

6      Q.    So you did not tell Mr. Durant that

7    David Watkins called you that afternoon?

8      A.    No, I didn't.

9      Q.    So let me get this -- this portion of it

10   correct.  Did the PD call you and tell you that you

11   were a suspect in a murder investigation?

12     A.    You said a PD?

13     Q.    Or someone from the police department?

14     A.    Yes.

15     Q.    After that occurred, did your cousin,

16   Robert, did he call you after you received the call

17   from the police department?    -

18     A.    I can't be exactly specific of who called

19   first.  But I got a phone call from both of them,

20   yes, I did.

21     Q.    Was it about the same time?

22     A.    No, it was separate.

23     Q.    How much time varied between those

24   telephone calls?

25     A.    I'm not sure.  At the time, I was

229

1    babysitting also, so --

2         Q.   Well, if you can't remember which one

3    came first, wouldn't it be fair to say that they

4    probably occurred about the same time.

5              MR. DURANT:  Asked and answered.  He

6    said he can't remember.

7              THE COURT:  I'm sorry.  I'm going to

8    overrule your objection.  I think it is a compound.

9    Would you rephrase it?

10             MR. KIDD:  I'll withdraw the

11   question, Your Honor.

12        Q.   Mr. Watkins, how long did Robert Watkins

13   talk to you on the telephone?

14        A.   It wasn't long.

15        Q.   Where was he calling you from?

16        A.   The police department.

17             MR. KIDD:  No further questions.

18             MR. DURANT:  I don't have any

19   further questions, Judge.

20             THE COURT:  Okay.  You can step

21   down.

22             (Witness excused.)

23             THE COURT:  Do you have any other

24   witnesses?

25             MR. DURANT:  No, Judge.  Defense

230

```
 1    rests.
 2                      THE COURT:  Are you going to have
 3    any rebuttal?
 4                      MR. KIDD:  No, ma'am.
 5                      THE COURT:  Do y'all need a moment
 6    to get things ready?
 7                      (Attorneys nod.)
 8                      THE COURT:  Both sides, at this
 9    time, have arrested, and the attorneys are going to
10    address you in closing argument.  But I think they
11    may need to get some of the exhibits together, and
12    I'm going to give you a ten-minute recess.  Then
13    when you come back, they'll argue, and I'll charge
14    you.
15                      (Out of the presence of the jury.)
16                      THE COURT:  And, Mr. Durant, do you
17    renew your motions?
18                      MR. DURANT:  Yes, Judge.
19                      THE COURT:  And, again, I think a
20    jury question is presented, and I'm going to deny
21    your motion.
22                      (Brief recess was taken..)
23                      (In the presence of the jury.)
24                      THE COURT:  Okay.  At this time, are
25    you ready for closing?
```

231

1               MR. POWELL:  We are, Your Honor.

2          May it please the Court, counsel, members of

3      the jury?  We're at the end of the trial now, and

4      you've heard all the evidence.  And we're here

5      today because they found Jonathan Christopher

6      Farrell, this woman's son, lying in a ditch at the

7      end of Keystone Street.  He was found in a kneeling

8      position.  And statements taken from the defendant

9      indicate that the entire time through this

10     altercation and kicking and the fight and

11     everything else that happened, the victim was

12     begging for his life, begging for someone just to

13     let him go and take him home.

14         So we're left to answer the question of who is

15     responsible for doing this to Jonathan Farrell.

16     And that's a good point in this case to look at the

17     law.  Now, as jurors, you're responsible for

18     determining what the facts are in this case.  And

19     at the and of the closing arguments, Judge Greenhaw

20     is going to tell you what the law is.  And in this

21     case, the defendant is charged with murder, the

22     intentional murder of the defendant.

23         And I'll be the first to tell you that we

24     cannot prove that that defendant was the one who

25     put the gun to that young man's head and pulled the

232

1   trigger.  But we don't have to prove that.  What we

2   have to prove is that this man did something to aid

3   and abet this murder.  And Judge Greenhaw is going

4   to tell you, when she instructs you on the law,

5   that there are several ways that you can aid and

6   abet someone in committing a crime.

7        In the past, there have been discussions of

8   principles and accessories and who did what and

9   this did what.  The Judge is going to tell you that

10  that distinction doesn't exist anymore.  The person

11  who put the gun to his head may be the principle or

12  the person involved, but we don't have to tell you

13  who was the principle and who were the accessories.

14  We just have to show you that the people that were

15  there surrounding this murder, including this

16  defendant, did something to aid and abet.  And the

17  Judge is going to tell you that ways they can do

18  that is by acts, words of encouragement, support,

19  or presence.  These are all ways someone can aid

20  and abet.

21       Now, just to be clear, mere presence is not

22  enough, and I think the Judge is going to tell you

23  that simply being there is not enough.  You have to

24  do something in support or words of encouragement

25  or by acts.  So if we've convinced you that this

233

1   defendant either through his acts, his words, or

2   his support went along with this murder, he is just

3   as guilty as the person who pulled the trigger.

4        Judge Greenhaw is also going to tell you about

5   co-conspirators, people who are commonly engaged in

6   unlawful activity. And if they are engaged in a

7   common scheme or plan and it gets carried out, then

8   each person involved is just as guilty of all the

9   rest for whatever happens. And we think that here

10  today this is the situation that Mr. Watkins put

11  himself in on that night back in October in 1999.

12       Now, how do we know this? How do we know that

13  David Watkins is guilty of murder because he aided

14  and abetted or was a co-conspirator? We know this

15  by his own confession. He gave a statement to the

16  police, where in that statement, all of these

17  elements come out. Then it becomes a confession

18  when he admits that he did acts and words and

19  things to support and go along with this murder,

20  that's a confession. And we'll go through the

21  defendant's confession, and I'll demonstrate to you

22  how by his acts and words and support, he's guilty

23  of this crime.

24       In this case, the defendant testified. Let's

25  talk about that for just a second right here. The

234

1    defendant took that witness stand and said on the

2    night I gave my confession, I had been drinking and

3    spoking marijuana, and I don't really remember what

4    I said.  You saw him on the videotape.  You saw

5    Detective Loria read him his miranda form.  At any

6    point, he could have said I don't want to talk.  At

7    any point, he could have said, I want a lawyer.  He

8    didn't do that.  He agreed to talk.

9         Now, you can also look at what he said and

10   what he was talking about.  In his videotape, he

11   was understanding to Detective Loria's questions.

12   He was responding to the questions.  Now, granted,

13   we all heard how mumbled and muffled it was, but is

14   that an indication that he didn't know what was

15   going on or he was too stunned or high?  He knew

16   what was going on on that case.  He knew why he was

17   there.  He knew the questions he was being asked.

18   And he signed a form saying he understood that he

19   did not have to speak with them if he did not want

20   to.  And he was voluntarily giving this statement.

21        Now, when you're considering what weight to

22   give the defendant's statement, he also said a

23   couple more things from that witness stand.  And I

24   wrote them down, because I didn't want anyone to

25   miss them now.  Now, this is my understanding of

1    it -- and you heard the testimony, so you can tell

2    me if I'm listening to it right. But his attorney

3    was asking questions on direct examination and what

4    his responses were. There were a lot of things I

5    said that I shouldn't have been said to begin with

6    in that statement. Well, that's true enough,

7    because in that statement, he convicts himself of

8    murder. And then, finally, on cross-examination,

9    he said, I wouldn't believe I said a lot of those

10   things I said on that video if he hadn't have sat

11   here in the courtroom and watched it today.

12   Because, basically, in that statement, he tells you

13   what happened. He tells you everything that

14   happened. He tells you about kicking them,

15   urinating on them, talking about killing him,

16   someone had a gun. It was offered to him first.

17   And then he sits up on the witness stand and he

18   says I can remember we were playing cards. I can

19   remember who was sitting where. I can remember I

20   went out to the car to get CD's. I can remember

21   how many hands of cards we played. I think it was

22   just one. I can remember all of these details,

23   except the parts where he's involved. He doesn't

24   remember urinating on him. He doesn't remember

25   kicking him. He doesn't remember walking down to

1  the end of Keystone Street. So when you're going

2  back in that jury room, the Judge is going to tell

3  you, as finders of fact, you're to weigh the

4  credibility of witnesses. And you can take into

5  account, not only the testimony he gave from the

6  witness stand, but also prior statements that he

7  had given, and whether those are consistent. And

8  factor all of that in when you're weighing whether

9  to believe someone's testimony. Whether to believe

10  what was in his statement to the police was closer

11  to the truth or whether to believe what he said

12  from the witness stand, that he doesn't remember

13  anything and he didn't do nothing.

14      Now, that we've talked about his statement,

15  and him giving a statement to the police, let's

16  look at the statement. Now, you saw the videotape

17  of the statement and we tried to play you the best

18  tape recording of it we had that we could.

19  Technology is not everything we would like it to

20  be. We wish we could play it through some space

21  age thing and get them to do magical things to it

22  so we could hear everything that happened in the

23  statement. The best we got is what we offered into

24  evidence. And when you go back in that jury room,

25  as finders of fact, part of your job is to

237

1    determine what was said on that statement.    I

2    encourage you to listen to it.   Listen to it

3    closely.   But what I'm going to show you now comes

4    from what we've listened to on the statement and

5    this is what we believe the defendant to be saying

6    from our view of the statement.   Again, as finders

7    of fact, you can tell us -- you can agree with us

8    or you can disagree with us or you can -- you can

9    determine what was actually said on this tape.   But

10   let's start with the defendant's statement.

11       Question:   Okay.   Answer:   Once he got there,

12   I urinated on him.   I took a leak on him for no

13   reason whatsoever.   Question:   All right.   Was this

14   before or after you kicked him?

15       It was before I kicked him.   Question:   Was

16   this before or after Robert picked him up and threw

17   him down on to the ground?   Answer:   It was after

18   I don't know if he dropped him on the head.   I

19   don't know.   When I came outside, his head was

20   bleeding, and that's when I took a leak on him.

21       This is where the defendant confesses to

22   urinating and kicking the victim during the

23   altercation.   I think we all heard that from the

24   statement, so we won't dwell on that.

25                THE COURT:   Come up here just a

238

1    minute.

2                    (Bench conference was held.)

3                    MR. POWELL:  Again, if you continue

4    to go through the defendant's statement, Question:

5    How did he get to the end of the street?  Answer:

6    He pretty much got up on his own.  Question:  And

7    he walked --

8                    THE COURT:  Come up here,

9    Mr. Powell.

10                   (Bench conference was held.)

11                   MR. POWELL:  There was another

12   portion of the statement where Sergeant Loria asked

13   him, Well, if you and Latoya urinated on him, how

14   did you pick him up and carry him to the end of the

15   street?  In the statement, the defendant says,

16   basically he got up and he staggered around and he

17   walked down to the end of the street where the

18   church was.  Play back the portion of the tape,

19   listen to it for yourself.  In that portion of the

20   tape, he says, that after they got done hitting him

21   and kicking him, they walked down to the end of the

22   street.

23        There's another portion of the statement where

24   Sergeant Loria asked the defendant who hit him over

25   the end with the board.  The defendant responds,

239

1.     Toya did.  There's a portion of the statement where

2.     Sergeant Loria goes, Well, you saw this?  And the

3.     defendant's response is I saw this.  And then the

4.     defendant talks about how he tried to stop her.  He

5.     even said the same thing on the witness stand.  He

6.     said he went over to her and grabbed her around the

7.     waist.  In his statement, he also says that when he

8.     grabbed her, she dropped the board.  And he also

9.     says in his statement that she was persistent.  She

10.    kept on.  So since she was persistent, he says in

11.    his statement, if you'll listen for it, I told her

12.    to do it.  Just do it.  And then she went on and

13.    did it, because she was going to do it any way.  If

14.    you'll listen, that's in the statement.

15.         Basically, the defendant is telling Toya, if

16.    you're going to hit him, go ahead and hit him.

17.            MR. DURANT:  Judge, may we approach?

18.            THE COURT:  Yes.

19.            (Bench conference being held.)

20.            MR. DURANT:  Judge, I know that you

21.    have admonished Mr. Powell not to use the actual

22.    statement in addressing the jury.  But in the fact

23.    he's still doing the same thing --

24.            THE COURT:  He can argue, but he

25.    cannot -- (inaudible.)

```
 1                    MR. DURANT:  Well, he is constan

 2    referring to that, Judge.

 3                    THE COURT:  Just refer to your

 4    notes.

 5                    (In the hearing of the jury.)

 6                    MR. POWELL:  If you continue

 7    listening to the statement, you'll come to a point

 8    where Sergeant Loria asked him, Why didn't you help

 9    him?  He was begging Robert for his life, why

10    didn't you help him?  And if you'll listen to the

11    defendant's response, he responds, He never begged

12    me.  If you continue on through his statement --

13                    MR. DURANT:  Judge, we object again.

14    May we approach?

15                    MR. POWELL:  I'm -- I'm not reading.

16                    (Bench conference was held.)

17                    MR. POWELL:  Then we get to the most

18    critical portion of the statement.  There comes a

19    point where Detective Kennedy asked him -- and

20    Junior said -- and before she can finish her

21    question, the defendant starts talking.  And I'm

22    going to play that portion of the videotape

23    statement for you again.

24                    (Taped statement played again. )

25                    MR. DURANT:  Judge, we're going to
```

241

1   object to this also.

2                THE COURT:  Overruled.

3                MR. POWELL:  Before we continue,

4   listen to this portion of the tape very closely.

5   It says that they were walking down there.  And as

6   they were walking, they were talking about killing

7   him.  Then they back up and they said, Whose idea

8   was it?  They say, It was Toya's.  Toya said,

9   Robert, you need to kill him because he knows where

10  you stay.

11               (Tape being played again. )

12               (Videotape stopped.)

13               MR. POWELL:  Thinking about what she

14  said -- she being Latoya, Robert, you need to kill

15  him.  He knows where you stay.  Sergeant Loria is

16  asking the defendant, After you started thinking

17  about what she said, what did you say next?

18               (Videotape being played again.)

19               (Videotape stopped.)

20               MR. POWELL:  I told him to do it.

21               (Videotape being played again.)

22               (Videotape stopped.)

23               MR. POWELL:  Standing on the porch.

24        Mike, can you just pull up the general crime

25  scene?

1          (Attorney complies.)

2          MR. POWELL:  Now, if you'll review

3  the defendant's statement -- particularly this

4  portion I'm referring to.  There's a portion where

5  they talk about we were walking down there and we

6  were talking about killing him.  And I said I

7  couldn't do it.  Following that, there's a portion

8  where Toya said you ought to kill him.  He knows

9  where you stay.  And he says, Where did y'all have

10  that conversation?  The defendant says, On the

11  porch.

12          Now, go back previously in the statement.

13  After y'all urinated on him, how did you carry him

14  down to the ditch?  Well, he got up on his own and

15  walked -- pretty much walked down to the ditch.

16  Based upon the defendant's own statements, after

17  they beat him and after they kicked him and after

18  they urinated on him, Mr. Farrell got up and tried

19  to walk off.  Based on the defendant's own

20  statements, him and Robert and Latoya were standing

21  on the porch.  Latoya had already said you're going

22  to have to kill him because he knows where you

23  stay.  They were standing on the porch on 659

24  Keystone Street.  When he thought about what she

25  said -- and this defendant told Robert Watkins, Do

243

```
 1    it.  Told who to do it?  Junior.  You told Junior
 2    to shoot him?  I told him to do it.
 3          Members of the jury, by acts, urinating,
 4    kicking the victim, by words of encouragement, I
 5    told him to do it.  At that point, they walked from
 6    659 Keystone to this area right here.  Where,
 7    according to the defendant's own words, the victim
 8    had walked.  And the evidence is undisputed -- it's
 9    undisputable that the victim was found --
10    Mr. Farrell was found in that ditch.
11          That is the evidence in this case that comes
12    from the defendant's own statement.  That's why
13    that statement -- the statement you saw the
14    videotape of and the statement that you can go back
15    in that jury room and watch and listen to.  He
16    talks about urinating on the victim, kicking the
17    victim.  They talk about discussing killing the
18    victim on the porch of that residence.  This
19    defendant decides he's going to go along with the
20    other two defendants while they walk down to the
21    end of that street, and then his statement to the
22    police, he describes how the victim got shot.
23    That's evidence that this defendant was down at the
24    end of that street too.  All throughout his
25    statement, he says I heard gunshots while we were
```

244

1    trying to walk back, while we were trying to walk

2    back.  He was down there at the end of Keystone

3    Street.

4         Now, members of the jury, again, I'll be the

5    first to tell you, we have not proven and cannot

6    prove that the gun that killed Jonathan Farrell was

7    in this man's hand.  But when you're engaged in an

8    altercation, an argument over a game of cards, this

9    murder was senseless and spilled out into the

10   street.  This defendant kicked John Farrell.  He

11   urinated on him.  Those are acts -- acts with an

12   indication that he's willing to aid and abet

13   whatever happens to this young man.  Then it

14   escalates.  You've got to kill him.  He know where

15   you stay.  This defendant went along with it from

16   the porch all the way down Keystone Street.  He

17   encouraged it through his words.  And he supported

18   it by his act and presence.

19        When you go back in that jury room, listen to

20   the defendant's statement, and you will see that

21   David Watkins is guilty of his role and

22   participation in this brutal beating and delegation

23   and humiliation and eventual murder of another

24   human being, Jonathan Farrell.

25        And we would ask you, after hearing the

245

1    State's evidence in this case, to take the

2    defendant's own words and convict him of this

3    murder that he was so tangled up in.  Thank you.

4              THE COURT:  Mr. Durant?

5              MR. DURANT:  May it please the

6    Court, counsel?

7         I believe in my opening statement, I asked you

8    not to be guided by your sympathy.  And when I say

9    not to be guided by sympathy, I think any time

10   anyone is killed -- it is -- this is a tragedy,

11   make no mistake about it.  Don't take my remarks as

12   condoning.  Whatever happened to Mr. Farrell, I

13   commensurate with his family.  I do, because it's a

14   another life.

15        But I told you -- I told you at my opening

16   statement that you shouldn't be guided or

17   controlled by sympathy or sensationalism.  The

18   prosecution, they have a very impressive graphic,

19   and you had the opportunity to repeat --

20   repetitious -- repetitive manner see sadly the body

21   of Mr. Farrell over and over again, so it's --

22   after a while, it becomes part of your psyche and

23   you might very well say somebody has to pay for

24   this.  But, like I said, it's despicable.  It's

25   reprehensible.  But, they have to have the right

246

1    person.   They have to prove beyond a reasonable

2    doubt.   That doesn't excuse them as laurent, as

3    awful as it might have been, they still have to

4    prove their case beyond a reasonable doubt.

5        And what I told you yesterday in opening

6    statement, presumption of innocence -- the

7    presumption of innocence that Mr. -- that the

8    constitution gives Mr. Watkins follows him right

9    into the jury deliberation room until you have

10   found otherwise.

11       Now, you've heard a lot -- you've seen -- you

12   have seen -- there's been display over and over to

13   you again -- and I don't mean to be redundant, but

14   it's true -- it's been displayed over and over

15   again.   But I'm asking you just not to be swayed by

16   that.   The fact that, you know, here is this body,

17   it's a morbid scene, you know, it is.   But you must

18   be convinced, each one of you -- each one of you

19   must be convinced that Mr. David Watkins

20   participated in this trial.

21       You know, as Mr. Powell enunciated the law,

22   aiding and abetting, co-conspirators, all of that

23   is true, it's a correct statement of the law.   But

24   I often -- I can't help but think that they're

25   wanted in every way.   Who the shooter might be.

247

 1    Not sure who the shooter might be.  There are three

 2    people charged in this case.  It could be anybody.

 3    But since we can't place the gun -- the gun has

 4    never been found, no fingerprints, nothing has been

 5    proven in this case to connect, other than, as they

 6    say, his words, to connect Mr. Watkins to this

 7    crime.  But they're wanted in every way.  They

 8    want -- well, if we can't get him -- since we can't

 9    prove that he had the gun, since we can't prove he

10    fired the gun, he aided and abetted, he gave

11    encouragement by words and by acts.

12        Is this -- this offense happened on the 18th

13    or of the early morning 19th, maybe, and

14    Mr. Watkins was picked up on the 21st.  Now, some

15    of you might give much credence to what I'm about

16    to say.  But, he was picked up, and he told you --

17    he told you when he was picked up how he was picked

18    up.  You know, I'm not saying there was anything

19    brutal about it, but that's police procedure, pick

20    him up, pull out the gun -- it's a murder

21    suspect -- pull out the gun, put the bottle down,

22    put the phone down.

23        Okay.  And you heard me -- you heard me ask

24    Officer Loria whether he was intoxicated.  He said,

25    No, he wasn't intoxicated.  I said, Did he tell you

248

```
 1    he was intoxicated?  Well, you're going to find in
 2    there what is called a forensic report, and a
 3    forensic report is checked off.  He said, No.  And
 4    it is signed by him.  It is signed by him.  Prior
 5    to that report, he had said no.  Now, you know, I
 6    have to question -- I have to question the
 7    officer's motives.  I have to.  You saw -- you saw
 8    the video.  And, you know, whatever I might feel
 9    about it is what you feel that is going to be
10    important here.  But you saw the video.  You saw
11    David Watkins being interrogated.  And I use the
12    word interrogated purposely as opposed to being
13    questioned.  You saw him being interrogated.  Do
14    you have any questions as to whether it was heavy
15    handed?  Do you have any question as to whether it
16    was oppressive?  You saw him sitting there in the
17    video.  He said he had been drinking and he had
18    been smoking on that same -- I'm not trying to tell
19    you, okay, that should excuse everything -- but
20    when you are questioning a suspect, and that
21    suspect might be impaired, it goes directly to what
22    that person is telling you -- directly to what that
23    person is telling you.  That's all I'm saying.  And
24    he said, there was -- that's standard procedure.
25    They talk to you.  You know, they play each
```

249

1    defendant off against each other.  They'll do it.

2    They do it all the time.

3        What this person said, so it's not farfetched

4    when David Watkins gets up here and tells you,

5    well, he had told me, and I just repeated -- they

6    tell you.  You know, it's -- you know, I'm not

7    saying that it's a direct replicable of what

8    happens in the real courtroom, but you see it on

9    television all the time, the topics --

10                MR. KIDD:  Judge, I'll object.

11                THE COURT:  Sustained.

12                MR. DURANT:  But, you know, they --

13   Robert Watkins called David Watkins.  He testified

14   to that.  He said they called.  He could not tell

15   that -- the time difference, but he said I got a

16   call from an officer, and I got a call from

17   David Watkins -- Robert Watkins.  Robert Watkins

18   was up at headquarters being questioned and called

19   David Watkins, and says, Hey, this is what is

20   happening.

21       The officer listening to the conversation --

22                MR. KIDD:  Judge, I'll object.

23   There's no --

24                THE COURT:  I'm sure that the jurors

25   will recall what is and what is not evidence.  You

250

```
 1    can respond.  Overrule.
 2                   MR. DURANT:  And that's the context
 3    that we're dealing here.  It's not a -- it's pretty
 4    complicated, ladies and gentlemen of the jury.  You
 5    saw him on the videotape.  And you saw him testify
 6    here today.  And you can make your minds up, each
 7    one of you can make your minds up as to the
 8    difference in his testimony here today and the
 9    difference in the videotape.
10         The officer had to ask him several times, do
11    you want to cooperate?  He says -- you know, say
12    the same thing that I said in the pre-interview.
13    As I said, it not farfetched that David Watkins
14    would regurgitate some of this.  He said that he
15    had been drinking and he had been smoking from the
16    time he got off of work for some four hours.
17         I think -- I think it's feasible for somebody
18    to have been drinking and somebody to have been
19    smoking and for them to -- for that individual to
20    answer certain questions.  That might very well
21    appear like that person knows what he's saying.
22    But you saw it.  You saw the video.  You saw the
23    officer stop several times.  In fact, one time and
24    then the top of his voice asking somebody whether
25    he could hear it?  You heard the officer say it,
```

1    you want to continue this?  And the defendant said,

2    No, not really -- something to that effect.  And

3    the officer continued.  And he continued to provide

4    answers.

5        It is our position, ladies and gentlemen of

6    the jury, that Mr. Watkins did not aid or abet.  If

7    you believe that Mr. Watkins' statement is a

8    statement given under duress or impairment, you

9    have to take that into consideration.  Did Mr. --

10   was Mr. Watkins fully aware of what he was saying?

11   Was all of his faculties intact that he could make

12   the statements that he was making?

13       I think -- I think you can listen to some of

14   the questions, and you can see that some of them

15   were suggested.  And Mr. Watkins said, Yes, I told

16   them so and so.  I think it's clear that they were

17   suggested.  And I think it was clear.  You saw it.

18   You might not agree with me, but I think it was

19   clear that the questioning was heavy-handed.

20       Now, you might say that that is something that

21   police have to do.  But when someone has indicated

22   to you that they are impaired, and that they've

23   been drinking and smoking, I think there's

24   something you need to take into consideration and

25   say, Well, listen, I'm going to wait for a couple

252

1    of hours or whatever it takes.  You don't have to

2    question them right there and then.  They are at

3    police headquarters, they aren't going anywhere.

4    They made statements.  They all made statements,

5    and the officers were using those statements.

6        David Watkins testified that they were telling

7    him what this person said and what that person

8    didn't say.  And how he was going to be implicated.

9    And, again, I say it's not farfetched, people

10   repeat -- they repeat.  People are in a

11   situation -- you saw -- you saw the interview room.

12   You saw the officers.  This is David Watkins and

13   several officers.  He has to deal with that.  He

14   has to answer their questions.  Oh, they say you

15   can stop any time you want to or you can have a

16   lawyer any time you want to.

17       But David Watkins was trying to do anything

18   that he could to please.  After a while, those

19   words, you can have a lawyer any time or you can

20   stop any time you want to, and especially after

21   you've had a pre-interview -- after you've had a

22   pre-interview where these things are set out.

23       If the pre-interview does not meet with the

24   officer's approval, there will be no videotaping of

25   that -- of the defendant, or in this case, my

297

253

1     client.

2       As I said -- as I said to you before, they

3     don't know who killed Mr. Farrell, and that's

4     unfortunate, because that's a big dragnet. They're

5     going to widen an umbrella, and that umbrella is

6     going to include aiding and abetting,

7     co-conspirators. I think it's not -- I don't think

8     it's inconsistent. You saw it on the video. I

9     don't think there's any inconsistence that a person

10    has been drinking and a person has been smoking

11    marijuana. I don't think it's inconsistent that a

12    person -- that that person would make a statement

13    that, Well, I -- I peed on him. But you think

14    about it. Think about it.

15      And there's no evidence -- there is no

16    evidence that has been presented here that, again,

17    that from the medical examiner's office, from the

18    forensic department that said that there was urine

19    on Mr. Farrell. No evidence. None has been

20    presented here. All of that has come back

21    negative. No evidence. Yes, it was a such and

22    such with such and such acidity, which I would -- I

23    have determined to be urine. None of that has come

24    back here.

25      Yeah, they'll say that his words implicated

1    him.  But his words that you cannot trust because

2    of the situation, the environment that he was in.

3    Yeah, you saw it on the tape.  We don't dispute

4    that.  But he said it on the stand.  And remember

5    what he said on the stand.  He said, but for the

6    fact that I see myself and I hear myself uttering

7    those words, I would not believe -- I would not

8    believe that I said those things.  That's what he

9    said.

10       Mr. Powell tried to make it more complicated

11    than that, but it's -- is that uncomplicated?  He

12    said, but for the fact.  Doesn't it sound like

13    somebody after the night said, What?  Did I say

14    that?  Did I do that?  It's scary sometimes.  Did I

15    do that?  Oh, man, I can't remember any of that.

16    Wow, and the person said, Yes, you were saying A,

17    B, C, and X, Y, Z.  And you say, I can't remember

18    that.  That's what happens when you inhale or you

19    imbibe alcohol.  And, in this case, inhale

20    marijuana.  That's what -- it distorts -- it

21    distorts not just your vision, but your mind and

22    everything.  And it's not anything -- and it's not

23    anything complementary to my client, but the way

24    these guys smoke, but you can't take that and hold

25    that against him.  This is murder.  This is not

255

1    smoking.  He's not charged with marijuana

2    possession.  This is murder.  But some folks smoke

3    that stuff and it really affects their mind and

4    their memory.

5         And, you know, if Mr. -- and I'm going to be

6    through in a minute -- if Mr. Watkins said, I can't

7    remember, not to my memory, he's -- let me just add

8    one thing.  He's doing the best he can getting up

9    there and testifying.  You know, he's not

10    accustomed to doing that.  He said that in the

11    interview, he's not accustomed to doing that.  He's

12    not a person who is a witness in two hundred cases.

13         So, you know, if he's a little confused by the

14    prosecution's steady stream of questions, don't

15    hold it against him.  He doesn't exactly have a BA

16    and a PH degree.  In fact, I'm being extreme.  He

17    hasn't even graduated from high school.  So, you

18    know, it's not that easy to get up there and deal

19    with a prosecutor bombarding you with questions.

20         If you believe that the officer was fair and

21    you believe everything that they said, then you

22    find Mr. Watkins guilty, if you believe them.  But

23    if you believe that officers can be appestat

24    sometime -- and not the entire police force, but

25    you saw it.

256

1    And I'm glad that they have the will to come

2    in here and bring all these beautiful impressive

3    graphics.  I'm glad that they -- in fact, I'm a

4    little envious.  I can't afford it.  So I'm doing

5    the best I can do standing up here and talking to

6    you.  That's what I'm doing here today.  Divorced

7    of all graphics, but the graphics benefit us.

8    Because you've been the beneficiaries of seeing

9    Mr. Watkins.  And if you can't -- don't think he

10   was intimidated, well, then convict him, if you

11   don't think he was intimidated and you don't think

12   his statement was an involuntary statement.

13       But I'm asking you to open your mind -- each

14   one of you to open your mind and deal with the

15   realities.  That's what I'm asking you, to deal

16   with the realities.  And if you deal with the

17   realities, I know you'll come back with a verdict

18   of not guilty for my client.  Thank you.

19                THE COURT:  Mr. Kidd, are you

20   going --

21                MR. KIDD:  If it pleases the Court,

22   Mr. Durant?

23       Ladies and gentlemen, Mr. Durant made a

24   reference to television.  This isn't television.

25   This is a real mother.  She's not fictional.  She

1    had a real son. He's dead. This is a real

2    defendant accused of doing things that I can't even

3    imagine to a fellow human being. In his own words,

4    for no reason at all. This is real. It's not

5    fiction.

6        Mr. Durant went through a laundry list of

7    things. He laid out an argument, You should acquit

8    this defendant, because he's a drug user and he

9    dropped out of high school. That's ridiculous.

10   It's insulting.

11       Ladies and gentlemen, people have to accept

12   responsibility. You saw the interview in your own

13   eyes. You saw Detective Loria. You heard what he

14   did. Ladies and gentlemen, he's not dealing with

15   choir children. He's dealing with people that are

16   street smart. He was fair. He read Mr. Watkins

17   his rights, not once, but twice. You heard how he

18   went through each individual one. Do you

19   understand? If you understand, check here. If you

20   don't understand, I'll explain it to you. Not only

21   did he read them in his pre-interview, he went back

22   over them on the videotape, another detective

23   there.

24       Mr. Durant said, They brought him in. They

25   coerced his statement. They knew he was drinking.

1   They could have given him a couple hours to sober

2   up before they talked to him, that's what

3   Mr. Durant said.  If they want to be fair, give him

4   a couple of hours.  Ladies and gentlemen, that's

5   what they did.  You put that video statement in.

6   That statement started at 0038 hours, almost one

7   a.m.  This gentleman said he got to the PD between

8   7:30 and 8:00.  That's almost five hours for him to

9   sober up.  He wasn't intoxicated.  You saw him.

10      Mr. Durant said he was under duress.  He was

11  under duress when he made that statement.  He was

12  under duress from the fact that he had a guilty

13  conscience about what he had done to somebody for

14  no reason at all.  That's real duress.  That's

15  where the duress came from.

16      Ladies and gentlemen, what type of standard

17  are we holding police officers to if you buy

18  Mr. Durant's argument?  What are they supposed to

19  do, go give people sobriety tests before they take

20  a statement?  You heard about the years of

21  experience that Sergeant Loria -- Sergeant, in

22  charge, supervisor of homicide investigations for

23  the City of Montgomery.  Not only is it his job to

24  investigate homicide, it's his job to make sure

25  that everybody else under his supervision does it

259

1    correctly.   He knows how to do an interview

2    correctly.   And, ladies and gentlemen, that's what

3    he did.

4         No better evidence than yourself to look at

5    this and say, Well, was Sergeant Loria fair to this

6    individual?   Did David Watkins listen to questions?

7    Did he appear to understand questions?   And was he

8    effectively able to communicate answers to Sergeant

9    Loria?   The answers to those questions are yes.

10   David Watkins could have stopped that interview at

11   any time he wanted to, but he didn't.   He says, I

12   can't believe I said those things.   I can't believe

13   I convicted myself of capital murder -- excuse

14   me -- of intentional murder.

15        Ladies and gentlemen, I told you yesterday

16   that this case was going to come in two phases.   I

17   told you that there would be evidence through a

18   confession, and that that confession convicted

19   David Watkins.   That's what we heard yesterday.

20   Everything you heard yesterday was about the

21   confession.   That's exactly the way I told you.   I

22   told you yesterday the State does not have to prove

23   to you that David Watkins pulled that trigger.

24        Ladies and gentlemen, I don't know who pulled

25   that trigger.   The only person who really knows or

260

1    the only people who really knows who pulled that

2    trigger are those individuals that were there.

3    Ladies and gentlemen, I'm not telling you that

4    David Watkins didn't pull that trigger. I'm

5    telling you what he told you in his statement.

6        His statement alone encompasses every single

7    element of aiding and abetting. In layman's terms,

8    aiding and abetting can be referred to as the three

9    musketeer statute. We're all for one, and we're

10   all for one. We're in this boat together. If it

11   goes down, we all go down. Responsibility on

12   others' actions.

13       David Watkins says that he acted by kicking,

14   by urinating. He acted by encouraging the

15   shooting. All of those things show that he aids

16   and abets. That came from David Watkins' own

17   mouth. Who better to believe?.

18       But, ladies and gentlemen, there's more than

19   just his statement to this case. Today, we went

20   through the physical evidence. The physical

21   evidence shows that there are some drastic

22   inconsistencies with what David Watkins told you.

23   The physical evidence indicates that David Watkins

24   is not being truthful about what happened. He took

25   the stand today. He remembered everything that

1   happened before the shooting took place outside
2   Keystone Street except for the portions that
3   implicated himself, right down to where everybody
4   was sitting down at the table. The exact same way
5   that he remembered everything that happened at the
6   police station up to the point where it came time
7   for him to give his statement. He's medicated his
8   involvement. He's not being truthful. And the
9   Judge will tell you that if you believe he's not
10  being truthful, you can completely disregard
11  everything David Watkins said from the stand.
12      Ladies and gentlemen, the physical evidence
13  shows that there was one shell casing found in that
14  ditch. The physical evidence shows from the
15  photographs there was brown dirt -- a dirt pile
16  very close to where the body was found. I want you
17  to go back in the jury room. I want you to take a
18  close look at State's 13. I'm not showing you this
19  picture to gross you out to try to involve some
20  type of emotional confrontation inside. I'm
21  showing you this for a reason. I want you to look
22  at the top of his head. What do you see? You see
23  dirt, not just regular dirt, but brown dirt. I
24  submit to you, the same type of dirt that was found
25  on that dirt pile. Go back. Look at State's 26.

262

1    Pass it around among yourselves.  What do you see

2    on his face?  Dirt.  The same type of dirt that was

3    on the back of his head.

4        And, finally, look at State's 27, down his --

5            MR. DURANT:  Judge, we object.

6    There was no evidence concerning dirt and --

7            THE COURT:  Again, I think the jury

8    will recall.  I don't recall.

9            MR. KIDD:  You can look.  It's on

10   the picture, ladies and gentlemen, decide for

11   yourself.  You can see in Page 27, there's dirt all

12   on the side of his face.  Look at the crime scene

13   video.  On the back of his shirt -- jacket, dirt on

14   his back.  What did Dr. Lauridson say?

15   Dr. Lauridson said that there were abrasion type

16   injuries to his face, to his knees, to his elbow,

17   pretty much the entire length of his body.

18       Now, Mr. Durant asked Dr. Lauridson, Could

19   that be consistent with someone tripping and

20   falling?  Sure, it could be.  But to get that many

21   injuries in that many locations, you would have had

22   to trip and fall several times.  What else did

23   Dr. Lauridson say?  Dr. Lauridson, are those type

24   of injuries consistent with someone being drug?  He

25   said, Yes, they are consistent with someone being

263

1    drug.

2         Ladies and gentlemen, I submit to you that

3    Jonathan Farrell did not walk into that ditch.   Day

4    Street was only a matter of yards from where his

5    initial confrontation -- confrontation took place.

6    He ended up almost two hundred yards in the

7    opposite direction.   I submit to you that the

8    physical evidence shows that he had some help

9    getting to where he ended up.   And, ladies and

10   gentlemen, this gentleman here wants you to believe

11   that a fifteen-year-old girl could have gotten that

12   individual down in that ditch by herself.

13        Ladies and gentlemen, the physical evidence

14   tells a different story.   The physical evidence

15   tells you that there were two gunshots, and that

16   they came in different directions.   You saw the

17   defendant.   He's on his knees.   If you believe that

18   those gunshots came in succession as the defendant

19   said, the -- one of the gunshots came from this

20   direction here.   That means that the shooter would

21   have had to have shot, then walked all the way

22   around to the other side while he was still on his

23   knees and shot again.   And there would have been

24   two shell casings in that ditch.   There weren't.

25   There was one.   I submit to you that that tells you

264

1    that there was another gunshot.  That gunshot that

2    grazed his face was the first gunshot, and it

3    didn't come in that ditch.

4         What did David Watkins say?  He said from the

5    very beginning, Jonathan Farrell was begging for

6    his life, Don't kill me.  Ladies and gentlemen, if

7    they're just out there kicking him, hitting him,

8    tussling with him, what in his head is going to

9    trigger the fact these people are going to kill me?

10        But if you're out there and you're cracked

11   over your head with a two-by-four and someone

12   shoots you in the face, these people are going to

13   kill me.  Please, don't kill me.  Don't take my

14   life.  I submit to you that's what happened.  He

15   was shot in that road and somehow he ended up

16   almost two hundred yards away with abrasions on his

17   body and with dirt all over his back and his face.

18        Ladies and gentlemen, even if you believe

19   David Watkins and that Latoya Davis fired that

20   fatal shot, Jonathan Farrell had help getting in

21   that ditch.  Someone aided and someone abetted, and

22   Jonathan Farrell is dead.

23        Ladies and gentlemen, it's your turn.  I asked

24   you yesterday, you have the opportunity to speak

25   with words of justice.  It's time to speak.

265

1    THE COURT:  Ladies and gentlemen,

2    it's now my duty to explain to you the law that

3    will guide you in your deliberations.  We

4    appreciate how carefully you've listened.  And I'm

5    going slow, because, unfortunately, in the State of

6    Alabama, you're not permitted to have a copy of my

7    charge to take with you to the deliberation room.

8    Now, I disagree with the law in that respect, but I

9    must follow it, and so must you.

10    Now, this case is brought to you by an

11    indictment which charges David Watkins with the

12    intentional murder of John Farrell.  I want you to

13    understand from the beginning that the indictment

14    here has no bearing whatsoever on the guilt or

15    innocence of any person.  It's not evidence in the

16    case.  It's merely the paperwork or legal process

17    by which a case is presented for trial.

18    Now, as to this charge, the defendant has pled

19    not guilty.  A plea of not guilty places the burden

20    on the State of Alabama to prove by the evidence

21    presented the guilt of defendant beyond a

22    reasonable doubt.  So before a conviction can be

23    had, each of you must be satisfied beyond a

24    reasonable doubt of his guilt.  Otherwise, he's

25    entitled to an acquittal.

266

1      Furthermore, the defendant is presumed to be

2    innocent.  And that presumption attends him until

3    his guilt is established from the evidence beyond a

4    reasonable doubt.  Now, the presumption of

5    innocence is evidence in the case and is to be

6    considered by you along with all the other

7    evidence.  It's a fact which is to be considered by

8    you and goes with the defendant to your verdict

9    unless the evidence convinces you beyond a

10    reasonable doubt of each and every element of the

11    offense here.

12      Now, we've all mentioned reasonable doubt, and

13    it is a relative term, and it's not easy to define.

14    But, basically, a reasonable doubt is a fair doubt.

15    It's based upon reason and common sense arising

16    from the evidence.  In short, it's a doubt for

17    which you can assign a reason that comes from the

18    evidence.  Now, a reasonable doubt may arise not

19    only from the evidence produced, but also from a

20    lack of evidence or any part of the evidence.

21    Again, the burden is on the State to prove all of

22    the elements beyond a reasonable doubt.

23      Now, the law tells us this about the term

24    reasonable doubt.  It's not just a mere possible

25    doubt.  In other words, it's not a mere guess,

267

1    surmise, or capricious doubt.  The doubt which
2    would justify an acquittal must be an actual doubt.
3    The reasonable doubt which entitles an accused to
4    an acquittal is not vague, fanciful, conjectural,
5    or speculative, but it's a reasonable doubt arising
6    from the evidence and remaining after careful
7    consideration of the testimony such as men and
8    women such as you would consider under all the
9    circumstances.
10       Now, the State is not required to convince you
11   of defendant's guilt beyond all doubt or to a
12   mathematical certainty.  Again, it's beyond a
13   reasonable doubt.
14       I told you earlier that you're the sole judges
15   of the evidence, and I'm going to remind you or
16   explain to you, again, what is and what is not
17   evidence.
18       First, as I just said, the indictment here, it
19   is not evidence.  In addition, the arguments,
20   assertions, the statements of the attorneys, those
21   are not evidence.  Rulings made by the Court during
22   the course of the trial, those are not evidence.
23   Evidence is simply the testimony of witnesses under
24   oath from that witness stand.  It's any exhibits
25   that have been admitted into evidence.  And it's

312

268

1    any presumptions of law that I've given you such as

2    the presumption of innocence.

3         Just as you're the judges of the evidence,

4    you're also the sole and exclusive judges of the

5    credibility of witnesses and the weight that should

6    be given their testimony.  In passing on the

7    credibility of a witness, you have the right to

8    consider such factors as any bias, interest, or

9    prejudice that may have been exhibited to you while

10    that person was testifying.  You also can consider

11    the demeanor of the witness on the stand.  That is,

12    how did they appear to you while they were

13    testifying?  Also, you can consider the basis for

14    their testimony.  That is, how did they know the

15    facts to which they testified?  Did they have an

16    opportunity to see, hear, learn, just how did they

17    know those facts?

18         Now, the defendant here has testified in his

19    own behalf, and he has a perfect right to do so.

20    And you cannot capriciously disregard his testimony

21    any more than that of any other witness.  The law

22    is that you must take his testimony in the case and

23    consider it along with all the other evidence in

24    the case.  But while you are considering his

25    testimony, you may also take into consideration his

269

1    interest in the outcome of the case.

2        Now, with regard to the statement made by the

3    defendant to the police, you should consider all of

4    the facts and circumstances surrounding the taking

5    of the statement in determining the weight or

6    credibility, if any, that you will give to him.

7    In determining the credibility or weight, to which

8    it is entitled, you should consider the

9    circumstances under which it was obtained and the

10    way or manner in which it was solicited, including

11    the situation and relationship between the

12    defendants and the others present or taking the

13    statement.  And those are the type factors you

14    should consider in that regard.

15        Now, with a particular charge here, the

16    defendant is charged with intentional murder.

17    Under the law of Alabama, a person commits the

18    crime of murder if he causes the death of another

19    person and in performing the act or acts which

20    caused the death of that person, he intends to kill

21    that person.  So in order to convict here, the

22    State must prove beyond a reasonable doubt, first

23    of all, that John Farrell is dead.  And, second,

24    that the defendant, David Watkins, caused the death

25    of Mr. Farrell by shooting him or aiding and

270

1    abetting -- and I'll explain that in just a moment.

2    And in committing the act or acts which caused the

3    death of the deceased, the defendant acted with

4    intent.

5        Under the law, a person acts intentionally

6    when it is his purpose to cause the death of

7    another person.  An intent may be inferred from the

8    facts and circumstances surrounding the whole

9    transaction or incident as well as the conduct of

10    the defendant.

11        Now, you've heard the attorneys mention aid

12    and abet.  The law in Alabama is that a person is

13    legally accountable for the behavior of another

14    person constituting a crime if with intent to

15    promote or assist the commission of that crime he

16    aids or abets such other person in committing the

17    crime.  In other words, there's really no

18    distinct -- distinction between principals and

19    accessories in the commission of an offense.

20        Aid and abet comprehends all assistance

21    rendered by acts or words of encouragement, support

22    or presence, actual or constructive, to render

23    assistance, should it become necessary.  However,

24    mere presence without giving aid or encouragement

25    at or before the commission of the crime does not

1    constitute aiding and abetting.  But where there
2    are two or more persons who enter into a common
3    enterprise and a criminal offense is contemplated,
4    then each could be said to be a co-conspirator.
5    And if the unlawful act is carried out, each is
6    guilty of the offense.  And, again, any word or act
7    contributing to the commission of the offense or
8    intended to incite or encourage its accomplishment
9    makes one a co-conspirator.
10        Now, it's a jury question for you to decide
11    whether or not the defendant aided or abetted or
12    was a co-conspirator in the commission of the
13    offense here.  And if you're convinced beyond a
14    reasonable doubt that he was present with a view to
15    render aid should it become necessary, then he
16    could be found guilty of being an aider or abettor.
17        However, if you're not convinced beyond a
18    reasonable doubt that he aided, abetted, and/or
19    conspired to commit the offense, then you would not
20    be able to determine that he aided and abetted in
21    the offense.
22        In a moment you'll be beginning your
23    deliberations.  In passing on the evidence, you
24    have the right to use your knowledge of people and
25    their affairs.  This is the tool that is given you

272

1  in which some of us simply call your common sense.

2  Also in arriving at your verdict, you must not

3  permit sympathy, prejudice or emotion to influence

4  you.

5      Furthermore, you must not base your verdict

6  upon any preconceived idea of what would be a

7  popular or unpopular verdict.  In other words, your

8  verdict must strictly be based on the evidence

9  presented and the law that applies.

10     Also, before you reach your verdict, all

11  twelve of you must reach the same verdict.  In

12  other words, there can be no split verdict.  It

13  must be unanimous.

14     In a moment, you'll be going back to the jury

15  deliberation room, and one of the first things you

16  need to do is to select one person to act as your

17  spokesperson or your foreperson.  Now, that person

18  will have no greater weight in your deliberations

19  than anyone else, but will simply act as your

20  foreperson.  You need to discuss the case.  And if

21  you have any questions -- there's paper and pencil

22  back there -- have the foreperson write out the

23  question, sign it.  And if it's a question of law,

24  I will answer it.  However, if it's a question of

25  fact, I cannot assist you, as you are the sole and

273

1    exclusive judges of the facts.

2        Once you have reached a verdict, have the

3    foreperson sign the verdict form, and you'll be

4    brought back into the courtroom, and it will be

5    read in the courtroom.

6        Now, the verdict form is really very simple.

7    It's either we, the jury, find the defendant guilty

8    of intentional murder as charged in the indictment.

9    Or we, the jury, find the defendant not guilty.

10        There's one last thing I must do -- and I just

11    want to stress the importance of this, because just

12    last Monday we had a situation where after the

13    first witness a juror had to be excused.  And it

14    was a one-day trial, and we did not get an

15    alternate and it presented a bad situation.

16    Particularly, in a criminal case, if for some

17    reason someone cannot continue deliberating and the

18    number reaches less than twelve, I would have to

19    declare a mistrial, and we would have to start all

20    over.  So because of that -- and we weren't sure

21    how long this case really would last, we got two

22    alternates.  And I'm going to ask the two

23    alternates to stay in the courtroom when the rest

24    of you go back in just a moment.

25        One thing, you are in charge of your time.  If

274

1    you want to take a break -- and you might want to

2    go downstairs. If you want to get a Coke or

3    something and bring back up here, you can do so.

4    You also have your own thermostat back there, so

5    you can have it as hot or cold as you want to. But

6    the attorneys are real good about letting me know

7    if I've overlooked something or misstated something

8    or need to charge you further. And what says the

9    State?

10                    MR. KIDD:  Satisfied Your Honor.

11                    MR. DURANT:  Satisfied.

12                    THE COURT:  Okay. It's going to

13   take us a minute to get all the exhibits back

14   there. And I may have Ms. Harrell take you back

15   there, and then it might be a good time to take a

16   break. We have a video back there. The stereo or

17   the -- I call them record players -- I guess that

18   shows how old I am -- it will go back there with

19   you. And if you need any assistance, the law clerk

20   can help you with it. But they'll go back there

21   with you, and you can look at the video, listen to

22   the audio, and, of course, the exhibits as well.

23   Because it's going to take a few minutes, I'm going

24   to let them have a break. There are restrooms back

25   there. And there are two doors. And she'll show

275

1   you which one you really need to knock on.  It's

2   not this one.  If you have any questions -- but I'm

3   going to get her to take y'all back there at this

4   time.

5       And the two alternates are -- I'm sorry --

6   Kim Dowe and John Harrison.  And if the two of you

7   would remain in here when you go back there?  Thank

8   you.

9                   (Jury deliberating.)

10                  (In the presence of the jury.)

11          THE COURT:  I understand you've

12  reached a verdict and you want the Court to read

13  the verdict.

14      It is the verdict of the jury, we, the jury,

15  find the defendant guilty of intentional murder as

16  charged in the indictment.

17      Do you want the jurors polled?

18          MR. DURANT:  Yes.

19          THE COURT:  I'm going to ask each of

20  you if this is your verdict.  And I'll start down

21  here.  Is it your verdict?

22          JUROR:  Yes.

23          JUROR:  Yes.

24          JUROR:  Yes.

25          JUROR:  (Juror nods.)

276

```
 1              JUROR:   (Juror nods.)

 2              JUROR:   (Juror nods.)

 3              JUROR:   Yes.

 4              JUROR:   (Juror nods.)

 5              JUROR:   (Juror nods.)

 6              JUROR:   (Juror nods.)

 7              JUROR:   (Juror nods.)

 8              JUROR:   (Juror nods.)

 9              THE COURT:   And let the Record

10    reflect that all jurors agreed it was their

11    verdict.   And in accordance with the jury verdict,

12    the Court will adjudicate the defendant guilty.

13    And I'll set sentencing in a moment.

14         I want to tell you how much we appreciate you

15    serving.   I know when most people come, they don't

16    realize what difficult decisions you're going to

17    have to make.   But we couldn't operate without you,

18    and I hope it's been a good experience over all.

19         The good news is you're excused for the rest

20    of the week.   The clerk's office isn't open.   They

21    will send you -- and it's small compensation -- but

22    they can send you your juror fees.   Or if you want

23    to come down tomorrow, you can come down and get

24    them.   But you are excused.   And I'm going to let

25    her take you out the back way and all the
```

277

```
 1    spectators will need to stay until the jurors have
 2    left the courthouse.
 3                    (Out of presence of jury.)
 4              THE COURT:  And I'm going to set
 5    sentencing -- I probably can set sentencing
 6    quickly, because I think he's been incarcerated
 7    since the youthful offender report was done and
 8    nothing would have changed.  So I'm going to try to
 9    set sentencing for May the 24th at 8:30.  I don't
10    think that will be a problem with whoever the
11    probation officer was, but I think we can do that.
12    And I'll recommit the defendant to the custody of
13    the sheriff.
14        Do you want to take the victim's family on
15    out?
16                    (Court adjourned.)
17
18              *  *  *  *  *  *  *  *  *  *  *
19
20                    (Court in session on Monday,
21                    October 22, 2001.)
22              THE COURT:  Robert Watkins,
23    David Watkins, and Latoya Davis.
24              MR. POWELL:  Your Honor, I believe
25    we still need Mr. Durant.
```

278

```
 1                    THE COURT:  Where is Mr. Durant?

 2                    MR. JOHNSON:  He is here.  I saw him

 3   this morning.

 4                    THE COURT:  Okay.  If you -- which

 5   family member are you here for?

 6                    MR. HARTLEY:  This is Latoya's

 7   father.

 8                    THE COURT:  Okay.  If he would sit

 9   down until I need to hear from him.  I don't need

10   anybody except the people up here.

11       Now, two of you were -- went to trial and were

12   convicted.  And Robert Watkins pled guilty.  And

13   you're all here for sentencing concerning the

14   murder.

15       And I'll start with Robert Watkins.  Is there

16   anything you want to say before I pronounce

17   sentence?

18                    THE DEFENDANT:  Yes, ma'am.  I want

19   to say --

20                    THE COURT:  Well, you need to speak

21   up.

22                    THE DEFENDANT:  I want to say I'm

23   sorry to the family for this happening.  I'm sorry

24   for the people of Jonathan Farrell.

25                    MR. JOHNSON:  Judge -- well, go
```

279

1    ahead.

2                    THE COURT:  And do you have anyone

3    here that you want to speak on his behalf or do you

4    have anything you want to say, Mr. Johnson?

5                    MR. JOHNSON:  His mother, and then

6    I'm going to say something.

7          Please state your name.

8                    THE MOTHER:  Brenda Faye Watkins.

9                    MR. JOHNSON:  Would you address the

10   Court, please, for your son?

11                   THE MOTHER:  Yes.  My son, Robert

12   Lee Watkins.  All I want to say was I'm sorry about

13   what happened and also with them.  And that he has

14   been good, got a job, family, fixing to have a

15   baby, and I was asking the Court to, you know, be

16   innocent with him and take that into consideration.

17                   THE COURT:  Okay.  Anyone else on

18   his behalf?

19                   MR. JOHNSON:  I don't -- Your

20   Honor --

21                   THE COURT:  And who is the mother of

22   this child?  I know that Latoya's sister is the

23   mother of some of the children.  Is this a new --

24   this is another -- okay.

25                   MR. JOHNSON:  Judge, when we entered

280

```
 1    a plea, we did have a plea agreement in this case.

 2    The agreement would have been or is that the

 3    State --

 4              THE COURT: Wait just a minute.  I

 5    don't remember.  And I just got Ms. Newman to type

 6    that up, and I don't remember any kind --

 7              MR. JOHNSON:  We didn't put it on

 8    the Record.

 9              MR. KIDD:  Well, Judge, I don't --

10    my understanding was that there was no specific

11    agreement that I agreed with --

12              MR. JOHNSON:  Basically, Your

13    Honor --

14              MR. KIDD:  We would not be taking

15    any position on what the Court decided to do in the

16    event that Mr. Watkins cooperated fully.

17              MR. JOHNSON:  If he cooperated

18    fully, the State would not object to a minimum

19    sentence of twenty years.

20              MR. KIDD:  I did not say that.

21              THE COURT:  Of course -- there's

22    nothing on Record about a plea agreement.  And I

23    don't know what you mean by cooperate fully.

24    Because I do recall him testifying at Latoya Davis'

25    trial.  And let's just say, his testimony was not
```

281

1    what I would consider cooperating fully.  Okay.

2        Anything else on behalf of Robert Watkins?

3                MR. JOHNSON:  I would just say that

4    he has -- as far as what he's done since this

5    happened, he has worked full-time.  He's been to my

6    office.  We've discussed this a number of times,

7    and I think he's tried to do something to make

8    himself better.

9        He's trying to take care of his family, and do

10   things he should, to try to be a better person.

11               THE COURT:  Now, Mr. Hartley, I'll

12   go to you and your client, Ms. Davis.

13               MR. HARTLEY:  Your Honor -- I'm

14   sorry.

15               THE COURT:  Okay.  Anything she

16   wants to say or you or anyone in her family?

17               MR. HARTLEY:  Your Honor -- do you

18   want to speak first and then --

19               THE DEFENDANT:  Yes.  I just want to

20   say I'm sorry for what happened.  And, you know, I

21   wish the family the best.

22               MR. HARTLEY:  Your Honor, most

23   importantly, I would say that we are claiming that

24   there is some surprise in this hearing in that

25   Mr. -- counsel has suggested -- Mr. Johnson has

282

1    suggested on his client's behalf that there is an

2    agreement about his testimony.  We inquired about

3    that.  We went into that at length during the

4    trial.  Prior to trial, I discussed it with the

5    district attorney.  If Mr. Robert Watkins testified

6    against my client with the expectation that he

7    would get minimum sentence, that didn't come out in

8    trial, Judge.

9              THE COURT:  I'm aware of what

10   occurred at trial.

11             MR. HARTLEY:  But, that is just a

12   matter that we claim that surprised us this

13   morning, Judge.  But, more importantly, we would

14   say that in hearing the trial from Latoya, it was

15   very clear, as convoluted and as contradictory as

16   the evidence was, that both Robert Davis and

17   David Watkins -- Robert Watkins and David Watkins,

18   both had a prior history with this man.

19   Mr. Farrell was known to them from some prior

20   incident that the Court heard about.  And it

21   involved them fighting and abusing and treating

22   this man badly.  There was no evidence in the case

23   that Latoya had ever seen or heard of John Farrell

24   before that night.  And I think that it rings very

25   hollow for them to say that they're so sorry about

283

```
 1    this, but they had -- it had to be drug out of them
 2    in Court that they had both been involved in an
 3    assault with Mr. Farrell two weeks before the date
 4    of his death.  And I hope the Court remembered that
 5    she wasn't involved in that, Judge.  She had no
 6    connection before.
 7              THE COURT:  Okay.  Anything else on
 8    her behalf?
 9              (No response.)
10              THE COURT:  Okay.  If you want to
11    come up here and -- I know you're her father and
12    have been here during other proceedings.  And would
13    you state your name for the Record?
14              THE FATHER:  Eugene Davis.
15              THE COURT:  And is there something
16    you want to bring to the Court's attention?
17              THE FATHER:  I'm sorry for the
18    defendant and everything.  But she has done a whole
19    lot better since this occurred.  And she started
20    school trying to do a little bit better for
21    herself.
22              THE COURT:  Okay.  If you'll have a
23    seat.
24         Now, I'll go -- Mr. Durant, do you and your
25    client, David Watkins, is there anything either of
```

284

1    you want to say or anyone on behalf of him?

2               MR. DURANT:  Judge, as the Court is

3    aware, Mr. Watkins went to trial.  Judge, I don't

4    think that there's anything that came out in trial

5    that would place a gun or make Mr. Watkins the

6    shooter.  I am not saying that in any way condoning

7    what happened.  This has been a tragic affair on

8    all sides.  These men were drinking and smoking

9    that evening and, although, that doesn't undermind

10   the charge that they are charged with, Judge, I

11   will ask you to take that into consideration.  And

12   that -- that he's a very young man.  And I would

13   ask that the Court impose the minimum sentence.

14   There's been some -- came out in testimony that

15   during the trial that there was some -- some

16   horrific things done, but, Judge, I don't think

17   that the prosecution was ever able to place my

18   client as the person who was doing those things in

19   terms of inflicting anything upon Mr. -- the

20   victim.  And I'll ask the Court to just consider

21   those factors in sentencing Mr. Watkins.

22               THE COURT:  Okay.  Mr. Watkins, is

23   there anything you want to say?

24               THE DEFENDANT:  I just want to

25   apologize to the victim's family.  And I would like

285

```
 1    to say that I had no control over what happened.  I
 2    really -- I didn't cause any of it that happened.
 3    There was no way I could stop what happened, and I
 4    just want to say I'm sorry.
 5                    THE COURT:  Okay.  Is there anything
 6    that --
 7                    MR. KIDD:  Judge, if I may speak for
 8    Ms. Davis?
 9                    THE COURT:  Okay.
10                    MR. KIDD:  First of all, Judge, I
11    would like to put on the Record that there was no
12    specific plea agreement with regard to
13    Robert Watkins' case.  And, in fact, if I'm not
14    mistaken, when Mr. Watkins took the stand in
15    Ms. Davis' case, I asked him specifically about
16    that, and he replied in the negative that there was
17    no specific plea agreement as to what would happen
18    to him at sentencing.
19         Judge, Ms. Davis and her family have sat
20    through two trials in this case.  She sat through a
21    plea in this case, and she has heard these three
22    individuals recite and regurgitate the facts of
23    that night in October.  Through all of that, I
24    don't think she yet has heard the truth about what
25    happened to her son.  Judge, you heard the facts in
```

1    this case and about how horrible of a death that

2    John Farrell went through.  Your Honor, I think

3    that in the least that Ms. Davis ought to be

4    afforded with the opportunity to know what really

5    happened that night.  And, at this point, Your

6    Honor, the only thing I can say from the State's

7    perspective is that all three of these individuals

8    cooperated fully in the death of John Farrell.

9    Each one of them had multiple opportunities to

10   prevent his death and took no action.  And for

11   those reasons, Your Honor, I feel the State's

12   position is that each defendant is equally guilty

13   as the other and should receive the same sentence,

14   a maximum sentence of life.

15            THE COURT:  Well, of course, the

16   Court has been through two trials and a plea, and I

17   will just say not all murders are equal.  And this

18   was a particularly, in my opinion, brutal

19   situation.  All of the defendants were pointing the

20   finger at each other.  All of them were involved.

21   It was senseless.  And this mother had to sit

22   through two trials and hear about her son's last

23   few minutes.  And I have considered this case, and

24   I am going to do the same sentence in each of them.

25            And being sorry now, just doesn't bring back

1    her son.

2         With regard to -- well, I think the easiest

3    thing to do --.and there are no priors applicable

4    for HOA purposes?

5              MR. KIDD:  No, ma'am.

6              THE COURT:  I'm sentencing each of

7    these defendants to life imprisonment.

8         What about restitution?

9              MR. POWELL:  Your Honor, there is

10   five-thousand dollars in each case to the Crime

11   Victim's Compensation Fund and two thousand six

12   hundred dollars and thirty-nine cents to the family

13   in each case.

14             THE COURT:  You've broken it down?

15             MR. POWELL:  I believe it's been

16   broken down and --

17             MR. KIDD:  Judge, we can give you a

18   total --

19             MR. POWELL:  -- prorated between

20   each of the three defendants.  And all of that is

21   for funeral expenses and missed work and travel

22   expenses for the family attending the trials and

23   the court hearings.

24             THE COURT:  Well, I'll order

25   restitution in each case in those amounts.  I'm not

288

```
 1    imposing fines, although, it would certainly be

 2    appropriate.  But I hope at some time this family

 3    gets back some monies that they deserve for

 4    restitution.  And because of that, I'm doing

 5    minimum on the others.  There would be fifty

 6    dollars to Crime Victim, because some of the other

 7    costs would be, if they're recovered, go to Crime

 8    Victims.  Of course, court costs.  And

 9    Robert Watkins, his attorney is retained.  And the

10    other two, there will be a hundred fifty dollars

11    toward court-appointed attorney's fees.

12                  MR. JOHNSON:  Your Honor, I was

13    appointed in this case.

14                  THE COURT:  You were appointed?

15                  MR. JOHNSON:  Yes, ma'am.

16                  THE COURT:  I'm sorry.  If you will

17    get the Court a fee declaration, there will be --

18    you're right.  I'll order attorney's fees in those

19    amounts.  I would order one half of any monies

20    earned paid toward your court-ordered monies.

21         You -- each of you do have a right to appeal.

22    If you cannot afford a transcript or an attorney,

23    that can be provided for you.  In addition, you

24    will be given credit for time actually served.

25         I would just say -- and I'm probably saying
```

289

1    more than I should -- but, now, Robert Watkins is

2    expecting to be a father of another child, knowing

3    that he's facing this.  Latoya Davis, after she's

4    indicted, had to continue the trial, she got

5    pregnant.  And I am aware that there are children

6    involved, but I think they should have been

7    thinking about the situation, and I -- that's

8    something I'm not going to consider in assessing

9    this.

10    Again, I'm sorry that the mother had to sit

11    through two trials and hear that her son was

12    begging for his life during those moments.  I think

13    that takes care of it.

14            MR. HARTLEY:  Judge, the -- Latoya

15    will give notice of appeal.

16            THE COURT:  I'll put down oral

17    notice of appeal --

18            MR. JOHNSON:  Also --

19            THE COURT:  -- on all of them, and

20    I'll set appeal bonds at a hundred fifty thousand

21    dollars.

22            * * * * * * * * * * *

23            END OF PROCEEDINGS

24            * * * * * * * * * * *

25

290

1          REPORTER'S CERTIFICATE

2      STATE OF ALABAMA

3      TALLAPOOSA COUNTY

4

5          I, Meridith Newman, Court Reporter and

6      Commissioner for the State of Alabama at Large,

7      hereby certify that on Tuesday, May 15, and Monday,

8      October 22, 2001, I reported the TESTIMONY AND

9      PROCEEDINGS in the matter of the foregoing cause,

10     and that the foregoing pages contain a true and

11     accurate transcription of said proceedings.

12         I further certify that I am neither of kin nor

13     of counsel to any of the parties to said cause, nor

14     in any manner interested in the results thereof.

15         This 5th day of December, 2001.

16

17

18                     Meridith Newman, Court Reporter
                       Commissioner for the State of
19                     Alabama at Large

20                 MY COMMISSION EXPIRES:  12/30/2001

21

22

23

24

25

EXHIBIT-4

# Court of Criminal Appeals

State of Alabama

Judicial Building, 300 Dexter Avenue

**P. O. Box 301555**

**Montgomery, AL 36130-1555**

April 19, 2002

H.W."BUCKY" McMILLAN
Presiding Judge
SUE BELL COBB
PAMELA W. BASCHAB
GREG SHAW
A. KELLI WISE
Judges



RELEASED

APR 19 2002

CLERK
ALA COURT CRIMINAL APPEALS

Lane W. Mann
Clerk
Wanda K. Ivey
Assistant Clerk
(334) 242-4590
Fax (334) 242-4689

## MEMORANDUM

CR-01-0232                Montgomery Circuit Court CC-2000-1506

<u>David Leonard Watkins, alias David L. Watkins and David Watkins v. State</u>

PATTERSON, Retired Appellate Judge.

Watkins appeals from his conviction for murder and sentence, as a habitual offender, of life imprisonment. He was also ordered to pay $7,600.39 in restitution; $50 to the Crime Victims Assessment fund; $150 in attorney fees; and court costs.

I.

Watkins contends that the trial court erred in failing to instruct the jury on intoxication and on the offense of manslaughter, as a lesser offense of the offense of intentional murder. He argues that the evidence of his intoxication at the time of the killing supported these instructions. Watkins's appellate counsel concedes that this issue was not preserved for our review. Because this is not

1

a death-penalty case, we cannot review it for plain error, as he requests. See Myers v. State, 677 So. 2d 807 (Ala. Crim. App. 1995).

## II.

Watkins contends that the trial court erred in allowing the prosecution, in closing argument, to allegedly quote to the jury a portion of a transcript of Watkins's videotaped confession. Prior to trial, the trial court denied the prosecution's request to provide that transcript to the jury.[1] Watkins asserts that, "in the closing statement, the prosecution repeatedly read from the transcript -- forcing upon the jury the prosecution's opinion of the contents of the tape." (Appellant's brief, p. 12.) He also argues that the trial court erred in not giving the jury curative instructions.

The pertinent portion of the prosecutor's closing argument shows the following:

"[W]hen you go back in that jury room, as finders of fact, part of your job is to determine what was said on that [videotaped] statement. ... But what I'm going to show you now comes from what we've listened to on the statement and this is what we believe the defendant to be saying from our view of the statement. Again, as finders of fact, ... you can agree with us or you can disagree with us or you can ... determine what was actually said on this tape. But let's start with the defendant's statement.

"Question: Okay. Answer: Once he got there, I urinated on him. I took a leak on him for no reason

_____

[1]In so ruling, the trial court noted the following: "I think that almost all of the transcript is correct. However, it does concern me that there are a few incidents where [the videotape] appeared to me to be inaudible ...." The court continued, "[T]here's only a few incidents and a few words that are really, in my opinion, not audible, although it -- certainly at times the defendant is not speaking as loudly ... [as] or clearly as other portions."

2

whatsoever.   Question: All right.   Was this before or after you kicked him?

"It was before I kicked him.   Question: Was this before or after Robert picked him up and threw him down on the ground?  Answer: It was after.   I don't know if he dropped him on the head. ...   When I came outside, his head was bleeding, and that's when I took a leak on him.

"This is where the defendant confesses to urinating and kicking the victim during the altercation.   I think we all heard that from the statement so we won't dwell on that.

"THE COURT: Come up here just a minute.

"(Bench conference was held.)

"MR. POWELL [the prosecutor]: Again, if you continue to go through the defendant's statement, Question: How did he get to the end of the street?  Answer: He pretty much got up on his own.   Question: And he walked --

"THE COURT: Come up here, Mr. Powell.

"(Bench conference was held.)

"MR.  POWELL: There was another portion of the statement where Sergeant Loria asked him, Well, if you and Latoya urinated on him, how did you pick him up and carry him to the end of the street?  In the statement, the defendant says, basically he got up and he staggered around and he walked down to the end of the street where the church was.   Play back the portion of the tape, listen to it for yourself.   In that portion of the tape, he says, that after they got done hitting him and kicking him, they walked down to the end of the street.

"There's another portion of the statement where Sergeant Loria asked the defendant who hit him over the end [sic] with the board.   The defendant responds, Toya did.   There's a portion of the statement where Sergeant Loria goes, Well, you saw this?   And the defendant's response is I saw this.   And then the defendant talks

3

about how he tried to stop her. He even said the same thing on the witness stand. He said he went over to her and grabbed her around the waist. In his statement, he also says that when he grabbed her, she dropped the board. And he also says in his statement that she was persistent. She kept on. So since she was persistent he says in his statement, if you'll listen for it, I told her to do it. Just do it. And then she went on and did it, because she was going to do it any way. If you'll listen, that's in the statement.

"Basically, the defendant is telling Toya, if you're going to hit him, go ahead and hit him.

"MR. DURANT [defense counsel]: Judge, may we approach?

"THE COURT: Yes.

"(Bench conference being held.)

"MR. DURANT: Judge, I know that you have admonished Mr. Powell not to use the actual statement in addressing the jury. But in ... fact he's still doing the same thing --

"THE COURT: He can argue, but he cannot -- (inaudible).

"MR. DURANT: Well, he is constantly referring to that, Judge.

"THE COURT: Just refer to your notes.

"(In the hearing of the jury.)

"MR. POWELL: If you continue listening to the statement, you'll come to a point where Sergeant Loria asked him, Why didn't you help him? He was begging Robert for his life, why didn't you help him? And if you'll listen to the defendant's response, he responds, He never begged me. If you continue on through his statement --

4

"MR. DURANT: Judge, we object again.     May we approach?

"MR. POWELL: I'm -- I'm not reading.

"(Bench conference was held.)

"MR. POWELL: Then we get to the most critical portion of the statement.  There comes a point where Detective Kennedy asked him -- and Junior said -- and before she can finish her question, the defendant starts talking.   And I'm going to play that portion of the videotape statement for you again.

"(Taped statement played again.)

"MR. DURANT: Judge, we're going to object to this also.

"THE COURT: Overruled."

The only adverse ruling, in the excerpt above, was in response to Watkins's general objection to the prosecutor's playing a portion of the videotape.   Up to that point, no adverse ruling was entered by the court.   See Lee v. State, 562 So. 2d 657, 665 (Ala. Crim. App. 1989) (the record presented no adverse ruling where, even though the trial court warned the prosecutor to refrain from referring to the appellant as a vicious person, it did not expressly rule on counsel's objection, and the appellant's attorney made no request for a curative instruction to be given, or motion to strike or exclude the comment).   Watkins's general objection preserved nothing for this court's review.   See Marty v. State, 656 So. 2d 416 (Ala. Crim. App. 1994).

"'Generally, improper argument of counsel is not ... subject to review on appeal unless there is a timely and specific objection by counsel or a motion to exclude, and adverse ruling thereon by the trial court, or a refusal of the trial court to make a ruling, and an objection thereto.'"

Steely v. State, 622 So. 2d 421, 423 (Ala. Crim. App. 1992) (quoting Trawick v. State, 431 So. 2d 574, 578 (Ala. Crim.

5

App. 1983)).   We cannot review Watkins's claim.

Accordingly, the trial court's judgment is affirmed.

The foregoing memorandum opinion was prepared by Retired Appellate Judge John Patterson while serving on active duty status as a judge of this court under the provisions of § 12-18-10(e), Ala. Code 1975.

AFFIRMED.

McMillan, P.J., and Cobb, Baschab, and Wise, JJ. concur. Shaw, J., concurs in the result.

EXHIBIT-5

IN THE COURT OF CRIMINAL APPEALS
STATE OF ALABAMA

Case No. 01-0232

DAVID LEONARD WATKINS,

Appellant,

v.

STATE OF ALABAMA,

Appellee.

APPEAL FROM THE CIRCUIT COURT
OF MONTGOMERY COUNTY, ALABAMA
CASE NUMBER: CC00-1506,

BRIEF OF APPELLANT DAVID LEONARD WATKINS

KELLY VICKERS
Attorney at Law
Post Office Box 230803
Montgomery, Alabama 36123
(334) 202-7750

ATTORNEY FOR APPELLANT

ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

TABLE OF OTHER AUTHORITIES--------------------------------------3

STATEMENT OF THE CASE---------------------------------------------4

RULINGS ADVERSE TO THE APPELLANT--------------------------5

STATEMENT OF THE FACTS------------------------------------------6

STATEMENT OF THE ISSUES-----------------------------------------7

SUMMARY OF THE ARGUMENTS--------------------------------------8

ARGUMENTS-------------------------------------------------------------9

CONCLUSION--------------------------------------------------------------14

CERTIFICATE OF SERVICE-----------------------------------------15

## ORAL ARGUMENT REQUESTED

Because of the multiple issues, counsel for the Appellant would be glad to argue the points herein in person, if so desired by the court, to provide further clarity on the pleading.

## TABLE OF OTHER AUTHORITIES

*Ex Parte Ingram*, 675 So.2d 863 (Ala. 1996) --------------------------9

*Code of Alabama 1975* § 32-5A-191(a)(1). -----------------------9
Ashley v. State, 651 So.2d 1096 at 1098 (Ala.Cr.App. 1994)-----10

Gray v. State, 482 So.2d 1318, 1319 (Ala.Cr.App. 1985)---------10

*Moore v. State*, 647 So.2d 43 (Ala.Cr.App. 1994))--------------10

*Hutcherson v. State*, 677 So.2d 1174 (Ala.Cr.App. 1994)---------10

*Phelps v. State*,  435 So.2d 158, 163 (Ala.Cr.App. 1983)------10

*Jones v. State*, 514 So.2d 1060, 1064 (Ala.Cr.App.)-------------11

*Ex parte Womack*,  435 So.2d 766, 769 (Ala.)-------------------11

*States v. Chaney*, 662 F.2d 1148, 1152 (5th Cir.1981))---------11

*United States v. Young*, 470 U.S. 1, 15, 105 S.Ct. 1038--------11

*United States v. Frady*, 456 U.S. 152--------------------------11

*Jones v. State*, 603 So.2d 419 (Ala.Crim.App., 1992)-----------12

*Quinlivan v. State*, 579 So.2d 1386 (Ala.Crim.App. 1991)--------12

*Bradley v. State*, 577 So.2d 1386 (Ala.Crim.App. 1991)----------12

## STATEMENT OF THE CASE

This appeal is from a finding of guilt on the charge of intentional murder, following a jury trial. On the 15th of September, 2000 the Appellant was indicted for one felony count: the intentional murder of Christopher Ferrell. (C 15)

On 9/28/00 he was arraigned in open court. (C 1)  On 3/8/01 he was denied youthful offender status. (C 1) On 3/22/01 he requested a speedy trial. (C 1) Beginning on 5/15/01 he had a jury trial. (C 1)

Six witnesses testified at trial: Geno Howton (R 50) who was the chief detective on the case, A. Loria (R 73) who took the statement from David Watkins, William R. Huett (R 112) who was the evidence technician who documented the scene and collected evidence, James Sparrow (R 114) who took the body of the victim to the morgue, James Lauridson (R 147) who performed the autopsy, and David Watkins (R 185) took the stand in his own defense. The focal point of the trial and evidence was the statement ("confession") by David Watkins.   On 5/16/01 the jury returned a verdict of guilty of intentional murder.  C 1,33)

On October 22, 2001 the Appellant appeared for sentencing along with the other two co-defendants.  The Court sentenced the Appellant to LIFE in the custody of the Department of Corrections. (C 3)  At the time of sentencing David Watkins entered oral notice of appeal. (C 3)    This appeal ensued.

**Rulings adverse to Appellant:**

Court appoints Winston Durant to represent Appellant at trial. (C 1)

Court denies youthful offender status. (C 2)

Sentence of life in prison (C 3)

Court denies defense counsel's verbal motion to suppress video of alleged confession.   (R 35)

Court fails to include manslaughter as an option on the verdict form.   (C 33)

Court allows (over objection) prosecution to repeatedly quote from the previously disallowed transcript of the taped statement. (R 237-242)

## STATEMENT OF THE FACTS

On or about October 19, 1999, the Appellant, David Watkins, was playing cards and listening to music with Robert Watkins, Latoya Davis, and Christopher Ferrell. They were in the home of Robert Watkins on Keystone Street in Montgomery, Alabama. (R 38-41, 186-193)) They were all drinking. (R 40, 191)  A fight broke out.  The taped confession indicates that Robert Watkins, Latoya Davis, and David Watkins all participated in beating Christopher Ferrell.  The taped statement indicates the Appellant urinated in the victim's face. (R 41)  The victim was found dead in a ditch with two gunshot wounds to the head. (R 50>, R 147>)  On the stand the Appellant stated he was intoxicated and intimidated when he gave the taped "confession" and that in fact he did not do anything to harm the victim or further the crime. (R 185>)

Law enforcement had no gun, fingerprints, etc. to connect any of the defendants to the crime.  The forensic evidence in and of itself did not indicate any particular perpetrator. (R 50>, R 147>) Each of the defendants blamed the others. (R 286) The chief evidence which convicted the Appellant was his taped statement.

This was originally charged as a capital murder case. (C 12) The grand jury returned an indictment on intentional murder, based on complicity.  (C 15)  The appointed trial counsel for the Appellant never filed any written motion whatsoever and rarely objected or otherwise attempted to preserve issues of potential error.  The appeal is therefore limited on preserved issues.

## STATEMENT OF THE ISSUES

1.  Did the Trial Court err in failing to instruct the jury regarding intoxication and failing to include the lesser included offense of manslaughter where it was undisputed that the Appellant was drinking and intoxicated at the time of the murder?

2.  Did the Court err in allowing the prosecution to quote from the transcript (which the Court had earlier refused to be shown to the jury) in the closing statement?

## SUMMARY OF THE ARGUMENTS

1. The Trial Court erred in failing to instruct the jury regarding intoxication and failing to include the lesser included offense of manslaughter where it was undisputed that the Appellant was drinking and intoxicated at the time of the murder.

2. The Court erred in allowing the prosecution to quote from the transcript (which the Court had earlier refused to be shown to the jury) in the closing statement.

## ARGUMENT

The Appellant's rights were violated and errors made on several issues and occasions. Most of the problems were not preserved by trial counsel, who never filed any written motion and rarely objected to preserve potential error. Counsel on appeal recognizes the holding of *Ex Parte Ingram*, 675 So.2d 863 (Ala. 1996) regarding the appropriate forum for raising issues of ineffective assistance of counsel. Nevertheless, the Appellant raises two issues which would indicate a reversal is appropriate in this cause.

## ISSUES 1

The Trial Court erred by failing to instruct the jury regarding intoxication and failing to include the lesser included offense of manslaughter where it was undisputed that the Appellant was drinking and intoxicated at the time of the murder. It was undisputed that all the defendants and the victim were drinking heavily and likely intoxicated at the time of the alleged murder. (See R 40, 49, 187, 191, 284, etc.) In fact the autopsy revealed the victim's blood alcohol level was at .29, more than three and half times the level the legislature has found indicates someone is too impaired to drive. (R 181) *Code of Alabama 1975* § 32-5A-191(a)(1).

The verdict form provided to the jury only included the indicted charge of intentional murder, and the Court never

mentioned anything to the jury regarding the law on intoxication

when the instructions were given to the jury (C 33, R 265-274)

Ashley v. State, 651 So.2d 1096 at 1098 (Ala.Cr.App. 1994)

states:

> Likewise, the Court committed reversible error in
> failing to instruct the jury on manslaughter." 'When
> the crime charged involves specific intent, such as
> murder, and there is evidence of intoxication, the
> trial judge should instruct the jury on the lessor
> included offense of manslaughter.' Gray v. State, 482
> So.2d 1318, 1319 (Ala.Cr.App. 1985)." McNeill, 496
> So.2d at 109.

(See also *Moore v. State*, 647 So.2d 43 (Ala.Cr.App. 1994)).

Further, the Court's failure to instruct on the law

regarding intoxication is plain error and requires a reversal

under these circumstances. See *Hutcherson v. State*, 677 So.2d

1174 (Ala.Cr.App. 1994):

> *Because we have determined that the failure to*
> *instruct the jury on intoxication was plain error,*
> *we need not address the question of whether the*
> *failure to give the manslaughter instruction was*
> *also plain error. We do observe, however, that*
> *degrees of homicide included in the indictment,*
> *when a party is on trial for murder, unless it is*
> *perfectly clear to the judicial mind that there is*
> *no evidence tending to bring the offense within*
> *some particular degree.' Phelps v. State,*
> *435 So.2d 158, 163 (Ala.Cr.App. 1983), quoted in Jones v.*
> *State, 514 So.2d 1060, 1064 (Ala.Cr.App.), cert.*
> *denied, 514 So.2d 1068 (Ala. 1987).*

Despite the fact that the appointed trial counsel failed to

preserve these issues, these matters are still properly before

the Appellate Court under the "plain error" doctrine. See

*Hutcherson*, ibid:

The Alabama Supreme Court has adopted federal "[p]lain error" only arises if the error is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings,' *Ex parte Womack*, 435 So.2d 766, 769 (Ala.), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983) (quoting *United States v. Chaney*, 662 F.2d 1148, 1152 (5th Cir. 1981))."

"[T]he plain-error exception to the contemporaneous-objection rule is to be 'used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.' "*United States v. Young*, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1, 14 (1985), quoting *United States v. Frady*, 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982). To find plain error "the claimed error [must] not only [have] seriously affected [the defendant's] 'substantial rights,' but. . . it [must have] had an unfair prejudicial impact on the jury's deliberations." *Young*, 470 U.S. at 18, 105 S.Ct. at 1047, n. 14, 84 L.Ed.2d at 14.

Intoxication, both at the time of the murder and later at the time the taped statement was given, was such an integral part of this case that the failure of the Court to instruct the jury on intoxication and the Court's failure to include appropriate lesser included offenses is plain error.

Accordingly, on these issues, the underlying case on appeal herein is due to be reversed.

ISSUE 2

The Court erred in allowing the prosecution to quote from the transcript (which the Court had earlier refused to be shown to the jury) in the closing statement.  As noted above the only connecting evidence the prosecution had was a statement given to law enforcement by the Appellant.  Prior to the beginning of the

trial, counsel and the Court engaged in a discussion regarding the taped statement; the Assistant District Attorney wanted to publish to the jury a written transcript of the statement. Counsel for the Appellant objected. The Court reviewed the tape and compared the prepared transcript and ruled that the transcript could not be provided to the jury. (R 31-36) This was a good ruling in that it preserved the juries' role as the fact finder. However in the closing statement the prosecution repeatedly read from the transcript—forcing upon the jury the prosecution's opinion of the contents of the tape. The Defense counsel objected to such several times, but it continued. The Prosecution was pulled to the bench by the judge two times and (though the bench conferences are not recorded) it appears he was admonished to stop. (R 237-239)

The prosecution may not offer opinion in closing arguments as to matters of fact. *Jones v. State*, 603 So.2d 419 (Ala.Crim.App., 1992) The Court never gave the jury a curative instruction on these improper and prejudicial statements. The Court's failure necessitates a reversal. See *Quinlivan v. State*, 579 So.2d 1386 (Ala.Crim.App. 1991) and *Bradley v. State*, 577 So.2d 1386 (Ala.Crim.App. 1991)

A fair and appropriate remedy for this and other violations of the Appellant's rights herein would be a reversal of the convictions.

<u>**CONCLUSION**</u>

For the foregoing reasons the Appellant prays that this Court will reverse the convictions on all the underlying cases with instructions to the trial court which will address injustices and protect his rights.

Respectfully submitted,

Kelly Vickers
Attorney for the Appellant

OF COUNSEL:
Kelly Vickers
Attorney at Law
P. O. Box 230803
Montgomery, Alabama   36123
(334) 202-7750

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of February, 2002, I did serve a copy of the foregoing on the following, by placing the same in the United States Mail, first class, postage prepaid and addressed as follows:

> The Honorable Bill Pryor
> Office of the Attorney General
> Criminal Appeals Division
> Alabama State House
> 11 South Union Street
> Montgomery, Alabama   36130
> (334) 242-7300

> David L. Watkins
> Kilby Correctional Facility
> P.O. Box 150
> Mt. Meigs, AL   36054

Kelly Vickers
Attorney for the Appellant

EXHIBIT-6

No. CR-01-0232

IN THE COURT OF CRIMINAL APPEALS OF ALABAMA

DAVID LEONARD WATKINS,

Appellant,

v.

STATE OF ALABAMA,

Appellee.

ON APPEAL FROM THE CIRCUIT COURT OF
MONTGOMERY COUNTY, ALABAMA

BRIEF AND ARGUMENT

OF

BILL PRYOR
ATTORNEY GENERAL

AND

MICHAEL B. BILLINGSLEY
ASSISTANT ATTORNEY GENERAL

ATTORNEYS FOR APPELLEE

Office Of The Attorney General
Criminal Appeals Division
Alabama State House
11 South Union Street
Montgomery, AL 36130-0152
(334) 242-7300

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................ii

STATEMENT OF THE CASE AND FACTS.............................................1

ISSUES PRESENTED FOR REVIEW .................................................3

ARGUMENT

    **I. WATKINS'S CLAIM THAT HE WAS ENTITLED
    TO AN INSTRUCTION ON THE LESSER INCLUDED
    OFFENSE OF MANSLAUGHTER IS NOT PRESERVED
    FOR REVIEW** .................................................................4

    **II. THE PROSECUTOR'S COMMENTS, MADE
    DURING CLOSING ARGUMENT, REGARDING
    THE STATEMENT GIVEN BY WATKINS, DO NOT
    WARRANT REVERSAL** ...................................................6

CONCLUSION ........................................................................8

CERTIFICATE OF SERVICE ......................................................9

i

## TABLE OF AUTHORITIES

**Cases**

*Brown v. State*, No. CR-99-1713, 2000 WL 1763377 (Ala. Crim. App. Dec. 1, 2000) .................................................................4, 7

*Carter v. State*, 627 So. 2d 1027 (Ala. Crim. App. 1992)...........................4

*Hutcherson v. State*, 677 So. 2d 1174 (1994) ..........................................4

*Myers v. State*, 677 So. 2d 807 (Ala. Crim. App. 1995) ............................5

*Taylor v. State*, 666 So. 2d 36 (Ala. Crim. App. 1994)..............................7

*Thomas v. State*, 622 So. 2d 415 (Ala. Crim. App. 1992) ..........................5

**Rules**

ALABAMA RULES OF APPELLATE PROCEDURE

Rule 45A.................................................................................................5

## STATEMENT OF THE CASE AND FACTS[1]

This is an appeal from an order entered by Montgomery County Circuit Court Judge Sally M. Greenhaw, adjudging David Watkins guilty of the crime of intentional murder in violation of Section 13A-6-2 of the *Code of Alabama* (1975). (R. 276) As a result of the conviction, Watkins was sentenced to serve life in the state penitentiary. (R. 287)

On September 15, 2000, Watkins was indicted for the offense of murder as follows:

> The Grand Jury of said County charge that, before the finding of this indictment, DAVID LEONARD WATKINS, alias DAVID L. WATKINS, alias DAVID WATKINS, whose name is otherwise unknown to the Grand Jury, and/or an accomplice did intentionally cause the death of another person, John Ferrell, by shooting with a gun, in violation of Section 13A-6-2 of the Code of Alabama, against the peace and dignity of the State of Alabama.

(C. 15-16) The indictment resulted from an incident in which John Ferrell was beaten and shot in the head following a dispute arising during a game of cards. David Watkins gave a taped statement to police, admitting his involvement in the murder of the victim. (R. 85) Two other individuals, Robert Watkins and Latoya Davis, were also involved. (R. 277) All three were convicted of murder and each received a life sentence. (R. 287)

---

[1] Due to the claims asserted by Watkins, a detailed recital of the facts would not be particularly "relevant to the issue[] presented for review." Rule 28(a)(4), *Ala. R. App. P.* This brief, therefore, does not include a separate "Statement of the Facts."

On September 28, 2000, Watkins was arraigned and entered a plea of not guilty to the charge. (C. 1) His trial began on May 14, 2001. (R. 1) Following the striking of the jury, opening statements, the presentation of evidence, closing arguments, and instructions from the trial judge, the jury found Watkins guilty as charged in the indictment. (C. 33) The record reveals that Watkins submitted no requested jury instructions and that, at the conclusion of the instructions, he affirmatively stated that he was "satisfied" with the charge. (R. 274)

On October 22, 2001, the trial court held a sentencing hearing. (R. 277) As noted, Watkins was sentenced to serve life imprisonment. (R. 287) He was additionally ordered to pay $7,600.39 in restitution, $50.00 to the Crime Victim Assessment Fund, and $150.00 in attorneys fees. (C. 3) Oral notice of appeal was given the date of sentencing. (C. 3)

## ISSUES PRESENTED FOR REVIEW

### I.

IS A CLAIM THAT WATKINS WAS ENTITLED TO AN INSTRUCTION ON THE LESSER INCLUDED OFFENSE OF MANSLAUGHTER PRESERVED FOR REVIEW?

### II.

DO THE PROSECUTOR'S COMMENTS, MADE DURING CLOSING ARGUMENT, REGARDING THE STATEMENT GIVEN BY WATKINS, WARRANT A REVERSAL OF HIS CONVICTION?

## ARGUMENT

### I.

**WATKINS'S CLAIM THAT HE WAS ENTITLED TO AN INSTRUCTION ON THE LESSER INCLUDED OFFENSE OF MANSLAUGHTER IS NOT PRESERVED FOR REVIEW.**

Watkins contends that "the trial court erred by failing to instruct the jury regarding intoxication and failing to include the lesser included offense of manslaughter where it was undisputed that [he] was drinking and intoxicated at the time of the murder." (Watkins's brief at p. 9) Watkins did not, however, request such an instruction at trial. In fact, at the conclusion of the trial court's instructions, Watkins affirmatively announced that he was "satisfied" with the charge. (R. 274) "This issue, [therefore,] having been raised first on appeal, was not preserved for [this Court's] review. Review by this court is limited to matters properly raised before the trial courts." *Brown v. State*, No. CR-99-1713, 2000 WL 1763377, at *6 (Ala. Crim. App. Dec. 1, 2000), *citing Carter v. State*, 627 So. 2d 1027, 1028 (Ala. Crim. App. 1992).

Recognizing his failure to preserve this issue, Watkins quotes from this Court's opinion in *Hutcherson v. State*, 677 So. 2d 1174 (1994), and asserts that "these matters are still properly before [this Court] under the 'plain error' doctrine." (Watkins's brief at p. 10) "[T]his court has, however, refused to apply the 'plain error' doctrine to any case that does not involve the death penalty." *Myers v. State*, 677 So. 2d 807, 810 (Ala.

Crim. App. 1995), *citing Thomas v. State*, 622 So. 2d 415 (Ala. Crim. App. 1992), *cert. quashed*, 622 So. 2d 420 (Ala. 1993); *see also* Rule 45A, *Ala. R. App. P.* ("In all cases in which the death penalty has been imposed, the court of criminal appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court . . . ."). Because Watkins is not under a sentence of death -- indeed, he was never even charged with capital murder -- the plain error doctrine does not apply here. His request that this Court review his claim in such a manner should, therefore, be rejected.

## II.

**THE PROSECUTOR'S COMMENTS, MADE DURING CLOSING ARGUMENT, REGARDING THE STATEMENT GIVEN BY WATKINS, DO NOT WARRANT REVERSAL.**

Watkins asserts that "the [trial] court erred in allowing the prosecution to quote from the transcript (which the Court had earlier refused to be shown to the jury) in closing statement." (Watkins's brief at p. 11) For the following reasons, this claim is without merit and due to be denied.

The record reveals that, before the presentation of evidence, the prosecutor informed the court of his intent to introduce a transcript of Watkins's videotaped statement to police, along with the videotape itself. (R. 31) After reviewing both, the court stated that it would admit the videotape, but would not allow the jury to have a copy of the transcript. (R. 36) The prosecutor, although he did not inform the jury regarding what he was referencing, apparently quoted from the transcript during closing argument. (R. 237) It is this action, on the part of the State, that Watkins brings into question on appeal.

Initially, the basis for Watkins's complaint is not accurate. He asserts that "the trial court erred in *allowing* the prosecution to quote from the transcript." (Watkins's brief at p. 11) (emphasis added) The record demonstrates, however, that it was the trial judge who -- without any prompting from Watkins -- called the prosecutor to the bench and told him "not to use the actual statement in addressing the jury." (R.

6

239) Plainly, the trial judge did not *allow* the prosecution to quote from the transcript, as is asserted by Watkins. Rather, the trial judge, *sua sponte*, affirmatively instructed the prosecutor not to do so. Watkins's claim is, therefore, due-to-be denied.

Watkins does additionally complain that "the Court never gave the jury a curative instruction on these improper and prejudicial statements." (Watkins's brief at p. 12) While not conceding that the statements were either improper or prejudicial, there is nothing in the record to indicate that Watkins ever requested a curative instruction. Whether such an instruction should have been given is, therefore, an issue not preserved for review. *See Brown v. State*, No. CR-99-1713, 2000 WL 1763377, at *6 (Ala. Crim. App. Dec. 1, 2000).

Finally, even assuming arguendo that error occurred, it was plainly harmless. The videotape of the statement itself was admitted into evidence and, therefore, was available to the jurors during deliberations. Moreover, the jury was informed that the statements of the attorneys are not evidence and that they were "the sole judges of the evidence." (R. 267) Jurors are presumed to follow their instructions. *See Taylor v. State*, 666 So. 2d 36, 70 (Ala. Crim. App. 1994), *aff'd*, 666 So. 2d 73 (Ala. 1995), *cert. denied*, 116 S. Ct. 928 (1996). Perhaps most significant, Watkins has failed to point to any portion of the prosecutor's closing argument that, in any way, misrepresented the content of his statement to the police.

7

For all of the foregoing reasons, Watkins's claim -- that the trial court erred in allowing the prosecution to quote from the transcript of his statement -- is without merit and due to be denied.

## CONCLUSION

For the above reasons, Watkins is not entitled to any relief. His conviction and sentence should be affirmed.

Respectfully submitted,

BILL PRYOR
ATTORNEY GENERAL


MICHAEL B. BILLINGSLEY
ASSISTANT ATTORNEY GENERAL



## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of February, 2002, I served a copy of the foregoing on the attorney for the Appellant, by placing said copies in the United States Mail, first class, postage prepaid, and addressed as follows:

> Kelly Vickers, Esquire
> P.O. Box 230803
> Montgomery, AL 36123

_Michael B. Billingsley_

MICHAEL B. BILLINGSLEY
ASSISTANT ATTORNEY GENERAL

ADDRESS OF COUNSEL:

Office of the Attorney General
Criminal Appeals Division
Alabama State House
11 South Union Street
Montgomery, Alabama 36130
(334) 242-7386

9

_Exhibit-7_

# THE STATE OF ALABAMA

## MONTGOMERY COUNTY

Circuit Court of Montgomery County, _____ SEPTEMBER _____ Term, A.D. __2000__

The Grand Jury of said County charge that, before the finding of this indictment,

DAVID LEONARD WATKINS, alias
DAVID L. WATKINS, alias
DAVID WATKINS,

whose name is otherwise unknown to the Grand Jury, and/or accomplice did intentionally cause the death of another person, John Ferrell, by shooting with a gun, in violation of Section 13A-6-2 of the Code of Alabama,

against the peace and dignity of the State of Alabama.

District Attorney, Fifteenth Judicial Circuit of Alabama

2000-1506 Smt
e.D

GJ NO. ___ 334

THE STATE OF ALABAMA
David L.    v. Watkins

HT: 5'7 WT: 150 DOB: 09/18/79

SID. NO. _____

_____ ARREST DATE ___ 10/22/99

FOR

MURDER

A TRUE BILL

_____
Foreperson of Grand Jury

No Prosecutor

BAIL IN THIS CASE IS FIXED AT

$    100,000

Judge of Circuit Court of Montgomery County

CC NO. _____

Redmond

Presented in open Court by the Foreperson of
the Montgomery County Grand Jury in the pres-
ence of ___ 16 ___ other members of
the Grand Jury and filed this ___ 15 ___ day of
__ Sept __, 2000

_____
Clerk of the Circuit Court of Montgomery County

WITNESSES

See Attached Witnesses

09/11/00  13.11.22

| FIRST NAME | LAST NAME | ADDRESS | CITY | STATE | EMPLOYER | EMPLOYER ADDRESS | PAGE 1 |
|---|---|---|---|---|---|---|---|
| K.B. | Barnett | | | | MPD | | |
| Scott | Belton | | | | ZDFS | | |
| Annie | Bozzeman | | | | | | |
| H. | Briggs | | | | | | |
| C.H. | Clark | 3650 Kruse St | | | 4MCSO | | |
| Marcus | Crenshaw | | | | 5MPD | | |
| Rickey | Scrumble | | | | | | |
| Eugene | Davis | 804 W. Edgemont | | | Bama Foundry | 491 N. Court St | |
| Ruby | Davis | 650 Kruse St | | | MPD | | |
| R.H. | Green | | | | White Roofing | 527 East Ann St | |
| Peter | Zacchia | 2607 Lark Drive | | | | | |
| | Happney | #5 Rouse St | | | | | |
| J. | Houston | 2627 Lark Drive | | | JMPD | | |
| Kenrick | Houston | 2661 W. Edgemont | | | IDFS | | |
| Levius | Howard | 3406 Clearview St | | | MPD | | |
| Sammy | Howton | | | | Student-ASU | | |
| E.E. | Huiett | | | | MPD | | |
| W.R. | Jackson | 2343 Carlisle St | | | MPD | | |
| Bridget | Jones | 522 Oak Street | | | | | |
| Cretia | Jones | 1675 Kimball Street | | | | | |
| Felicia | Jones | 3406 Clearview St | | | | | |
| Tameeka | Kennedy | | | | CABI | | |
| G.A. | Kenney | | | | MPD | | |
| H.E. | Lauridson | | | | | | |
| James | Lehman | | | | | | |
| Aorzell | Lofira | | | | | | |
| J.K. | Mercado | 2627 Lark Drive | | | | | |
| Tavaris | Nabson | | | | MPD | | |
| Scott | Mackey | | | | MPD | | |
| A. | Marcio | | | | MPD | | |
| C.A. | Mhura | | | | MCSO | | |
| Rosie | Moss | | | | MPD | | |
| C. | Nacinovich | | | | MPD | | |
| C. | Naquin | | | | MPD | | |
| Sarawanee | Parrish | | | | DFS | | |
| Joe | Saloom | underwood Street | | | DFS | | |
| Tshaboonda | Sanford | 3682 | | | MPD | | |
| Ronnie | Smith | 1020-B Oak Street | | | MPD | | |
| S. | Smith | | | | | | |
| Christina | Somerlott | Community St | | | MPD | | |
| J. | Sparrow | | | | | | |
| Antwania Rene | Whisenant | 3675 Kimball Street | | | | | |
| Torrah Phonsha | Whisenant | 659 Keystone Street | Ramada Inn | | | 3 Eastern Blvd | |
| DezKendray | Williams | 1263 Bell Street | | | | | |
| Kanyko? | Williams | 1263 underwood Street | | | | | |
| Keisha | Williams | 3406 Clearview St | | | | | |
| Tyrone | Williams | 1186 Homeview St | | | | | |
| Michael | Woods, II | 1342 Bancroft Ave | | | MPD | | |

***** END OF REPORT *****

EXHIBIT-8

| State of Alabama Unified Judicial System | CASE ACTION SUMMARY | Case Number |
|---|---|---|
| Form C-7    Rev 2/79 | CONTINUATION | CC-00-1506 |

Style: STATE OF ALABAMA V. David Watkins

Page Number _____ of _____ Pages

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|---|---|
| 10/22/01 | Defendant & attorney appeared for sentencing. Court asked if he/she had anything to say why sentence should not now be pronounced and Defendant having his/her say, it is ORDERED:

HOA Enhancements Applicable (Yes/No
Defendant Admits_____ State Proves ____ Priors

Sentenced to _____yrs./split to serve____ yrs. _____ reverse split postpone ____ review _____ Concurrent _____ Consecutive_____

SUSPENDED YES/NO SUPERVISED/COURT PROBATION ____ years LEVEL II _____ Monitor_____

ENHANCEMENTS - Weapons_____years Drug -_____years School/Public Housing _____years Sale under 18 $1000/2000 Fine _____ Remit portion completion SAP _____ Driver License suspended 6 mo. _____ $100.00 DFS fee GED_____ BootCamp_____/SAP ____/Chain Gang_____ Work Release_____ Frank Lee_____/Employment_____ Community Service_____hrs.at _____/PO Select Review upon completion - Yes_____

Other - _____

Restitution $ 7600.39    Fine $ _____ Crime Victim $25.00/$50.00/$_____ Ct.Costs____ Attorneys Fees $150.00/ Attorney/GAL Fees ____ Payment $____ Mo/Wk Begin __/__/01 OR 1/2 monies earned ✓ Review _____

Defendant advised rt. appeal, credit time served Appeal Bd. set $_____.   JUDGE SALLY GREENHAW

SMG |

371

IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

STATE OF ALABAMA,             *

    Plaintiff,              *

v.                            *    CASE NO. CC-00-1506 GR

DAVID LEONARD WATKINS,        *

    Defendant.             *


<u>ORDER</u>


The Court having found Defendant to be indigent, it is ORDERED that the Honorable Winston Durant is allowed to withdraw and the Honorable Kelly Vickers is appointed to represent Defendant in the above referenced matters on appeal.

DONE this the 22nd day of October, 2001.


SALLY GREENHAW
CIRCUIT JUDGE


Pc:

Winston Durant
Kelly Vickers
District Attorney
Court of Criminal Appeals
Office of the Attorney General

RECEIVED
10-26-01
CIRCUIT COURT CLERK

EXHIBIT-9

## Kelly Dean Vickers
Attorney at Law
P.O. Box 230803, Montgomery, AL 36123
phone: 334-202-7750
fax: 866-422-7026
THIS IS THE DAY THE LORD HATH MADE, LET US REJOICE AND BE GLAD IN IT.

**Inmate David Watkins**
**Booking # 76489     Cell 4F**
Montgomery County Detention Facility
P.O. Box 4599
Montgomery, AL 36103

November 3, 2001

Re:   Your Appeal

Dear David:

I have been appointed to represent you on the appeal you have filed in your criminal case.  I have already reviewed your court file and noticed some things about your case that concern me.  I don't know that we will be able to fix the past, but it was unfair that you had to wait so long to see an attorney and that you did not get a preliminary hearing—especially considering the seriousness of the original charge.

I have ordered a transcript of all your sessions in Court and copies of your court file.  In the next week or so I will come to see you in jail.  As soon as possible I need you to write down a list of the issues you feel need to be considered on the appeal.  Of course I will be examining all the legal issues, but it is important to me to have your ideas on what needs attention.  Of course if you get out on bond or get transferred to another facility notify me immediately so I have contact information on you at all times.  I will also want names and numbers of family and friends who are helping you.   I am sorry, but I can not accept collect calls from the jail; if you have an urgent matter arise have a friend or family member contact me.

In warmest regards,

*Kelly Vickers*
Kelly Vickers

THE PRECEDING IS CONFIDENTIAL AND PROTECTED UNDER THE ATTORNEY-CLIENT PRIVILEGE.
ANY MISUSE OR IMPROPER DISSEMINATION OF THE FOREGOING SHALL BE IMMEDIATELY DEALT WITH
BOTH CRIMINALLY AND CIVILLY AS PERMITTED BY LAW.

EXHIBIT-10

11-14-2001

Dear Kelly;

I'm writing in response to the letter sent concerning my appeal. I know that this is a very serious offense but I don't feel I should have recieved the maxium for my involvment in this case. The state had all the evidences they needed to convict the trigger person and prove my innocence but instead let me be convicted of a crime I didn't committ.

But here's a list of some of the issues I have giving some thought to:

1) I feel that my intoxicated statement was a violation to help gain a conviction.

2) There were witnesses who could have help prove my innocence whom I had no knowlege of at trial.

3) There wasn't a weapon presented at trial so how did the state exercise a gun law for Murder.

4) The Complicity Law wasn't pass until after this crime was committed so how could it be used against me.

5) According to ALA Rules 32 A-5 A conviction obtained by a violation of the privilege against self-incrimination is grounds for a appeal.

There are a few other issues that I would like to discuss in person as for as Sentence reduction and etc.

Submitted,

David L Watkins

374

EXHIBIT-11

Copy

1-6-2002

Dear Kelly Vickers:

I am writing again in concerns of my appeal situation. I am currently incarcerated at Kilby Correctional Facility. I'm anxiously awaiting to see and hear what you've found in the transcripts you've ordered from the court files. Are there any hopes of getting the appeal granted or the sentence reduced considering the truth is out in the open and evidents at Lacey's trial proves that I am not the guilty person the state is trying to place me as. And I still feel like the state shouldn't have been aloud to use my intoxicated statement to convicted me of this crime Because, if that statement was to be used to convict some other person, it would have probly been inadmissable in court. Well Mr. Vickers I am looking forward to your visit I really need to know if something can be done about this case. I have arranged for my sister to call so she may be aware of what's taking place so she can tell the rest of my family that's living in Lownes County. Her name is Demisha Watking thanks for your concerns to this matter.

Respectfully Submitted,
David L Watkins
David L Watkins

EXHIBIT-12
Copy

2/10/02

Dear Mr. Vickers

    I'm writing because you told me you ordered a transcript of all my sessions in Court and of my court file. You also said in the next two weeks or so you'd come to see me in jail- now that was at least 3 months ago and I haven't seen you or so much as a letter from you. And all I want to know is what type of grounds are you basic-ing the appeal on and which appeal are we re-questing for (Sentencing or charge) but you're giving me the impression that it's not import-ant to you.
    So now I just want to let you know you've had more than enough time to give me some type of information and I think it's only fair to inform you that you have approximately 5 working days from tomorrow before I file a complaint to Ala-bama State Bar Asso for neglecting your client. I rather not proceed with these actions but you have left me no other choices.
    Sorry it has to be this way, but I'm sure it no worst then the situation I'm in.

                          Your Client,

                          David L. Watkins
                          David L Watkins



EXHIBIT - 13

THE LAW FIRM OF VICKERS & ASSOCIATES
## KELLY VICKERS
*ATTORNEY AT LAW*
100 Commerce St., Suite 900
Montgomery, AL 36104
Phone: 334-202-7750—Fax: 334-263-7782

February 14, 2002

**Inmate David Watkins, AIS: 219698**
Draper Correctional Center
P.O. Box 1107
Elmore, AL 36025

Re:   *Your Appeal*

Dear David:

I received your threatening letter today.   I had sent a letter and a copy of your appeal to Kilby—where you last wrote me from.  Please let me know whether those mail items have reached you.  If not I can send everything again.

On an appeal we have the opportunity to ask the appeal court to reverse or remand your case—if, and only if, your trial attorney preserved errors and those errors made by the court warrant such a reverse or remand.  Unfortunately your trial attorney rarely objected to any issue to give us something to appeal. The key error I raised to the appeals court is that the jury should have been given an option to find a lesser included offense—manslaughter, and the jury should have been advised by the judge regarding the law on intoxication.   Your trial attorney did not object or otherwise preserve these errors so I had to ask the appeal court to reverse on these issues on the "plain error doctrine." I would say you have a fifty-fifty chance this will work to get you another trial.  There were other issues that would have been relevant had your attorney objected, but we can't bring them up since he didn't.  You can raise those issues after the appeal process is over in a Rule 32 motion.  I will tell you more on that later if we lose in the appeals court.  I will be sure to keep you notified of any news.  The next thing that will happen is we will get a reply brief on our appeal from the Attorney General's office.

I pray you and yours are well.

In warmest regards,

*Kelly Vickers*
/Kelly Vickers

EXHIBIT-14  14

2-27-08

Dear Mr. Vickers

I would first like to apologize for the threatening letter that I sent but at the time I didn't know you sent a copy of the appeal to Killey because I didn't receive anything from you since the first letter I ever got from you. So I'm sorry for the misunderstood and I would like to have copies from the court transcripts so I may view them for myself.

On the appeal I've been reading over the copies that you sent and I noticed on page 7- Statement of the Issues) theres nothing concerning Winston Durant ineffective assistance as my counsel and I think better yet I know that's a big issue and I hope its included in the appeal, however I've been wondering if you've also included some of the other issues I've written from Rule 32 Post-Conviction Remedies in my first letter I wrote from Montgomery County Detention Facility which includes:

Rule 32.1;(e)(1) The facts relied upon were not known by petitioner or petitioner's counsel at the counsel at the time of trial or sentencing or in time to file post-trial motion pursuant to Rule 24, or in time to be included in any previous collateral proceeding and could not have been discovered by any of those through the exercise of reasonable diligence; — there most likely goes along with that (record)(1,5)

Well thats about all for now and I will continue to keep in touch and I recieve the trial transcript



EXHIBIT-15

The VICKERS law firm
# KELLY VICKERS
*Attorney at law*
100 Commerce St., Suite 900
Phone: 334-834-6639—Fax: 334-263-7782
Montgomery, AL 36104

November 21, 2002

**Inmate David L. Watkins (AIS #219698)**
C6/B83
Draper C.C.
P.O. Box 1107
Elmore, AL 36025-1107

Dear David;

I sincerely apologize for the delay of contact. It has never been my intention to leave you in the dark about matters concerning your case. You most certainly have not fallen through the cracks and I have not forgotten you.

At this moment I have my staff preparing the documents that you requested. Bare with me it might be after Thanksgiving before it reaches you. I just wanted you to know that we are working diligently on your behalf.

God bless you and yours,

Kelly Vickers

EXHIBIT-16

3-18-04

Dear Mr. Vickers:

It's been over a year and three months since I heard any news concerning my appeal. Mr. Vickers, how long does it take the Appeals Court to return a response?

Furthermore, when I wrote you Nov. 2002, I requested a copy of my Court Transcripts, in which you promised to send. Well, I never received them and my request is still the same.

Mr. Vickers, I look forward to receiving a response from you soon. In addition I also look forward to receiving the requested materials.

Thanks for your time, cooperation, and prompt response.

Sincerely,

David Watkins

David Watkins #21969
P.O.Box 1107
6 Cell Bed 26
Elmore, AL 36025

*EXHIBIT -17*

# Court of Criminal Appeals

State of Alabama

Judicial Building, 300 Dexter Avenue

P. O. Box 301555

Montgomery, AL 36130-1555

March 31, 2004

H. W. "BUCKY" McMILLAN
Presiding Judge
SUE BELL COBB
PAMELA W. BASCHAB
GREG SHAW
A. KELLI WISE
Judges

Lane W. Mann
Clerk
Wanda K. Ivey
Assistant Clerk
(334) 242-4590
Fax (334) 242-4689

Mr. David L. Watkins
AIS #219698
P. O. Box 1107
Elmore, AL 36015-1107

RE:    CR-01-0232
David Leonard Watkins v. State

Dear Mr. Watkins:

This is in response to your letter inquiring about your appeal. Please be advised that your case was affirmed by memorandum on April 19, 2002. The certificate of judgment was issued on May 7, 2002, thereby concluding your appeal.

Sincerely yours,

LANE W. MANN, CLERK
COURT OF CRIMINAL APPEALS

LWM/jz

cc:    Honorable Kelly Dean Vickers
P. O. Box 230803
Montgomery, AL 35123-0803

*EXHIBIT - 18*

# THE VICKERS LAW FIRM
*KELLY VICKERS. ATTORNEY*
Mail: .P.O. Box 230803, Montgomery, AL 36123
Office: 100 Commerce Street, 9th floor above the bank
Phone: 334-834-6639—Fax: 334-262-0936

**April 2, 2004**

*David L. Watkins, AIS # 219698*
P.O. Box 1107
Elmore, AL 36015-1107

Re:    Appeal

Dear David:

The Court of Criminal Appeals sent me a copy of the letter they just sent you about your appeal. My records show that we sent out a copy of the court's decision back in April of 2002. Based on the fact you sent an inquiry to the Court of Criminal Appeals I see you may not have received everything we have sent you. I am enclosing a copy of the Appellate Court decision. I am also enclosing a copy of your transcript. If there is anything else you need me to send you please let me know.

You still have one recourse left, a rule 32 petition, but you need to file it immediately—before April 19 if possible. Most attorneys charge several thousand dollars to do one, but I have seen many inmates do it themselves. My previous appointment does not include services for a rule 32, but I will certainly make sure you have everything I have in your file to help you. I will also answer any questions you may have about the process.

May God bless you and yours.

With warmest regards,

*Kelly Vickers*

Kelly Vickers

**Toll Free: voice: 1-866-399-2990  fax: 1-866-422-7026
email: kv@kellyvickers.com**

382

EXHIBIT-19

# THE VICKERS LAW FIRM
## *KELLY VICKERS, ATTORNEY*
Mail: P.O. Box 230803, Montgomery, AL 36123
Office: 100 Commerce Street, 9th floor above the bank
Phone: 334-834-6639—Fax: 334-262-0936

April 2, 2004

*David L. Watkins, AIS # 219698*
P.O. Box 1107
Elmore, AL 36015-1107

    Re:   Appeal docs

Dear David:

    I sent you by separate package a copy of the transcript and other documents from your appeal. Please write me and confirm that it got to you. It was good size box, and the DOC staff may be inspecting it. I don't want any delays in your getting what you need.

    May God bless you and yours.

                           With warmest regards,

                           Kelly Vickers

                           Kelly Vickers

IN THE CIRCUIT COURT OF
MONTGOMERY COUNTY, ALABAMA

David Watkins,                )
                              )
        Petitioner,           )
                              )
vs.                           )      CASE NO. CC-2000-~~156~~:60   *1506.60*
                              )
State of Alabama,             )
                              )
        Respondent.           )

## ORDER

This cause is before the Court on Petitioner's request that filing fees be waived due to his substantial hardship status, and the same having been considered, it is ORDERED that Petitioner is granted permission for filing of the petition in this cause without immediate payment of a filing fee.

Done this the 15 day of August 2006.

_____
Truman M. Hobbs, Jr.
Circuit Court Judge

cc:    David Watkins

RECEIVED
8-16-06
CIRCUIT COURT CLERK



IN THE CIRCUIT COURT OF MONTGOMERY ALABAMA

David L. Watkins )
)
vs. )    CASE NO: OO-1506.60
)
State of Alabama )
)

**PETITIONER OBJECTION TO THE STATE'S FAILURE TO SUBMIT A TIMELY CONTROVERING AFFIDAVITS, TIMELY MOTION TO DISMISS RULE 32 PETITION AND PETITIONER REQUET FOR ORAL ARGUMENT.**

Comes now, the Petitioner pro-se, an without the benefit of a Counsel, respectfully make an objection to the State's failure to submit a timely controverting affidavits and a timely motion to dismiss, for pleading any and all grounds of preclusion of Petitioner Rule 32 petition, that the State is relying on.

## Grounds

1) Petitioner submitted Rule 32 petition and supporting affidavits, exhibits no later than July 26, 2006. Which the State has not respond to as required by Ala. Rules. Cr. P., 32.3.

2) Petitioner contends that by A.R.Cr.P., 32.3, the State is required to plead the ground or grounds of preclusion that it believes apply to the petitioner's case, thereby giving the petitioner the noticed he needs to attempt to formulate arguments and present evidence to "disprove the existance of those grounds by a preponderance of the evidence. A general allegation that merely refers to the Rule does not provide the type of notice necessary to satify the requirements of due process and does not meet the burden of pleading assigned to the State by Rule 32.3 Cited from Ex Parte Rice 565 So. 2d 606, 608 (Ala. 1990)

3) Petitioner contends by A.R.Cr.P., Rule 32.7 (8) Prosecutors Response, states:

: "With 30 days ⬤fter the service of ⬤e Petitioner or within the time otherwise specified by the Court, the district attorney shall file with the Court and send to the petitioner or counsel for the petitioner if any, a response. Which may be supported by affidavits and a certified record or such portions thereof as are appropriate or material to issues raised in the petition.

4) Petitioner contends that the state has fail to comply with A.R.Cr.P. Rule 32.7 (a) by not responding in a timely manner to petitioner's Rule 32 petition. Had the state filed with the Court a response as required by Rule 32.7 (a), Petitioner should have recieved the state's allegation back in August or the first week in September.

5) Therefore, the petitioner makes an objection to the state's failure to file a timely response to petitioner's Rule 32 petition and makes an objection to the state's failure to submit a timely controverting affidavits as of grounds that the state has in effect waived all grounds of preclusion, by the state's failure to make a timely objection, submitting a timely controverting affidavits an motion to dismiss Rule 32 petition, without good cause shown by the state for their failure to file those documents on time, would be prejudice to the Petitioner. Because the petitioner has made a timely objection to the state's waiver and Petitioner have submitted supporting factual documents with his Rule 32 petition and affidavit, (Exhibits - Trial's Transcript, Attorney's letters, motions - ...ect) without the state's controverting affidavit and motion to Dismiss Petitioner's Rule 32 petition, petitioner evidence outweights the states in which a Rule 32 petition is decided by the preponderance of the evidence. Therefore the petitioner is entitled to relief of his conviction and sentencing an should be rendered a new trial and/or sentencing.

## Relief Sought

Therefore, Petitioner request the following:

1) That Petitioner be allowed access into the Court in order that his petition be held. Furthermore, the Court has not dismissed the petitioner's petition. Therefore, petitioner is entitled to an evidentiary hearing to determine disputed issues of material fact as required by A.R.Cr.P., 32.9 Evidentiary Hearing.

2) However, if the Court see otherwise. Petitioner ask that respondent within (7) days, file and serve a response to the motion, showing good cause why they should be allowed to file an out-of-time response to dismiss Petitioner's Rule 32 petition and controverting affidavits.

3) That the Responses be in the form required for motions and if no response is filed, within (7) days the motion shall be deemed submitted on the record before the Court, and the respondent be deemed to have waived all grounds of pleading preclusion.

4) Petitioner contents, do to the complication of this case, request for an oral Argument on this matter.

PLACE IN THE HANDS OF THE HONORABLE CIRCUIT CLERK OF MONTGOMERY COUNTY.

Respectfully Submitted,

David L. Watkins

9-18-06

387



9-16-06    00-1506.60

**Filed**
SEP 2006
Melissa Rittenour
Circuit Clerk

To the Circuit Court's Clerk of Montgomery County:

I've written on numerous occasions seeking a response of the date in which my Rule 32 petition was filed. I sent it by package-mail back in July. I have not recieved any type of response that will allow me to know if those documents were recieved by you.

I'm not satisfied that my request are unanswered, considering the requirements of your perfection. Furthermore, you're hindering my progress in violation of Ala. Codes 1975 §12-17-94 /and § 36-12-40,(41) by not responding. I truely wish not to preceed outside my common objective. So I respectfully ask again, that as clerk please send me a up to date copy of the case action summary on Case No: 00-1506.60 to allow me to monitor the on-going status of this appeal.

In addiction, please send me any motions /or motion of Extension the State may have filed doing this on going appeal.

Thanks for your speedy response to this matter.

Respectfully Submitted,
David R Watkins

Sworn and Subscribe before me this 16 day of September : 2006
My commission expires _____
MY COMMISSION EXPIRES JAN. 8, 2009

Sonya M Rose
Notary Public

IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

STATE OF ALABAMA )
    Plaintiff, )
 )
 )   Case Number: CC 00-1506
 )
    v. )
 )
DAVID LEONARD WATKINS )
    Defendant )

## MOTION FOR EXTENSION

COMES NOW, the State of Alabama by and through the District Attorney for the Fifteenth Judicial Circuit of Alabama, Eleanor I. Brooks, and requests this Honorable Court to grant an extension in the above-styled case, and as grounds states the following:

1.   The Defendant filed a Rule 32 Petition in the Circuit Clerk's Office 07 /27/2006.

2.   The District Attorney's Office received that petition on 8/22/06 and has 30 days to reply.

3.   Due to it being a grand jury week and preparation for a murder case before the Honorable Judge Shashy on next week, the State requests an additional seven days to respond to the petition.

WHEREFORE, premises considered, the State moves this Honorable Court to continue this matter.

Respectfully submitted this the 21st day of September, 2006.

          ELEANOR I. BROOKS
          DISTRICT ATTORNEY

          By: _____
          Azzie Taylor (MEL 028)
          Deputy District Attorney

RECEIVED
9-25-06
CIRCUIT COURT CLERK

GRANTED 9-25-06
          DATE

TRUMAN M. HOBBS, JR.
CIRCUIT JUDGE

## CERTIFICATE OF SERVICE

I hereby certify that I have this date served a copy of the foregoing motion upon the Defendant and/or his Attorney by placing a copy in the mail or by placing a copy of the same in the Courthouse box, this the 21st day of September, 2006.

Azzie Taylor (MEL 020)
Deputy District Attorney

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
MONTGOMERY COUNTY, ALABAMA

DAVID LEONARD WATKINS,           )
    Petitioner,                  )
                                 )
v.                               )     Case No: CC 00-1506 TMH
                                 )          .60
STATE OF ALABAMA,                )
    Respondent.                  )

### STATE'S MOTION TO DISMISS OR IN THE ALTERNATIVE ANSWER TO DEFENDANT'S PETITION FOR RELIEF FROM CONVICTION OR SENTENCE

Comes now the State of Alabama, by and through its District Attorney for the Fifteenth Judicial Circuit, Eleanor I. Brooks, and responds to the "Petition for Relief From Conviction or Sentence" filed with this Honorable Court by the above named Defendant. The State respectfully asks this Honorable Court to DISMISS the Defendant's petition, and as grounds therefore would show:

### PROCEDURAL HISTORY

The Petitioner was indicted by the Montgomery County Grand Jury on September 15, 2000, for one count of Murder. The petitioner pleaded not guilty on August 1, 2002 and the case was set for trial for May 14, 2001 and on May 15, 2001, the Petitioner was found guilty of Murder. On October 22, 2001, the Petitioner was sentenced to life in the Department of Corrections. Petitioner now files this Rule 32 petition. Hence the State's Answer follows:

### GROUNDS FOR RELIEF

As the basis for this petition, Petitioner alleges the following grounds in support of his petition:

I. **PETITIONER ARGUES THAT HIS APPELLATE COUNSEL WAS INEFFECTIVEBECAUSE HE FAIL TO PRESERVE THE ISSUE OF THE DENIAL OF THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL .**

Petitioner alleges that his trial counsel, as well as his appellate counsel were both ineffective attorneys throughout his trial and appeals process. He charges his trial counsel as being ineffective because the trial counsel failed to submit a written request that the Court instruct the jury on a lesser included offense regarding intoxication. He avers that the evidence undisputedly reflects that he, his co-defendants and the victim were drinking heavily and likely intoxicated at the time of the alleged murder. He further avers that because of this, the jury should have been instructed on the lesser offense of manslaughter. The petitioner quotes several cases, some of which are just not relevant to the issue or case name does not match the citation. He relies in part on *Moore v. State of Alabama*, 647 So.2d 43 which the Court and he quotes " When the crime is charged involves specific intent, such as murder, there is evidence of intoxication the trial judge should instruct the jury on the lesser included offense of manslaughter." The case goes on to say that a defendant is entitled to a charge on a lesser included offense if there is any reasonable theory from the evidence.

After reviewing the transcript, the issue of intoxication at the time was not raised by the defendant during trial. The defendant testified and he raised the subject of drinking and smoking only prior to his arrest and statement to the police. That theory did not evolve during the State's case nor the defendant's case. The State of Alabama argues that intoxication prior to committing the offense was not a reasonable theory that was derived from the evidence in this trial and the jury was instructed properly by the Court. He further alleges that his trial attorney was ineffective because he failed to request that the court instruct

the jury on intent to kill regarding accomplice liability. According to the transcript, the Court gave the standard jury instructions on the charge of Murder, which included the language on intent.

The Defendant's claim that his appellate attorney was ineffective because he failed to raise the claim of ineffective assistance of the trial attorney during his appeal. The State contends that for the above reasons the appellate attorney had no grounds on which to raise that issue.

## II. THE PETITIONER CONTENDS THAT THE INDICTMENT WAS DEFECTIVE BECAUSE IT WAS NOT SPECIFIC.

The petitioner argues that the indictment uses generic terms and was not specific enough to allow him to prepare his defense. The State argues that the indictment meets the requirements of the law by setting forth the elements of the offense and it sufficiently apprised the defendant of what he must be prepared to meet.

## STATE'S RESPONSE TO PETITIONER'S GROUNDS FOR RELIEF

For the above reasons, this Petition is barred and the Petitioner is not entitled to the relief requested. Therefore, the State of Alabama would move this Honorable Court dismiss, with prejudice, the Petitioner's Rule 32 petition and deny any and all relief requested.

Respectfully submitted on this the 25th day of September, 2006.

ELEANOR I. BROOKS
DISTRICT ATTORNEY

By: _____

Azzie Taylor (MEL 020)
Deputy District Attorney

## CERTIFICATE OF SERVICE

I hereby certify that I have this date served a copy of the foregoing motion upon the Defendant and/or his Attorney by placing a copy in the mail or by placing a copy of the same in the Courthouse box, this the _25th_ th day of _September_, 2006.

_A. M. Taylor_

Azzie Taylor (MEL 020)
Deputy District Attorney

STATE OF ALABAMA,       *   IN THE CIRCUIT COURT OF

     Plaintiff,       * MONTGOMERY COUNTY, ALABAMA

VS.       *

DAVID WATKINS       *

     Defendant.       *   CASE NO. CC-00-1506-TMH

## ORDER

It is hereby ORDERED that this matter be and the same is hereby set for a hearing on Rule 32 Petition on October 12, 2006 at 10:30 a.m., Courtroom 3-A, Montgomery County Courthouse, 251 South Lawrence Street, Montgomery, Alabama.

DONE this the 25th day of September, 2006.

TRUMAN M. HOBBS, JR.
CIRCUIT JUDGE

Copies to:

District Attorney: Azzie Taylor

Attorney for Defendant: Winston Durant

Attorney for Defendant: Kelly Vickers
           P O Box 230803
           Montgomery, AL 36123

Defendant by mail :   AIS# 219698
           P O Box 1107
           Elmore, AL 36025

CC 00-1506.60 ①

IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

DAVID L. WATKINS          ]
     PETITIONER           ]

V.                       ]     CASE NO: CC-1506

STATE OF ALABAMA      ]
     RESPONDENT       ]

---

**AFFIDAVIT IN SUPPORT**

STATE OF ALABAMA       ]    SS: Affidavit of David L. Watkins
COUNTY OF ELMORE      ]

Before me, the undersigned Notary Public in for said State and County, personally appeared before David L. Watkins whom is know to me as such, first being duly sworn and deposes and states the following:

I am the Petitioner named here and the above style cause and make this affidavit in truth concerning specific facts that transpired in my case. On Oct. 22, 1999, I was charged with Capital Murder in which I was arrested and placed in the custody of Montgomery County Jail. On September 15, 2000, the Grand Jury of Montgomery County later indicted me on the Charge of "Intentional Murder in violation of §13A-6-2 of the Code of Alabama, 1975. On September 28, 2000, the court appointed Winston Durant as my defense counsel, whom is known to me to be a registered member of the Alabama Bar Association. Mr. Durant interviewed me at the pre-trial stage, which he informed me that it would be a good idea to plead guilty to the charges against me. I informed Mr. Durant that the charges against me are not true and that I deserved a fair chance to tell my side of the story. I did not intentionally cause the death of John Ferrell,

and that his death was not caused by any act or acts on my part. His death was caused by a gunshot wound to the head, by a co-defendant, which was also charged with the same exact crime. I, while under the influence of alcohol, admitted that I did in fact assault the victim. But, it was the vicious act of my co-defendant that discharged the firearm that resulted in his death. I also informed my counsel, as well as the law-enforcers, that I did everything in my power to prevent the crime from happening. Neither, did I cause the crime to go further than the assault, because, the crime was taking on a new undertaking which was outside of my objective or purpose. These same facts or allegations were made in a taped statement given by me, (while under the influence of alcohol – which the officers of Montgomery Police Department never performed any tests to determine to what degree (or) level my intoxication was). Still, the State of Alabama believed that I helped commit the crime of murder. Mr. Durant without my permission (or) consent waived the preliminary hearing, and forfeited my right to a preliminary hearing.

Furthermore, Mr. Durant never retained a private investigator nor did he conduct any forensic analysis or tests. He relied solely on the State's evidence during trial in which he subpoenaed only one witness to verify that I was intoxicated at the time the arresting officer apprehended me. I also would like to point out the fact that Mr. Durant never conducted any pretrial investigations whatsoever. Because there is no proof in the Court records and exhibits admitted at the trial. Since Mr. Durant is a known, registered, member of the Alabama Bar Association – it should have occurred to him that these types of procedures should take place in order to increase the possibilities of the truth emerging during his client's trial.

fact Kelly Vickers' response was that he/she thought they had informed me because their records indicate that fact. This is almost (2) years after my appeal had been affirmed, in fact, I did not receive a copy of the trial's transcript until April 2, 2004. I would also like to point out the fact that, I have no knowledge whether or not Counsel Vickers has heard the taped statement given by me to the law enforcement officers. If so, I still have not received it from the counsel.

Due to this counsel's negligence, I was not able to file a proper Rule 32 Post Conviction Relief in the subscribed manner in which the Rules of Court requires. In conclusion, I again, sincerely believe that had Kelly Vickers given me the effective assistance, which is required by law, the outcome of this appeal would have been different.

AFFIANT FURTHER SAYETH NAUGHT

David L. Watkins
Affiant

Sworn to and subscribed before me this ___5___ day of _____, 2006.

___3/04___
My commission expires

Notary Public

CC 00-1506.60

## IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
## MONTGOMERY COUNTY, ALABAMA

DAVID L. WATKINS ]
PETITIONER ]
]
]
V. ]    CASE NO: CC 00-1506
]
STATE OF ALABAMA ]
RESPONDENT ]
]

### TRAVERSE

Comes now, the above Petitioner pro-se; and without the benefits of a counsel, and respectfully responds to the State's Motion to Dismiss, or in the Alternative Answer to Defendant's Petition for Relief From Conviction of Sentence. The Petitioner does not concede any of his arguments, they are well founded on facts and law, and as grounds shows unto this Honorable Court as follows.

1.)    The State contends that the Appellant Counsel for the Petitioner had no grounds on which to raise the issue of intoxication and that the issue of intoxication at that time was not raised by the defendant during trial. This is one of the reasons Appellant Counsel should have raised ineffective assistance of trial counsel in his arguments on direct appeal. Because Appellant Counsel stated in his Statement of Facts in his brief that:

"On or about October 19, 1999, Appellant David Watkins, was playing cards and listening to music with the other two co-defendants and the victim when a fight broke out. (R 38-41, 186-193) They were all drinking. (R 40, 191) (See Counsel's Appellant Brief pg.6)

The law states in Gray v. State 482 So.2d 1318, 1319 [Ala.Crim.App.1985]

"When the crime charged involves specific intent, such as murder, and there is evidence of intoxication the trial judge should instruct the jury on the lesser included offense of manslaughter. (See also McNeil, 496 So.2d at 109, Moore v. State, 647 So.2d 43 [Ala.Cr.App.1994])

Furthermore, Appellant Counsel stated in his argument on direct appeal that:

"The chief evidence which convicted the Appellant was his taped statement."

And also:

"The appointed trial counsel for the Appellant never filed any written motion whatsoever and rarely objected or otherwise attempted to preserve issues of potential error."

Petitioner contends that his Appellate Counsel had every obligation under the requirements of law to protect his client. Appellate Counsel should have had a copy of both the trial's transcript and the taped "confession" in order to allege his allegations to the Appeals Court.

Furthermore, the decision of the Supreme Court of Alabama are to the effect that every accused is entitled to have charges given, which would not be misleading, which correctly state the law of his case, and which are supported by [any] evidence, however weak, insufficient, or doubtful in credibility. BURNS v. STATE, 229 Ala.68, 155 So. 561 (1934). ([Quoting]) Ex Parte Long, 600 So.2d 982 (Ala. 1992)

THIS IS CLEARLY A mistake on the Trial Counsel's part, but Appellate Counsel should have noted these facts and properly raised them before the Criminal Appeals

Court.    THEREFORE, PETITIONER RAISES INEFFECTIVE ASSISTANCE ON BOTH COUNSELS.

2.)    The State of Alabama also contends that the Court gave the jury the standard jury instructions on the charge of Murder, which included the language on intent. (See State's Motion to Dismiss...at pg.1-2)

However, Petitioner contends that the court did in fact give instructions on murder, but the court did not properly instruct the jury on the particularize intent to kill issue with regards to accomplice liability.

In relevant part, the trial court charged the jury as follows:

"The law in Alabama, is that a person is legally accountable for the behavior of another person constituting a crime if with intent to promote or assist the commission of that crime he aids or abets such other person in committing the crime.    There is no distinction between principals and accessories in the commission of an offense...etc. (See Petitioner's exhibit 3 at R. 270-71

In Duncan v. State, 827 So.2d 838, 848 (Ala.Crim.App.1999) the trial court correctly instructed the jury on the particularize intent to kill issue. Furthermore, the trial court correctly instructed the jury with regards to accomplice liability relevant part as follows:

"The mere presence of a defendant, who intends to assist with the criminal act, should it become necessary, is aiding and abetting if, and only if, the one who commits the act knows of the defendant's presence and the intent to assistance in [that] offense."

As shown from (Petitioner's exhibit 3 at R. 270-71) the trial court did not clearly charge the jury on the essential element that the principle has to be aware of the accomplice's support and willingness to lend assistance to kill the victim.

Also, Petitioner content as stated in (Reeves v. State, 530 So.2d 894) that the [key elements of accomplice liability] are encouragement or presence with a view to render aid should it become necessary. When liability is predicated on the latter, it is essential that the principle be aware of the accomplice's support and willingness to lend assistance.

Therefore, since in this present case the key element the principle knew that the Petitioner was assisting him to kill is absent from the court's oral charge the jury could not intelligently comply with their duty as Jurors. Moreover, the prosecution were relieved of finding [every] element of the charge offense beyond a reasonable doubt.

While the state is relying solely upon the standard jury instructions;

It has been well established, in the federal courts, that:

It will be observed that all those definitioins have nothing whatsoever to do with the forbidden result would follow upon the accessory's conduct; and that they will demand that he in some sort, [associated] himself with the venture, that he [participated] in it as in something he wished to bring about, that he seek by action to make it succeed.

All the words used – even the colorless, abet – carry on implication, of attitude towards it. See Hill v. State, Ala.Cr.App., 348 So.2d 848, 851

Considering these facts, in absence of such elements of aiding and abetting the Petitioner's counsel hurt Petitioner's defense. For this reason, Petitioner raises this claim as stated in his Rule 32 Petition.

3.)     The State contends that the indictment meets the requirements of the law be setting forth the elements of the offense and it sufficiently apprised the defendant of what he must be prepared to meet.

WHEREFORE, Petitioner contends that his indictment is defective due to the indictment not being accompanied with such a statement of facts and cause of the accusation of the specific offense, coming under the general description in which Petitioner was charged.

Petitioner contends that the indictment below is defective in substance that it will not support the judgment of conviction. Indictment read as follows:

Omitting the formal parts, the indictment reads as follows:

The grand jury of said County charge that before the finding of the indictment.

David Leonard Watkins, alias

David L. Watkins, alias

David Watkins

Whose name is otherwise unknown to the Grand jury, and/or accomplice did intentionally caused the death of another person, John Ferrell, by shooting with a gun, in violation of section 13A-6-2 of the Code of Alabama (See Petitioner's Exhibit __7__ )

Again, Petitioner contends that the above indictment is defective in substance that it will not support the judgment of conviction.

Petitioner contends that his indictment is defective in substance that it will not support the judgment of conviction. In Russell v. United States, 8 L.Ed.2d 240, 251 The United States Supreme Court stated:

"It is an elementary principle of criminal pleading, that where the definition of an offense, whether it be a common law or by statue; includes generic terms, it is not sufficient that the indictment shall charge the offense in the same generic terms as in the definition; but it must state the specifics, - it must descend to particulars, an indictment not framed to appraise the defendant "with reasonable certainty to the nature of the accusation against him is defective although it may follow the language of the statute...

In the case at hand, the State contends that Petitioner committed the crime of intentional murder as an accomplice. However, the language of the indictment does not set forth the necessary means by which Petitioner committed the offense (HORNSBY v. STATE, 94 Ala. 55, 10 So. 522; Nelson v. State, 50 Ala.App. 285). In order to properly inform the accused of the nature and cause of the accusation, within the meaning of the constitution and of the rules of common law; not only must all the elements of the offense be stated in the indictment, but that also they must be stated with clearness an certainty, and with a sufficient degree of particularity to identify the transaction to which the indictment relates as to place, persons, things and other details.

At common law, it was necessary to set forth in an indictment for murder the means by which an offense was committed. (HORNSBY v. STATE, 94 Ala. 55, 10 So. 522; Nelson v. State, 50 Ala.App. 285)

An indictment must state the facts constituting the offense, in ordinary and concise language, in such a manner as to enable a person of common understanding to know what is intended. It must likewise inform the accused not only of the nature of the offense, but also of the particular act or means by which it was committed. (See Ala. Code 1975 Title 15-8-25. Indictment)

An indictment must also enable he defendant to enter a plea that will bar any "future prosecutions for the same offense." (Hamling 418 U.S. at 117 94 S.Ct. at 2907.)

However, this indictment charges that Petitioner "did as an accomplice, intentionally caused the death of another, by shooting with a gun."

(See Petitioner's exhibit ___7___ ) Petitioner is apprised of the charges against him to this extent but he could not know the contentions of the state as to how he committed murder. Under the law, a person acts intentionally when it is his purpose to cause the death of that person. An intent may be inferred from the facts and circumstances surrounding the whole transaction or incident as well as the conduct of the defendant.

Therefore, this conviction cannot stand, because it offends the first requirement of the constitutional due process. Furthermore, the State's arguments are without merit to show this court what their evidence intends to prove.

The kind of defects shown by Petitioner, according to the due Process of law, cannot stand.

Petitioner respectfully urges this Honorable Court, for this reason, to reverse and remand for a new trial and sentence.

_David L. Watkins_
David L. Watkins
Petitioner, pro-se

Sworn to and subscribed before me this ___5___ day of ___Rt___, 2006.

___2/06___
My commission expires

_Notary Public_
Notary Public

+MH

*CC 00 - 1506.60*

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
MONTGOMERY COUNTY, ALABAMA

DAVID L. WATKINS )
    PETITIONER )
)
V. )       CASE NO: CC 00-1506
)
STATE OF ALABAMA )
    RESPONDENT )
)

**MOTION FOR SUBPOENA DUCES TECUM**

Comes now the Petitioner, David L. Watkins, by and through himself in the above-styled cause respectfully moves the Court pursuant to Rule 16 Alabama Rules of Criminal Procedure of the entry of an order directing that the State of Alabama be returnable before the Court on or before 12th day of October, 2006, and further, directing that the books, papers, records and documents described in said subpoenas, upon their production, be available for inspection and/or copying by the named Petitioner.

In support thereof, movant state that the books, papers, records and documents described in the attached subpoenas are evidentiary in nature, that the Petitioner lacks access to these items from any other source, and that an order directing production of these items prior to an evidentiary hearing will expedite the hearing of this cause and facilitate the introduction of material and relevant evidence during the course thereof.

WHEREFORE, premises considered, the Petitioner prays that this Honorable Court shall make the entry of an order to require the opposing party to produce the requested materials.

1.

Done this the ___5___ day of October, 2006

Respectfully submitted,

*David L. Watkins*

David L. Watkins
Draper Correctional Center
P.O. Box 1107
Elmore, AL 36025-1107

### CERTIFICATE OF SERVICE

I hereby certify that on this ___5___ day of October, 2006, I did serve a copy of the

foregoing on the following, by placing the same in the United States Mail, first class,

postage prepaid and addresses as follows:

The Honorable Judge Truman M. Hobbs Jr.
Circuit Court of Montgomery County
Montgomery County Courthouse
251 S. Lawrence St.
P.O. Box 1667
Montgomery, AL 36102-1667

Offices of Ellen Brooks
District Attorney
Fifteenth Judicial Circuit of Alabama
Montgomery County Courthouse
P.O. Box 1667
Montgomery, AL 36102-1667

*David L. Watkins*

David L. Watkins
Petitioner, pro-se

Sworn to and subscribed before me this ___5___ day of _October_, 2006.

MY COMMISSION EXPIRES JAN. 8, 2008

_____          *Donya Rose*
My commission expires                    Notary Public

2.

IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

DAVID L. WATKINS
    PETITIONER

    V.                   CASE NO: CC-1506

STATE OF ALABAMA
    RESPONDENT

AFFIDAVIT IN SUPPORT

STATE OF ALABAMA        ]   SS: Affidavit of David L. Watkins
COUNTY OF ELMORE       ]

    Before me, the undersigned Notary Public in for said State and County, personally appeared before David L. Watkins whom is know to me as such, first being duly sworn and deposes and states the following:

    I am the Petitioner in the above-entitled case and make this affidavit in good faith to support matters pursuant to a Rule 32 Proceeding.

    On or about the 21st day of October, 1999, I was apprehended by the police of Montgomery Police Department for questioning concerning the murder of John Ferrell. The police took from me a taped statement, which was admitted into evidence as exhibit No.44, with the letter "A" written on its side. That taped statement contains proof that I, the Petitioner, was indeed intoxicated at the time that the crime was committed.

    The State of Alabama has possession of that tape. I respectfully ask that the tape marked as Exhibit No.44 along with the videocassette be available for inspection at the hearing on October 12, 2006 at 10:30 a.m., Courtroom 3-A, Montgomery County

3.

Courthouse, 251 South Lawrence Street, Alabama. I intend to prove by a preponderance of that taped statement that I am entitled to a new trial or sentence

AFFIANT FURTHER SAYETH NAUGHT!

David L. Watkins
Affiant

Sworn to and subscribed before me this ___5___ day of ___October___, 2006.

___3/UY___
My commission expires

Notary Public

4.

APPENDIX

EXHIBIT A: AFFIDAVIT IN SUPPORT
OF
MOTION FOR SUBPOENA DUCES TECUM

IN THE CIRCUIT COURT OF MONTGOMERY COUNTY ALABAMA
10TH JUDICIAL CIRCUIT

DAVID L. WATKINS

DEFENDANT

VS.

STATE OF ALABAMA

PLAINTIFF

CASE NUMBER:
CC-00-1506 . 60

---

### MOTION TO SHOW CAUSE WHY THE NEW ROUNDS WERE NOT KNOWN OR COULD NOT HAVE BEE ASSCERTAINED THROUGH REASONABLE DILIGENCE WHEN FIRST PETITION WAS HEARD AND FAILURE TO ENTERTAIN THE PETITION WILL RESULT IN A MISCARRIAGE OF JUSTICE

---

Comes now the Petitioner David L. Watkins, pro se, in the above styled cause, by and through himself and respectfully ask for consideration of this Motion Pursuant to Rule 32.2 (b)(A.R.Crim. P.) and Whitt v. State, 827 So.2d 869 (A.Crim.App. 2001).

In Whitt v. State, The Court Held That:

(" We now interpret 32.2 (b) as Federal Courts interpret Habeas Corpus Petitions to mean that new claims in subsequent Petitions are barred as being successive unless") The Petitioner shows both that good cause exist why the new grounds. Or grounds were not known or could not have been ascertained through reasonable diligence when the first Petition was heard, and that failure to entertain the Petition will result in a miscarriage of justice, Rule 32.2 (b) (Ala, R. Crim. P.).

## EXPLANATION FOR NEW GROUNDS OF RELIEF
## GOOD CAUSE WHY THE NEW GROUNDS WERE NOT KNOWN

The Petitioner's Appeal Counsel filed Notice of Appeal and submitted brief on Direct Appeal on February 6, of 2002. Petitioner conviction had been affirmed on April 19, of 2002.

Petitioner was not aware that his appeal was affirmed, because his Appellate Counsel was negligent in keeping him informed of the status of his appeal (and) failed to inform him (Petitioner) that his appeal had been ruled upon. In fact, Petitioner did not know his appeal was affirmed until almost two years later. (See Petitioner exhibits 15-17)

Petitioner contends that his exhibits will show that his Appellate Counsel led him to believe that his appeal was still alive month(s) after it had been affirmed; by quoting the following:

"You most certainly have not fallen through the cracks and I have not forgotten about you."

"I just wanted you to know that we are working diligently on your behalf."

This was almost 7 months after Petitioner's appeal had been affirmed. (See Petitioner exhibit 15). Petitioner after not receiving information from his counsel wrote the Honorable Criminal Courts of Appeals on March 13, 2004 and received information about his appeal and learned that his conviction had been affirmed on April 19, 2002. (See Petitioner's exhibit 16-17)

Because, Appellate Counsel failed to inform Petitioner the outcome of his appeal, the Petitioner was not able to continue his appeal. In fact, Petitioner did not receive a copy of his trial's transcript until April 2, 2004. (See Petitioner exhibits 18-19) This is two (2) years after his appeal had been affirmed, well past the two (2) or one (1) year limitation period in which to file a proper Rule 32 Post-Conviction Remedy petition.

Additionally, the Petitioner himself is not learned in the law, the Sixth Amendment stands, as the defendant shall not be bound by the errors of his counsel. **See Strickland v. Washington, 466 US 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).**

Moreover, the power of an attorney is not co-equal, co-extensive, or equivalent of that of the client. The realistic recognition of the obvious truth is that the average Petitioner does not have the professional skill to recognize a constitutional violation that resulted in his liberty being deprived form him without due process of law. That which is simple, orderly and necessary to the experience and learned counsel, but to the untrained layman, may appear intricate, complex and mysterious. The right to be heard in a Rule 32 petition is of little avail because it does not comprehend the right to be heard by effective counsel. "Even the intelligent and educated layman has small and sometimes no skill in the science of law. If convicted of a crime, he is incapable, generally of determining for himself, whether the indictment was good or bad, whether his constitutional rights were violated or whether he received effective assistance from his counsel. A layman is unfamiliar with the Rules of Evidence and Criminal Procedure." **Johnson v. Zerbst, 304 US at 463**

Therefore, a Petitioner lacks both the skills and knowledge adequate to prepare a proper Rule 32 petition whether it is in 2-years or 1-year. Even though he has perfect constitutional violations to raise in a Post Conviction Remedy.

## FAILURE TO ENTERTAIN THE PETITION WILL
## RESULT IN A MISCARRIAGE OF JUSTICE

The Petitioner contends that the failure of this court to entertain this petition will result in a "miscarriage of justice". Black Law Dictionary defined *miscarriage of justice* as:

> "Decision of outcome of a legal proceeding that is prejudicial or inconsistent with substantial rights of a party."

The United States Constitution, Article VI, C1. [2] states:

> "This Constitution, and the laws of the United States which shall be made in pursuance thereof, and all Treaties made, or which in shall be made, under the authority of the United States, shall be the Supreme law of the3 land; and the Judges in every state shall be bound thereby, anything in the Constitution or laws of any state to the contrary notwithstanding."

The United States Constitution [Federal Constitution] has been expanded by the decision of the United States Supreme Court. See Black Law Dictionary, Due Process of Law, p. 500, 501 (6th ed. 1990).

In City of Dothan v. Halloway, 50 So.2d 1136, 1170, (Ala. 1986); the court then quoted from the Alabama Constitution (1901), §6, and they stated:

> "The manifest purpose of this provision is to accord to every citizen security against the arbitrary action of those in authority, and to place him under the protection of the, 'law of the land,' which is synonymous with the expression, 'due process of law.'"

The United States Constitution Fourteenth Amendment states:

"No person shall be deprived of his liberty without due process of law."
(equivalent or synonymous, "No person shall be deprived of his liberty
without the Supreme Law of the Land.").

The word "shall" generally indicates a command that admits of no discretion on
the part of the person instructed to carry out the directive. As used in statutes, this word
is generally imperative or mandatory. Guierrez De Martinez v. Lamago, 132 L.Ed.2d
375, 393 (1995); also see, State v. Redman, 885 So.2d 850 (2004).

According to Article VI, Cl. [3] of the United States Constitution; The Senators
and Representative before mentioned, and the members of the several state, Legislatures,
and all executive and judicial officers; both of the United States and of the several States,
shall be bound by [oath] or Affirmation, to support this Constitution.

In Alabama, judicial officers took an oath of office; as follows:

I,..., Solemnly swear (or affirm, as the case may be) that I will support the
Constitution of the United States, and the Constitution of the State of
Alabama. See Art. XVI, Sex. 279, Code of Ala. 1975.

In the United States Constitution Article VI, Cl. [2], it clearly states that judges in
every state shall be bound by the Supreme Law of the Land; anything in the Constitution
or laws of any state, to the contrary notwithstanding. It is also clear from a reading of
Black Law Dictionary, page 500-501, 6th Edition, 1990, the definition of "Due Process of
Law" is that the United States Supreme Courts decisions are the "Supreme Law of the
Land."

The United States Supreme Court in Chessman v. Teets, 1L.Ed.2d 1253, stated:

"The requirement of the Due Process Clause of the Fourteenth
Amendment must be respected no matter how heinous the crime in
question and no matter how guilty an accused may ultimately be found to
be guilt has been established in accordance with the procedure demanded
by the constitution. Evidently, it also needs to be repeated that the

overriding responsibility of this Court is to the constitution of the United States, no matter how late it may be that a violation of the Constitution is found to exist. This Court may not disregard the Constitution because an appeal in this case, as in other, has been on the eve of execution. We must be deaf to all suggestions that a valid appeal to the Constitution even by a guilty man comes too late, because courts, including this Court, were not earlier able to enforce what the Constitution demands. The proponent before the Court is not the Petitioner, but the Constitution of the United States."

In Mooney v. Holohan, 79 L.Ed.791, the United States Supreme Court noted:

"We are not satisfied, however, that the State has failed to provide such corrective Judicial process. The prerogative Writ of Habeas Corpus is available in the State Constitution of California, Art. I §5; Art. VI §4. No decision of the Supreme Court of California has been brought to our attention holding that the State Court is without power to issue this historic remedial process when it appears that one is deprived of his liberty, without due process of law in violation of the Constitution of the United States. Upon the State Court's equally with the Courts of the Union, rests the obligation to guard and enforce every right secured by that Constitution. In view of the dominant requirement of the fourteenth Amendment, we are not at liberty to assume that the State has denied to its Court jurisdiction to [redress] the prohibited wrong upon a proper showing and in an appropriate proceeding for that purpose.

A proceeding under [Rule 32] displaces all post-trial remedies except post-trial motions under Rule 24 and appeal. Any other post conviction petition seeking relief from a conviction or sentence shall be treated as a proceeding under this rule. Rule 32.4 (emphasis added)

"Rule 32 should not be viewed as foreclosing this important post-conviction remedy [habeas corpus] which is designed to do justice in those cases where there has been an injustice. Salter v. State, 606 So.2d at 211 (Ala.Cr.App. 1992)

Take note, Post-conviction relief is intended to eliminate confusion and avoid repetitious and successive applications for relief while [protecting] Petitioner's Constitutional rights. Drayton v. State, 600 So.2d 1088, 1090 (Ala.Cr.App. 1992).

A state may properly adopt neutral procedural rules to discourage frivolous litigation of all kinds, as long as those rules are not preempted by a valid federal law; however, a state my not relieve congestion in its courts by declaring a whole category federal claims to be frivolous. Howlett v. Rose, 496 US 356, 110 S.Ct 2430, 110 L.Ed.2d 332.

In Ex Parte Ebbers, 871 So.776, the Supreme Court of Alabama noted:

"The State-Court procedural considerations must at all times yield, however, to relevant federal constitutional principles, when state concerns for judicial economy conflict with federal constitutional rights, the state concerns must give away."

In Pennzoil Co. v. Texaco Inc., 95 L.Ed2d 1, the United States Supreme Court noted:

Article VI, of the United States Constitution declares that the Judges in every State shall be bound by the Federal Constitution, laws, and treaties. [We] cannot assume that state judges will interpret ambiguities in state procedural law to bar presentation of federal claims."

This so being, the Petitioner contends that Alabama Rules of Criminal Procedure, Rule 32.2, preclusion of grounds do not apply to this petition, because the Petitioner

raises Federal Constitutional violations within this Rule 32 petition; in which after making a specific finding of fact, if 'merited on its face' the Petitioner is entitled to relief.

Moreover, in Falkner v. State, 586 So.2d 39, the Court of Criminal Appeals of Alabama noted:

> "While Rule 20's (now Rule 32's) procedural bars should be followed to foreclose frivolous and repetitive allegations, they are not to be construed to procedurally foreclose a Petitioner from the remedy which he is due."

On the other hand, Rules of practice and procedure are devised to promote the end of justice, not to defeat them. A Rigid and undeviating judicially declared practice under which counts of review would invariably and under all circumstance decline to consider all questions which had not previously been specifically urged would be out of harmony with this policy. Hormel v. Helvering, 85, L.Ed. 1037. Because "[C]onventional notions of finality of litigation have no place where life or liberty is at stake and infringement of constitutional rights is alleged."

At the same time Petitioner note that while proceedings under Rule 32.2 "ordinarily cannot be used as a substitute for a direct appeal involving mere trial errors or as a substitute for a second appeal, "nevertheless" trial errors [affecting] Constitutional rights maybe raised even though (See Kaufman v. United States, 394 US at 228, 22 L.Ed.2d 227, 238, 89 S.Ct. 1068.) the error could have been raised on appeal. (DROPE v. MISSOURI, 420 US 162, 43 L.Ed 103, 95 S.Ct. 896)

Because, it is axiomatic that a conviction upon a charge not 'made' or upon a charge not 'tried' constitutes a denial of due process. JACKSON v. VIRGINIA, 443 US at 314 61 L.Ed.2d, at 570.

Therefore, the questions we face today is rather the Petitioner had a trial, because there is no trial without due process. MACKENNA v. ELLIS, 280 F.2d at 603.

Petitioner contends that he had been denied any real notice of the true nature of the charge against him, the first and most universally recognized requirement of due process. SMITH v. O'GRADY, 312 U.S. 329, 334, 61 S.Ct. 572, 85 L.Ed. 859.

Moreover, the Due Process Clause of the fourteenth amendment denies the States the power to deprive the accused of his liberty unless the prosecution proves beyond a reasonable doubt [every] element of the charged offense. Jury instructions [relieving] states of this burden violate a defendant's due process right. Carella v. California, 491 US at 265 (See Petitioner's EXHIBIT 3 at R.269-274).

At first blush it would seem that the law on this subject is in a sad state of flux. Be that as it may, these are rules of state practice and procedure. Otherwise stated, these are judge-made decisions. When rules of state practice and procedure conflict with the due process Clause of the fourteenth Amendment, they must yield to the commandments of the Amendment. In the words of the Supreme Court of the United States, "Conviction upon a charge not made would be sheer denial of due process." See Nelson v. State, cited at 50 Ala.App. 285, 289.

The Petitioner sole contention is that none of federal constitution violations raised in the petition was waived at trial, on appeal, or at any previous post-conviction remedies.

In Barker v. Wingo, 33 L.Ed.2d 101, the Supreme Court 'defined' waiver as:

"An intentional relinquishment or abandonment of a known right or privilege. Courts should indulge every reasonable presumption against waiver and they should not presume waiver from a silent record is impermissible.

The record must show, or there must be an allegation and evidence, which shows that an accused was offered counsel but intelligently and understandably rejected the offer. Anything less [is] not waiver. The Court ruled similarly with respect to waiver of other rights designed to protect the accused."

In Green v. United States, 2 L.Ed.2d 199, the United States Supreme Court, fatherly, noted:

"Usually no such waiver is expressed or thought of. Moreover, it cannot be imagined that the law would deny to a prisoner the correction of

a [fatal] error, unless he should waive other rights so important as to be saved by an express clause in the Constitution of the United States."

## CONCLUSION

The Constitutional mandate is addressed to the action of the State in obtaining a criminal conviction through a procedure that fails to meet the standards of due process of law. "Unless a defendant charged with a serious offense has counsel able to invoke the procedural and substantive safeguards that distinguish our system of justice, a serious risk of injustice infects the trial itself when a state obtains a criminal conviction through such a trial it is the state that unconstitutionally deprives the defendant of his liberty." Evitts v. Lucey, 83 L.Ed.2d 821, 829-30.

"Consistent with society's overriding concern with justice of finding of guilt." (United States v. Agurs, 427 U.S. [97] 112 [(1976)]), the Courts, as well as the prosecution, must be vigilant to correct a mistake. 'It is the State that tries a man, and it is the State that must insure that the trial is fair' (Moore v. Illinois, 408 U.S. 786, 810, 33 L.Ed.2d 706, 92 S.Ct. 2562 [(1972)] [Marshall J., concurring in part and dissenting in part]). Put another way, 'the State's obligation is not to convict, but to see that, so far as possible, truth emerges' (Giles v. Maryland, 386 U.S. 66, 98, 17 L.Ed.2d 737, 87 S.Ct., 793 [(1967)] [Fortas, J. concurring]). ([Quoted] in Dowdell v. State of Alabama, 854 So.2d 1195, 1198 (2002 Ala.Crim.App.).

That concern is reflected, for example, in the "fundamental value determination of our society that it is far worse to convict on innocent man than to let a guilty man go free." (The maxim of the law is...that it is better that ninety-nine percent...offenders should escape, than that an innocent man should be condemned). See Schulp v. Delo, (1995) 513 US at 325 130 L.Ed.2d at 835, 115 S.Ct. 851.

The principle that no man shall be deprived of his liberty or property except by "the law of the land" is said to be more ancient than written constitutions, "and breathes so palpably of exactly Justice that it needs no formulation in the organic law." It is but an expression of the fundamental principle that inspired civilized man to form a government,

the ultimate purpose of which is to protect the individual in working out his destiny, and finds expression in our Constitution in these words:

> "That in all criminal prosecutions, the accused has a right to be heard by himself and counsel, or either; and shall not be compelled to give evidence against himself, nor be deprived of life, liberty, or property except by due process of law, 'and' that every person, for an injury done him in his person, or reputation, shall have a remedy by due process of law, and right and justice shall be administered without sale, denial, or delay." Constitution of Alabama 1901. §§ 6, 13 [(Opinion by: Brown) in The State v. Bush, 68 So. 492, 493 (1915 Ala.App.)]

Because, "under our system of criminal justice even a thief is entitled to complain that he has been unconstitutionally convicted and imprisoned as a burglar." Jackson, 443 US at 323, 24, 61 L.Ed.2d at 576.

Nevertheless, under the Federal Constitution, no court, State or federal, may serve as an accomplice in the [willful transgression] of the laws of the United States, laws by which judges in every state are bound under Article 6 of the Constitution. Lee v. Florida, 392 U.S. 378, 88 S.Ct. 2069, 20 L.Ed.2d at 1168.

Therefore, based on the foregoing, Federal Constitution Violations may be raised in a Post-Conviction Remedy at any time, unless the Petitioner has intentionally relinquished or abandoned those Federal Constitution rights or privileges; however, presuming waiver from a Silent Record is impermissible.

Accordingly, confidence in the outcome of the trial has been undermined, thereby, Petitioner was denied due process. That denial requires a reversal of his conviction and a new trial or other relief as the law requires.

IN THE CIRCUIT COURT OF
MONTGOMERY COUNTY, ALABAMA

David Watkins,                    )
                                  )
    Petitioner,               )
                                  )
vs.                               )     CASE NO. CC-2000-1506.60
                                  )
State of Alabama,                 )
                                  )
    Respondent.               )

## ORDER

A hearing was held on October 12, 2006 with Petitioner present. Petitioner raises three claims via his Rule 32 petition. Initially, he alleges ineffective assistance of counsel due to the failure of counsel to ask for a jury charge on manslaughter because of his intoxication. However, Petitioner acknowledged that there was no actual evidence at trial concerning his intoxication. Thus, there was no basis for requesting the lesser-included charge. In addition, Petitioner failed to satisfy the requirements of Strickland.

Secondly, Petitioner claims that the jury was not properly charged as to the mens rea required for a conviction of an accomplice. The Court specifically told the jury that the Petitioner could only be found guilty of accomplice liability if he intended to assist in the murder. Not only is the assertion of Petitioner without merit but also it is precluded as time-barred.

Finally, Petitioner questions his indictment. This claim too is precluded as it could have been raised previously and it is time-barred. The Alabama Department of Corrections is directed to withhold 50% of each dollar the Petitioner received through his Prisoner's Money on Deposit

RECEIVED
10-20-06
CIRCUIT COURT CLERK

Account and to deliver the same to the Clerk of this Court when the full amount has been collected.

Petition DISMISSED.

Done this the _18_ day of October 2006.

Truman M. Hobbs, Jr.
Circuit Court Judge

cc:    David Watkins
       Azzie M. Taylor

TMH

CC 00-1506.60

IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

RECEIVED
10-31-06
CIRCUIT COURT CLERK

DAVID L. WATKINS
PETITIONER          DENIED          10/26/06
                                    DATE
V.                                  CASE NO: CC-1506
                    TRUMAN M. HOBBS, JR.
STATE OF ALABAMA    CIRCUIT JUDGE
RESPONDENT

## MOTION TO ALTER, AMEND OR VACATE A JUDGMENT

Comes now Petitioner, pro se in the above styled cause, without the benefits of counsel and submit this request to the Honorable Court pursuant to Rule 59(e), Ala.Civil.P asking this Court to postpone (or) set aside its judgment to hear Petitioner's arguments due to the following:

1.    Petitioner filed a Rule 32 Petition and received a hearing on the 12th day of October 2006.

2.    Petitioner contends that his Appellate Counsel was ineffective for his failure to raise the issue of, the denial of the effective assistance of trial counsel, due to trial counsel's failure to submit a written request that the trial court instruct the jury on a lesser included offense of manslaughter regarding intoxication; and failure to submit a written request that the trial court properly instruct the Jury on a particularize intent to kill issue with regard to accomplice liability.

3.    Petitioner filed Motion For Subpoena Duces Tecum and affidavits respectfully asking that the State Of Alabama to submit a taped statement that was admitted into evidence at trial (marked as No.44 with the letter "A" written on its side) be available for

inspection at the hearing on October 12, 2006 at 10:30 a.m., Courtroom 3-A, Montgomery County. (See attached motion and affidavit as exhibits)

4.      Furthermore, Petitioner filed his documents with certificate of service on the 5th day of October 2006 sworn and subscribed by both Officer Rose and Sgt. King Notary Public of Draper Correctional Facility.

5.      However, the taped statement was not available for inspection which, at the time, was Petitioner's only and sole evidence in which to properly argue his claim of Ineffective Assistance of Counsel as required under Strickland.

6.      Petitioner contends that had these documents reached the Circuit Court's Clerk in time, or had these documents been filed by the Clerk of Montgomery County, Petitioner could have properly addressed and proven, by a preponderance of the evidence, his claims.

7.      Petitioner in furtherance, recognizes **Houston v. Lack**, 487 US 266, 101 L Ed 2d 245, 108 S.Ct 2379 to be proper remedy in which addressed this soon to be miscarriage of justice.

Petitioner prays that this Honorable Court reconsider its decision and take judicial notice and allow him to submit his issues along with the taped statement to address his claims properly as required under the U.S. Constitution.

Respectfully Submitted,

_David L. Watkins_
Petitioner


Sworn and subscribed before me this _23_ day of _October_ 2006.

_Jerome Rose_                           My Commission Expires March 25, 2008
Notary Public                           My Commission Expires

## IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
## MONTGOMERY COUNTY, ALABAMA

DAVID L. WATKINS      ]
    PETITIONER        ]
                   ]
    V.                 ]      CASE NO: CC 00-1506 . 60
                   ]
STATE OF ALABAMA     ]
    RESPONDENT       ]
                   ]
                   ]

### MOTION FOR SUBPOENA DUCES TECUM

Comes now the Petitioner, David L. Watkins, by and through himself in the above-styled cause respectfully moves the Court pursuant to Rule 16 Alabama Rules of Criminal Procedure of the entry of an order directing that the State of Alabama be returnable before the Court on or before 12th day of October, 2006, and further, directing that the books, papers, records and documents described in said subpoenas, upon their production, be available for inspection and/or copying by the named Petitioner.

In support thereof, movant state that the books, papers, records and documents described in the attached subpoenas are evidentiary in nature, that the Petitioner lacks access to these items from any other source, and that an order directing production of these items prior to an evidentiary hearing will expedite the hearing of this cause and facilitate the introduction of material and relevant evidence during the course thereof.

WHEREFORE, premises considered, the Petitioner prays that this Honorable Court shall make the entry of an order to require the opposing party to produce the requested materials.

Done this the __5__ day of October, 2006

Respectfully submitted,

_David L. Watkins_
David L. Watkins
Draper Correctional Center
P.O. Box 1107
Elmore, AL 36025-1107

## CERTIFICATE OF SERVICE

I hereby certify that on this __5__ day of October, 2006, I did serve a copy of the foregoing on the following, by placing the same in the United States Mail, first class, postage prepaid and addresses as follows:

The Honorable Judge Truman M. Hobbs Jr.
Circuit Court of Montgomery County
Montgomery County Courthouse
251 S. Lawrence St.
P.O. Box 1667
Montgomery, AL 36102-1667

Offices of Ellen Brooks
District Attorney
Fifteenth Judicial Circuit of Alabama
Montgomery County Courthouse
P.O. Box 1667
Montgomery, AL 36102-1667

_David L. Watkins_
David L. Watkins
Petitioner, pro-se

Sworn to and subscribed before me this __5__ day of __October__, 2006.

MY COMMISSION EXPIRES JAN. 8, 2008
_____
My commission expires

_Denise Rose_
Notary Public

<u>IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA</u>

DAVID L. WATKINS       ]
    PETITIONER        ]
                        ]
    V.                   ]      CASE NO: CC-1506
                        ]
STATE OF ALABAMA      ]
    RESPONDENT      ]
                        ]

<u>AFFIDAVIT IN SUPPORT</u>

STATE OF ALABAMA      ]    SS: Affidavit of David L. Watkins
COUNTY OF ELMORE     ]

    Before me, the undersigned Notary Public in for said State and County, personally appeared before David L. Watkins whom is know to me as such, first being duly sworn and deposes and states the following:

    I am the Petitioner in the above-entitled case and make this affidavit in good faith to support matters pursuant to a Rule 32 Proceeding.

    On or about the 21st day of October, 1999, I was apprehended by the police of Montgomery Police Department for questioning concerning the murder of John Ferrell. The police took from me a taped statement, which was admitted into evidence as exhibit No.44, with the letter "A" written on its side. That taped statement contains proof that I, the Petitioner, was indeed intoxicated at the time that the crime was committed.

    The State of Alabama has possession of that tape. I respectfully ask that the tape marked as Exhibit No.44 along with the videocassette be available for inspection at the hearing on October 12, 2006 at 10:30 a.m., Courtroom 3-A, Montgomery County

Courthouse, 251 South Lawrence Street, Alabama. I intend to prove by a preponderance of that taped statement that I am entitled to a new trial or sentence

AFFIANT FURTHER SAYETH NAUGHT!

David L. Watkins
Affiant

Sworn to and subscribed before me this __5__ day of _____, 2006.

__3/09__
My commission expires

Notary Public

4

APPENDI X

EXHIBIT A: AFFIDAVIT IN SUPPORT
OF
MOTION FOR SUBPOENA DUCES TECUM

Pg. 3

TMH

CCOO-1506.60

<u>IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA</u>

DAVID L. WATKINS             ]
      PETITIONER          ]

    V.                       ]        CASE NO: CC-1506

STATE OF ALABAMA           ]
      RESPONDENT       ]
                         ]

FILED
Melissa Rittenour
Circuit Clerk

<u>AFFIDAVIT IN SUPPORT</u>

STATE OF ALABAMA        ]   SS: Affidavit of David L. Watkins
COUNTY OF ELMORE     ]

     Before me, the undersigned Notary Public in for said State and County, personally appeared before David L. Watkins whom is know to me as such, first being duly sworn and deposes and states the following:

     I am the Petitioner named here and the above style cause and make this affidavit in truth concerning specific facts that transpired in my case. On Oct. 22, 1999, I was charged with Capital Murder in which I was arrested and placed in the custody of Montgomery County Jail. On September 15, 2000, the Grand Jury of Montgomery County later indicted me on the Charge of "Intentional Murder in violation of §13A-6-2 of the Code of Alabama, 1975. On September 28, 2000, the court appointed Winston Durant as my defense counsel, whom is known to me to be a registered member of the Alabama Bar Association. Mr. Durant interviewed me at the pre-trial stage, which he informed me that it would be a good idea to plead guilty to the charges against me. I informed Mr. Durant that the charges against me are not true and that I deserved a fair chance to tell my side of the story. I did not intentionally cause the death of John Ferrell,

and that his death was not caused by any act or acts on my part. His death was caused by a gunshot wound to the head, by a co-defendant, which was also charged with the same exact crime. I, while under the influence of alcohol, admitted that I did in fact assault the victim. But, it was the vicious act of my co-defendant that discharged the firearm that resulted in his death. I also informed my counsel, as well as the law-enforcers, that I did everything in my power to prevent the crime from happening. Neither, did I cause the crime to go further than the assault, because, the crime was taking on a new undertaking which was outside of my objective or purpose. These same facts or allegations were made in a taped statement given by me, (while under the influence of alcohol – which the officers of Montgomery Police Department never performed any tests to determine to what degree (or) level my intoxication was). Still, the State of Alabama believed that I helped commit the crime of murder. Mr. Durant without my permission (or) consent waived the preliminary hearing, and forfeited my right to a preliminary hearing.

Furthermore, Mr. Durant never retained a private investigator nor did he conduct any forensic analysis or tests. He relied solely on the State's evidence during trial in which he subpoenaed only one witness to verify that I was intoxicated at the time the arresting officer apprehended me. I also would like to point out the fact that Mr. Durant never conducted any pretrial investigations whatsoever. Because there is no proof in the Court records and exhibits admitted at the trial. Since Mr. Durant is a known, registered, member of the Alabama Bar Association – it should have occurred to him that these types of procedures should take place in order to increase the possibilities of the truth emerging during his client's trial.

On May 15, 2001 I had a jury trial in which I think it is safe to say that we had no type of defense whatsoever, due to the negligence of my counsel Winston Durant. He rarely, if ever, objected or subjected the state's case to any meaningful testing to even show a possibility of innocence in the charges against me. He, in addition, stood by while the state incriminated me, they even got away with quotes that were made in a transcript of the "so called" taped "confession", which the judge ruled to be dismissed from the trial itself.

I sincerely believe that, had I received effective assistance of counsel, the outcome of the trial would have been different, and the jury could have either found me not guilty, or guilty upon a lesser included offense, had my said trial counsel requested a lesser included offense, the instructions on intoxication, the proper instructions of aiding & abetting, and insufficiency of the evidence. Rather than pleading "satisfied" when the court asked if any further instructions were needed.

In addition, Kelly Vickers was appointed to represent me on appeal in which he (or) she promised to visit with me to discuss issues concerning the appeal. I never got the chance to meet with her/him during the foregoing appeal. However, I was able to contact the appeal's counsel in writing, in which I constantly reminded counsel Vickers that I was being neglected as her/his client. My appeal's brief was filed by Counsel Vickers February 6, 2002. My counsel, Kelly Vickers, informed me that I would be notified of the outcome. On April 19, 2002, my appeal had been affirmed by memorandum and certificate of judgment was issued May 7, 2002, thereby concluding the appeal. Apparently, counsel had forgotten to inform me and was not aware of this fact. I later wrote the Criminal Court of Appeals and received the news from there, which after the

fact Kelly Vickers' response was that he/she thought they had informed me because their records indicate that fact. This is almost (2) years after my appeal had been affirmed, in fact, I did not receive a copy of the trial's transcript until April 2, 2004. I would also like to point out the fact that, I have no knowledge whether or not Counsel Vickers has heard the taped statement given by me to the law enforcement officers. If so, I still have not received it from the counsel.

Due to this counsel's negligence, I was not able to file a proper Rule 32 Post Conviction Relief in the subscribed manner in which the Rules of Court requires. In conclusion, I again, sincerely believe that had Kelly Vickers given me the effective assistance, which is required by law, the outcome of this appeal would have been different.

        AFFIANT FURTHER SAYETH NAUGHT

                                              David L. Watkins
                                              Affiant

Sworn to and subscribed before me this ___5___ day of ___nt___, 2006.


___2/09___
My commission expires                         Notary Public

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
MONTGOMERY COUNTY, ALABAMA

DAVID L. WATKINS
PETITIONER

V.                                                      CASE NO: CC 00-1506.60

STATE OF ALABAMA
RESPONDENT

## MOTION TO SET ASIDE JUDGMENT

COMES NOW the Petitioner, David L. Watkins, pro-se in the above-styled cause, moves this Honorable Court to set aside the judgment entered on October 12, 2006, and allow him to re-enter his evidence to show just cause why he is entitled to another trial and/or sentencing reasons as follows:

1.      On August 17, 2006 Petitioner's Rule 32 Petition was filed and a hearing was set in Montgomery County on October 12, 2006 to discuss the issues in his Rule 32 Petition.

2.      On October 5, 2006 (7) seven days in advance, Petitioner filed a Motion for Subpoena Duces Tecum asking that the State of Alabama turn over a taped statement to be available for inspection at the hearing. Petitioner also submitted Traverse and Affidavits in support of Rule 32 and Subpoena Duces Tecum.

3.      On October 8, 2006 while incarcerated at Montgomery County Detention Facility Petitioner wrote an inmate's request form asking the Clerk of Montgomery County if she had received these documents. The Clerk responded on October 11, 2006 by sending a copy of the case action summary, which did not indicate these documents. (See Petitioner's Exhibit A, B)

4.    Petitioner later filed Motion to Alter, Amend or Vacate a Judgment on October 23, 2006 due to the fact that the taped statement was not available for inspection. In addition, on 23 October, Petitioner wrote a letter to the Clerk whom sent him another copy of his case action summary, which was dated October 26, 2006. in this newly discovered case action summary Petitioner learned that his documents had not only reached the clerk in time, but, they were supposedly filed on the 10th day of October, (2) two days before the hearing was held according to his case action summary. (See Petitioner's Exhibit C)

Wherefore, premises considered, Mr. Watkins prays that this Honorable Court shall grant his request to set aside the judgment entered on October 12, 2006 and either re-schedule another evidentiary hearing to permit Mr. Watkins the opportunity to show the evidence needed to prove his ineffective assistance claim or in the alternative take judicial notice of the taped statement (evidence), and make a decision on its merits. Furthermore, Petitioner asks this Court to send, by mail, a specific findings of fact after the decision on his evidentiary hearing. A failure to do so shall constitute the denial of due process and fundamental fairness.

Done this  6  day of November 2006.

Respectfully submitted,

David L. Watkins

David L. Watkins
Draper Correctional Center
P.O. Box 1107
Elmore, AL 36025-1107

## CERTIFICATE OF SERVICE

I hereby certify that on this ___6___ day of November 2006, I did serve a copy of the

foregoing on the following, by placing the same in the United States Mail, first class,

postage prepaid and addresses as follows:

The Honorable Judge Truman M. Hobbs Jr.
Circuit Court of Montgomery County
Montgomery County Courthouse
251 S. Lawrence St.
P.O. Box 1667
Montgomery, AL 36102-1667

Offices of Ellen Brooks
District Attorney
Fifteenth Judicial Circuit of Alabama
Montgomery County Courthouse
P.O. Box 1667
Montgomery, AL 36102-1667

David L. Watkins
Petitioner, pro-se

Sworn to and subscribed before me this _____ day of _____, 2006.


_____          _____
My commission expires                                  Notary Public

IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

DAVID L. WATKINS      ]
     PETITIONER    ]
                      ]
V.              ]    CASE NO: CC-~~1506~~.  00-1506.60
                      ]
STATE OF ALABAMA   ]
     RESPONDENT   ]
                      ]

NOTICE OF APPEAL TO THE
COURT OF CRIMINAL APPEALS OF ALABAMA

Notice is hereby given that <u>David L. Watkins</u>, appeals to the above-named court

from the judgment of denial and dismissal of Rule 32 Post Conviction Petition entered in

this case on the 12th day of October 2006.

Done this the _14_ day of November 2006.

Respectfully submitted,

_David L. Watkins_
David L. Watkins
Draper Correctional Center
P.O. Box 1107
Elmore, AL 36025-1107

Sworn and subscribed before me this _14_ day of _Nov_, 2006.
My Commission Expires March 25, 2008

My commission expires _____

_Notary Public_

Pg. 1

## CERTIFICATE OF SERVICE

I hereby certify that on this __14__ day of October 2006, I did serve a copy of the foregoing on the following, by placing the same in the United States Mail, first class, postage prepaid

David L. Watkins
Petitioner, pro-se

Sworn to and subscribed before me this _____ day of _____, 2006.

_____
My commission expires

_____
Notary Public

APPENDIX BB

| State of Alabama<br>Unified Judicial System<br>Form ARAP-26 (front)     8/91 | COURT OF CRIMINAL APPEALS<br>DOCKETING STATEMENT | Criminal Appeal Number<br>_____ - _____ |
| --- | --- | --- |

## A. GENERAL INFORMATION:

☑ CIRCUIT COURT   ☐ DISTRICT COURT   ☐ JUVENILE COURT OF   MONTGOMERY                                    COUNTY

_____ , Appellant

V.   ☑ STATE OF ALABAMA      ☐ MUNICIPALITY OF _____

| Case Number<br>CC 00 - 1506.60 | Date of Complaint or Indictment | Date of Judgment/Sentence/Order<br>Oct. 12, 2006 |
| --- | --- | --- |
| Number of Days of Trial/Hearing<br>_____ Days | Date of Notice of Appeal<br>Oral: ~~11-14-06~~ | Written: ~~11-14-06~~   11-14-06 |
| Indigent Status Requested: ☑ Yes ☐ No | Indigent Status Granted: ☑ Yes ☐ No | |

## B. REPRESENTATION:

Is Attorney Appointed or Retained?   ☐ Appointed   ☐ Retained.        If no attorney, will appellant represent self?   ☑ Yes   ☐ No

Appellant's Attorney (Appellant if pro se) (Attach additional pages if necessary)     David L Watkins

Telephone Number     N/A

| Address<br>P.O. Box 1107 | City<br>Elmore | State<br>Ala. | Zip Code<br>36025 |
| --- | --- | --- | --- |

## C. CODEFENDANTS: List each CODEFENDANT and the codefendant's case number.

| Codefendant | Case Number |
| --- | --- |
| Codefendant | Case Number |
| Codefendant | Case Number |

## D. TYPE OF APPEAL: Please check the applicable block.

1 ☐ State Conviction          4 ☐ Pretrial Order              7 ☐ Juvenile Transfer Order      10 ☐ Other (Specify)
2 ☑ Post-Conviction Remedy    5 ☐ Contempt Adjudication       8 ☐ Juvenile Delinquency
3 ☐ Probation Revocation      6 ☐ Municipal Conviction        9 ☐ Habeas Corpus Petition

## E. UNDERLYING CONVICTION/CHARGE: Regardless of the type of appeal checked in Section D, please check the box beside each offense category for which the appellant has been convicted or charged as it relates to this appeal. Also include the applicable section of the Code of Alabama for State convictions.

1 ☐ Capital Offense - § _____        6 ☐ Trafficking in Drugs - § ____       11 ☐ Fraudulent Practices - § _____
2 ☑ Homicide - § _____               7 ☐ Theft - § _____                   12 ☐ Offense Against Family - § _____
3 ☐ Assault - § _____                8 ☐ Damage or Intrusion                 13 ☐ Traffic - DUI - § _____
4 ☐ Kidnapping/Unlawful                     to Property - § _____             14 ☐ Traffic - Other - § _____
     Imprisonment - § _____          9 ☐ Escape - § _____                  15 ☐ Miscellaneous (Specify):
5 ☐ Drug Possession - § _____        10 ☐ Weapons/Firearms - § _____            _____ - § _____

## F. DEATH PENALTY:

Does this appeal involve a case where the death penalty has been imposed?     ☐ Yes   ☑ No

## G. TRANSCRIPT:

1. Will the record on appeal have a reporter's transcript?     ☑ Yes   ☐ No
2. If the answer to question "1" is "Yes," state the date the Reporter's Transcript Order was filed.     11-14-06
                                                                                                          (Date)
3. If the answer to question "1" is "No:"
   (a) Will a stipulation of facts be filed with the circuit clerk?     ☐ Yes   ☐ No
   (b) Will the parties stipulate that only questions of law are involved and will the trial court certify the questions?   ☐ Yes   ☐ No

NOTE: If the appeal is from the district or juvenile court and the answer to question "1" is "No," then a positive response is required for question 3(a) or 3(b).

| Form ARAP-26 (back)    8/91 | COURT OF CRIMINAL APPEALS DOCKETING STATEMENT |
|---|---|

**H. POST-JUDGMENT MOTIONS:** List all post-judgment motions by date of filing, type, and date of disposition (whether by trial court order or by the provisions of Rules 20.3 and 24.4 (ARCrP)):

| DATE OF FILING | | | TYPE OF POST-JUDGMENT MOTION | DATE OF DISPOSITION | | |
|---|---|---|---|---|---|---|
| Month | Day | Year | | Month | Day | Year |
| 10 | 23 | 06 | Motion to Alter, Amend or Vacate A Judgement | | | |
| 11 | 7 | 06 | Motion to Set Aside Judgment | | | |
| | | | | | | |
| | | | | | | |

**I. NATURE OF THE CASE:** Without argument, briefly summarize the facts of the case.

The denial of Rule 32 petition

**J. ISSUE(S) ON APPEAL:** Briefly state the anticipated issues that will be presented on appeal. *(Attach additional pages if necessary.)*

Issue shall be presented upon the Completion of the record.

**K. SIGNATURE:**

11-14-06
Date

*David L. Watkins pro-se*
Signature of Attorney/Party Filing this Form

APPENDIX X

| State of Alabama<br>Unified Judicial System<br>Form ARAP- 1C      8/91 | **REPORTER'S TRANSCRIPT ORDER -- CRIMINAL**<br>See Rules 10(c) and 11(b) of the<br>Alabama Rules of Appellate Procedure (A.R. App.P.) | Criminal Appeal Number<br>___ - ___ |

TO BE COMPLETED BY COUNSEL FOR THE APPELLANT OR BY THE APPELLANT IF NOT REPRESENTED AND FILED WITH THE WRITTEN NOTICE OF APPEAL OR FILED WITHIN 7 DAYS AFTER ORAL NOTICE OF APPEAL IS GIVEN.

☑CIRCUIT COURT ☐DISTRICT COURT ☐JUVENILE COURT OF _Montgomery_ _____ COUNTY

_David L. Watkins_ _____, Appellant

V. ☑STATE OF ALABAMA ☐MUNICIPALITY OF _____

| Case Number<br>CC 00-1506.60 | Date of Judgment/Sentence/Order<br>10-12-06 |
| Date of Notice of Appeal<br>Oral: _____  Written: _11-14-06_ | Indigent Status Granted:<br>☑Yes  ☐No |

**PART 1. TO BE SIGNED IF THE APPEAL WILL NOT HAVE A COURT REPORTER'S TRANSCRIPT:**
I CERTIFY THAT NO REPORTER'S TRANSCRIPT IS EXPECTED AND THAT THE RECORD ON APPEAL SHALL CONSIST OF THE CLERK'S RECORD ONLY. IF THE APPEAL IS FROM DISTRICT COURT OR JUVENILE COURT, I ALSO CERTIFY (1) THAT A STIPULATION OF FACTS WILL BE INCLUDED IN THE CLERK'S RECORD AND THAT THE APPELLANT WAIVES HIS RIGHT TO A JURY TRIAL IF SO ENTITLED; OR (2) THAT THE PARTIES HAVE STIPULATED THAT ONLY QUESTIONS OF LAW ARE INVOLVED AND THAT THE QUESTIONS WILL BE CERTIFIED BY THE JUVENILE/DISTRICT COURT FOR INCLUSION IN THE CLERK'S RECORD (SEE RULE 28(A)(1), ALABAMA RULES OF JUVENILE PROCEDURE, AND §12-12-72, *CODE OF ALABAMA 1975*).

_____        _____        _____
Signature                Date                     Print or Type Name

**PART 2. DESIGNATION OF PROCEEDINGS TO BE TRANSCRIBED.** Request is hereby made to the court reporter(s) indicated below for a transcript of the following proceedings in the above referenced case (see Rule 10(c)(2), Alabama Rules of Appellate Procedure (A.R.App.P.)):

MARK PROCEEDINGS REQUESTED:                                                      COURT REPORTER(S)
_UNKNOWN_

A. ☑ TRIAL PROCEEDINGS - Although this designation will include the judgment and sentence proceedings, a transcript of the organization of the jury and arguments of counsel must be designated separately.

B. ☐ ORGANIZATION OF THE JURY - This designation will include voir dire examination and challenges for cause. Note that in noncapital cases the voir dire of the jury will not be recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)

C. ☑ ARGUMENTS OF COUNSEL - Note that in noncapital cases the arguments of counsel will not be recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)

_UNKNOWN_

IN ADDITION TO ANY PROCEEDINGS DESIGNATED ABOVE, SPECIAL REQUEST IS HEREBY MADE TO INCLUDE THE FOLLOWING PROCEEDINGS IN THE REPORTER'S TRANSCRIPT PORTION OF THE RECORD ON APPEAL. (ATTACH ADDITIONAL PAGES IF NECESSARY.)

| ADDITIONAL PROCEEDINGS REQUESTED | DATE | COURT REPORTER(S) |
| D. _Evidentiary Hearing_ | _10-12-06_ | _UNKNOWN_ |
| E. _Arguments of Counsels_ | | |
| F. _All Motions_ | | |
| G. _Clerk's Record_ | | |

IMPORTANT NOTICE: The court reporter who reported the proceedings for which a transcript is requested must be identified on this form to be effective. Additionally, it is important to note that the appellant may not be permitted to raise any issue on appeal relating to any proceedings in the case that are not specifically designated on this form for inclusion in the reporter's transcript. A general designation such as "all proceedings" is not sufficient. (See Rule 10(c)(2), A.R.App.P.)

**PART 3. MUST BE SIGNED IF THE APPEAL WILL HAVE A COURT REPORTER'S TRANSCRIPT:**
I CERTIFY THAT I HAVE DISTRIBUTED THIS FORM AS SET OUT BELOW. I ALSO CERTIFY (1) THAT I HAVE MADE SATISFACTORY FINANCIAL ARRANGEMENTS WITH EACH COURT REPORTER LISTED ABOVE FOR PREPARING HIS OR HER PORTION OF THE REPORTER'S TRANSCRIPT HEREIN REQUESTED; OR (2) THAT THE APPELLANT PROCEEDED AT TRIAL AS AN INDIGENT AND THAT THAT STATUS HAS NOT BEEN REVOKED; OR, (3) THAT THE APPELLANT HAS BEEN GIVEN PERMISSION TO PROCEED ON APPEAL IN FORMA PAUPERIS.

_David L. Watkins_        _11-14-06_        _David L. Watkins_
Signature                 Date              Print or Type Name

DISTRIBUTION: Original filed with Clerk of Trial Court and copies mailed to:  (1) Clerk of the Court of Criminal Appeals,  (2) the District Attorney, (3) the Attorney General or the municipal prosecutor in lieu of the District Attorney and the Attorney General if the appeal is from a municipal conviction, and (4) each Court Reporter who reported proceedings designated for inclusion in the reporter's transcript.

REV. 4/1/97

## NOTICE OF APPEAL TO THE ALABAMA COURT OF CRIMINAL APPEALS
### BY THE TRIAL COURT CLERK

DAVID WATKINS                    V.              STATE OF ALABAMA

**APPELLANT'S NAME**                                      **APPELLEE**
(as it appears on the Indictment)

[✓] CIRCUIT [ ] DISTRICT [ ]     JUVENILE COURT OF    MONTGOMERY    COUNTY

CIRCUIT/DISTRICT/JUVENILE JUDGE:      TRUMAN HOBBS

| DATE OF NOTICE OF APPEAL: | 11/14/06 |
|---|---|

(NOTE: If the appellant is incarcerated and files notice of appeal, this date should be the date on the certificate of service, or if there was no certificate of service, use the postmark date on the envelope.)

**INDIGENCY STATUS:**
Granted Indigency Status at Trial Court
Appointed Trial Counsel Permitted to Withdraw on Appeal:       [✓] Yes [ ] No
Indigent Status Revoked on Appeal:                              [ ] Yes [ ] No    N/A

**DEATH PENALTY:**
Does the appeal involve a case where the death penalty has been imposed?    [ ] Yes [✓] No.

**TYPE OF APPEAL:** (Please check the appropriate block)
[ ] State Conviction          [ ] Pretrial Appeal by State      [ ] Juvenile Transfer Order
[✓] Rule 32 Petition          [ ] Contempt Adjudication         [ ] Juvenile Delinquency
[ ] Probation Revocation      [ ] Municipal Conviction          [ ] Habeas Corpus Petition
[ ] Mandamus Petition         [ ] Writ of Certiorari            [ ] Other (Specify)

IF THIS APPEAL IS FROM AN ORDER DENYING A PETITION (I.E. RULE 32 PETITION, WRIT OF HABEAS CORPUS, ETC.) OR FROM ANY OTHER ORDER ISSUED BY THE TRIAL JUDGE, COMPLETE THE FOLLOWING:

TRIAL COURT CASE NO.:      CC 00-1506.60

DATE ORDER WAS ENTERED:      10/20/06           PETITION: [✓] Dismissed [ ] Denied [ ] Granted

IF THIS IS AN APPEAL FROM A CONVICTION, COMPLETE THE FOLLOWING:

DATE OF CONVICTION: _____        DATE OF SENTENCE: _____

**YOUTHFUL OFFENDER STATUS:**
Requested: [ ] Yes [ ] No        Granted: [ ] Yes [ ] No

LIST EACH CONVICTION BELOW: *(attach additional page if necessary)*
1.  Trial Court Case No. _____        CONVICTION: _____
    Sentence: _____
2.  Trial Court Case No. _____        CONVICTION: _____
    Sentence: _____
3.  Trial Court Case No. _____        CONVICTION: _____
    Sentence: _____

| POST-JUDGMENT MOTIONS FILED: (complete as appropriate) | Date Filed | Date Denied | Continued by Agreement To(Date) |
|---|---|---|---|
| [ ] Motion for New Trial | | | |
| [ ] Motion for Judgment of Acquittal | | | |
| [ ] Motion to Withdraw Guilty Plea | | | |
| [ ] Motion in Arrest of Judgment | | | |
| [ ] Other | | | |

COURT REPORTER (S) ................      JUDY SHELTON
ADDRESS: ................

APPELLATE COUNSEL: ................      N/A
ADDRESS: ................

APPELLANT: (IF PRO SE) ................   AIS#_ 219698  DAVID WATKINS
ADDRESS: ................                 P.O. BOX 1107
                                         ELMORE, ALABAMA 36025-1107
APPELLEE (IF CITY APPEAL) ....           N/A
ADDRESS: ................

I certify that the information provided above is accurate and
to the best of my knowledge and I have served a copy of this
Notice of Appeal on all parties to this action on
this  5th  day of  DECEMBER  , 2006 .

*Melissa Rittenour*
CIRCUIT COURT CLERK

| State of Alabama<br>Unified Judicial System<br><br>From ARAP-14 Rev. 11/91 | CERTIFICATE OF COMPLETION AND<br>TRANSMITTAL OF RECORD ON<br>APPEAL BY TRIAL CLERK | Appellate Case Number<br><br>CR 06-408 |
|---|---|---|

| TO: THE CLERK OF<br>THE COURT OF CRIMINAL APPEALS OF ALABAMA | DATE OF<br>NOTICE OF APPEAL: | 11/14/06 |
|---|---|---|
| APPELLANT | DAVID WATKINS | |
| v. STATE OF ALABAMA | | |

I certify that I have this date completed and transmitted herewith to the appellate court the record on appeal by assembling in ( a single volume of __445__ pages) (_____ volumes of 200 pages each and one volume of _____ pages) the clerk's record and the reporter's transcript and that one copy each of the record on appeal has been served on the defendant and the Attorney General of the State of Alabama for the preparation of brief.

I certify that a copy of this certificate has this date been served on counsel for each party to the appeal.

DATED this __26TH__ day of __JANUARY__ , __2007__ .


_Melissa Rittenour_
Circuit Clerk

1

1

2          IN THE FIFTEENTH JUDICIAL CIRCUIT
               IN AND FOR MONTGOMERY COUNTY
3                    MONTGOMERY, ALABAMA

4

5

6     STATE OF ALABAMA,        )

7              Plaintiff,      )

8     VS.                      )  CRIMINAL ACTION

9     DAVID LEONARD WATKINS, )    NO. 00-1506

10             Defendant.      )

11    _____/

12          TRANSCRIPT OF PROCEEDINGS

13              OCTOBER 12, 2006

14        MONTGOMERY COUNTY COURTHOUSE

15               COURTROOM 3-A

16

17    BEFORE:  THE HON. TRUMAN M. HOBBS, JR.

18             CIRCUIT JUDGE

19                  APPEARANCES
20    FOR THE STATE:
      SCOTT GREEN, ASST DA
21    AZZIE TAYLOR, ASST DA
      MONTGOMERY, ALABAMA
22
      FOR THE DEFENDANT:
23    (No Appearance)

24
               JUDY E. SHELTON
25             OFFICIAL REPORTER

2

```
1
2                    * * * * * * * * * *
3              THE COURT:  All right.  Mr.
4    Watkins, you filed a Rule 32
5    application.  Do you want to offer any
6    testimony or call any witnesses?  What do
7    you want to do?
8              THE DEFENDANT:  Can I sit or do
9    I have to stand or --
10             THE COURT:  You can sit.
11   That's fine.
12             THE DEFENDANT:  Really, the
13   only thing I want to do is submit a brief
14   that actually show where -- I just want
15   to submit this brief in on my appeal when
16   I first came down.  I would like to show
17   exactly the issue that I should have
18   brought up at trial that wasn't brought
19   up by my counsel, Winston Durant.
20             THE COURT:  And that issue --
21   what you are saying there is that he
22   should have asked for a charge on
23   manslaughter?
24             THE DEFENDANT:  Uh-huh
25   (indicating yes), as well as a
```

3

1    particularized intent instruction on

2    aiding and abetting because when I was

3    given the instructions on aiding and

4    abetting it wasn't properly filed before

5    the Court at the time that I went.

6            So what I did, I actually did

7    research and actually found it under --

8    give me a minute -- under Duncan versus

9    State where it talks about particularized

10   intent and the brief on page -- it will

11   be on page nine of my brief, if you still

12   have a copy of it that I submitted on my

13   Rule 32.

14           THE COURT:  I do.

15           THE DEFENDANT:  Yeah.  If you

16   start from the beginning of it, it

17   explains how any time you are dealing

18   with particularized intent you have to

19   bring in the issue of -- I'm sorry -- you

20   have to break down the two issues.  It

21   talks about -- I'm sorry.  Excuse me one

22   minute.

23           That is what I'm saying.  I'm

24   sorry.  The instruction that was given by

25   the judge at the time that I went to

4

```
1      trial wasn't fully -- it didn't break
2      down the paricularized intent of aiding
3      and abetting.  Now they charged them on
4      complicity that we went through but they
5      never break down the whole case for it.
6              What I'm saying is if you read
7      the instruction on particularized intent
8      it should have been submitted at the
9      time.  By them not submitting these
10     instructions that pretty much -- it
11     lessens the state's burden of proof as
12     far as finding me guilty or not.
13              THE COURT:  Okay.
14              THE DEFENDANT:  Sir?
15              THE COURT:  I said okay.  I
16     have read what you have submitted.  I
17     guess the only question I have for you
18     today is do you want to present any
19     testimony or do you want to call any
20     witnesses on your behalf?
21              THE DEFENDANT:  I really don't
22     have any witness.  Everything that I have
23     is here unless you want me to question
24     the attorneys that was there.  That's
25     about it.
```

5

```
 1              THE COURT:  I think the state
 2      is probably going to call Mr. Durant to
 3      testify.  I guess you can cross examine
 4      him.
 5              THE DEFENDANT:  Okay.  Other
 6      than that, I don't have any witnesses I
 7      want to present at this time.
 8              THE COURT:  Are y'all ready to
 9      go forward with your case?
10              MR. GREEN:  Yes, sir.  Judge,
11      we will call Mr. Durant in this case.
12              THE COURT:  Okay.
13              WINSTON DURANT,
14      having been first duly sworn, was
15      examined and testified as follows:
16              DIRECT EXAMINATION
17      BY MR. GREEN:
18          Q.  Can you tell us your name
19      please?
20          A.  Winston Durant.
21          Q.  Mr. Durant, what is it that you
22      do for a living?
23          A.  The practice of law.
24          Q.  How long have you been doing
25      that type work?
```

6

```
 1          A.    Approximately thirty years.

 2          Q.    And over your thirty years have

 3    you had an occasion to -- you are a

 4    defense attorney; is that right?

 5          A.    Yes.

 6          Q.    Have you had an occasion to

 7    defend people who are charged with

 8    felonies including murder, capital

 9    murder?

10          A.    Yes, I have.

11          Q.    Specifically a guy by the name

12    of David Watkins, were you his defense

13    counsel?

14          A.    Yes.

15          Q.    How did that case progress?

16    Did it go to trial?

17          A.    Yes, it went to trial.

18          Q.    And you were his attorney at

19    trial; is that correct?

20          A.    Yes, that's correct.

21          Q.    He has alleged in a Rule 32

22    petition that you were ineffective and

23    provided him with ineffective

24    assistance.  Are you aware of those

25    allegations?
```

7

1      A.   Yes.

2      Q.   Now, Mr. Durant, when preparing

3  for this case did you read the

4  discovery? Did you do anything that you

5  normally would or would not do in a

6  criminal trial?

7      A.   Generally in a criminal trial,

8  in particular in murders, I would read

9  the discovery on numerous occasions in

10  order to be well versed as far as the

11  facts are concerned.

12     Q.   Okay.  Did you do that in this

13  case?

14     A.   Of course.

15     Q.   Would you have considered

16  yourself well versed in the facts of this

17  particular case?

18     A.   Of course.

19     Q.   Now, specifically the

20  allegations in this case are that after

21  the state had made its case, after the

22  defense had made its case, that you

23  failed to offer the Court in writing a

24  request for a lesser included charge of

25  manslaughter.  Are those charges

8

1    correct?  Did you in fact not do that?

2        A.   I did not ask the Court for a

3    lesser included.

4        Q.   Why was that?

5        A.   Because the facts were of such

6    that I felt that it wasn't warranted.  I

7    -- in my estimation, in my professional

8    judgment I didn't think that there was a

9    legal theory that --

10           THE DEFENDANT:  Objection, Your

11    Honor.  We have proof from the evidence

12    at the trial that intoxication was --

13    everybody was intoxicated at the time of

14    the crime.  In dealing with the law --

15           THE COURT:  You can point that

16    out on cross examination where it says

17    that.

18           THE DEFENDANT:  Okay.

19           THE COURT:  He is entitled to

20    at least say it, and you can come back

21    and challenge it when you question him.

22        Q.   So, Mr. Durant, are you saying

23    you didn't feel as though the facts of

24    this case or the law warranted a lesser

25    included charge --

9

```
 1        A.    That's correct.
 2        Q.    -- of manslaughter?  Now the
 3   defendant brought up the issue of
 4   intoxication.  Can you explain to us
 5   about that, why did you ask that that --
 6   why did you not ask that that be
 7   considered by the Court?
 8        A.    My recollection is that during
 9   the course of the trial, that was not an
10   essential element of the defense.  There
11   was some -- I believe there might have
12   been a statement that we were drinking
13   but not to rise to the proportion where
14   you would think it would impair a
15   person's intent.  With that missing, I
16   didn't think that it was necessary for me
17   to ask for a lesser included.
18        Q.    Was there any evidence put
19   forth at trial that the defendant had
20   been drinking to such an extent that it
21   would have impaired --
22        A.    None that I can recall.
23        Q.    What about during the time that
24   he gave his statement, was there any
25   evidence of that?
```

10

```
1        A.   No.

2             MR. GREEN:  Judge, that's all

3    the questions we have for Mr. Durant.

4             THE COURT:  Okay, Mr. Watkins.

5             THE DEFENDANT:  Excuse me, Your

6    Honor.  I have one request because I saw

7    this opinion on Friday.  Just one thing.

8    The taped statement that was made at

9    trial, is it still here?  I asked that it

10   be subpoenaed here at the time before I

11   came down.  I tried to get in touch with

12   the clerk in order for her to get it in

13   here on the date so I could actually let

14   you hear the taped statement that was

15   made at the time that I came down for an

16   interrogation.  This is the same exact

17   tape that we used at trial that we

18   actually listened to that the state

19   brought forward to actually -- which they

20   said was --

21            THE COURT:  Well, intoxication

22   when you give your statement and

23   intoxication during the offense are two

24   different issues.

25            THE DEFENDANT:  That is what I
```

11

1    was about to -- that was what I was going

2    to point out. At the time that the crime

3    happened, there is evidence in that tape

4    that says that we were intoxicated at the

5    time. Not only that, this issue was not

6    even -- it wasn't an issue at trial

7    because everybody had already admitted

8    that we all was intoxicated at the time.

9    So it wasn't an issue at the time.

10         If it had of been, I want to

11    point out the fact that Mr. Durant was

12    ineffective for not actually pointing

13    this out at trial.

14         MS. TAYLOR: Your Honor, I do

15    have a copy of the case file if he would

16    like to look at his statement that he

17    gave to the police. It's the transcribed

18    statement of the tape that would have

19    actually been entered into evidence.

20         THE COURT: Okay. Do you want

21    to look at your statement?

22         THE DEFENDANT: I would like to

23    look at it.

24         MS. TAYLOR: I would just

25    request that you hand it back but you are

12

```
 1      more than welcome to look at it.
 2                  THE DEFENDANT:  Also, Your
 3      Honor, I actually have this down in my
 4      property.  I wasn't able to bring it up.
 5      I was trying to get everything to bring
 6      it up so I could be prepared but I'm not
 7      prepared.  So --
 8                  THE COURT:  Well, take your
 9      time.  We will make sure you get a fair
10      hearing.
11                  THE DEFENDANT:  Okay.  Right
12      here on page four -- I will show it to
13      you as well.  Page four right here.  When
14      the officer asked -- okay, I think I want
15      to be correct.  This is the question that
16      was asked by me and I answered it.  It's
17      the same statement that she's talking
18      about.
19                  It says, I think I want to be
20      correct.  After then I don't know if
21      Latoya -- Latoya was already there and
22      she came back but I remember seeing her
23      before.  I was there already or
24      something.  Anyway, but it gets on down
25      here.  When it gets on down to the
```

13

1    statement, it says specifically right

2    here that we was drinking.  This is the

3    statement that I made.

4            So there was no dispute whether

5    we were drinking at the time of the

6    crime, which is now.  It said, he had

7    beer when he came in.  In the statement I

8    was letting the officer know.  She was

9    asking me was, did y'all give the victim

10   alcohol or did he bring his own.  I was

11   letting her know that he already had

12   his.  He was drinking when we came.

13           So the evidence as far as being

14   intoxicated at the time of the crime or

15   at the time of the event, it's right here

16   in the statement.

17           THE COURT:  You are going to

18   have to have something more than that.

19   That is a long way from --

20           THE DEFENDANT:  This is what

21   the statement was relying on as being a

22   confession.  So if it was a confession,

23   it's already in evidence.  This is the

24   only evidence that we had at the time.

25   Any witnesses that could verify this was

14

1    true would be a codefendant which I

2    wasn't able to subpoena them here today.

3          THE COURT:  Okay.  Anything

4    else you want to point out?

5          THE DEFENDANT:  I also have a

6    brief in the trial transcript in which

7    Mr. Durant also admits himself that --

8          THE COURT:  The problem with

9    the transcript that I have seen -- I'm

10    not going to say I have read every page

11    but what you cite to in your brief is the

12    arguments of the attorneys, and that is

13    not evidence.  So if there is evidence in

14    the record of intoxication, I would

15    really appreciate it if you would show me

16    where a witness testified that -- you

17    know, would leave me to believe that you

18    were intoxicated at the time this poor

19    guy was brutally murdered.

20          THE DEFENDANT:  That is the

21    thing I was trying to point out, Your

22    Honor.  A lot of these issues wasn't

23    reserved for appeal, and I couldn't

24    reserve them because I didn't have an

25    effective attorney to reserve these

15

1    issues for me.  This is the reason why

2    I'm trying to raise them as much as I can

3    now.  I really don't have the knowledge

4    that I need to actually effectively --

5          THE COURT:  Well, you have had

6    the transcript with you in prison.  You

7    have reviewed it.  You obviously have

8    because you cited it in your brief and

9    make reference to it.

10          Can you point to me any

11    witness, either by page or just the name

12    of a witness, who said that y'all had --

13    how much you had had to drink or that you

14    were drunk or that you --

15          THE DEFENDANT:  That's another

16    thing.  At the time that he actually took

17    a statement, they never took a

18    Breathalyzer test or anything.

19          THE COURT:  Mr. Watkins, they

20    don't have to give you a Breathalyzer

21    test.  Come on.  Show me where there is

22    testimony that I can look at that would

23    lead me to believe that you were

24    intoxicated beyond the fact that you were

25    drinking.

16

```
1              THE DEFENDANT:  There is
2    nothing else in here.
3              THE COURT:  Okay.  Appreciate
4    your candor.
5              THE DEFENDANT:  This's it for
6    the intoxication.
7              THE COURT:  Mr. Durant, are you
8    aware of any testimony from any witness
9    either in Court or out of Court that Mr.
10   Watkins was intoxicated or was so
11   impaired that would -- that you could
12   argue to the Court that he lacked the
13   ability to form an intent to kill?
14             MR. DURANT:  I am not aware of
15   that, Judge.  I believe if I were so
16   aware, I would have raised it.
17             THE DEFENDANT:  Objection, Your
18   Honor.  If I may, can I ask for a
19   continuance in order to subpoena the
20   codefendants that were on the case.
21   They're the only ones I know of right now
22   that could verify that we were.
23             THE COURT:  That really
24   wouldn't help you.  I'm pretty sure there
25   is a case that says the testimony of a
```

17

1  codefendant in Rule 32s is not very
2  helpful.
3  　　　　THE DEFENDANT:  That is the
4  only proof I have, Your Honor.
5  　　　　THE COURT:  Okay.  Anything
6  from the state?
7  　　　　MR. GREEN:  We would just say
8  that even in the petitioner's own brief
9  he mentioned that he was likely
10  intoxicated at the alleged time of the
11  murder.  Even he himself did not say that
12  he was intoxicated at the time.  And in
13  regards to the allegations of ineffective
14  assistance of counsel, as the Court is
15  aware in Strickland v. Washington he has
16  to prove the two-prong test that the
17  defense counsel was so ineffective as to
18  essentially provide no counsel and that
19  the means of his ineffectiveness were so
20  egregious that had he had an effective
21  counsel, the outcome would have been
22  different.  We feel as though the
23  defendant has failed to meet either prong
24  of the Strickland rule.
25  　　　　THE DEFENDANT:  Objection, Your

18

1       Honor.  There has only been one issue

2       right up to now as far as the

3       intoxication.  There is also another

4       issue dealing with the aiding and

5       abetting which I would point out.

6               THE COURT:  Is there anything

7       else you want to do or say or ask of the

8       witness about the aiding and abetting

9       issue?

10              THE DEFENDANT:  Yeah.  I have a

11      few questions as far as aiding and

12      abetting.

13              THE COURT:  All right.

14              THE DEFENDANT:  Do you want me

15      to stand or sit?

16              THE DEFENDANT:  You can sit.

17      BY THE DEFENDANT:

18          Q.   As far as the aiding and

19      abetting.  From my understanding of what

20      you just told me, you said you were

21      defense counsel for about thirty years as

22      a defense counsel.  Right?

23          A.   Yes.

24          Q.   Are you familiar with the

25      complicity statute of aiding and

19

1    abetting?

2        A.    Yes.

3        Q.    Are you familiar with the whole

4    breakdown as far as the particularized

5    intent that it talks about in Rellick

6    (sic) and so on in --

7        A.    Yes.

8        Q.    You are?  So when you -- I

9    don't think you actually need

10   instruction.  These were instructions

11   given by the state that they gave.  I

12   don't think you actually went through and

13   -- did you actually ask them whether

14   this the fully -- the full record of the

15   instructions on this?

16            I think I'm asking this

17   question wrong but in aiding and

18   abetting, it talks about a common -- they

19   are talking about a common purpose, in

20   other words.  You have to have a meeting

21   of the minds.  You are familiar with

22   that?

23       A.    Yes.

24       Q.    Are you familiar that the Court

25   did not instruct the jury on the whole --

20

```
 1    the law as it applies with this.  Are you
 2    familiar with that?
 3         A.    I believe the Court instructed
 4    the jury on the standard definition of
 5    intentional murder which encompassed
 6    aiding and abetting and complicity.  You
 7    know, from the facts of the case there
 8    was more than enough evidence to show
 9    that there was aiding and abetting and
10    complicity.
11             THE DEFENDANT:  Okay.  As far
12    as particularized intent, I found this
13    case in Duncan versus State.  If you read
14    the rule on page nine in Duncan versus
15    State it talks about how the trial court
16    incorrectly -- in this case correctly
17    instructed the jury on the particularized
18    intent issue.  Furthermore, the trial
19    court correctly instructed the jury with
20    regard to accomplice liability.
21             The relevant part -- and this
22    is what they read.  The mere presence of
23    a defendant who intends to assist with
24    the criminal act should it become
25    necessary is aiding and abetting if and
```

21

1    only if the one who commits the act knows

2    that the defendant is present and

3    attempts to assist in that offense.

4         All right.  When they did this,

5    there was no evidence at trial to show

6    that I actually knew exactly what these

7    codefendants of mine was planning.  The

8    only evidence I have of that would be

9    that taped statement once again.  The

10   state actually goes off this taped

11   statement that we actually point out in

12   which there is nowhere in the record

13   where I actually admit to helping anybody

14   commit any crime.  Not only that -- in

15   the statement I admit that I did

16   commit some acts but I do not admit in

17   that statement saying that I was helped

18   by anybody in this statement.

19        Now, my question is, how did

20   the state actually come about getting an

21   aiding and abetting out of something

22   which -- I mean, if you used the tape to

23   say confession but there is nowhere in

24   the record where I actually talked about

25   confessing to helping anybody.  That was

22

```
1       my defense at trial which I tried to
2       point out to Mr. Durant.
3                I am asking him now in front of
4       everybody, I am asking if you are
5       familiar with the aiding and abetting
6       statute why didn't you use this as a
7       defense to actually try to get the point
8       across?  You know what I mean?
9                Basically what I'm saying, if
10      you knew about the aiding and abetting
11      and you did read -- you did hear the
12      taped statement, right?
13      A.    Yes.
14      Q.    You heard the part where it
15      actually says I kicked and urinated on
16      the victim and so on and so forth?
17      A.    Yes.
18      Q.    But is there anywhere in the
19      record to your recollection that I
20      actually state that I was there to help
21      any of my codefendants or if my
22      codefendants were there to help me?  Is
23      there anywhere in the record that it says
24      this that you know of to the best of your
25      knowledge?
```

23

1    A.   I can't recall that but I think

2    your actions -- you know, that you could

3    draw conclusions from your actions. And

4    if you concede that you urinated and you

5    kicked the defendant, I think that speaks

6    for itself.

7    Q.   That is what brings me back to

8    different -- where it talks about -- in

9    the law where it talks about different

10   intents. Have you ever read the law on

11   that? Let me see if I can find it.

12        THE COURT: Mr. Watkins, let me

13   just say this. Your argument in your

14   brief is that they didn't prove -- they

15   omitted any element of intent.

16        THE DEFENDANT: No. What I'm

17   saying --

18        THE COURT: I am looking at

19   what the judge charged the jury. Under

20   the law, a person acts -- a person is

21   legally accountable for the behavior of

22   another person constituting a crime if

23   with the intent to promote or assist in

24   the commission of that crime he aids or

25   abets. So the Court did in fact tell the

24

1    jury that you had to have the intent to
2    aid or abet.  I don't know what else you
3    wanted the Court to say.
4            THE DEFENDANT:  Yeah.  I was
5    trying to get him to point out the fact
6    that, all right, even though it's aiding
7    and abetting -- my aiding and abetting
8    that they talked about didn't cause the
9    death of the victim.  I wasn't working in
10   behalf of my codefendants.
11           Now true enough, I did assault
12   the victim but he wasn't killed by any
13   acts on my part.  He was shot.  He was
14   killed with a gunshot wound to the head.
15   That's what killed him.  Now if that
16   would kill him, there is no way you can
17   tie me in with the rest of it because
18   there is nowhere in the record where
19   anybody admits that I actually used a
20   weapon.  Neither did I.
21           I keep pointing at the fact
22   that everybody said this is a
23   confession.  So if this is a confession,
24   shouldn't I have to say this in the
25   record?

25

```
1              THE COURT:  No.

2              THE DEFENDANT:  I shouldn't?

3              THE COURT:  No.  The jury can

4      infer your intent from your actions.

5              THE DEFENDANT:  But the thing

6      is, they wasn't properly instructed on

7      the law that actually come through me so

8      it pretty much limits my defense.

9              THE COURT:  No.  I think she

10     gave the same instruction I have been

11     giving ever since I got here on aiding

12     and abetting.  If it is wrong, somebody

13     needs to go ahead and tell me.  But she

14     charged the jury that you had to have the

15     intent to assist in the murder of the

16     victim.  I don't know what else she was

17     supposed to tell the jury.

18             THE DEFENDANT:  All right.  I'm

19     still pointing out Duncan versus State

20     where it says --

21             THE COURT:  Let me just read

22     your own brief to you.  This is what you

23     are complaining about.  Therefore, in the

24     absence of the element of aiding and

25     abetting your lawyer hurt your defense.
```

26

1    You say that element that he did not

2    intend to promote or assist the principal

3    by aiding and abetting him caused the

4    death of the victim.  That is exactly

5    what the judge charged the jury, that you

6    had to assist -- you had to have the

7    intent to aid or abet in the death of the

8    victim.  That is exactly what she told

9    the jury.  I don't see what else you want

10    her to say.

11        THE DEFENDANT:  But I didn't

12    have a proper -- I feel if I had a proper

13    defense there as far as that statement.

14        THE COURT:  Mr. Watkins, look,

15    you acknowledge that you assaulted the

16    victim.  You acknowledge that you

17    urinated on him.  And while you didn't

18    fire the bullets, that doesn't make you

19    in the eyes of the law any less culpable

20    or any less responsible.  That is just

21    the way the law is.  I just haven't heard

22    anything here today that leads me to

23    believe that you were denied any adequate

24    assistance of counsel, due process, or

25    just plain old justice.  You got your day

27

1    in Court. The jury found against you. I

2    don't see how else they could have found

3    under the evidence in this case.

4            You were there. You take the

5    guy out. You kick him. You urinate on

6    him. I think there is also some

7    testimony about you said do it, do it to

8    Latoya who is apparently the one who may

9    have actually pulled the trigger.

10            THE DEFENDANT: That's another

11   point I would like to point out. In that

12   statement where it talks about do it,

13   that's not even -- that -- that --

14            THE COURT: You're capable --

15            THE DEFENDANT: I think I was

16   asking a question in that one.

17            THE COURT: Maybe. Maybe you

18   were. But that's a jury question, and

19   the jury believed against you. That is

20   all I can -- I'm not going to come back

21   here and second-guess the jury. But Mr.

22   Watkins, for God's sake, there is more

23   than proof beyond a reasonable doubt in

24   this case of your culpability. I'm going

25   to deny your Rule 32 petition. I'm going

28

```
1      to get out an order.

2              THE DEFENDANT:  Okay.  One more

3      question.  Did you get a chance to look

4      at the indictment?

5              THE COURT:  No.  The Supreme

6      Court has said -- they claim it's

7      time-barred.  You are too late to raise a

8      problem with the indictment.  It does not

9      affect the jurisdiction of this Court.

10     So I have not read the indictment.

11              END OF PROCEEDINGS

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

29

```
 1                          CERTIFICATE

 2

 3          STATE OF ALABAMA      )
            COUNTY OF MONTGOMERY  )
 4

 5

 6                  I, JUDY E. SHELTON, OFFICIAL

 7          COURT REPORTER IN AND FOR THE FIFTEENTH

 8          JUDICIAL CIRCUIT, MONTGOMERY COUNTY,

 9          ALABAMA, DO HEREBY CERTIFY THAT I

10          REPORTED IN MACHINE SHORTHAND THE

11          FOREGOING HEARING AS STATED IN THE

12          CAPTION HEREOF; THAT MY SHORTHAND NOTES

13          WERE LATER TRANSCRIBED BY ME OR UNDER MY

14          SUPERVISION, AND THAT THE FOREGOING PAGES

15          REPRESENT A FULL, TRUE AND CORRECT

16          TRANSCRIPT OF SAID PROCEEDINGS; THAT I AM

17          NEITHER KIN NOR OF COUNSEL TO ANY PARTIES

18          IN THIS PROCEEDING NOR IN ANY WAY

19          INTERESTED IN THE RESULTS THEREOF.

20              DATED THIS THE _____ DAY OF _____,

21          2006.

22

23                          _____

24                              JUDY E. SHELTON

25                          OFFICIAL COURT REPORTER
```

Appeals No. <u>CR-06-0408</u>

IN THE ALABAMA COURT OF CRIMINAL APPEALS

David L. Watkins, Appellant

v.

STATE OF ALABAMA, Appellee.

ON APPEAL FROM THE CIRCUIT COURT OF

MONTGOMERY COUNTY, ALABAMA

(CASE NO. CC 00-1506.60)

<u>BRIEF OF APPELLANT DAVID L. WATKINS</u>



STATE'S
EXHIBIT
D
PENGAD 800-631-6989

David L. Watkins
A.I.S.# 219698
Draper Correctional Center
Post Office Box 1107
Elmore, AL 36025

## STATEMENT REGARDING ORAL ARGUMENT

The Appellant – David L. Watkins, does not request oral argument, because just and correct and this Court's decisional process would not be significantly aided by oral argument. Ala.R.App.P. Rule 34(a)(3).

i

## TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT.................................... i

TABLE OF CONTENTS.................................................................. ii

TABLE OF AUTHORITIES........................................................... iii

STATEMENT OF CASE................................................................. 1

STATEMENT OF ISSUES............................................................. 4

STATEMENT OF FACTS.............................................................. 5

STANDARDS OF REVIEW........................................................... 9

SUMMARY OF THE ARUGEMENT.............................................. 10

ARGUMENT

I.    Whether Appellate Counsel was ineffective for his
failure to raise in a motion for new trial the issue
of the denial of the effective assistance of trial
counsel, due to counsel's failure to submit a written
request that the trial court instruct the jury on a
lesser-included offense of manslaughter regarding
intoxication ................................................................. 12

II.   Whether the trial court erred by its failure to afford
Watkins his right to compulsory process to compel the
production of the evidence at the evidentiary
hearing........................................................................ 19

CONCLUSION............................................................................. 26

CERTIFICATE OF SERVICE....................................................... 27

ADVERSE RULINGS.................................................................. 27

## TABLE OF AUTHORITIES

Adam v. State, 484 So.2d 460 (Ala.App.1985) ............... 16

Beck v. Alabama, 447, 625, 65 L.Ed.2d 392,
100 S.Ct. 2382 .......................................................... 15

Bowman Dairy Co. v. United States, 341 U.S. 214, 71 S.Ct. 675,
95 L.Ed. 519 (1951) ..................................................... 21

Burns v. State, 229 Ala. 68, 155 So. 561 (1934) ...... 16

Eddins v. State, 581 So.2d 274
(Ala.Crim.App.1991) ..................................................... 9

Evitts v. Lucey, 469 I.S. 387, 105 S.Ct. 830,
33 L.Ed.2d 821 (1985) ................................................ 10

Ex Parte Long, 600 So.2d 982 ..................................... 16

Ex Parte Summit Medical CTR of Montgomery,
supra, 854 So.2d at 619 ............................................. 24

Ex Parte White, 792 So.2d 1097, 1098 (Ala.2001) ...... 9

Grady v. State, 831 So.2d 646, 648
(Ala.Crim.App.2001) ..................................................... 9

Hamm v. State, 439 So.2d 829 (Ala.Cr.App.1983) ........ 6

Keeney v. Tamayo-Royes, 504 U.S. 1, 112 .................... 23

Moore v. State, 647 So.2d 43 (Ala.Cr.App.1994) ........ 15

Owen v. State, 611 So.2d 1128 ................................... 17

Reed v. State, 748 So.2d 231, 233
(Ala.Crim.App.1999) ..................................................... 9

Sale v. State, 570 So.2d 862 (Ala.Crim.App.1990) ... 22

State v. Cartwright, 173 Or.App. 59, 67,
20 p.5d 223, 229 (2001) ............................................. 24

State v. Hill, 690 So.2d 1201, 1203 (Ala.1996) ........ 9

State v. Reynolds, 819 So.2d 72
(Ala.Crim.App.1999) .......................................................................... 22, 24

Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80
L.Ed.2d 674 (1984) ...................................................................... 8,11,13,14,16,
                                                                          20,22,23

United States v. Iozia, 13 F.R.D. 335, 338
(S.D.N.Y.1952) .................................................................................. 21

United States v. Nixon, 418 U.S. 683, 698,
94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) .................................... 21, 22, 24

Williams v. State, 489 So.2d 4 (Ala.Cr.App.1986) ... 22

## STATEMENT OF CASE

On September 15, 2000, the Appellant (Hereinafter "Mr. Watkins") was indicted for one felony count of intentional murder of Christopher Ferrell in violation of §13A-6-2(a)(1) Code of Alabama (1975 as amended)(C. 367-369)

On May 15, 2001, Watkins received a jury trial. On May 16, 2001 the jury returned a verdict of guilty of intentional murder (C.319-320).

On October 22, 2001, Watkins appeared for sentencing along with the other two co-defendants. The Court sentenced all (3) three defendants to life in the Department of Corrections (C.331).

On May 7, 2002, Alabama Court of Criminal Appeals issued a Certificate of Judgment that certified its affirmance.

On April 2, 2004, Watkins' Appellate Counsel, Kelly Vickers, forwarded a via letter stating that he was enclosing a copy of the Appellate Court decision, enclosing a copy of Watkins transcript, and Watkins still have one recourse left, a Rule 32 Petition, but you need to file it immediately – before April 19 if possible (C.379-381).

On August 17, 2006, Mr. Watkins filed an objection to the State's failure to submit a timely motion to dismiss his Rule 32 Petition (C.384).

On September 28, 2006, Mr. Watkins received a written order from the trial court finding that this matter was set for a hearing on October 12, 2006 (C.394).

On October 5, 2006, Mr. Watkins mailed a "Motion for Subpoena Duce Tecum" (attached with an affidavit in support) that was filed by the Circuit Clerk of Montgomery County on October 10, 2006 (C.1, 406-409)

On October 12, 2006, the evidentiary hearing pertaining to this matter was conducted (See Transcript of hearing, pp.1-29). The trial court entered an order that denied Mr. Watkins said Rule 32 Petition (C.423-24).

On October 23, 2006, Mr. Watkins submitted a motion to alter, amend or vacate judgment, due to the tape statement was not available for inspection and was the sole evidence in which to properly argue his claim of ineffective assistance of counsel (C.425-26). The trial court denied said motion.

On November 7, 2006, Mr. Watkins submitted a "Motion to Set Aside Judgment" where he requested the trial court to re-schedule another evidentiary hearing permitting him the opportunity to show the evidence needed to prove his ineffective assistance claim or in the alternative take judicial notice of the taped statement (C.436-38). The trial court denied said motion.

On November 11, 2006, Mr. Watkins filed a timely notice of appeal with the Circuit Court of Montgomery County (C.439).

## STATE OF THE ISSUES

I.   Whether Appellate Counsel was ineffective for his failure to raise in a motion for new trial.  The issue of the denial of the effective assistance of trial counsel, due to counsel's failure to submit a written request that the trial court instruct the jury on a lesser included offense of manslaughter regarding intoxication?

II.  Whether the trial court erred by its failure to afford Watkins his right to compulsory process to compel the production of evidence at the evidentiary hearing?

## Statement of Facts

This is an appeal of a Rule 32 Post-Conviction petition where your Appellant was convicted for murder in violation of §13-6-2(a)(1) Code of Alabama, 1975, and was sentenced (hereinafter "Mr. Watkins") to serve life imprisonment. Watkins raised several pertinent constitutional issues that he alleged were deprived from him during the course of his criminal proceeding, and the issues in nature are both substantive and procedural due process pursuant the Fourteenth Amendment to the United states Constitution.

On or about October 19, 1999, the Appellant, David Watkins was playing cards and listening to music with co-defendants Robert Watkins, Latoya Davis and, the victim, John Ferrell. They were in the home of Robert Watkins on Keystone Street in Montgomery, Alabama. The audio "taped confession" indicates that all parties were drinking around the time the alleged crime transpired. In which, John Ferrell was beaten and killed from a gunshot wound to the head[1] (C.130, 138, 139). The body of the victim was later found in a ditch at the end of the street. The chief evidence, which convicted Watkins, was his taped statement.

---

[1] The taped confession was admitted into evidence as exhibit 44, with the letter 'A' marked on it (C.130, 135, 139).

Watkins respectfully requests that this Court take judicial notice of its own records in <u>Watkins v. State</u> of Alabama, CR-01-0232[2].

Watkins filed his Rule 32 petition with the Circuit Court of Montgomery County on August 22, 2006. Watkins raised (3) three claims and one of those claims was ineffective assistance of Appellate Counsel due to Counsel's failure to raise a non-frivolous claim in a motion for new trial (C.23-25). Watkins demonstrated a "failure to entertain this petition will result in a miscarriage of justice" (C.414-422).

The State of Alabama filed a response to the allegations containing to the said Rule 32 Petition; requesting the trial court to dismiss the Rule 32 petition. However, the state did not plead any ground of preclusion in this instant case (C.390).

On October 12, 2006, a hearing was conducted in this case. During the hearing, Watkins' trial counsel offered testimony that he had been practicing law for approximately (30) thirty years (R.5-6). Watkins' trial counsel, Mr. Durant, stated that he did not ask the court for a less included offense of manslaughter because the facts were of such that he felt they were not warranted, due to his professional judgment he didn't

---

[2] This Court has the authority to take judicial notice of its own records in another proceeding if pleading in instant case refers to the other proceeding is of record in trial court whose decree or judgment is basis of the instant appeal, and prior proceeding is of record in the appellate court in another appeal or is set out in the instant record. <u>Hamm v. State</u>, 439 so. 2d 829 (Ala.Cr.App. 1983)

6

think that there was a legal theory for such an instruction (R.7-8)

Watkins' trial counsel, Mr. Durant, explained why he did not request for an instruction on the lesser included offense of manslaughter to be considered by the court, his reason was that there might have been a statement that Watkins and his co-defendants were drinking but not to rise to the proportion that you would think it would impair a person's intent. With that missing, Mr. Durant stated that he did not think it was necessary to request for an instruction on the lesser included (TRANSCRIPT OF HEARING, pp.9).

Also, during the hearing, Mr. Watkins made a request by asking the trial court was the "taped statement" that was entered into evidence at his trial available, so that he could point out, at the time the crime occurred there was evidence in that "tape statement" that indicates that he was intoxicated[3]. The State of Alabama contended that (they had the transcribed statement of the tape that would have actually been entered into evidence TRANSCRIPT OF HEARING, pp.10 C.77-79). The trial court stated that "you are going to have to have more than that. That is a long way from – –"(See TRANSCRIPT OF HEARING pp.13)

---

[3] The transcribed statement of the tape the state produced at the hearing was not legal evidence because it was not admitted into evidence at trial (C.77-79).

October 20, 2006, the trial court issued a written order finding that there was no basis for Watkins' Trial Counsel requesting the lesser-included charge; in addition, Watkins fail to satisfy the requirements of Strickland.

October 23, 2006, Mr. Watkins submitted a motion to alter, amend or vacate judgment; due to the tape statement was not available for inspection and was the sole evidence in which to properly argue his claim of ineffective assistance of counsel (C.425-26). The trial court denied said motion. On November 7, 2006, Mr. Watkins submitted a "Motion to Set Aside Judgment" where he requested the trial court to re-schedule another evidentiary hearing permitting him the opportunity to show the evidence needed to prove his ineffective assistance claim or in the alternative take judicial notice of the taped statement (C.436-38). The trial court denied said motion and this appeal follows:

## STANDARDS OF REVIEW

A petitioner in a Rule 32 proceeding has the burden of pleading and proving his allegation. <u>Eddins v. State</u>, 581 So.2s 274 (Ala.Crim.App. 1991); <u>Ala.R.Crim.P.</u> Rule 32.3. The Trial Court's judgment is reviewed only for an abuse of discretion, and will be affirmed if correct for any reason. <u>Grady v. State</u>, 831 So.2d 646, 648 (Ala.Crim.App.2001), citing <u>Reed v. State</u>, 748 So.2d 231, 233 (Ala.Crim.App.1999). The Court's review in a Rule 32 proceeding is de novo when the facts or undisputed and an appellate court is presented with pure questions of law. <u>State v. Hill</u>, 690 So.2d 1201, 1203 (Ala.1996) <u>Ex Parte White</u>, 792 So.2d 1097, 1098 (Ala.2001).

## Summary of the Argument

The Trial Court erred in summarily denying, Watkins' claims for post-conviction.

Watkins claims that the sixth Amendment of the United States Constitution and Article I, §6 of the Alabama Constitution of 1901, affords him the right to effective assistance of trial counsel in all stages and entitled to the effective assistance of counsel on a direct appeal as of right. Evitts v. Lucey, 469 I.S. 387, 105 S.Ct. 830, 33 L.Ed.2d 821 (1985).

Watkins claims that his Appellate Counsel was ineffective for his failure to raise a non-frivolous issue in a motion for new trial that Watkins' Trial Counsel was ineffective by not requesting a jury charge on the lesser-included offense of manslaughter regarding intoxication. Watkins contends that due to counsel failure his due process rights were violated because he is entitled to have any charges given which is supported by any evidence, however weak, insufficient, or doubtful incredibility.

Watkins claims that his right to compulsory process to compel the production of evidence was violated - due to trial court's failure to compel the State of Alabama to produce the tape audio statement that was entered into evidence at trial in

tape audio statement that was entered into evidence at trial in the present case, thereby, Watkins contends that he could not successfully meet the Strickland requirements.

For each of these reasons, the Trial Court denial of Watkins claims is due to be remanded and reversed.

I.   WHETHER APPELLATE COUNSEL WAS INEFFECTIVE FOR HIS FAILURE
TO RAISE IN A MOTION FOR NEW TRIAL THE ISSUE OF THE DENIAL OF
THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL, DUE TO COUNSEL'S
FAILURE TO SUBMIT A WRITTEN REQUEST THAT THE TRIALCOURT INSTRUCT
THE JURY ON AN LESSER-INCLUDED OFFENSE OF MANSLAUGHTER REGARDING
INTOXICATION?

---

Watkins answers yes.  Watkins presented this claim in his
petition (C.23-33).  Watkins claimed that the Constitution of
the United States and ART. I, §6 of the Alabama Constitution
requires a new trial, or other relief as law requires.

Because Watkins was deprived of his liberty due to the
denial of effective Appellate Counsel, due to his failure to
raise non-frivolous issues in a motion for new trial as follows:
The denial of the effective assistance of trial counsel, due to
counsel's failure to submit a written request that the trial
court instruct the jury on an lesser included offense of
manslaughter regarding intoxication.

The basics for this claim is that the trial court failed to
charge the jury regarding intoxication in its instructions to
the jury, which relieved the state of its burden of proof,
thereby, the jurors could not intelligently comply with their
duties as jurors.

12

A hearing was conducted in this present case. At the hearing, Watkins' trial counsel offered testimony that he had been practicing law for approximately (30) thirty years (TRANSCRIPT OF HEARING pp.5-6). Watkins' trial counsel, Mr. Durant, stated that he did not ask the court for a lesser-included offense of manslaughter because the facts were of such that he felt they weren't warranted, due to his professional judgment he didn't think that there was a legal theory for such an instruction (TRANSCRIPT OF HEARING pp.7-8). Watkins' trial counsel, Mr. Durant, explained why he did not request for an instruction on the lesser included offense of manslaughter to be considered by the court, his reason was that there might have been a statement that Watkins and his co-defendants were drinking but not to rise to the proportion that you would think it would impair a person's intent. With that missing, Mr. Durant stated that he did not think it was necessary to request for an instruction on the lesser included (TRANSCRIPT OF HEARING pp.9).

On October 18, 2006, the trial court issued a written order finding that Watkins acknowledged that there was no actual evidence at trial concerning his intoxication. Thus, there was no basis for requesting the lesser-included charge. In addition, Watkins failed to satisfy the requirement of Strickland.

Watkins contends that the Trial Court erred when it denied his claim that his trial counsel rendered ineffective assistance of counsel for failure to ask for a jury charge on manslaughter because of Watkins' intoxication. Watkins asserts that he did not acknowledge the fact that there was no actual evidence a trial concerning his intoxication, as the trial court erroneously stated in its order (C.423-24).

In order to prevail on a claim of ineffective assistance of counsel, a defendant must show (1) that his counsel's performance was deficient, and (2) that he was prejudiced by the deficient performance. Strickland v. Washington, 466 U.S. 668, 669, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Watkins respectfully requests this Court to address this issue in light of the standards in issue (1) one of this brief.

In addition to the testimonies from the Rule 32 proceedings, in this present case, Watkins was charged by an indictment in the Circuit Court of Montgomery County with intentionally causing the death of John Ferrell by shooting with a gun, in violation of section 13A-6-2 of the Code of Alabama (C.367-369). The State's theory at trial was that Watkins was an aider and abetter in the death of "Mr. Ferrell". But the evidence tended to show the following:

On or about October 19, 1999, the Appellant, David Watkins was playing cards and listening to music with co-defendants

14

Robert Watkins, Latoya Davis, and the victim John Ferrell.  They were in the home of Robert Watkins on Keystone Street in Montgomery, Alabama.  The audio "taped confession" indicates that all parties were drinking around the time the alleged crime transpired.  In which, John Ferrell was beaten and later killed from a gunshot wound to the head[4].  The body of the victim was later found in a ditch at the end of the street.  The chief evidence in this case was a taped statement made by Watkins to the arresting officers.

Watkins argues that due to the above evidence in this present case, his trial attorney, indeed, should have submitted a written request that the trial court instruct the jury on the lesser-included offense of manslaughter regarding intoxication.

Because, in federal courts, the defendant is entitled to an instruction on a lesser included offense and acquit him of the greater.  Beck v. Alabama, 447, 625, 65 L.E.2d 392, 100 S.Ct. 2382.  Moreover, when the crime charged involves specific intent, such as murder, and there is evidence of intoxication the judge should instruct the jury on the lesser-included offense of manslaughter.  Gray v. State, 482 So.2d 1318, 1319 [Ala.Crim.App. 1985](See also McNeil, 496 So.2d at 109, Moore v. State, 647 So.2d 43 [Ala.Cr.App.1994])

---

[4] The taped confession was admitted into evidence as exhibit 44 with the letter 'A' marked on it.(C.130, 138, 139).

15

"Whether the level of intoxication is sufficient to negate an essential element the crime, such as intent is a question of fact to be resolved by the jury. Adams v. State, 484 So.2d 460 (Ala.App.1985). In fact, the decisions of the Supreme Court of Alabama are to the effect that every accused is entitled to have charges given, which would not be misleading, which correctly state the law of his case, and which are supported by [any] evidence, however weak, insufficient, or doubtful incredibility. Burns v. State, 229 Ala 68, 155 So. 561 (1934), (Quoting) Ex Parte Long, 600 So.2d 982 (Ala. 1992)

## DEFICIENT PERFORMANCE

In order to meet the first prong of the Strickland test, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." 466 U.S. at 688, 104 S.Ct. at 2064.

From the Rule 32 hearing Watkins' attorney offered into evidence that "he did not ask the Court for a lesser included offense of manslaughter because the facts were of such that he felt they weren't warranted, due to his professional judgment he didn't think that there was a legal theory for such an instruction (R.7-8).

However, the evidence solicited via 'taped confession' indicated that all parties had been drinking during the course of the alleged crime. Therefore, under the circumstance a

16

competent trial counsel would have requested the trial court to charge the jury on the lesser included offense of manslaughter regarding intoxication, because, in determining that Watkins was not so intoxicated during the crime was exclusively province of the jury." Owen v. State, 611 So.2d at 1128 (emphasis added)

Therefore, Watkins' trial counsel representation fell below the objective standard of reasonableness.

### PREJUDICIAL EFFECT OF DEFICINET PERFORMANCE

The evidence solicited via taped confession indicated that all parties were drinking around the time the alleged crime transpired (C.130,138,139), therefore, Watkins contends that by his trial attorney's failure to ask the trial court to charge the jury on a lesser included offense of manslaughter regarding intoxication, hurt his defense – that he was so intoxicated that he did not know what he was doing – and it allowed the jury to convict without considering the fact whether or not Watkins was so intoxicated that he did not know what he was doing. This omission was prejudicial to Watkins and he concludes that the outcome of this case would have been different had the jury been afforded the opportunity to reflect upon, discern, and distinguish upon the facts presented by the state; the "taped confession" (facts) presented by the state; whether or not they believe beyond a reasonable doubt that Watkins was intoxicated to the point of mania.

17

BASED UPON THE FOREGOING, Watkins' appellate counsel was ineffective for his failure to raise this claim of ineffective assistance of trial counsel in a 'motion for new trial'. Additionally, the failure of counsel to raise this claim in said styled motion later foreclosed Watkins from preserving this issue for appellate review, therefore, for this cause Watkins urges this court to reverse remand this case for a new trial or other relief as law requires.

II. WHETHER THE TRIAL COURT ERRED BY ITS FAILURE TO AFFORD WATKINS HIS RIGHT TO COMPULSORY PROCESS TO COMPEL THE PRODUCTION OF THE EVIDENCE AT THE EVIDENTIARY HEARING?

Watkins affirmatively answers yes.  On October 10, 2006, Watkins filed a "Motion for Subpoena Duces Tecum" (attached with an affidavit in support) wherein Watkins asserted that he was apprehended by the police of Montgomery Police Department for questioning concerning the murder of John Ferrell.  Watkins further stated that the police took from him a taped statement, which was admitted into evidence as exhibit no.44, with the letter "A" written on its side.  That taped statement contains proof that he indeed was intoxicated at the time that the crime was committed.  Watkins respectfully asked that said tape marked as Exhibit 44 along with videocassette be available for inspection at the hearing that was conducted on October 12, 2006 (C.406-409).  During the hearing in this present case the following occurred:

> "[The Defendant]: Excuse me, your Honor, I have one request because I saw this opinion on Friday.  Just one thing.  The taped statement that was made at trial, is it still here? I asked that it be subpoenaed here at the time before I came down.  I tried to get in touch with the clerk in order for her to get it in here on the date so I could actually let you hear the taped statement that was made at the time that I came down for an interrogation.  This is the same exact tape that we used at trial that we actually listened to that the State brought forward to actually – which they said was – "

"[The Court]: Well, intoxication when you give your
statement and intoxication during the offense are ~~tow~~ two
different issues."

"[The Defendant]: That is what I was about to — that was
what I was going to point out. At the time that the crime
happened, there is evidence in that tape that says that we
were intoxicated at the time. Not only that, this issue
was not even — it was not an issue at trial because
everybody had already admitted that we all were intoxicated
at the time. So, it was not an issue at the time. If it
had been, I want to point out the fact that Mr. Durant was
ineffective for not actually pointing this out at trial."

"[Ms. Taylor]: Your Honor, I do have a copy of the case
file if he would like to look at his statement that he gave
to the police. It's the transcribed statement of the tape
that would have actually been entered into evidence."
(TRANSCRIPT OF HEARING pp.10-11)

On October 20, 2006, the trial court entered a written
order finding that Watkins failed to satisfy the requirements of
Strickland, thereby, denied Watkins' Rule 32 Petition (C.423-
424).

On October 31, 2006, Watkins filed a request to Alter,
Amend, or Vacate the judgment entered on October 20, 2006.
Wherein, Watkins asserted that the taped statement was admitted
into evidence at trial (marked as exhibit No.44 with the letter
"A" marked on its side) was not available for inspection at the
hearing which was his only and sole evidence in which to
properly argue his claim of Ineffective Assistance of Counsel as
required under Strickland (C.424-426). Afterwards, Watkins,
filed a motion styled as "Motion to Set Aside Judgment"
requesting the trial court to reschedule another evidentiary
hearing permitting him the opportunity to show the evidence

needed to prove his ineffective assistance claim (C436-437). The trial court denied said motion.

Rule 17.3, Ala.R.Crim.P., governs the issuance of subpoena duce tecum. It is clear from the wording of Rule 17.3(b) that the rule states, "The Court may direct that books, papers, documents, or other objects designated in the subpoena be produced before the court at a time prior to the trial or prior to the time when they are to be offered in evidence[5].

The view adopted by the Alabama supreme Court in Rule 17.3(d), [Ala.R.Crim.P.] was previously expressed by the United States Supreme Court in United States v. Nixon, 418 U.S. 683, 698-700, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). In Nixon, the United States Supreme Court stated:

> "A subpoena for documents may be quashed if their production would be 'unreasonable or oppressive' but not otherwise. The leading case in this Court interpreting this standard is Bowman Dairy Co. v. United States, 341 U.S. 214, 71 S.Ct. 675, 95 L.Ed. 819 (1951). This case recognized certain fundamental characteristics of the subpoena duce tecum in criminal cases: (1) it was not intended to provide a means of discovery for criminal cases, id. at 220; (2) its chief innovation was to expedite the trial b providing a time and place before trial for the inspection of subpoenaed materials, ibid. As both parties agree, cases decided in the wake of Bowman have generally followed Judge Weinfeld's formulation in United States v. Iozia, 13 F.R.D. 333, 338 (S.D.N.Y. 1952), as to the required showing. Under this test, in order to require production prior to trial, the moving party must show: (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party

---

[5] Proceedings under this Rule shall be governed by the Rules of Criminal Procedures. See Rule 32.4, Ala.R.Crim.P.

cannot properly prepare for trial without such production
and inspection in advance of trial and that the failure to
obtain such inspection may tend unreasonably to delay the
trial; and (4) that the application is made in good faith
and is not intended as a general 'fishing expedition'."

"(Footnotes omitted; emphasis added.) This court has
embraced the standard of review set out in United States v.
Nixon,. See Sale [v. State, 570 So.2d 862 (Ala.Crim.App.1990)],
and Williams v. State, 489 So.2d 4 (Ala.Cr.App.1986).

In State v. Reynolds, 819 So.2d 72 (Ala.Crim.App.1999) the
Court ordered the Circuit Court to make specific findings
concerning the four factors articulated by the United States
Supreme Court in United States v. Nixon.

Watkins contends that the requested "taped statement" that
was admitted into evidence at his trial complies with all the
prerequisites of United States v. Nixon; therefore the trial
court erred by its failure to afford Watkins his right to
compulsory process to compel the production of the said "taped
statement" at the evidentiary hearing.

Watkins points this Court to the standard for showing
prejudice as stated in Strickland v. Washington, in which the
Supreme Court held: "[To show prejudice, the] defendant must
show that there is a reasonable probability that, but for
counsel's unprofessional errors, the result would have been
different. A reasonable probability is a probability sufficient

to undermine confidence in the outcome." 466 U.S. 668, 694, 104
S.Ct. 2052.

Watkins argues that it would have been impossible to
satisfy, the Strickland requirements without the requested
"taped statement". He maintains that in order to have shown the
trial court a reasonable probability that the outcome would have
been different, he must obtain actual proof in the form of
evidence that was admitted at trial and that there was some
evidence that supported a jury charged on the lesser-included
offense of manslaughter. Watkins says:

[Without the "taped statement", the trial courts] review is
no review at all, and will require the federal courts
compel the reduction of how evidence in the possession of
the state and heighten federal involvement in Alabama
cases. See Keeney v. Tamayo-Reyes, 504 U.S. 1, 112 is
entitled to federal evidentiary hearing on merits of claim
when applicant was deprived of full and fair opportunity to
present evidence in state courts; 28 U.S.C. §2254; Rule
6(a) Habeas Rules [Governing §2254 cases in the United
States District Courts]. Advisory Committee notes ('where
specific allegations before the Court show reason to
believe that the petitioner may, if the facts be fully
developed, be able to demonstrate that he is confined
illegally and is therefore entitled to relief, it is the

23

duty of the Court to provide the necessary facilities and procedures for an adequate inquiry.')

As the Oregon court of Appeals stated in <u>State v Cartwright</u>, 173 Or.App. 59, 67, 20 P.5d 223, 229 (2001), cerning the purpose of a subpoena:

"[A] subpoena compels the production of evidence."

Quoting <u>Ex Parte Summit Medical CTR of Montgomery</u>, 854 So.2d 618

"The right to compulsory process has its roots in constitutional principles which recognize that a defendant must be able to compel the production of evidence in the proceedings…" <u>Ex Parte Summit Medical CTR of Montgomery</u>, supra, 854 So.2d at 619… "The right to compel material pursuant to subpoena is, therefore, limited to the compulsion of 'evidence'…" ID. at 619.

Watkins' final contention is that the sole purpose of the subpoena was to show unto the trial court at the hearing in this instance proceeding, that there was evidence within the contents of the "tape statement" that supported a jury charge on a lesser-included offense of manslaughter.

Based upon the foregoing in compliance with the holding in <u>Reynolds supra</u>, Watkins respectfully requests this Court to remand this case for this cause to the Circuit Court of Montgomery County to address the four factors in <u>United States v. Nixon</u>. Specifically direct this Circuit Court of Montgomery

24

County to address (1) whether the "audio taped statement" requested by Watkins is evidentiary and relevant. (2) Whether they are not otherwise procurable reasonably in advance of the evidentiary hearing otherwise of due diligence; (3) Whether Watkins can prepare for his Evidentiary Hearing without the production and inspection of the requested "audio taped statement" in advance of the hearing and whether the failure to inspect the "audio taped statement" may tend unreasonably to delay the Evidentiary hearing; and (4) Whether the application for the subpoena was made in good faith and not as a general "fishing expedition".

## CONCLUSION

Wherefore, premises considered, Mr. Watkins prays that upon reviewing the facts and points of law, this Honorable Court shall Reverse the Judgment and Remand this case back to the trial court for an evidentiary hearing or new trial, and grant any other relief that Mr. Watkins may be entitled.

Done this the 22 day of February, 2007.

Respectfully Submitted,

David L. Watkins
A.I.S.# 219698
Draper Correctional Center
Post Office Box 1107
Elmore, AL 36025

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon the Honorable Troy King,

Attorney General for the State of Alabama at 11 S. Union Street, Montgomery, Alabama 36130,

by placing the same in the U.S. Mail, First Class, postage prepaid and correctly address on this

the 22 day of February , 2007.

David L. Watkins, Pro se

## ADVERSE RULINGS

Summary

Denying Watkins the right to inspect and produce said "taped statement" at the

Evidentiary Hearing by way of subpoena Duce Tecum. Motion is on page C. 405-409 of the record.

Denying Watkins' Rule 32

Petition for Relief.

04/20/07
Notice: This unpublished memorandum should not be cited as precedent. See Rule 54, Ala.R.App.P. Rule 54(d), states, in part, that this memorandum "shall have no precedential value and shall not be cited in arguments or briefs and shall not be used by any court within this state, except for the purpose of establishing the application of the doctrine of law of the case, res judicata, collateral estoppel, double jeopardy, or procedural bar."

# Court of Criminal Appeals
State of Alabama
Judicial Building, 300 Dexter Avenue
**P. O. Box 301555**
**Montgomery, AL 36130-1555**

PAMELA W. BASCHAB
Presiding Judge
H.W."BUCKY" McMILLAN
GREG SHAW
A. KELLI WISE
SAMUEL HENRY WELCH
Judges

Lane W. Mann
Clerk
Gerri Robinson
Assistant Clerk
(334) 242-4590
Fax (334) 242-4689

## MEMORANDUM

CR-06-0408                Montgomery Circuit Court CC-00-1506.60

David Watkins v. State of Alabama

Baschab, Presiding Judge.

On May 15, 2001, the appellant was convicted of murder. On October 22, 2001, the trial court sentenced him to serve a term of life in prison. We affirmed his conviction in an unpublished memorandum and issued a certificate of judgment on May 7, 2002. See Watkins v. State, (CR-01-0232) 860 So. 2d 914 (Ala. Crim. App. 2002) (table). On August 16, 2006, the appellant filed a Rule 32 petition, challenging his conviction. After the State responded, the circuit court conducted an evidentiary hearing and denied the petition. This appeal followed.

I.



STATE'S EXHIBIT
E
PENGAD 800-631-6989

The appellant argues that he is entitled to post-
conviction relief because his appellate counsel rendered
ineffective assistance.[1]  However, this claim is time-barred.
See Rule 32.2(c), Ala. R. Crim. P.  Because the appellant's
claim was precluded, the circuit court properly denied his
petition.  See Rule 32.7(d), Ala. R. Crim. P.

## II.

The appellant also argues that the circuit erred when it
did not grant his motion for a subpoena duces tecum.
Specifically, he contends that he requested that the State
provide him with the audiotape of his statement that was
admitted into evidence at trial and that the audiotape was
necessary to prove his ineffective-assistance-of-appellate-
counsel claim.  In Ex parte Land, 775 So. 2d 847, 852-53 (Ala.
2000), the Alabama Supreme Court held:

> "We agree with the Court of Criminal Appeals
> that 'good cause' is the appropriate standard by
> which to judge postconviction discovery motions.  In
> fact, other courts have adopted a similar
> 'good-cause' or 'good-reason' standard for the
> postconviction discovery process.  See [State v.]
> Marshall, [148 N.J. 89, 690 A.2d 1 (1997)]; State v.
> Lewis, 656 So. 2d 1248 (Fla. 1994); People ex rel.
> Daley v. Fitzgerald, 123 Ill. 2d 175, 121 Ill. Dec.
> 937, 526 N.E.2d 131 (1988).  As noted by the
> Illinois Supreme Court, the good-cause standard
> guards against potential abuse of the postconviction
> discovery process.  See Fitzgerald, supra, 123 Ill.
> 2d at 183, 121 Ill. Dec. 937, 526 N.E.2d at 135.  We
> also agree that New Jersey's Marshall case provides
> a good working framework for reviewing discovery
> motions and orders in capital cases.  In addition,
> we are bound by our own rule that 'an evidentiary
> hearing must be held on a [petition for
> postconviction relief] which is meritorious on its

---

[1]The appellant also raised an additional claim in his
petition, but he does not pursue it on appeal.  Therefore, we
deem that claim abandoned.  See Brownlee v. State, 666 So. 2d
91 (Ala. Crim. App. 1995).

face, <u>i.e.</u>, one which contains matters and allegations (such as ineffective assistance of counsel) which, if true, entitle the petitioner to relief.' <u>Ex parte Boatwright</u>, 471 So. 2d 1257, 1258 (Ala. 1985).

"We emphasize that this holding -- that postconviction discovery motions are to be judged by a good-cause standard -- does not automatically allow discovery under Rule 32, Ala. R. Crim. P., and that it does not expand the discovery procedures within Rule 32.4.  Accord <u>Lewis</u>, supra, 656 So. 2d at 1250, wherein the Florida Supreme Court stated that the good-cause standard did not affect Florida's rules relating to postconviction procedure, which are similar to ours.  By adopting this standard, we are only recognizing that a trial court, upon a petitioner's showing of good cause, may exercise its inherent authority to order discovery in a proceeding for postconviction relief. In addition, we caution that postconviction discovery does not provide a petitioner with a right to 'fish' through official files and that it 'is not a device for investigating possible claims, but a means of vindicating actual claims.'  <u>People v. Gonzalez</u>, 51 Cal. 3d 1179, 1260, 800 P.2d 1159, 1206, 275 Cal. Rptr. 729, 776 (1990), <u>cert. denied</u>, 502 U.S. 835, 112 S. Ct. 117, 116 L. Ed. 2d 85 (1991).  Instead, in order to obtain discovery, a petitioner must allege facts that, if proved, would entitle him to relief.  Cf. <u>Porter v. Wainwright</u>, 805 F.2d 930, 933 (11th Cir. 1986) ('a hearing [on a habeas corpus petition] is not required unless the petitioner alleges facts which, if proved, would entitle him to federal habeas relief'), <u>cert. denied</u>, 482 U.S. 918, 919, 107 S. Ct. 3195, 96 L. Ed. 2d 682 (1987).  Furthermore, a petitioner seeking postconviction discovery also must meet the requirements of Rule 32.6(b), Ala. R. Crim. P., which states:

"'The petition must contain a clear and specific statement of the grounds upon which relief is sought, including full

3

disclosure of the factual basis of those grounds. A bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceedings.'"

Also, in <u>Jackson v. State</u>, 910 So. 2d 797, 801-04 (Ala. Crim. App. 2005), this court stated:

"Though Alabama has had little opportunity to define what constitutes 'good cause,' in <u>Ex parte Mack</u>, 894 So. 2d 764, 768 (Ala. Crim. App. 2003), we quoted with approval an Illinois case the Alabama Supreme Court relied on in <u>Land</u> -- <u>People v. Johnson</u>, 205 Ill. 2d 381, 275 Ill. Dec. 820, 793 N.E.2d 591 (2002):

"'"A trial court has inherent discretionary authority to order discovery in post-conviction proceedings. See <u>People ex rel. Daley v. Fitzgerald</u>, 123 Ill. 2d 175, 183, 121 Ill. Dec. 937, 526 N.E.2d 131 (1988); <u>People v. Rose</u>, 48 Ill. 2d 300, 302, 268 N.E.2d 700 (1971). A court must exercise this authority with caution, however, because a defendant may attempt to divert attention away from constitutional issues which escaped earlier review by requesting discovery. ... <u>Accordingly, the trial court should allow discovery only if the defendant has shown 'good cause,' considering the issues presented in the petition, the scope of the requested discovery, the length of time between the conviction and the post-conviction proceeding, the burden of discovery on the State and on</u>

4

<u>any witnesses, and the availability of the evidence through other sources</u>. <u>Daley</u>, 123 Ill. 2d at 183-84, 121 Ill. Dec. 937, 526 N.E.2d 131; see <u>People v. Fair</u>, 193 Ill. 2d 256, 264-65, 250 Ill. Dec. 284, 738 N.E.2d 500 (2000). We will reverse a trial court's denial of a post-conviction discovery request only for an abuse of discretion. <u>Fair</u>, 193 Ill. 2d at 265, 250 Ill. Dec. 284, 738 N.E.2d 500. A trial court does not abuse its discretion in denying a discovery request which ranges beyond the limited scope of a post-conviction proceeding and amounts to a 'fishing expedition.'""

"894 So. 2d at 768-69 (quoting <u>Johnson</u>, 205 Ill. 2d at 408, 275 Ill. Dec. at 836-37, 793 N.E.2d at 607-08). See also <u>State v. Lewis</u>, 656 So. 2d 1248 (Fla. 1994).

"The New Jersey Supreme Court in <u>State v. Marshall</u>, 148 N.J. 89, 690 A.2d 1 (1997), a case also cited with approval by the Alabama Supreme Court in <u>Land</u>, stated:

"'We anticipate that only in the unusual case will a PCR [postconviction relief] court invoke its inherent right to compel discovery. In most cases, a post-conviction petitioner will be fully informed of the documentary source of the errors that he brings to the PCR court's attention. Moreover, we note that PCR "is not a device for investigating possible claims, but a means for vindicating actual claims." <u>People v. Gonzalez</u>, 51 Cal. 3d 1179, 275 Cal. Rptr. 729, 776, 800 P.2d 1159, 1206 (1990), <u>cert. denied</u>, 502 U.S.

5

835, 112 S. Ct. 117, 116 L. Ed. 2d 85
(1991). The filing of a petition for PCR
is not a license to obtain unlimited
information from the State, but a means
through which a defendant may demonstrate
to a reviewing court that he was convicted
or sentenced in violation of his rights.
...

"'Moreover, consistent with our prior
discovery jurisprudence, any PCR discovery
order should be appropriately narrow and
limited. "[T]here is no postconviction
right to 'fish' through official files for
belated grounds of attack on the judgment,
or to confirm mere speculation or hope that
a basis for collateral relief may exist."
Gonzalez, supra, 275 Cal. Rptr. at 775, 800
P.2d at 1205; see Deputy v. Taylor, 19 F.3d
1485, 1493 (3d Cir.), cert. denied, 512
U.S. 1230, 114 S. Ct. 2730, 129 L. Ed. 2d
853 (1994); State v. Thomas, 236 Neb. 553,
462 N.W.2d 862, 867-68 (1990). However
where a defendant presents the PCR court
with good cause to order the State to
supply the defendant with discovery that is
relevant to the defendant's case and not
privileged, the court has discretionary
authority to grant relief. See Rules
Governing Section 2254 Cases in the United
States District Courts, 28 U.S.C.A. §2254
Rule 6(a); [State v.] Lewis, ... 656 So. 2d
[1248,] 1250 [(Fla. 1994)]; [People ex rel.
Daley v.] Fitzgerald, [123 Ill. 2d 175,
183,] 121 Ill. Dec. [937,] 941, 526 N.E.2d
[131,] 135 [((1998)] (noting that "good
cause" standard guards against potential
abuse of PCR discovery process).'

"Marshall, 148 N.J. at 270-71, 690 A.2d at 91-92.

"The federal courts have adopted a similar
standard for discovery in relation to federal habeas
corpus actions. In Murphy v. Bradshaw, [No. C-1-03-

053, September 13, 2003] (S.D. Ohio 2003) (not published), an Ohio court stated:

> "'A habeas petitioner is not entitled to discovery as a matter of course, but only upon a fact-specific showing of good cause and in the Court's exercise of discretion. Rule 6(a), Rules Governing §2254 Cases; <u>Bracy v. Gramley</u>, 520 U.S. 899, 117 S. Ct. 1793, 138 L. Ed. 2d 97 (1997); <u>Harris v. Nelson</u>, 394 U.S. 286, 89 S. Ct. 1082, 22 L. Ed. 2d 281 (1969); <u>Byrd v. Collins</u>, 209 F.3d 486, 515-16 (6th Cir. 2000). Good cause exists "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is ... entitled to relief ...." <u>Bracy</u>, 520 U.S. at 908-909, quoting <u>Harris</u>, 394 U.S., at 300, 89 S. Ct., at 1091. Conversely, <u>where a petitioner would not be entitled to relief on a particular claim, regardless of what facts he developed, he cannot show good cause for discovery on that claim.</u>'

"(Emphasis added.) 'This authority [to order discovery in postconviction proceedings] must be exercised with caution, because of the potential for abuse of the discovery process and because of the limited scope of postconviction proceedings.' <u>People v. Williams</u>, 209 Ill. 2d 227, 236, 282 Ill. Dec. 824, 830, 807 N.E.2d 448, 454 (2004). '[T]he range of issues in a post-conviction proceeding is relatively narrow, and discovery requirements are correspondingly limited.' <u>People ex rel. Daley v. Fitzgerald</u>, 123 Ill. 2d 175, 182, 121 Ill. Dec. 937, 940, 526 N.E.2d 131, 134 (1988).

> "....

> "... In <u>Hooks v. State</u>, 822 So. 2d 476 (Ala. Crim. App. 2000), we held:

"'We agree with the State that a claim that is procedurally barred in a postconviction petition clearly is not one that entitles a petitioner to relief. If a postconviction claim does not entitle the petitioner to relief, then the petitioner has failed to establish good cause for the discovery of materials related to that claim. See <u>Land</u>.'

"822 So. 2d at 481. '[I]f a particular claim is procedurally defaulted, no matter what facts a petitioner develops, he will not be able to show that he is entitled to relief. Therefore, there can be no good cause to allow discovery of facts underlying a procedurally defaulted claim.' <u>Murphy v. Bradshaw</u>, (No. C-1-03-053, September 13, 2003) (S.D. Ohio 2003) (not published)."

(Footnote omitted) (emphasis added).

As we discussed in Part I of this memorandum, the appellant's ineffective-assistance-of-appellate-counsel claim was time-barred, and he was not entitled to relief as to that claim. Therefore, the appellant did not show good cause as to why the audiotape necessary. Accordingly, his argument is without merit. <u>See Ex parte Land</u>, supra; <u>Jackson</u>, supra; <u>Hooks</u>, supra.

For the above-stated reasons, we affirm the circuit court's judgment.

**AFFIRMED.**

McMillan, Shaw, and Wise, JJ., concur; Welch, J., concurs in the result.

8

# COURT OF CRIMINAL APPEALS
## STATE OF ALABAMA

Lane W. Mann
 Clerk
Gerri Robinson
 Assistant Clerk



P. O. Box 301555
Montgomery, AL 36130-1555
(334) 242-4590
Fax (334) 229-0521

May 11, 2007

**CR-06-0408**

David Watkins v. State of Alabama  (Appeal from Montgomery  Circuit Court:
CC00-1506.60)

## <u>NOTICE</u>

You are hereby notified that on May 11, 2007 the following action was taken in the above referenced cause by the Court of Criminal Appeals:

Application for Rehearing Overruled.


**Lane W. Mann, Clerk**
**Court of Criminal Appeals**

cc: Hon. Melissa Rittenour, Circuit Clerk
 David L. Watkins, Pro Se
 Daniel W. Madison, Asst. Atty. Gen.



STATE'S
EXHIBIT
F
PENGAD 800-631-6989

No _____

---

## In The Supreme Court of Alabama

---

## Ex Parte David L. Watkins

---

In re:

**David L. Watkins,**

Petitioner-Appellant,

v.

**State of Alabama**

Respondent-Appellee,

---

### On Appeal from Montgomery County Circuit Court

### (CC-00-1506.60)

---

### On Petition for Writ of Certiorari to the Court of

### Criminal Appeals (CR-06-0498)

---

### Petition for Writ of Certiorari

[Pro'Se/Appellant]

          <u>David L. Watkins</u>
          A.I.S.# 219698
          Draper Correctional Facility
          P.O. Box 1107
          Elmore, Alabama 36025


STATE'S EXHIBIT
6
PENGAD 800-631-6989

## PETITION FOR WRIT OF CERTIORARI

The Appellant, **David L. Watkins**, petitions this court to issue a writ of certiorari to the Court of Criminal Appeals. Your Petitioner respectfully ask that this Court reverse the lower court's opinion published April 20, 2007, in which it affirmed the trial court's decision denying Rule 32 Post-Conviction Relief in case number CC-00-1506.60, Your Petitioner request that this Court find that the Court of Criminal Appeals decision was in conflict with prior decisions of the United States Supreme Court, the Alabama Supreme Court and the Alabama Court of Criminal Appeals, **Watkins** further submits that the lower court's published opinion of April 20, 2007, does not follow established legal precedent, nor does it correctly construe a controlling provision of the Alabama Constitution and the United States Constitution regarding whether the Court of Criminal Appeals decision violated **Watkins'** due process rights and whether the State satisfied its burden of pleading under Rule 32.3 of the Alabama Rules of Criminal Procedure.

In support of this petition, **Watkins** submits the following facts in support of third petition which were filed in his Application for Rehearing pursuant to Rule 40 (e):

On or about October 19, 1999 your Petitioner, **David Watkins** was playing cards and listening to music with co-defendants **Robert Watkins**, **Lataya Davis**, and the victim, John Ferrell. They were in the home of **Robert Watkins** on Keystone Street in Montgomery, Alabama. The "Audio taped confession," indicates that all parties involved were drinking around the time the alleged crime transpired. In which, John Ferrell was beaten and killed from a gunshot wound to the head. (C.130, 138,139) 1 the body of the victim was later found in a ditch at the end of the street.

---

**FOOTNOTE:**

The taped confession was admitted into evidence as exhibit No. 44, with the letter "A" marked on it. (C.130, 135,139)

Each of the defendants blames the other. The Chief evidence, which convicted Watkins, was his taped statement. (C.74)

On May 15, 2001, the appellant was convicted of murder. On October 22, 2001, the trial court sentenced him to serve a term of life in prison. This court affirmed his conviction in an unpublished memorandum and issued a certificate of judgment on May 7, 2007. See Watkins V. State, (CR-01-0232) 860 So. 2d 914 (Ala. Crim. App. 2002) (table). On August 16, 2006, the appellant filed a Rule 32 petition, challenging his conviction.

The State filed its response to Watkins' petition on September 25, 2006 and asserted the petition was due to be dismissed because the petition was barred and meritless. (C. 390-392)

On September 25, 2006, the Circuit Court issued an order setting the matter for an evidentiary hearing.

On October 5, 2006, Mr. Watkins mailed a "Motion for Subpoena Duce Tecum" (attached with an affidavit in support) that was filed by the Circuit Court Clerk of Montgomery County on October 10, 2006. (C. 1,406-409) Wherein he requested the trial court to compel the production of the "audio taped statement" to be available for inspection at the hearing because said "taped statement" contains evidence that he and his co-defendants were intoxicated during the commission of the crime. (C. 406-408)

On October 12, 2006, Watkins' was given an evidentiary hearing. (R.1) Winston Durant, Watkins' trial counsel, testified that he had familiarized himself with the facts of the case before trial and after the state had presented its case in chief. Mr. Durant did not submit a requested jury instruction on the lesser-included offense of Manslaughter based upon intoxication, because in his professional judgment, the facts of the case did not support such a request. (R. 7-8) Mr. Durant's recollection of testimony was that there was some evidence of drinking; however, the evidence was insufficient to rise "to the proportion where you would think it would impair a person's intent." (R. 9)

During the hearing, Mr. Watkins made a request by asking the trial court was the "taped statement" that was entered into evidence at his trial available, so that he could point out, at the time the crime occurred there was evidence in that said "taped statement" that indicates that he was in fact intoxicated. (R. 10-11) The State produced a transcribed

statement of the tape during the hearing, and Watkins reviewed the statement and argued that the statement clearly indicates that there was drinking going on at the time of the crime. However, the transcribed statement of the tape that the state produced at the hearing was insufficient because said copy of the statement was not admitted into evidence at trial in this case at bar. (C. 77-79)

Based upon the copy of the statement that the state produced at the hearing was insufficient the Circuit Court stated, "You are going to have to have more than that. "That is a long way from —" (R.13) And further questioned Watkins, whether there was any testimony from any of the witness that he could present who could testify to his alleged impairment, and Watkins replied, "There is nothing else here." (R.15-16)

The Court heard some further argument from Watkins, and at the conclusion of the hearing stated:

The Court: Maybe. Maybe you were. But that is a jury question

And the jury believed against you. That is all I can – I am not going to come back here and second – guess the jury. But Mr. Watkins, for God's sake, there is more than proof beyond a reasonable doubt in this case of your culpability. I am going to deny your Rule 32 Petition. I am going in Court. The jury found against you I do not see how else they could have found under the evidence in this case.

On October 20, 2006, The Circuit Court issued it's order dismissing Watkins' Rule 32 Petition and stated the following as its findings of fact and conclusions of law:

A hearing was held on October 12, 2006 with Petitioners present. Petitioner raises three claims via his Rule 32 Petition initially; he alleges ineffective assistance of counsel due to the failure of counsel to ask for a jury charge on manslaughter because of intoxication. However, Petitioner acknowledge that there was no actual evidence at trial concerning the lesser – included charge. In addition, Petitioner failed to satisfy the requirements of Strickland.

On October 23, 2006, <u>Mr. Watkins,</u> submitted a Motion to Alter, Amend or Vacate Judgment; due to the tape statement not made available for inspection and was the sole evidence in which to properly argue his claim of ineffective assistance of counsel (C-425-426) The Trail Court denied said motion. On November 7, 2006, <u>Mr. Watkins,</u> submitted a "Motion to Set Aside Judgment" where he requested the trial court to re-schedule another evidentiary hearing permitting him the opportunity to show the evidence needed to prove his ineffective assistance claim or in the alternative take judicial notice of the "taped statement (C-436-38) The Trail Court denied said motion on May 3, 2007, <u>Watkins,</u> filed an application For Rehearing and Motion pursuant to Rule 40(e) of the Alabama Rules of Appellate Procedure For The Finding of Additional Facts on May 11, 2007 the Court of Criminal Appeals overruled <u>Watkins'</u> Application.

## ARGUMENT

Your Petitioner, argues that the Petition for writ should issue pursuant to the Rule 39 (a) ( I ) ( A ) and ( D ).

<u>The following language from the published opinion of December 15, 2006 is submitted pursuant to Rule 39 (1)(a) (D) (I):</u>

<u>"The appellant's ineffective assistance of counsel claim was time-barred, and he was not entitled to relief as to that claim. Therefore, the appellant did not show good as to why the audio was necessary. Accordingly, his argument is without merit."</u>

The above ruling is in conflict with the United States Constitution, The Alabama Constitution, The Alabama Supreme Court and Rule 32.3, Alabama Rules of Criminal Procedure on this issue. WHY?

Because in this present case the District Attorney asserted in its Motion to dismiss that the instant petition was "barred" and meritless (C.392) The District Attorney merely, denied the allegations of the petition and did not specify any Grounds of Preclusion. (C.390-392).

Therefore, the questions presented in this Writ is whether your Petitioner's due process right was violated and whether the State satisfied its burden of pleading under Rule 32.3.

The Alabama Supreme Court consistently held that under former Rule 20.3 (now Rule 32.3) the State is required to plead the ground or grounds of preclusion that it believe apply to the petitioner's case, thereby giving the petitioner the notice he needs to attempt to formulate arguments and present evidence to "disprove [the] existence of the evidence." A general allegation that merely refers the petitioner and the trial court to the Rule does not provide the type of notice necessary to satisfy the requirements of due process and does not meet the state burden of pleading assigned to the State by former Rule 20.3, A.R.Cr.P. **Ex Parte Rice**, 565 So. 2d 606, 608 (Ala. Crim. App. 1990) Faulkner v State, 586 So.2d 39, 42 (Ala. Crim. App. 1991)

After diligent research, your petitioner has found no legal precedent excusing this fundament due process requirement.

**Watkins**, contends that the denial of his petitioner on the basis of the State's broad 'barred' allegation constitutes a denial of his right to due process. He maintains that the State's failure to allege a specific ground of procedural bar deprived him of the notice to which he was entitled, thus making it impossible for him to disprove the existence of a ground of procedural bar. In addition, he argues that the state's blanket allegation did not satisfy the burden of pleading assigned to the State by Rule 32.3, produced below;

### Rule 32.3 Burden of Proof

"The petitioner shall have the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle him to relief. The State shall have the burden of pleading any ground of preclusion, but once a ground of preclusion has been plead, the petitioner shall have the burden of disproving its existence by a preponderance of the evidence."

**(Emphasis added)**

The Alabama Supreme Court has never held that the Rule 32.2 ( c )' one-year deadline is jurisdictional, see   Ex Parte Hutcherson , 847 So. 2d 386, 388 (Ala. 2002).

Therefore, since the state failed to argue that this issue is time barred by Rule 32.2 (e) in its motion to dismiss the State has ineffective waived that ground of preclusion. See **Ex Parte Williams**, 571 So. 2d 987, 989 (Ala. 1990) (the failure of a party from raising that matter on appeal as error) See also **Faulkner v. State**, 586 So. 2d 39, 42 (Ala. Crim. App. 1991).

**WHEREFORE, DAVID L. WATKINS,** respectfully ask this Court to grant certiorari review and issue writ to the Alabama Court of Criminal Appeals reversing its decision and adjudicate Watkins claims which was presented on appeal, grant Watkins' request for Rule 32 Post-Conviction Relief, remand this case to the Montgomery Circuit Court for a New Trail, and/ or other relief deemed appropriate, these premises considered.

Respectfully submitted

David L. Watkins #219698
Draper Correctional Center
P.O. Box 1107
Elmore, Alabama 36025

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon Daniel W. Madison

Attorney General for the State of Alabama at 11 S. Union Street Montgomery,

Alabama 36130, by placing the same in the U.S. Mail, First Class postage pre-paid

and correctly addressed on this _22_ day of _May_____, 2007.

David L. Watkins, Pro-se
A.I.S. # 219698
Draper Correctional Center
P.O.Box 1107
Elmore, Alabama 36025

## VERIFICATION OF SUBMITTED FACTS

Undersigned Petitioner hereby swears, under penalty of perjury, that the facts submitted in this Petition for Writ of Certiorari are a verbatim copy of the statement presented to the Court of Criminal Appeals in the application for rehearing of this matter.

Dated: May 22, 2007.

David L. Watkins

David Watkins #219698
Draper Correctional Center
P.O. Box 1107
Elmore, AL 36025

# IN THE SUPREME COURT OF ALABAMA



August 31, 2007

**1061236**

Ex parte David Watkins.  PETITION FOR WRIT OF CERTIORARI TO THE COURT OF CRIMINAL APPEALS  (In re: David Watkins v. State of Alabama)   (Montgomery Circuit Court: CC00-1506.60; Criminal Appeals : CR-06-0408).

## CERTIFICATE OF JUDGMENT

### Writ Denied

   The above cause having been duly submitted, IT IS CONSIDERED AND ORDERED that the petition for writ of certiorari is denied.
   BOLIN, J. - See, Stuart, Smith, and Parker, JJ., concur.  Lyons, Woodall, and Murdock, JJ., dissent.  Cobb, C.J., recuses herself.

I Robert G. Esdale, Sr., as Clerk of the Supreme Court of Alabama, do hereby certify that the foregoing is a full, true and correct copy of the instrument(s) herewith set out as same appear(s) of record in said Court.
Witness my hand this _31st_ day of ___August,_   _2007_

Clerk, Supreme Court of Alabama



/bb

## Alabama Court of Criminal Appeals Docket Sheet

**CR-04-0731**                    PET : Writ of Mandamus                    **CR-04-0731**

Ex parte David Watkins   (In re: State of Alabama vs. David Watkins)   (Montgomery Circuit Court: CC00-1506)

---

### EXPEDITED

---

**Petition Filed : 01/25/2005**                                      Docketed 01/26/2005  JZ
                                                                     Last Updated  / /

**Post Judgment Motions**

---

**Attorneys & Officials**

| | | |
|---|---|---|
| Circuit Judge | Truman Hobbs | Montgomery, AL  (334) 832-7147 |
| Circuit Clerk | Melissa Rittenour | Montgomery, AL  (334) 832-1289 |
| Pro Se Pet. | David L. Watkins | Elmore, AL  (  ) - |
| A.G. for Resp. | Troy King | Montgomery,  (334) 242-7300 |
| D. A. for Resp. | Eleanor Idelle Brooks | Montgomery, AL  (334) 832-2550 |

---

**Case Actions / Postings**

| | |
|---|---|
| 01/25/2005 | Petition for writ of mandamus filed.  (rec'd 1/26/05) |
| 01/26/2005 | Petitioner allowed 14 days to file certificate of service showing service on respondent.  If certificate of service is not "received" within 14 days, petitioner placed on notice that this petition shall be dismissed for non-compliance with Rule 21(a), Ala. R. App. P. |

---

***END OF DOCKETING INFORMATION***



# COURT OF CRIMINAL APPEALS
## STATE OF ALABAMA

76297

H. W. "BUCKY" McMILLAN
Presiding Judge
SUE BELL COBB
PAMELA W. BASCHAB
GREG SHAW
A. KELLI WISE
Judges



Lane W. Mann
Clerk
Sonja McKnight
Assistant Clerk
(334) 242-4590
Fax (334) 242-4689

### CR-04-0731

Ex parte David Watkins   (In re: State of Alabama vs. David Watkins)   (Montgomery
Circuit Court: CC00-1506)

### ORDER

The Court of Criminal Appeals ORDERS that the petitioner in this cause be and the
same is hereby given 14 days from the date of this order to file a certificate of service with
this Court evidencing his/her compliance with the service requirements of Rule 21(a) of the
Alabama Rules of Appellate Procedure.  Rule 21(a) requires that the petitioner serve the
respondent judge or judges and all parties to the action in the trial court with a copy of the
petition.  The petitioner's certificate of service shall indicate the name and address of each
person served with a copy of the petition, as well as the date and manner of such service.

Lastly, the petitioner is hereby placed on notice that in the event this Court has not
"received" a certificate of service that conforms to the directives in this order within the
14-day period herein allowed, this petition shall be dismissed for non-compliance with Rule
21(a), Alabama Rules of Appellate Procedure.

Done this the 26th day of January, 2005.

H. W. "Bucky" McMillan, Presiding Judge
Court of Criminal Appeals

cc: Hon. Truman Hobbs, Circuit Judge
Hon. Melissa Rittenour, Circuit Clerk
David L. Watkins, Pro Se
Hon. Troy King, Attorney General
Hon. Eleanor Idelle Brooks, District Attorney

STATE'S
EXHIBIT
J

PENGAD 800-631-6989

# COURT OF CRIMINAL APPEALS
## STATE OF ALABAMA

76297

H. W. "BUCKY" McMILLAN
Presiding Judge
SUE BELL COBB
PAMELA W. BASCHAB
GREG SHAW
A. KELLI WISE
Judges



Lane W. Mann
Clerk
Sonja McKnight
Assistant Clerk
(334) 242-4590
Fax (334) 242-4689

**CR-04-0731**

Ex parte David Watkins   (In re: State of Alabama vs. David Watkins)   (Montgomery Circuit Court: CC00-1506)

## <u>ORDER</u>

Upon consideration of the above referenced Petition for Writ of Mandamus, the Court of Criminal Appeals orders that said petition be and the same is hereby DISMISSED because it does not contain proof of service on the respondent.

Done this the 2nd day of March, 2005.

H. W. "Bucky" McMillan, Presiding Judge
Court of Criminal Appeals

cc: Hon. Truman Hobbs, Circuit Judge
Hon. Melissa Rittenour, Circuit Clerk
David L. Watkins, Pro Se
Hon. Troy King, Attorney General
Hon. Eleanor Idelle Brooks, District Attorney

STATE'S EXHIBIT
K
PENGAD 800-631-6989